UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ROGER BASILE,

Plaintiff, 20-CV-00576 (EK)(RLM)

-against-

COUNTY OF NASSAU, DET. JESSE PERKINS
and DET. ROBERT LASHINKSY,

Defendants.
------------------------------------------------------------X

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

**THOMAS A. ADAMS**
**Nassau County Attorney**
**Attorney for Defendants**
**1 West Street**
**Mineola, New York 11501**
**(516) 571-3046**

**RALPH J. REISSMAN**
**Deputy County Attorney**
***Of Counsel***

# TABLE OF CONTENTS


| | PAGE |
|---|---|
| Preliminary Statement | 1 |
| Allegations of the Amended Complaint | 1 |
| Basis for Partial Summary Judgment | 2 |
| Plaintiff's Deposition Testimony Defeats His Claims Against Lashinsky | 2 |
| Det. Lashinsky's Testimony Confirms Plaintiff's Deposition Testimony That Lashinsky Never Assaulted Plaintiff | 5 |
| Legal Standard for Summary Judgment | 11 |
| ARGUMENT<br>BASED ON PLAINTIFF'S TESTIMONY THAT HE NEVER MET LASHINSKY ON OCTOBER 11, 2018, COUPLED WITH LASHINSKY'S TESTIMONY THAT HE NEVER CAME INTO PHYSICAL CONTACT WITH PLAINTIFF, THE AMENDED COMPLAINT SHOULD BE DISMISSED AS AGAINST LASHINSKY ON SUMMARY JUDGMENT | 13 |
| Conclusion | 13 |

## TABLE OF AUTHORITIES


| | PAGE |
|---|---|
| **CASES** | |
| *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) | 12 |
| *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) | 11 |
| *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423 (2d Cir. 2001) | 12 |
| *Holcomb v. Iona Coll.*, 521 F.3d 130 (2d Cir. 2008) | 12 |
| *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) | 12 |
| **FEDERAL RULES OF CIVIL PROCEDURE** | |
| Rule 56 | 1, 13 |
| Rule 56(a) | 11 |
| **UNITED STATES CONSTITUTION** | |
| Fourth Amendment | 1, 13 |
| Fourteenth Amendment | 1, 13 |

## Preliminary Statement

Defendants, County of Nassau, Det. Jesse Perkins ("Perkins") and Det. Robert Lashinsky ("Lashinsky") respectfully submit this Memorandum of Law in support of their motion for an order granting partial summary judgment pursuant to Fed. R. Civ. P. 56, dismissing the action as against defendant Robert Lashinsky, in its entirety, with prejudice, on the ground that no genuine material issues of fact exist upon which the Court or a jury could issue a finding or verdict of liability as a matter of law against Det. Robert Lashinsky as a defendant in this action.

On June 21, 2023 plaintiff Roger Basile ("plaintiff") filed an Amended Complaint [DE 47] alleging two causes of action arising out of his arrest on October 11, 2018. Plaintiff alleges that he was arrested by members of the Nassau County Police Department, including defendants Perkins and Lashinsky, and was transported to the Seventh Precinct. However, the Police Department's Arrest Report established that plaintiff was arrested by Police Officer Daniel Minervini, who is no longer a defendant in this action.

**Allegations of the Amended Complaint**

Plaintiff claims that on October 11, 2018 while he was handcuffed by one hand to a wall in an interrogation room, Perkins and Lashinsky beat and struck him several times, causing him to lose consciousness. Plaintiff was subsequently transported to Nassau University Medical Center, where he was diagnosed with a concussion. The Amended Complaint asserts a cause of action for excessive force under 42 U.S.C. § 1983 for violation of the Fourth and Fourteenth Amendments and New York State law, and a second cause of action for assault and battery under New York State law.

**Basis for Partial Summary Judgment**

The Amended Complaint alleges at ¶ 7, "While in the room Mr. Basile was threatened, beaten and struck several times by Detective Jesse Perkins and Detective Robert Lashinsky."

**Plaintiff's Deposition Testimony Defeats His Claims Against Lashinsky**

When questioned at his deposition conducted February 2, 2021 (Exhibit "A") plaintiff identified only Perkins as the purported assailant, and testified that he never met or saw Lashinsky in the Precinct. Perkins is an African American male, while Lashinsky is a white male. Plaintiff testified between pp. 37-45 that he was handcuffed by one hand to a wall in the interrogation room when a Black detective came into the room:

Q. Do you remember the first detective that came into that holding area?

A. Yes, I do.

Q. Do you recall that detective's name?

A. I do.

Q. What was that detective's name?

A. Perkins.

Q. Can you describe Detective Perkins?

A. He was a big guy, six foot, six and change, built, muscular, dark complexion shaved head. How I describe him, I always describe people that look like characters. He is a cross between Cory Booker, the senator from New Jersey and Dwayne the Rock Johnson. ***

Q. When he entered the room, did he identify himself to you?

A. I believe so. *** He walked into that room. I believe he introduced himself[.] There were no officers inside the room. I was there alone.

Q. Did anybody accompany Detective Perkins into that room?

A. No. ***

Q. At some point during the questioning did a physical altercation occur?

A. He was angry and yelling in my face the disrespect thing and then he head-butted me. *** Immediately after that, which could only be a couple of seconds and while he was ranting, he open-handed cracked me in the face.

Q. Which side of the face did he hit?

A. The left side. ***

Q. Did anything else happen after he open-handed hit you?

A. Yes.

Q. What else happened?

A. I think I screamed, and he hit me on the other side of my head, on the right side with what I believe was a closed fist.

Q. Anything else after he hit you on the right side?

A. Not that I recall. The next time I kind of opened my eyes, I was on the floor.

Exhibit "A", pp. 37-45.

With regard to Lashinsky, however, plaintiff testified at p. 47:

Q. At any point before this incident with Detective Perkins, had you ever talked to a Detective Lashinsky?

A. I would have to see a picture. I don't recall and I don't believe so. I didn't talk to any detective beforehand.

*Id.* p. 47.

Further, plaintiff testified beginning at p. 70:

Q. When you initially made the complaint [to the Police Department], was that against Detective Lashinsky or Detective Perkins or someone else?

A. When I made the initial complaint I never used the name Lashinsky, so again, going back to my original complaint, if I used a name, it was Detective Perkins.

*Id.* p. 70.

Finally, at p. 73 plaintiff testified:

Q: Since this incident, have you had any contact with a Detective Lashinsky?

A. No, I don't know a Detective Lashinsky.***

Q. But you don't know of any direct involvement from that day of a Detective Lashinsky, is that correct?

A: No.

Q: No, that's not correct or no, you don't - -

A. No, I don't recall speaking with a Detective Lashinsky, again, unless you show me a picture, but I don't recall the name alone or speaking to a detective named Lashinsky that day.

*Id.* p. 73.

From reading plaintiff's own admissions in his deposition testimony, it is overwhelmingly clear that plaintiff never met Lashinsky in the Seventh Precinct on October 11, 2018; that plaintiff has never in his lifetime met anyone named Robert Lashinsky; and that Lashinsky never physically attacked plaintiff in the Seventh Precinct on October 11, 2018. There is therefore no set of facts under which a court or a jury could find, based on plaintiff's own testimony, that Lashinsky could be liable for using excessive force under the Fourth or Fourteenth Amendments, or for assault and battery under New York State Law. If plaintiff were to testify at trial contrary to what he testified at his deposition, the court or jury will be compelled to find that plaintiff will have committed perjury either at his deposition, or at trial.

**Det. Lashinsky's Deposition Testimony**
**Confirms Plaintiff's Deposition Testimony**
**<u>That Lashinsky Never Assaulted Plaintiff</u>**

At his deposition conducted February 9, 2022 (Exhibit "B") Lashinsky testified that he was in the Seventh Precinct on October 11, 2018 in the Squad Room, adjacent to the room in which plaintiff was located when police officers placed him in the interrogation room. Lashinsky was able to hear plaintiff yelling and screaming at the officers. Lashinsky, trained as a negotiator, went into the interrogation room for two or three minutes in an attempt to calm down plaintiff. However, when plaintiff continued to scream and yell and flail his arms around, Lashinsky concluded that he could not calm plaintiff down, and simply left the interrogation room without ever physically touching plaintiff. He left plaintiff to be processed by the investigating detective assigned to the case.

Q: So what's the first time your attention was brought to him [plaintiff]? Was that after he was already in the cell?

A: Correct.

Q: That's because you hear his voice, is that right?

A: I heard him yelling, yes.

Q: Did you hear anyone else yelling or just him?

A: I heard the officers trying to reason with him. I couldn't hear each word. I just heard the yelling.

Q: When you heard the yelling, you didn't know why he was there?

A: Correct. No, I did not.

Q: When you said the officers tried to reason with him, can you explain what that means?

A: I could hear him yelling and I can just hear the officers speaking back to him. I couldn't tell

you at all what was being specifically said. I just could hear his yelling and I could hear them try to reason with him and, again, that's the cell room and the Squad Room are adjacent to each other. It's completely tight up there.

Exhibit "B", pp. 27-28

Q: So yelling and screaming for everyone to hear. It was very loud?

A: Yes.

Q: Was it annoying you?

A: No, it wasn't. You know what? After 20 some odd years – no, it wasn't. It didn't bother me. I knew it had to be dealt with. It did not bother me.

Q: Why did it need to be dealt with?

A: For safety reasons.

Q: Can you explain?

A: For the safety of the defendant, for the safety of the officers. It would have escalated. You don't want either party getting hurt.

Q: How could it have escalated if he's in cuffs?

A: He could have escalated it himself. It could have turned extremely violent. So at some point you just want to intervene and stop it from escalating.

Q: How long was the yelling going on before you went into the cell?

A: A few minutes.

Q: When you went into the cell, were there officers present in the cell?

A: Yes.

Q: Do you remember who?

A: Again, I couldn't tell you their names.

Q: They were not detectives?

A: No, they were not.

***

Q: Detective, how tall are you?

A: Six foot.

Q: How much did you weigh at that time in 2018?

A: 220.

Q: I can't see you that well, but you appear to be a white male, is that correct?

A: Yes.

Q: And can you describe Mr. Basile's physical – how tall was he? How much did he weigh?

A: I was going to say five-ten, 195.

Q: Prior – and when you saw him at that time, is that the first time you had ever seen him? You don't know who he is?

A: At that time that was the first time I've ever seen him, yes.

Q: When you walk in, is there an interaction going on between him and the officers there?

A: There was.

Q: Can you describe it?

A: I remember him yelling and screaming.

Q: And the officers?

A: When I walked in, they were trying to speak with him in an attempt to calm him down.

Q: But in your view it was not working?

A: No, it was not.

***

Q: When you walked in that room, were you aware if Mr. Basile had been read his rights?

A: No, I had no knowledge of the case at that time.

Q: When you walked in, your intention was to calm him down?

A: That was my job to, yes.

Q: You didn't read hm is rights, correct?

A: No, I did not.

Q: When you walked in, did you say something?

A: I don't recall the conversation. So I know based on what I was trained to do. I was trained to try to calm him down.

Q: The purpose of calming him down was to be able to question him?

A: No, not for me, no. I was not the investigating detective.

Q: What's the purpose of trying to calm him down?

A: Safety.

***

Q: All right. So did you say something when you walked in the room?

A: I don't recall the specifics, but I know I that based on what I was trained to do, it was to calm him down to prevent any further escalation, to prevent anyone from getting injured.

***

Q: When you walked in, you took over, is that right?

A: Correct.

Q: What did you [you] do?

A; I tried to reason with him and tried to calm him down.

Q: When you did that, were the officers still in the room?

A: I asked them to step outside because the cell is extremely small. We would have been on top of each other.

Q: So the first thing you did is ask them to leave?

A: I asked them to step out of the cell.

Q: Did they comply?

A: Yes.

Q: Did you close the door behind them?

A: No.

Q: Was the door closed behind them?

A: No.

Q: You asked them to step out, but the door remained open?

A: Correct.

Q: Fully opened or partly opened or something else?

A: If I was in there, it would have had to be fully opened.

Q: Why is that?

A: For safety.

***

Q: In your efforts to reason with him, what did you do?

A: Again, I don't remember. I would have just used what I was trained to do.

Q: Do you remember him talking to you?

A: I remember his yelling. I remember him flailing his hands.

Q: Flailing both hands?

A: He was standing. Even though you are cuffed in there, you can stand. I know he was standing. That was part of the issue. He refused to sit down and try to relax. I think he had a problem with being cuffed overall and unfortunately, it's procedure.

***

Q: So you're in the room with him alone; he's irate, correct?

A: Yes.

***

Q: How long were you in there with him alone?

A: Like maybe a couple minutes.

Q: Two minutes?

A: Two or three maybe. It was not long at all.

Q: Physically, how far away were you from him?

A: Three feet.

Q: Were you raising your voice?

A: I don't believe so, no. I don't remember.

Q: Were you frustrated with him?

A: I wasn't frustrated, no.

Q: Were you disappointed that he was being irate?

A: No, not really.

Q: What was your feeling at the time?

A: It came to a point that I felt I was not going to be able to negotiate [with] him to calm down, at which point I stepped out of the room with the officers and told them to just leave [him] in there and we all walked into the common area of the squad room.

Q: So just to be clear. It's your testimony you were in the room with him for about two minutes, you spoke with him, but you don't remember the specific conversation?

A: I can't tell you.

Q: Then you left the room"

A: Yes.

Q: When you left the room, was he still standing?

A: Yes, he was.

Q: Was there any physical contact between you and him while you were in the room?

A: No. The reason I left was he continued to flail his arms. He was angry, agitated. He refused – I couldn't negotiate with him to sit down, and I just determined at that point to leave him alone in the room.

Q: You were going to leave him in the room for how long?

A: At that point, there was nothing more I can do, so it was in the hands of whatever detective was assigned to the case.

***

Q: So you leave the room and there was no physical contact between you and him, correct?

A: Yes.

Exhibit "B," pp. 27-44.

It is therefore clear, despite plaintiff's deposition testimony that he never met Lashinsky in the Seventh Precinct on October 11, 2018 or ever in his life, that Lashinsky did in fact meet plaintiff on that date, and that Lashinsky spoke briefly with plaintiff in an attempt to calm him down. However, Lashinsky testified to the fact that he never physically came into contact with plaintiff in the course of speaking with him, and this fact is absolutely confirmed by plaintiff's deposition testimony that he, plaintiff, never met Lashinsky or even heard of his name, much less was assaulted by Lashinsky on October 11, 2018. There is no factual evidence to prove that Lashinsky ever touched plaintiff or assaulted him. Therefore, this Court should grant defendants' motion for partial summary judgment, and dismiss the Amended Complaint as against Lashinsky in its entirely, with prejudice.

## Legal Standard for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " (quoting former Fed. R. Civ. P. 56(c) ) ). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323). To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e) ). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586 (citations omitted), and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks and citation omitted).

In this motion defendants have included the deposition testimony of both plaintiff and Lashinsky as the evidentiary basis for granting partial summary judgment to Lashinsky.

## ARGUMENT

**BASED ON PLAINTIFF'S TESTIMONY THAT HE NEVER MET LASHINSKY ON OCTOBER 11, 2018, COUPLED WITH LASHINSKY'S TESTIMONY THAT HE NEVER CAME INTO PHYSICAL CONTACT WITH PLAINTIFF, THE AMENDED COMPLAINT SHOULD BE DISMISSED AS AGAINST LASHINSKY ON SUMMARY JUDGMENT**

Defendants have provided sufficient evidence in the form of deposition testimony to prove that no genuine issue of material fact exists for a court or jury to find Lashinsky liable for violation of plaintiff's Fourth or Fourteenth Amendment rights, or for assault and battery under New York state law. Plaintiff testified under oath at his deposition that he never met Lashinsky on October 11, 2018 in the Seventh Precinct, and therefore plaintiff cannot testify at trial without committing perjury that Lashinsky assaulted him on that date. Plaintiff insisted at his deposition that it was Det. Perkins, a Black male, who assaulted him, while Lashinsky is a white male. For his part, Lashinsky testified at his deposition that while he did meet plaintiff on October 11, 2018, he never came into physical contact with plaintiff, and therefore cannot be liable to plaintiff for his claims under either federal or state law. Defendants have therefore proved that there is no genuine issue of material fact precluding partial summary judgment in favor of Lashinsky. If plaintiff chooses to oppose defendants' motion in an attempt to create an issue of fact for trial, it will have to be in the form of an affidavit by plaintiff that his deposition testimony was completely perjurious. Either way, plaintiff cannot at this late stage manufacture an issue of fact to defeat defendants' motion. Defendants' motion should therefore be granted in its entirety.

## CONCLUSION

For all the foregoing reasons, defendants' motion for partial summary judgment pursuant to Fed. R. Civ. P. 56 for an order dismissing the action as against defendant Robert Lashinsky, in

its entirety, with prejudice, on the ground that no genuine material issue of fact exist upon which the Court or a jury could issue a finding or verdict of liability against Det. Robert Lashinsky. The motion should be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Dated: Mineola, New York
August 18, 2023

**THOMAS A. ADAMS**
Nassau County Attorney
Attorney for Defendants

By: /s/ Ralph J. Reissman
RALPH J. REISSMAN
Deputy County Attorney
1 West Street
Mineola, New York 11501
(516) 571-3046
rreissman@nassaucountyny.gov