UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

ROGER BASILE, . Docket No. 2:20-CV-00576-EK-LB
.
Plaintiff, .
. Brooklyn, New York
v. . Monday, October 30, 2023
. 9:30 a.m.
COUNTY OF NASSAU ET AL., .
.
Defendants. .
. . . . . . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: Rickner PLLC
ROBERT H. RICKNER, ESQ.
STEPHANIE PANOUSIERIS, ESQ.
14 Wall Street
Suite 1603
New York, New York 10005
212-300-6506

For the Defendants: Nassau County Attorney's Office
RALPH J. REISSMAN, ESQ.
VICTORIA LAGRECA, ESQ.
One West Street
Mineola, New York 11501
516-571-3046

Transcription Service: Superior Reporting Services LLC
P.O. Box 5032
Maryville, TN 37802
865-344-3150

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

# I N D E X


| OPENING STATEMENT: | Page |
| --- | --- |
| On behalf of the Plaintiff, by Mr. Rickner | 49 |
| On behalf of the Defendant, by Mr. Reissman | 52 |

| WITNESSES | Page |
| --- | --- |
| ROGER BASILE | |
| Direct Examination by Mr. Rickner | 61 |
| Cross Examination by Mr. Reissman | 99 |
| Redirect Examination by Mr. Rickner | 151 |
| ROBERT LASHINSKY | |
| Direct Examination by Ms. Panousieris | 155 |
| Cross-Examination by Mr. Reissman | 182 |
| JESSE PERKINS | |
| Direct Examination by Mr. Rickner | 186 |
| Cross-Examination by Mr. Reissman | 200 |
| Redirect Examination by Mr. Rickner | 202 |

P R O C E E D I N G S

THE CLERK: The Court now calls Basile versus County of Nassau et al., docket number 20-cv-00576.

Would you please state your appearance for the record starting with the Plaintiff?

MR. RICKNER: Yes. Good morning, Your Honor. Rob Rickner, Rickner PLLC, for the Plaintiff.

THE COURT: Good morning.

MS. PANOUSIERIS: Good morning, Your Honor. Stephanie Panousieris, also with Rickner PLLC, for the Plaintiff.

THE COURT: Good morning.

MR. REISSMAN: For Defendants --

THE COURT: Hold on.

MR. BASILE: Good morning, Your Honor. Roger Basile, Plaintiff.

THE COURT: Good morning to you.

MR. REISSMAN: Okay. For the Defendants, Deputy County Attorney Ralph Reissman.

MS. LAGRECA: Deputy County Attorney Victoria LaGreca. Good morning, Your Honor.

THE COURT: Good morning.

MR. PERKINS: Jesse Perkins, retired detective from Nassau County.

THE COURT: Good morning.

MR. LASHINSKY: Robert Lashinsky.

THE COURT: Good morning.

All right. Let me ask just up front for the lawyers for the parties to be here at 9:00 every day to account for the possibility that we have issues we want to take up before the jury gets here so we can start with them promptly at 9.

I have a set of preliminary instructions for the jury that I have written myself. I have a fuller set of jury instructions that were proposed by the parties that I don't think constitute a full set of jury instructions. They seem to be jury instructions going to the substantive causes of action. And I don't need proposed instructions on everything else we might say at the end of the case, but I would like a list of the types of instructions that the parties want. So if you want, you know, an instruction on -- I'm just making something up here -- generally speaking, how the jury should assess testimony from a party as opposed to any other evidence in the case, just tell me the name of that instruction. I thought I mentioned this to the parties in the past, but I may not have. My practice, generally speaking, is that if there is a pattern instruction on a given subject in Judge Sand’s pattern instructions book, there's a really strong presumption that we're going to be using the Sand's instruction on that topic. And so maybe

just let me know if you see an instruction in the Sand resource or not. And if not, we'll talk about, you know, where that instruction might come from.

But am I right that -- you know, I think I got nine pages of jury instructions from the parties jointly. You're not viewing that as everything you would want me to instruct the jury at the end of the case, are you?

MR. RICKNER: No, Your Honor. My understanding of your individual rules is that weight of the evidence -- falsus uno, falsus -- or whatever the Latin phrase is -- you know, conduct of the jury in deliberations, all of that stuff that --

THE COURT: That would come from Sand's.

MR. RICKNER: - you didn't necessarily want us to write that out.

THE COURT: Right.

MR. RICKNER: I don't happen to have a copy of Sand's or easy access to one. To be blunt, it's really expensive.

THE COURT: He's on either Westlaw or Lexis, I think Lexis. And I'm a Westlaw guy, so that's not particularly helpful to me.

MR. RICKNER: I can give you titles --

THE COURT: Do the best you can.

MR. RICKNER: Yeah. I can do the titles the same

way we do in state court where you want the presumptions, you want circumstantial evidence instruction and all of that.

THE COURT: Right.

MR. RICKNER: No problem.

THE COURT: Okay.

MR. RICKNER: But no. I don't think either of us planned on that being everything.

THE COURT: Yeah. So I was rereading over the weekend the joint pretrial order. It talks about things like the Defendant wanting to assert a defensive qualified immunity. It seems unlikely to me that, at this stage of this case, there's going to be much, if any, relevance to the doctrine of qualified immunity. This event either happened and it was a legal violation, or it didn't and it wasn't. And so, you know, my view is, we're not going to be instructing the jury on the law of qualified immunity even though it's in the JPTO as an affirmative defense. I just would like confirmation from the parties that my understandings are consistent with your understandings on stuff like that so that we don't have surprises popping up at the last moment.

MR. RICKNER: Well, two things. One, in this circuit, although not necessarily every circuit, qualified immunity is not a jury issue. It goes to the Court as to whether or not the law at issue -- essentially the law

provided in the jury instructions -- is clearly decided. With respect to hitting somebody in handcuffs, there's -- although I didn't cite it in the jury instructions -- we would actually --

THE COURT: But there's never a need for special verdict forms in qualified immunity cases.

MR. RICKNER: That was my next point.

THE COURT: Okay.

MR. RICKNER: The only way that it does come up is if there are specific facts at issue here, you know, did he pull the gun first --

THE COURT: Right.

MR. RICKNER: -- kind of classic stuff --

THE COURT: Exactly. Exactly.

MR. RICKNER: Then, yes, there would be a role for special interrogatories. But there's no allegation here that I've ever heard that Mr. Basile started to use force against the officer and then there was a response, that either happened or it didn't.

THE COURT: That's consistent with my view of the case. I raised that as an example of an instance where I have a strong intuition about how the verdict form and any interrogatories and the instructions will work. But I do not have confirmation from the parties that they agree, and I want to try to smoke out any areas of potential disagreement.

So that's jury instruction-related issues. And I hate to ask for same-day turnarounds, but if you all could get me letters before the opening tomorrow on what topics you see the jury being instructed on at the close of this case, that's how we can accomplish that.

The other, I think, preliminary item is motions in limine. We got no motions in limine, but the JPTO contemplates motions in limine I think from the Plaintiff's side, seeking to solute any reference to alleged underlying criminal activity by the Plaintiff. I think that's uncontested, that the Defense has said they're not going to seek to introduce any such evidence. And we have a contemplated motion in limine by the Defense to exclude any reference to the disciplinary history, if any, of the officer Defendants. Am I right that neither party is seeking to introduce any such evidence?

MR. REISSMAN: Your Honor, I understand, during the week, last week, Mr. Rickner served subpoenas on at least two officers who were former Defendants. And they were involved in the pulling over of the Plaintiff in a car. And the reasons for that, I don't know if Mr. Rickner wants to bring that up, that goes to the reason for the arrest and why he was placed in the cell. But that's up to Mr. Rickner. If he wants them to testify, that's what they're going to testify to.

MR. RICKNER: I'm not going to keep this a secret. I'll tell you exactly what I plan on doing. The officers who arrested my client are also officers who are in the precinct and have knowledge of what happened in the cell or right outside the cell and the movements in and out and all of that stuff. That's what we're calling them on. We do have to bring up the arrest and a tiny bit of what they claimed he did, just because it comes up in the conversation with the detective essentially just prior to it, almost during the altercation. So we can't say nothing about my client being arrested, but are we going to own up, yes, he was arrested. He was arrested in his 2018 white Mercedes. That part --

THE COURT: What was he arrested for?

MR. RICKNER: Stealing his own car.

THE COURT: Okay.

MR. REISSMAN: Well, he was charged with grand larceny for stealing his wife's pocketbook.

MR. RICKNER: Which happened to be under the seat in the car. It's messy. We don't plan on getting into it. We have to reference a tiny bit of it just because otherwise what the detective says --

THE COURT: What about the question of whether he was arrested for a felony or misdemeanor?

MR. RICKNER: Doesn't matter in this particular case. I guess --

THE COURT: If it mattered, it would matter as context for simply why this guy was taken to a precinct and in an interrogation room rather than --

MR. RICKNER: But we're not contesting that he went to an interrogation room. I supposed if he had only been arrested for a misdemeanor the strip searches might be questionable. We're not going there. That's not part of this case, and it's really not the heart of the case.

THE COURT: All right.

MR. RICKNER: It's not a false arrest case anymore. And one thing I just want to bring up is, there are exhibits that were on the JPTO that weren't objected to on the basis of relevance because back then there were false arrest claims, and I understand why he wants to put the arrest reports in. At this point, I don't think the arrest reports and all of the details and the probable cause and the alleged furtive movements towards the glovebox while my client was sitting in the passenger side, none of that -- we're not bringing it out. And, actually, we would object to it coming in because we also think it would confuse the jury to turn this into a false arrest case. You're never going to hear those words come out of my mouth in front of a jury. Obviously, whichever detective says he was interrogating my client, there were questions, didn't you steal the car? That much is necessary to understand the interaction.

THE COURT: Yeah.

MR. RICKNER: But going into further detail, I don't believe is necessary. And I don't want to jump topics too far, but going back to your first question, my client does have a misdemeanor conviction in 2007 for assault. I think it's out because it's not a crime of dishonesty. It's way over 10 years old. It's only a misdemeanor. So as far as impeachment value, it fails every --

THE COURT: I wasn't even asking about that.

MR. RICKNER: Well, I'm just bringing it up. That's the only, you know, prior bad acts or impeachment.

THE COURT: That would have had to be the subject of a motion in limine if the Defense was seeking to put it in, and we have no such motion. So I'm going to assume that nobody's even moving to admit that.

MR. RICKNER: Yeah. Or even bring it up on cross. I mean it's just so far --

THE COURT: Correct.

MR. RICKNER: -- it's out.

THE COURT: Correct.

MR. RICKNER: As far as disciplinary histories, it depends if somebody opens the door.

THE COURT: How would that be?

MR. RICKNER: Says I have a squeaky-clean record, nobody's ever accused me of anything, what are you nuts?

Well, I don't think they're going to do it --

THE COURT: All right. But barring that --

MR. RICKNER: Yeah.

THE COURT: -- we're not getting into it.

MR. RICKNER: If somebody says it, we're ready for it. And if they don't, we're not going to use it.

THE COURT: Okay. All right. It sounds like we are in blissful agreement on most of this, which is a nice way to start.

MR. REISSMAN: Well, Your Honor, may --

THE COURT: Yeah. Before we bring the jury in, let's just make sure --

MR. REISSMAN: On cross-examination of the Plaintiff, I was going to start out with his actions on the day he was arrested from leaving his house in the car and he was driving and he was pulled over. And I was planning to ask him why were you pulled over and what happened to the charge. I don't think that's terribly prejudicial unless Your Honor rules that it is.

THE COURT: It sounds like you may be getting into some of the same stuff. We're going to hear the phrase stolen car anyway. This is kind of the context through which this whole situation arises. You know, it's not like this is a murder case or something where just hearing the name of the thing for which the Plaintiff was arrested would be so

prejudicial that we'd have to worry about it. Am I correct on that?

MR. RICKNER: Yeah. You're correct on that. And if he brings out that there were charges, we're going to bring out that they were all dismissed.

THE COURT: That's all fine, correct?

MR. RICKNER: I don't want to cut off Mr. Reissman, but --

MR. REISSMAN: No. Go ahead.

MR. RICKNER: I also do have -- I just want to clear some logistical things with respect to witnesses, packing them in, keeping the case moving, tell you what the plan is. Today, obviously, openings, the parties, my clients, Perkins and Lashinsky. I believe that's going to fill the day or get pretty close to it. Tomorrow, I'm really hoping that everybody's done, and I can just put my expert on first since, you know, he's a practicing physician.

Then afterwards, I subpoenaed several non-party officers for Tuesday. One of them, Mr. Rothenberg, has agreed to show up on Tuesday. I think that may only -- I don't know how long these witnesses are going to take exactly. My instinct is that takes us to about 1:30 on the outside, which would leave us with a little downtime if some of the other officers came the next day. Now, my impression from Mr. Reissman is, is that it's just better for all of

those other officers to do Wednesday. I personally am fine with that.

THE COURT: I would like to use the full trial day --

MR. RICKNER: That's why I'm asking.

THE COURT: -- just for the jury's sake -- to the maximum extent of our abilities.

MR. RICKNER: I would like to know which ones Mr. Reissman would chose, but then I would ask for at least two of the other non-party officers to be called on Tuesday just so we pack the day.

THE COURT: Yes.

MR. RICKNER: Which is why we're --

THE COURT: Yeah. We're going to go at least until 5:00 each trial day, maybe somewhere between 5 and 5:30, with an eye towards getting the jury out of here in the lowest number of trial days possible. And that means we've got to have a witness ready at all times.

MR. RICKNER: Well, again, bringing this up, I don't know that today -- if everybody goes quickly today, we may run out and then have the expert on tomorrow. I think it's more like a 3:30 or a 4:00. But I don't have a --

THE COURT: That may be fine for today because you all have homework on jury instructions to do.

MR. RICKNER: Okay.

THE COURT: But starting tomorrow, we'll be in a different posture.

MR. RICKNER: No. Understood. And so, you know, I hate to bring somebody out here twice, but we may even need three to fill the day because some of the non-parties are going to be pretty swift, I think. Just let’s see the testimony.

THE COURT: Okay.

MR. REISSMAN: Well, Your Honor --

THE COURT: And as of now, is the Defense anticipating an affirmative case?

MR. REISSMAN: No.

THE COURT: Okay.

MR. RICKNER: One other thing I just -- sorry, I meant to put this on my logistical list. The practice, at least in a case I've had against the City of New York, is that to avoid putting witnesses on more than once, you know, Plaintiff's case, Defense case. For example, if I call Detective Lashinsky, I go through essentially it's a cross, then let's say that the cross/direct done by Mr. Reissman can go outside the scope of --

THE COURT: You're asking for the rules of cross-examination to apply in your case in chief as to the opposing parties?

MR. RICKNER: For what it's worth, Magistrate Bloom

told me specifically to bring this up with you. So I --

THE COURT: Yeah.

MR. RICKNER: Look, I agree it's intuitive. It hasn't always been intuitive. I'm just saying that I'm not going to invoke that the scope of cross-examination that he does -- even though it's more like a direct -- is limited to what I do. He can go further. And then I might go further on my direct. Just to make sure --

THE COURT: But your initial direct is a direct, right? You're not leaving on direct in the first instance, are you?

MR. RICKNER: I am. I think that under federal rules you're absolutely permitted to lead an adverse party.

THE COURT: Okay. Even when you call them -- even in your case in chief?

MR. RICKNER: Right. I mean, they don't stop being an adverse party just because we called them in the case in chief.

THE COURT: Your colleague is holding a book.

MS. PANOUSIERIS: I just was going to give you the rule. It's rule 611. It's 611, subsection C2.

THE COURT: 611, C2.

MS. PANOUSIERIS: Yes.

THE COURT: 611, C2, leading questions should not be used on direct examination except as necessary to develop

the witness' testimony. Ordinarily the Court should allow leading questions, C2, when the party calls a hostile witness or an adverse party. That seems pretty straightforward. Okay.

MR. RICKNER: And to the extent Your Honor's curious, we also plan on using at least some leading questions with the non-party detectives. And I'll provide case law for you tonight that says we're allowed to do that if it's questioned.

THE COURT: Thank you.

MR. REISSMAN: Your Honor --

THE COURT: Yeah. I want to waste as little of the jury's time as possible with us arguing evidentiary issues. And so to the extent you can see those in advance, please, write letters that I will read before the trial day, and then we can talk about starting at 9:00 in the morning on whatever subjects you have in mind.

MR. RICKNER: Right.

MR. REISSMAN: Your Honor, a couple questions. When you mentioned affirmative case, I do have a non-party witness who will testify as to his observation of the events on the date in question. Is that considered an affirmative case or just a Defense --

THE COURT: I'm asking, is there a Defense case?

MR. REISSMAN: In what sense, Your Honor? I don't

understand.

THE COURT: Will you be calling any witnesses after the Plaintiff rests?

MR. REISSMAN: Let's see. Yeah.

THE COURT: And, if so, how many?

MR. REISSMAN: I'd like to know if Plaintiff's calling Lieutenant Shnayderman?

MR. RICKNER: If he is not planning on calling him, I was going to call him. But since Mr. Reissman's said he wanted to call him, I said, fine, you know.

THE COURT: Okay. Yeah. To the extent you all need a witness here but are indifferent as to who calls him or her, talk to each other and make sure that somebody is calling that witness so that we don't have late breaking surprises.

MR. RICKNER: Right. And obviously I have no problem with him adopting our case as part of his Defense case. It seems pretty standard.

THE COURT: Okay.

MR. REISSMAN: Okay. Your Honor, I'd like to call some of those witnesses right now that were planning to come on Wednesday to come tomorrow. I should call them now and give them a heads up.

THE COURT: Do you need to do that personally or can you --

MR. REISSMAN: Yes. Yes, I do.

THE COURT: -- send your colleague to do that?

MR. REISSMAN: I need to do that because I have their numbers, I have a relationship with them. I'd like to get the timing on this on Tuesday. The Plaintiff will start with the doctor.

MR. RICKNER: Uh-huh.

MR. REISSMAN: And then Lieutenant Rothenberg. And then you rest with your witnesses?

MR. RICKNER: No.

MR. REISSMAN: No. No. No. You have Garibotto, Minervini --

MR. RICKNER: And Scott.

MR. REISSMAN: -- and Scott. Okay.

MR. RICKNER: And I understand that Scott has childcare issues. So if you wanted to be the one that --

THE CLERK: Microphone, Counsel.

MR. RICKNER: I understand that Scott had childcare issues. So if he wanted to be the one that's called Wednesday morning, as I said before, I have no objection. But I do think the other two should be on deck so that we can at least try to get to them and push through to 5:30.

MR. REISSMAN: And what time should they be here, in your estimation, Mr. Rickner?

MR. RICKNER: Don't ask me to predict the future.

Sometime around lunch.

MR. REISSMAN: Okay.

MR. RICKNER: If we're doing two others in the beginning, I think our chances of going 9:30 to 12 or 12:30 are pretty high.

THE COURT: Yeah. I would say 12:30 is the presumptive time, sometime between 12:30 and 1:00 is the presumptive lunchbreak. Going forward, to the extent you all have questions about what time you need to have a witness here and so forth, talk to each other offline to the maximum of your abilities rather than with the jury waiting in the jury room.

MR. REISSMAN: Your Honor, may I have five minutes to call those two witnesses.

THE COURT: Is it really five minutes?

MR. REISSMAN: Yeah. I have their direct cell numbers.

THE COURT: Okay.

MR. REISSMAN: I'll be right back.

THE COURT: Thank you.

MR. RICKNER: And I'd appreciate the chance to grab some water before --

THE COURT: Yeah, please.

MR. RICKNER: -- if you don't mind.

THE COURT: All right. We'll reconvene in five

minutes. And we're off the record for the moment.

(Recess)

THE COURT: All right. And there's no issue, I take it, with needing to exclude any witnesses from the courtroom who are scheduled to testify, right? We're not going to exclude the parties?

MR. RICKNER: Well, we can't exclude the parties, is my understanding of the federal rules.

THE COURT: Right.

MR. RICKNER: But with respect to the nonparties, I actually would prefer if they sat on the benches outside.

THE COURT: Yeah. There are none --

MR. RICKNER: Well, they're not here that I see. We just have Mr. Roper who's a co-counsel who's not going to be sitting at the counsel table. But otherwise, for tomorrow, my preference would be that the non-parties wait outside.

THE COURT: Okay.

MR. REISSMAN: Your Honor, just to clarify a point, I think we talked about this earlier. The prior assault in 2007. You would like to exclude that? Do you think it's irrelevant or prejudicial?

MR. RICKNER: I don't think I need to exclude it. I think that three different federal rules say you can't use it.

THE COURT: Why is it relevant?

MR. REISSMAN: Well, it was a physical assault on another man. And the allegation in this case is that the Plaintiff was beaten up by a detective. And we'd like to show that the Plaintiff has a violent tendency which could have provoked his own aggressive reaction to being told he was arrested.

THE COURT: Is there any evidence in the summary judgment record that would suggest that that happened? Your clients have not suggested that they -- or either of them, used physical force against the Plaintiff in self-defense, have they?

MR. REISSMAN: That's correct.

THE COURT: Okay. So, A, if you were going to be asking to include this it should've been the subject of a formal motion in limine given the 403 and other issues. B, it seems overwhelming clear to me that that has either no relevance or only the most marginal relevance, and any probative value is more then sufficiently outweighed by the potential prejudice.

MR. RICKNER: I would also note that propensity evidence is excluded except in the most specific areas where you have an MO that is so identical that it becomes probative. So I hope that the cross-examination is not going to be, well, are you the type of person that type questions,

because that's obviously excludable.

MR. REISSMAN: I understand, Your Honor.

THE COURT: Yeah. Defense Counsel understands my ruling.

MR. REISSMAN: Yeah.

THE COURT: Okay. Anything else before we bring in the jury.

MR. RICKNER: No, Your Honor.

MR. REISSMAN: No, Your Honor.

THE COURT: All right. Let's bring them in.

(Jury enters)

THE COURTROOM DEPUTY: All rise.

THE CLERK: You may be seated.

THE COURT: Have we sworn the jury?

THE CLERK: Do you want me to do that now or --

THE COURT: Let's do it now.

THE CLERK: I'm sorry. Please stand. Raise your right hand.

(Jury sworn)

THE CLERK: Okay. You may be seated.

THE COURT: Can you hear me on the microphone? Okay.

Good morning, ladies and gentlemen. My name is Eric Komitee, I'm a United States District Judge here in the Eastern District of New York. And I will be with you here residing over this trial. Now that you've been sworn, I would like to give you some preliminary instructions that will guide you in your participation in this trial. We are about to begin the trial of this civil case. You've already learned something about the case during the process of jury selection. Before the trial begins, however, there are certain things that I wish to tell you that I hope will help you understand what will be presented and how you should conduct yourselves as jurors during the trial.

To begin with, you are here to administer justice

in this case according to the law and the evidence. You are to perform this task with complete fairness and impartiality, and without bias, prejudice, or sympathy, either for or against the Plaintiff or the Defendants.

This is a civil case. And, as such, the Plaintiff has the burden or proving the material allegations of his complaint by a preponderance of the evidence. Let me tell you what a preponderance of the evidence means. To establish a fact by the preponderance of the evidence means to prove that the fact is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. It refers to the quality and the persuasiveness of the evidence, not to the number of witnesses or documents. In determining whether a claim has been proved by preponderance of the evidence, you may consider the relevant testimony of all witnesses regardless of which of the parties called them and all of the relevant exhibits received in evidence regardless of who may have produced or introduced those documentary or other exhibits.

If you find that the credible evidence on a given issue is evenly divided parties, that is that it is equally probable that one side is right as it is that the other side is right, essentially a tie, then you must decide that issue against the party that has the burden of proof. That is because the party bearing this burden must prove more than

simple equality of evidence, that party must prove the element at issue by a preponderance of the evidence.

On the other hand, the party with this burden of proof need prove more than a preponderance. So as long as you find that the scales tip, however slightly, in favor of the party with this burden of proof, that what the party claims is more likely true than not true, then that element will have been proved by a preponderance of the evidence.

Some of you may have heard of proof beyond a reasonable doubt, which is the proper standard of proof in a criminal trial. That requirement does not apply in a civil case like this one, and you should put it out of your mind. Reasonable doubt is a concept that is not relevant to this trial.

So in summary, if, after considering all of the testimony, you are satisfied that the Plaintiff has carried his burden on each essential point as to which he has the burden of proof, then you must find for the Plaintiff on his claims. If, after such consideration, you find the testimony of both parties to be in balance or equally probable, essentially a tie, or if you find that the evidence favors the Defendant, then the Plaintiff has failed to sustain his burden and you must find for the Defendant on that point.

I'll say a word now about the complaint in this case. As you've already heard, the complaint contains two

claims. I will define each of these claims and the elements of those claims for you in my instructions after the presentation of the evidence.

My microphone is cutting in and out a little bit.

But in the most general terms, let me describe the claims in the complaint as follows. Plaintiff Roger Basile alleges that Defendants Detective -- I not pronouncing Basile correctly, am I?

UNIDENTIFIED VOICE: Yes, you are, Your Honor.

THE COURT: The Defendants Detective Jesse Perkins and Robert Lashinsky assaulted Mr. Basile. First, Mr. Basile asserts that this alleged assault and battery amounted to the use of excessive force, violating Mr. Basile's constitutional right to be free from unreasonable seizures.

Second, Mr. Basele asserts that Defendant County of Nassau, Nassau County, is liable for Detective Lashinsky and Detective Perkins alleged assault. Mr. Basile has brought his claims under both federal and New York state law. And we will further discuss these claims and their elements and any differences between the federal and the state claims after the presentation of the evidence.

Let me now give you a preview of the stages which this case will proceed through here. Trial will proceed in the following order. First, the parties have the opportunity to make opening statements. The Plaintiff's lawyer may make

an opening statement, and then the Defendants' lawyer may make an opening statement. What the lawyers say in their opening statements is not evidence. Rather, the attorneys are simply attempting to give you an introduction to or an overview of the evidence that they expect will be produced in the course of the trial. But what the lawyers say is not evidence itself.

Second, after the opening statements, the Plaintiff will put on his case. The Plaintiff will present evidence. This may be testimony from witnesses. It may be physical items like photographs or clothing or anything else, it may be documents that are offered in evidence. After each witness testifies on direct examination --

UNIDENTIFIED VOICE: Judge, you went out --

THE COURT: Yeah. Would it help if I put this up here with me? Let's try that.

After each witness testifies on direct examination, they will then be cross-examined. So the Plaintiff's lawyer will do the direct examination and then the Defense lawyer will have an opportunity, if he chooses, to do a cross-examination, asking his questions of the Plaintiff's witness. After that there may be some redirect examination, which is an opportunity for the Plaintiff to follow up on certain points that may have come up on the cross-examination. And then perhaps the Defendant will do

some recross-examination following up on only the points that were covered in the redirect.

But each time the examination will get shorter and smaller because the parties in their new examination are only responding to the subjects that were covered in whatever examination came immediately before. They can't go back to things that came up two rounds ago or three rounds ago, it's just responding to the last round.

There are two kinds of evidence, primarily speaking. Direct evidence and circumstantial evidence. Direct evidence is the direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or deduce or conclude that other facts exist. I will give you further instructions on these concepts as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence.

So the classic example that we use to explain the difference between direct evidence and circumstantial evidence is as follows. It would be direct evidence that it's raining outside right now if a witness came in and testified from the witness stand, I was just outside 30 seconds ago and it's raining. That's a witness's testimony. It's direct evidence. If a witness came in to be on the witness stand and was holding an umbrella and shaking it and

there was water shaking off the umbrella and the umbrella was introduced in evidence with the water on it, you might be able to infer from the water on the umbrella that it's raining outside right now. And so because that's a little bit more indirect, we call that circumstantial evidence.

But the way the law works is you are entitled, as the finders of fact, to give every piece of evidence whatever weight you think is the proper amount of weight to give that evidence, and you're not required to draw any qualitative distinction between direct evidence on the one hand and circumstantial evidence on the other. The law allows you to consider both as you see fit.

During the course of trial, exhibits will be received into evidence. They will have exhibit numbers. You will be able to review those exhibits in the jury room during your deliberations if you need them. I will also give you a written copy of my final instructions at the end of the case so that when you deliberate you'll have those with you as well. If an item is received in evidence, the attorneys may choose to have you look at it here in court right after it is received. We sometimes call that publishing an exhibit to the jury. You'll be able to pass it down the line and each person can examine it for themselves. But whether the lawyers do this or not, you will have ample opportunity to examine any exhibits you wish to see in the jury room during

your deliberations.

The lawyers may also agree or stipulate to certain facts or certain testimony. If there is a stipulation, you should accept the facts that are covered in that stipulation as true. That means the parties have agreed, basically, that a fact is true, and you should treat it as true. You should accept those facts and accept that testimony as what a witness would have said but you must still then decide the weight to give to that evidence. Just because the parties have agreed that something is true, doesn't dictate to you any decision about how important that fact is. The weight to give the evidence is still up to the jury.

It may happen on one or more occasions during this trial that I instruct you that an item of evidence is being offered for a limited purpose only. You must follow that instruction. It's called a limiting instruction. If I strike an answer or I instruct you to disregard an answer, you should then also disregard that testimony. It's not evidence and it should not be considered by you as evidence. I know we're all human beings and that's somewhat hard to do. When you've heard an answer to a question or seen an exhibit, the Judge tells you, okay, I'm striking that, you should put it out of your mind, you can't force yourself to forget that fact or actually remove that memory from your brain. But, as jurors, I have every confidence that in your deliberations

you will be relying only on the evidence that is properly before you and not anything I've instructed you to disregard or any testimony that I have stricken.

The next thing I'm going to say is very important. Anything you may see or hear outside of the courtroom is not evidence and must be disregarded because your verdict must be based solely on the evidence that is introduced and presented here in this courtroom.

After the Plaintiff has concluded putting in his evidence. The Plaintiff may rest his case. At that point, the Defendants may present evidence and the Plaintiff's lawyer will have a change to cross-examine the Defense witnesses. After that, once all of the evidence has been presented for both sides, each party will have the opportunity to present a closing argument, which we also sometimes call a summation. What is said, again, in those arguments by the lawyers is not evidence. The parties are simply presenting to you their view of what the evidence has shown and suggesting to you what inferences or conclusions you should draw from the evidence. You may find their argument sound and persuasive or you may not.

The Defendants will argue first, and the Plaintiff, because the Plaintiff has the burden of proof, will argue second. The Plaintiff side has the burden of proof in this case, and therefore they get the last word. After you've

heard closing arguments, I will then instruct you on the law applicable to this case. You will then retire to consider your verdict. Your verdict must be unanimous.

Let me just talk for a moment about the importance of jury service. Jury service comes from the Constitution. The Constitution of the United States gives people a right to a trial by a jury in certain circumstances. A jury is people like you, members of the community that were brought in here who serve the government in this capacity to find the facts.

The United States government does some things quite well, does some things less well. We all have opinions on how the government could be better and some of those areas are extremely important. I would respectfully submit to you, as jurors, that this part of our founding documents that provides in criminal cases, which this is not, and in some civil cases, that only a jury can find the facts. This is one of the best and most important aspects of our system.

I genuinely believe that groups of individuals drawn from all walks of life who get together in good faith to do this very important public service of sitting on a jury make better decisions than any one person would do, including me. One person is just one person and, in my experience, when you get a group of people together to share their reactions, their assessment of the evidence in a case, that collective working together will come out with better

decisions than any one person could possibly do. And that happens because those jurors listened throughout the trial with an open mind, and then engaged with one another in good faith, you know, obviously, to make arguments that they think are important about the way the case should come out, but also willing to listen to their fellow jurors' arguments with an open mind.

As judges of the facts, it will be your job to determine which of the witnesses you believe and what portion of their testimony you accept and what weight you attach to that testimony. You, not me, are the sole and only judge of the facts. I'm the judge of the law, you are the judge of the facts. I will try to preside impartially and not to express any opinion concerning the facts here. If at any time I should make a comment with respect to the facts, you may disregard it. It is your judgment as to the facts, not mine, which controls.

I may ask questions of the witnesses if I think something important is not clear. But you should not try to read anything into my questions, should not assume because of my question that I have any opinion about the facts one way or the other. And even if it does seem like I have an opinion about the facts, you should disregard it.

In the course of the trial, the attorneys may from time to time stand and say that they object to a certain

question or to certain evidence. In those cases, the attorneys are asking me to make a ruling of law as to whether that evidence is admissible or not admissible at this trial. There are rules of evidence that apply to dictate what evidence comes in and what evidence stays out in a trial. When you hear me sustain an objection, I'll say sustained, it means that I think the law does not permit the evidence in question to be considered or the answer to whatever question is being asked to be considered. In that case, you should disregard the question that's been asked. You are not to speculate about how the witness might have answered that question. You simply have no evidence, one way or the other, before you on that subject.

It may be, from time to time, that a witness will answer the question before I have time to overrule or sustain the objection in question. So you'll have heard the answer to the question, and then I'll sustain the objection. In those cases, I will strike the answer, meaning that you are not to consider it at all in your deliberations. You are to act as if that answer simply had never been given.

On the other hand, if I overrule an objection, it means that I find no legal reason not to allow the evidence to come before you. In those cases, again, you should not attach any special weight to the fact that the evidence came in over an objection. Simply consider that evidence together

with all other evidence and forget about the fact that the party objected to it.

No statement, ruling, remark, or comment that I may make during the course of this trial is intended to indicate any opinion as to how you should decide the case or to influence you in any way in your determination of the facts. At times, I may ask questions of witnesses. As I indicated, I do so simply to bring out matters which I think should be brought out and not in any way to indicate any opinion on my part about the facts or about the weight you should give to the testimony of that particular witness.

Your assessment of the evidence is what controls. If the lawyers tell you in closing argument or they say in opening argument that the evidence will show X, but you think the evidence did not show X and instead it showed Y, which one controls as between your recollection and the lawyers' arguments? It's your recollection that controls, not the lawyers opening or closing arguments.

It's very important that you not be influenced by anything you may have seen or heard outside the courtroom. It's really important that this case be decided by jurors who base their decision solely on the witness's testimony that you see come from this witness stand right here, and the other evidence introduced at this trial. I don't think there's going to be any publicity about this trial, but if

there was a news article written about this trial, it would be extremely important that you not read it and that if you hear anything about this trial, you let us know as soon as possible.

From today, until the end of trial, you must not -- this is really important to the system -- you must not conduct any independent research about this case. The matters in this case, the law of this case, or the individuals involved in this case. You should not consult any reference materials. You should not search the internet for anything having to do with this case. Don't use any other tools to obtain information about this case or help you in your decision as jurors. Rely entirely on the evidence that comes in at trial, through the witness stand, through the introduction of documentary evidence. That way each of you in your deliberations is relying on exactly the same evidence and nobody's trying to bring in anything from the outside. Needless to say, do not try to visit any of the places mentioned in this trial

Please do not, during the pendency of this trial, Google the lawyers, the parties or me. And let me just say now, these rules apply until the end of your work here as jurors. Once we're done, if you want to Google the parties, the lawyers, me, you may feel free to do so. But during the trial itself, while you are sworn to the oath as jurors, you

must not Google any of the people involved in this case or any of the facts or places involved in this case. Needless to say, don't blog or tweet or X -- or whatever Twitter's called now -- about this case, or post anything on the internet in any form, nothing about your experiences as a juror during the trial. It's very important, again, that your decision be made solely on the basis of the evidence presented in this case and that you not seek any information from any source outside the confines of this courtroom.

Every once in awhile, people read a newspaper article about how a whole trial had to be redone because a juror did not follow that instruction and it tainted the entire outcome. So it is sometimes the case that if a person violates that instruction, the entire trial has to be redone from scratch. That's how important this is.

Also, if at any point you recognize somebody who comes into the courtroom, you should let me know that. You've already met Ms. Guy (ph), who is the case manager and courtroom deputy for this courtroom. You'll be with her a lot during this trial. If you recognize somebody who comes in, let her know that you need to get a message to the Judge about that. There's nothing wrong, by the way, with recognizing somebody who comes in. This is a public courtroom. Anybody who wants to can come in and watch. But if it's somebody known to you, I will still want to know.

Let me talk for a while -- I'm going to be done in about 10 minutes, I think -- for a while about conduct during recesses. Recesses mean just when we're on break. There are several rules which should govern your conduct during any recess or break that we take during this trial. First of all, do not discuss the case with anyone else during any recess. This means anyone from the outside world, and also discussions with each other. Even among yourselves, you see, it is extremely important that each and every one of you keeps an open mind, reaching your conclusion only during your final deliberations after all the evidence has come in and after you've heard the attorneys' summations and my instructions on the law. Only then will you even begin to exchange views among yourselves and reach your verdict.

Now, the instruction I just gave you is counterintuitive, let's say. It's contrary to human nature. Serving on a jury is a unique experience. It's an interesting experience. It's an experience that most people have only once or twice in a lifetime. And it's something you would naturally want to share with your friends or family as the trial goes along. And it's natural, as well, for you want to discuss the evidence that you're seeing with each other instead of waiting until you actually begin your formal deliberations at the end of this case. But you cannot do any of that.

The problem is that once you begin discussing the case with others, they begin giving you their opinion, what they think about the case, even though, if they're outsiders, they've not been here, even though they haven't heard any of the evidence, even though they haven't heard the arguments of counsel or my instructions on the law. And it fundamentally deprives all of the parties of the verdict that is based on the determination of jurors who have heard all of what I've just referred to and nothing else.

I'm often asked, now that I'm a Judge, if there's some trial going on somewhere in the country that's getting a ton of media attention, what do you think about this trial? And my answer is always the same -- in just conversation with friends or others outside -- my answer is, I think that unless you've seen every minute of the testimony and you know all of the evidence that's come in in that case, you're probably not equipped to render a useful opinion on whatever should be the outcome of the trial. And that's true every bit as much -- even more true -- here.

The same is true, ladies and gentlemen, with respect to discussing the case amongst yourselves. That, too, is counterintuitive and contrary to human nature. After all, the thing that brings you all together here is this trial. That's the one thing you have in common with one another at the outset. But what's wrong with beginning your

discussion of the case before you retire to deliberate, is that if you begin talking about the case, even among yourselves, you begin to come to tentative opinions and conclusions that might close your mind to other evidence that hasn't come in yet, arguments by Counsel, or even my later instructions on the law.

So during the case, every time we take a break, you all can talk about the weather, you can talk about how the Giant's lost yesterday and what a problem that is, you can talk about any topic you want except what's going on here in the case. Don't talk to each other -- even each other about the witnesses, who was believable, who was not believable, what evidence came in, what was important, what was not important. You have to save all that for the actual deliberations at the end of the case.

Here again, when I say do not talk about the case, I'm giving you a commonsense rule. When I say don't talk about the case even among yourselves, I'm talking about the evidence you hear in the courtroom and whether the Defendants are liable or not liable. If you have an opinion on, you know, a tie that I'm wearing one day or something, you can talk about that amongst yourselves, but not the evidence and not the arguments.

You should not, needless to say, permit any other person to discuss this case with you or in your presence.

And if any person should approach you in an effort to discuss this case with you, you must report that fact to me immediately. And you should tell that person who tries to discuss the case with you that you cannot discuss this case. If somebody tries to talk to you about the case, you'll let Ms. Guy know immediately, and we will deal with it appropriately. If somebody tries to talk to you about the case, don't even discuss that fact with your fellow jurors. Either that fact or any other fact that you may feel necessary to bring to my attention. The reason why you go to Ms. Guy but don't talk to each other about anything along these lines that happened, is that if something occurs that affects the ability of a juror to continue to serve fairly and impartially, we don't want that juror to communicate that fact to other fellow jurors, so that them more people, even than just one, are affected. Come straight to Ms. Guy, rather than discussing it among yourselves.

Third, although it is normal for people to talk with those with whom you are thrown in day-to-day conduct, please do not, while you're serving as jurors in this case, have any conversation with the parties, the attorneys, or any witnesses in this case, whether in the courtroom, in the hallways of this courthouse, in the elevators, or anywhere else, even outside.

By this I mean not only not to talk about the case,

when it comes to the lawyers and the parties and the witnesses, don't talk to them at all, not even about the weather. And the reason for that is that somebody who sees from a distance a juror in conversation with a party, a lawyer, or a witness, might think rightly or wrongly, that something improper was being discussed. You might be talking about the weather, but they, standing 30 yards away from you, have no idea what you're talking about and not talking about. You don't want to give even the appearance of impropriety. And therefore, you must have simply no conversations with anybody you see here or any of the witnesses.

If you're waiting for an elevator, the lawyers know these rules, if they see you waiting for an elevator, they'll probably hang back and wait for the next elevator. And it's not because they're rude, it's because they know these rules. They don't want even to give rise to the possibility of a suggestion of impropriety. And so the likelihood is they will simply wait.

So let me tell you that if you pass any of these people in the halls and they don't even acknowledge your presence, it's not because they mean to be rude. It's because they know these roles and they are striving to comply with them perfectly.

Again, I expect you will inform me not only if somebody talks to you improperly, but if you become aware of

another juror's violation of these instructions. I don't expect that to happen, of course, but if you see something improper or even seemingly improper happening, it is very important that you bring that to the Court's attention. A juror who violates any of these restrictions, again, jeopardizes the fairness of these proceedings and a mistrial could result, which could require the entire trial process to start over again.

I'm coming towards the end here. Let me say a few words about note-taking. I think you've all been given a notepad. These are for the use of each individual juror during the course of the trial. I want to caution you about a couple of things in connection with taking notes.

Number one, your notes are not a substitute for the official court record. Our court reporters take down everything that the witnesses say. We're making an electronic recording of what's going on here and we will have transcripts, and those transcripts will be available to you. It is the evidence and the trial transcript that reflect the evidence in this case, not even your notes. The evidence and the transcripts will be available to you if you need to have your recollection refreshed about what a witness said.

The real purpose of the notepad -- well, there are a couple of purposes. One, some people feel they can listen better if they're taking notes. Or two, if you see an

exhibit that you think is potentially important and you want to get back to it later, you can write down the exhibit number, and that will help you later when you want to ask for the evidence you want to see.

But do not let your note-taking distract you from the main event here, which is listening to the witness and evaluating the witness. Don't let note-taking interfere with your listening to the testimony. And please do not rely on your notes in place of the official record.

Finally, your notes will be just for your own individual use. You should not, even during deliberations, share your notes themselves with other jurors. You should leave your notepad in the jury room at the end of each day, and the notebooks are destroyed at the end of the case.

Let me say a few words about the schedule. The trial day will start each day at 9:30 sharp. I am extremely and acutely aware of the sacrifices that people like you make to do this very important service on behalf of our judicial system. And I mean to make the most efficient use of your time as I possibly can. I'm going to make sure the lawyers are here every day at 9:00. So if there are legal issues the lawyers want to talk about, we do that before you get here, and don't leave you waiting in the jury room.

Sometimes unforeseen or unforeseeable issues come up and we can't avoid the fact that you're sitting back in

the jury room for a period of time while the lawyers are hashing out some issue. But trust me when I say I make it my business to minimize those instances to make the most efficient use of your time that I possibly can.

If you would, for the same reason, arrive -- try to arrive in the jury room at 9:15 every day. Give yourself enough time to clear security downstairs, to get an elevator up here, even if you have to wait for a second elevator because you don't want to be on an elevator with lawyers or parties, leave yourself enough time for all of that.

In terms of the lunch break, we will typically stop for 45 minutes, an hour thereabouts, typically around 12:30 p.m. or between 12:30 and 1 p.m. It depends what's going on. We might, you know, five minutes left in a witness's testimony. Might just want to get that witness done so they don't have to come back after the lunch break. If that's the case, we'll go a little bit later. But we will break around 12:30 to 1 every day.

We have a courthouse cafeteria, which I've eaten at. I've actually found the food very respectable. You may also, during the trial, leave the courthouse if you want to go out to lunch. You may bring your own food. But if you leave the courthouse for lunch or even if you're in the cafeteria, be sure not to talk to any of the lawyers, witnesses, or parties, and be sure to be back on time for the

afternoon session. If you go out, remember, again, like, sometimes there's a big line at the security checkpoint downstairs, and so you do need to leave a buffer of time to make sure we're all here and we can start on time.

Not during the trial, but when summations have concluded and you begin your deliberations, we will provide lunch to you in the jury room, so that you can eat lunch together there, and it'll be efficient for you continuing deliberations.

In addition to the lunch break, we'll take a short break in the morning each day and a short break in the afternoon. And we will typically end the trial day sometime between 5:00 and 5:30.

So let me just sum up again. Number one, thank you all for doing this extremely important service, for paying close attention to everything that happens here. Arguments, evidence, the whole thing. It's hard to imagine, outside of the context of serving in the military, it's hard to imagine much more significant public service than serving on a jury and assisting the system to get to the right decisions on the facts and the law in important cases like this federal case.

Just to sum up in terms of the order of operations here, the trial begins with opening statements, then the plaintiff's case, then the defense case, then closing statements. Then I give you my more final instructions on

the law. I'll walk you through each of the causes of action that the plaintiff has brought and what the elements of those causes of action are and what those elements mean and what you do need to find and what you don't need to find in order to decide at each issue. Those much more fulsome instructions will come after you've seen the evidence. And after you have my instructions, you will then deliberate and you will reach a verdict.

With that all, by way of introduction, we're going to begin with the plaintiff's opening statement. Do you want this podium left here?

MR. RICKNER: Yes. As long I can get the microphone.

THE COURT: Give us 30 seconds to set up here, and then we'll kick off with opening statements. Just making sure we don't run out of battery life in the microphone in the middle of opening statements. While we're waiting, I'll just say to the jury as well, after you've finished deliberating and returned a verdict, I'll come by in the jury room to chat and to thank you for your service, to answer any questions you have about how the system works. I look forward to that. But in the meantime, I'll be subject to the same rules as the lawyers are, the witnesses are, in terms of being very limited in any offline conversation that we can have.

PLAINTIFF'S OPENING STATEMENT

MR. RICKNER: Good morning. And thank you very much, Your Honor, and thank you for coming today. This is an extremely important role in the American judicial system. And I just -- this is my chance to talk to you directly and give you a brief outline of the evidence. I don't get to talk to you directly until the very end of the case. And in between, you're going to hear from the witnesses and you're going to hear the exhibits that constitute our presentation.

Now, this is a case about excessive force. This is a case about unreasonable force by a detective at the Nassau County Police Department, who hit Mr. Basile multiple times while he was in handcuffs for no legitimate reason. That's what this case is about.

Now, I'll go over briefly what the evidence is going to show and the evidence that we're going to present to you. Mr. Basile wakes up in the morning, October 11th of 2018. He has a real estate investment company and that requires a lot of work. He's meeting with people, somebody from an environmental assessment. He's dressed in work clothes, old T-shirt, cargo jeans -- or cargo shorts. And he's driving in the passenger seat of a 2018 brand-new white Mercedes.

He gets pulled over and he gets arrested, in part, for allegedly stealing that Mercedes, his company car. Now,

initially they take him to the Seventh Precinct and he's downstairs. He's there for a couple of hours. He's being processed. There are officers who are making chitchat with him. You're going to hear testimony about that.

And then he goes upstairs to where the detectives are and they put him in a bench, in a relatively small room, with a bar, and they handcuff one of his hands to the bench. And after a few minutes, an officer, a detective from the Nassau County Police Department, comes into interrogate him and to ask him about this Mercedes that he stole. And the detective isn't happy with the answers he's getting and he gets angry. And Mr. Basile maybe laughs, cracks some jokes, perhaps thinks it's an absurd situation.

And how does the detective react? He headbutts him. Mr. Basile reacts as you would expect. Swears at him. He isn't happy. The detective takes his left hand, smacks him, and then in a smooth move, as his head is going the other direction from being slapped, hits him in the right temple, right on the side of the head, right between the eye, the temple and the ear area.

Now, Mr. Basile goes unconscious. He wakes up on the floor. The officer is around. At this point, Mr. Basile -- he's going to testify. He's pretty angry. He's swearing. He just got knocked unconscious. He waits. He talks to some officers, has some choice words, and then he

gets picked up by EMS and he gets taken to the hospital where he's treated. And you're going to hear testimony. You're going to see exhibits that they find out he had a concussion.

Now, unfortunately, as you're going to hear testimony, this concussion didn't just resolve itself. It actually troubled him for quite some time. He went to some specialists, and actually, we're going to call as a witness a doctor who evaluated him. And he's going to explain to you the mechanics of exactly what happened, about what physically is underneath the skin when you're on the side of the head rather the hard part in the front, about what could happen when you have a blow to that part of the head, and what the consequences of that can be, both in the past and in going forward.

And he's going to give you a diagnosis of what happened, medically speaking, to Mr. Basile. And that's a concussion and post-concussion syndrome. And you're going to hear an expert, who's going to explain exactly what that is and how he diagnosed Mr. Basile with those injuries.

Now, there are two detectives who are defendants in this case. Now, Mr. Basile is going to testify that it was Detective Perkins who was alone in the cell with him, who hit him. Now, everyone agrees, when Mr. Basile goes into that cell in the detective room, he's not hurt. When he comes out, he is hurt. What happened in between is in sharp

contrast. Certainly, the parties don't agree on it. But Mr. Basile identified the officer who hit him as Detective Perkins.

Now, you're going to hear other evidence from witnesses that we're going to call, where the other officer says, "No, no, no. It was actually Detective Lashinsky," that Mr. Basile was wrong about who was in the detective room with Mr. Basile when he was handcuffed to that bench. And ultimately, it's going to be you to decide which officer that was.

In addition, either way, they're Nassau County Police Department officers. They're on the job. They're doing their work. And our contention is going to be that either way, Nassau County itself is responsible for what its officers do in its own precinct.

So that's what we believe the evidence is going to show, and I thank you very much for letting me give you this brief introduction. And I look forward to talking to you at the end of the case.

THE COURT: Thank you, Mr. Rickner. Does the defense have an opening statement at this point?

MR. REISSMAN: Yes, Your Honor. Thank you.

THE COURT: Okay.

DEFENDANT'S OPENING STATEMENT

MR. REISSMAN: Good morning, ladies and gentlemen.

May it please the Court. Good morning, ladies and gentlemen of the jury. My name is Ralph Reissman. I am an attorney with the Nassau County Attorney's Office. And together with my colleague, Deputy County Attorney Victoria LaGreca, we are representing the defense on behalf Defendants Jesse Perkins -- Detective Jesse Perkins, Detective Rob Lashinsky, and Nassau County.

First, as the judge mentioned, the jury is the cornerstone of our justice system. Without you, it could not function. So on behalf of the defendants, Nassau County, Detective Lashinsky, and Detective Perkins, I want to thank you all for taking time out of your busy lives, your jobs, your family obligations, to sit here today and listen to the witnesses, see the exhibits, and you will render a judgment, a verdict at the close of the evidence.

Now, you are going to hear different testimony from different witnesses. Some of that testimony will seem contradictory to you. It is your job, based on your life experiences, your own intelligence, and your ability to discern who is telling the truth, to make a decision as to find a verdict in favor of the plaintiff or the of the defendants.

Now, I'm old enough to know -- I'm older than all of you. I know there was a TV show when I was younger called Who Do You Trust? And that was a quiz show. And on that

quiz show one party or more than one party would give a story to a panel of judges. The other side would give their story to a panel of judges. And at the end of the show, that panel of judges would decide who was telling the truth and who was not telling the truth.

Now, Judge Komitee is obviously the judge in this courtroom. However, as the judge indicated to you, you are the judge of the facts. You will hear testimony and you will have to decide what the facts are in this case, who is telling the truth, and who is not telling the truth.

I submit to you that when you hear the evidence, hear the testimony, see the documents, that you will find in favor of the defendants. Now, I will give you a brief overview of the evidence we will show.

There is no dispute between the plaintiff and the defendants that on October 11th, 2018, Plaintiff Mr. Basile was driving in his white Mercedes with his son, Brandon. There is no dispute that prior to leaving the house that day, he had had an argument with his wife Regina and drove off in that car with her purse. She called 911 to report that Mr. Basile had driven off in the car with her purse.

Two Nassau County police officers, who are not defendants any longer in this case, will be testifying that they noticed that car driving in Nassau County and pulled the car over. They will testify that one of the officers asked

Mr. Basile and his son to get out of the car.

They will testify that when Mr. Basile got out of the car, they saw the purse. That was the basis for arresting for Mr. Basile. Had nothing to do with the vehicle. He was arrested on the charge of grand larceny and transported in handcuffs to the Seven Precinct in Seaford.

In the Seventh Precinct, he was processed, fingerprinted, and photographed on the first floor. He was then led up the stairs to the squad room. The squad room -- the detectives call themselves a squad. Officers are in the precinct, they're cops, they're officers, but detectives pride themselves on being detectives, and they reside in the squad room, which, in this case, was upstairs.

Mr. Basile was let sit and was put in a small interrogation room. Small room. And there was a bench and he was handcuffed in his left wrist to the bench. But there was about a four-foot chain that he could move around his left hand, and his right hand was free.

Now, there is no dispute that on October 11th, 2018, Mr. Basile suffered a head injury. He was taken from the precinct to Nassau University Medical Center, where he was diagnosed with a head injury. The question you alone have to decide is what caused that head injury.

Now, the plaintiff is claiming that one of the detectives, not both, only one of the detectives struck him.

Now, you can clearly see that Detective Perkins is an African American male, quite handsome, and Detective Lashinsky is a white male, also very handsome.

Now, this incident occurred on October 11th, 2018. The next day, October 12th, 2018, Mr. Basile filed a citizen complaint with the Nassau County Police Department. His complaint was that he was held in a cell in the Seventh Precinct, and was assaulted by a detective. He did not name the detective. He did not say Jesse Perkins. He did not say Robert Lashinsky. He did not name the detective. He did not say whether the detective was African American or Caucasian.

After Mr. Basile filed that complaint, some time went by. And in the interim, Mr. Basile -- and he's -- well, I -- he's going to testify, but I have evidence that I will bring to you in the form of statements he made to an internal affairs investigator. Mr. Basile told the investigator that after the incident of October 11th, again, not knowing on October 12th the name of the detective, he called a friend in the New York City Police Department and asked that friend, what could the name of the detective who hit him be?

Mr. Basile told the investigator that when this New York City police officer told him it could be Jesse Perkins, Mr. Basile looked up Jesse Perkins on Facebook and saw a picture of Jesse Perkins.

Now, on January 21st, 2019, Mr. Basile filed a

letter to the police commissioner, Nassau County Police Commissioner Patrick Ryder, and the district attorney of Nassau County, Madeline Singas.

In this letter, these both are identical letters, he stated that the Detective Jesse Perkins, dark-skinned male, about six feet or 6'2, well-built, who looked like a cross between Senator Cory Booker from New Jersey and Dwayne "The Rock" Johnson. And in his letter, he complained that Detective Jesse Perkins headbutted him, slapped him, and punched him in the cell.

Now, you will hear Detective Jesse Perkins testify that he never met Mr. Basile in his life until last Monday when you met Mr. Basile in jury selection. Detective Perkins never heard of Mr. Basile, never saw Mr. Basile. He never even learned this case until 2020, two years later, when Mr. Basile filed this complaint against him and Detective Lashinsky and some other officers who have been dismissed from the case.

Detective Perkins will tell you that in his 33-year career as a Nassau County police officer and detective, he has never punched anybody, headbutted anybody, or slapped anybody. In fact, Detective Perkins will tell you that in his entire life, police officer or civilian, he has never punched anybody, headbutted anybody, or slapped anybody.

Now, Detective Perkins, as you see, is an African

American male and Detective Lashinsky is a white male. Now, this case was started in 2020. We are now in 2023. Between 2020 and 2023, after the complaint was filed, the parties engaged in what's known as pre-trial discovery. That is the parties, the lawyers exchange documents and they take depositions of the parties and other witnesses.

Now, what is a deposition? A deposition is a question and answer session between a lawyer and a party or another witness. And the party who is being deposed swears under oath to tell the truth. And all the statements are taken down by a certified court reporter and rendered into a written typed transcript.

Mr. Basile sat for two depositions in this case. One in 2019 and one in 2021. In both depositions, Mr. Basile identified Jesse Perkins as the perpetrator who allegedly hit him. In both depositions, Mr. Basile clearly stated that when he was in the cell, Detective Perkins came into the cell and introduced himself and identified himself as Jesse Perkins. However, on October 12th when Mr. Basile filed that original complaint with the police department, he did not name Jesse Perkins. He didn't know who Jesse Perkins was.

And the reason is, Jesse Perkins never went into that cell. That's what Detective Perkins is going to tell you and that's what other members of the Seventh Squad in the Seventh Precinct will tell you, that Detective Perkins never

went into that cell.

Now, in addition to identifying Jesse Perkins in both occasions, in his deposition, under oath, Mr. Basile stated -- and I will read you portions of the transcript, that on October 11th, 2018, he never met Detective Lashinsky. He testified he didn't know who Detective Lashinsky was. He testified, "If you show me a picture, I may recognize him." But he testified under oath that he never met Detective Lashinsky in his life.

Now, I ask you: How could it be that Detective Lashinsky is a defendant in this case when the plaintiff says he never met him? Well, I'll tell you. You will hear Detective Lashinsky say that he was in the Seventh Squad that day. He heard a commotion in the cell area. He was asked by his lieutenant to see what was going on in the cell. And he walked into the cell, tried to calm Mr. Basile down, as he was trained -- as Detective Lashinsky was trained to do, and he saw Mr. Basile acting very aggressively.

Detective Lashinsky tried to calm him down to no avail. After 20 or 30 seconds, Detective Lashinsky walked out of the cell. And you will hear not only him, but other officers and detectives, say the same thing. Detective Lashinsky will tell you that when he walked out of the cell, he said, "I never touched him. I never hit him."

Now, what could have caused Mr. Basile to suffer a

head injury? We submit that Mr. Basile caused his own injury by acting very aggressively, banging his head against the wall, banging his head on the table, and falling to the ground.

Now, this is very key to this case. Lieutenant Simon Shnayderman was in the Seventh Squad that day. When he heard the noise, he went over to the cell -- and he's going to testify that when he went to the cell, he saw Mr. Basile on the ground. Detective Shnayderman said to Mr. Basile, "What happened?" And Mr. Basile said, "He hit me." He didn't say who hit him. He didn't say it was Jesse Perkins. He didn't say it was Detective Lashinsky.

What he did say was the following: Lieutenant Shnayderman said, "What happened?" And again, Mr. Basile said, "He hit me." Lieutenant Shnayderman said to Mr. Basile, "Oh. That didn't happen. We don't hit people here." And Mr. Basile said to Sergeant Shnayderman, "You're right. I just want to go to the hospital."

Now, Mr. Basile will never admit to you that he caused his own injury. Well, he just -- I just told you he admitted to Sergeant Shnayderman that nobody hit him. I submit to you that when you hear all of the evidence, hear all of the witnesses, and consider who is telling the truth, you will find that Detective Lashinsky and Detective Perkins are telling the truth that Mr. Basile is not telling the

truth, and that in that case, you should find a verdict for the defendants. Thank you.

THE COURT: Plaintiff should call his first witness, please.

MR. RICKNER: Thank you, Your Honor. The plaintiff calls Plaintiff Roger Basile.

THE CLERK: Would you remain standing? Raise your right hand.

ROGER BASILE, WITNESS, sworn

THE CLERK: You may be seated. Please state and spell your name for the record.

THE WITNESS: My name is Roger Basile, R-O-G-E-R Basile, B-A-S-I-L-E.

MR. RICKNER: May I inquire?

THE COURT: Please.

DIRECT EXAMINATION

BY MR. RICKNER:

Q. Mr. Basile, how old are you today?
A. Fifty-nine.
Q. And how old were you in 2018 on October 11th?
A. Fifty-four. Fifty-five.
Q. Now, are you married?
A. Yes. I am.
Q. Are you still married?
A. Yes. I am.

Q. Who's your wife?
A. Regina Basile.
Q. And were you married to her back in 2018?
A. Yes. I was.
Q. Do you have any family?
A. I do.
Q. How many children do you have?
A. I have three kids.
Q. What are their names?
A. My oldest is Brandon. He's 24. My middle girl is Logan. She's 22. And my youngest, Olivia, she's 20.
Q. Now, what do you for a living, Mr. Basile?
A. I'm in the real estate business. I own -- I own, buy, develop. All aspects of commercial residential real estate.
Q. Okay. I'd just like to go through sort of some of your day-to-day activities. What types of things do you do on any given day?
A. Oh. Every day is a -- every day is different, but normal duties. I -- I -- you know, I manage most of the properties that -- that I own. So dealing with that. Repairs, complaints, summons, permits, legal, refinances, lawyers, taxes, you know, a -- a whole host of a -- things. There's never a dull moment. There's always something going on. Building, new plans, scouting new sites. I can go on, but it just -- it -- it's -- it's complicated.

Q. Does any of it involve you actually building things, like swinging a hammer?
A. Sure. That's how I started.
Q. Tell me a little bit about that, please.
A. Well, I -- you know, I started -- started young for the company, but I -- I still -- I'm -- you know, by trade I'm a -- I'm a carpenter. I -- I frame. I still GC most of my jobs. I do get out there. I get out there and I do swing a hammer still. You know, what I can do these days I do. What I can't, I let the younger guys handle it. But still active.
Q. And going back to the morning of October 11th, 2018, did you have a dispute with your wife?
A. We definitely had an argument.
Q. Was anybody else in the family involved?
A. No. I don't think so. I -- I know -- I know family members were home, but just a argument with me and her, I think.
Q. Okay. And where did you go afterwards?
A. I -- I left for work. I had an appointment. I left for work.
Q. Okay. And you say you left for work. Were you going any specific place or to do any specific thing?
A. I was. I -- I -- I was going to one of our properties. We have a commercial property a few miles away. I was going there. I remember I had an appointment. I -- I had a

appointment with -- I think it was environmental company. I had to get some environmental work done at the property.
Q. And how were you dressed?
A. In my work clothes. I had my T-shirt, probably my work shorts, my cargo shorts or something similar to that. Either sneakers or work boots. I keep -- I keep them in the car. So I switch them as I need to.
Q. Now, which car did you take in the morning?
A. I took my work truck. I have a 2008 Navigator I keep my tools in.
Q. Now, at some point, did you meet up with somebody else?
A. Yes.
Q. Who was that? And tell me about it.
A. My son Brandon came and met me at the jobsite.
Q. And what car was Brandon driving?
A. He was driving a 2018 white Mercedes. E-class, I think.
Q. And when he came, did you start driving the car or were you riding a passenger or something else?
A. No. He came and met me. Finished up my business and I had some other errands to do, so he pulled up. I left my car and I jumped in his car. Passenger seat.
Q. Okay. Front or back?
A. Front.
Q. Okay. And where did you start driving to?
A. My first stop I had to go to my accountant, Marvin

Weinstein. He's up in Westbury, so we headed there.
Q. Did you get there?
A. We did.
Q. Okay. And after you met with your accountant, did you go somewhere else?
A. After that, my next stop was the bank. So we had to come back down to Bellmore where -- where my -- Merrick, where I live. Same two house next to each other. We had to go to the bank, so we headed that way. That was our next stop.
Q. Okay. And did you get to the bank?
A. No.
Q. What happened?
A. I was pulled over, you know, in route to it.
Q. Okay. And did you end up actually getting arrested?
A. I did.
Q. Okay. And where were you taken?
A. To Seventh Precinct.
Q. Do you remember the names of the officers who arrested you?
A. I -- again, there were a lot of names going around. It's hard for me to place faces with names, but I -- I -- Minerviri was there. Or Minervini. I'm not sure how to say it. Or -- and Garibotto was there. There was a -- there was a host of officers. Probably 8 to 10.

THE COURT: Do you want to spell those two names that you gave us as best you can, as you were using them?

THE WITNESS: Garibotto, G-A-R-I-B-O-T-T-O. And Minervini, M-I-N-I-V-I-N-I. Best as I can do.

BY MR. RICKNER:

Q. And were there 8 to 10 officers that arrested you or is that back at the precinct or something else?

A. No. At the actual arrest scene, there were -- there were a lot of officers. Lot of cars, lot of police cars, and lot of officers.

Q. Okay. And when you got to the Seventh Precinct, what happened?

A. I was taken in and brought -- I was brought in. We were on the first floor. We went around where the -- we walk in, there's a bench. We went right to your left, and then like a little left, and there's like a little holding area with some desks, and there was a holding pen, like a metal gated holding pen.

Q. And were you placed inside the holding pen?

A. Yes. I was.

Q. Okay. After you were arrested, were you placed in handcuffs?

A. When I was arrested, yes.

Q. Okay. At any point in the Seventh Precinct were the handcuffs removed?

A. They removed cuffs to re-cuff me in -- in certain areas.
Q. Okay. Were you in cuffs in the holding cell?
A. The first holding cell?
Q. Yes.
A. I believe so.
Q. And how long were you in that first holding cell?
A. Seemed like two to three hours.
Q. And could you see officers outside of the holding cell?
A. Yes.
Q. Did you make conversation with them?
A. I did.
Q. Could you just tell me generally the topics of conversations without going into what they said?
A. Well, basically, they were doing reports, and I was answering information, you know, live, H, you know. I was just answering questions while they were doing their -- their reports.
Q. Okay.

THE COURT: Mr. Rickner, we're going to look for a time in the next 10 minutes or so to break, so I'll leave it to you to find a natural stopping point for that.

MR. RICKNER: Okay. I appreciate that. Thank you, Your Honor.

BY MR. RICKNER:
Q. And did you answer all of those officers' questions to

the best of your ability?
A. I did.
Q. And what was the demeanor of the officers downstairs?
A. They were -- they were very nice. I mean, I -- I -- respectful, you know, I -- I actually had a little small banter with them. You know, we -- we talked a little bit back and forth. But they were very nice, very professional. Not an issue.
Q. Okay. Now, did you explain to them who owned the car?
A. I -- I definitely had said -- well, I -- I remember asking -- I -- I did ask repeatedly. I says, you know, "What am I being arrested for?" I -- I still was -- still was never told until the next day. So no one knew. They said, "Soon as we find out what your charge is, we'll let you know."
Q. Okay. And when you were first arrested, did they find your wife's purse?
A. They did.
Q. Where was it?
A. It was on the floor in the seat -- floor on the car.
Q. Okay. And did you place it there?
A. I did not.
Q. Okay. Was it there when you got into the car?
A. I don't even know. I don't -- I don't recall. I mean, it -- it definitely had to be there because it was in there.

Q. And so after you were in the cell, I think you described, for two to three hours, what happened next?

A. After that, we -- they came in, they got me up. They said, "You have to go upstairs, upstairs detective area." So they got me up, they walked me -- well, first they took me to the bathroom, which was next to the steps, and they -- they had to search me. So I had to undress, take my socks off. I did a lot that day. Yeah. Checked me. Very respectful. We had a couple laughs in the bathroom. It was just routine. Every time you make a move, they have to search you. So we did that.

After that, we went -- they took me right up the stairs. It was two flights of stairs, two stairways up to the detective's area. It said "Detectives area" on the wall.

Q. So you used the phrase "they." Who were they in this sentence?

A. They were two police officers. Two -- Officer Garibotto was one. The other officer -- I -- I -- I can't -- his name was -- I think it started with an M. I can't remember. Mena. Maybe -- maybe Mena. M-E-N-C-H.

Q. Okay. Now, with respect to the downstairs area in the Seventh Precinct, could you just give me an idea of about how big it is?

A. The downstairs? Small area. Maybe -- you walk in, the bench is right in front of you, from what I saw, that one

room. And that's the only room to the steps. I mean, it couldn't have been more than 1,000 feet, if that, the area that I was in. 800 square feet. Something like that.

MR. RICKNER: And actually, Your Honor, since we're getting to the detective's room, this would be a good place to hit the brakes.

THE COURT: All right. Let's take the morning break. We will take 10 minutes and reconvene somewhere between 40 and 45 minutes after the hour.

THE COURTROOM DEPUTY: All rise.

(Jury exits)

THE COURT: We'll see you all in about 10 minutes.

MR. RICKNER: Thank you, Your Honor.

MR. REISSMAN: Thank you, Your Honor.

(Recess)

THE COURT: You want to be between 6 and 12 inches from these microphones, according to the user manual.

MR. RICKNER: Kind of hard to judge when it's right at the tip of your nose.

THE COURT: Yes. Carry a ruler with you and break it out every once in a while.

MR. REISSMAN: Your Honor, we're all lined up with the witnesses for tomorrow.

THE COURT: Terrific.

MR. REISSMAN: We're in good shape.

THE COURT: Good. Thank you.

MR. REISSMAN: Thank you.

MR. RICKNER: Don't keep it a secret. Who else besides Rothenberg is going to be coming?

MR. REISSMAN: Well, Garibotto and Minervini and Shnayderman.

MR. RICKNER: But not Scott?

MR. REISSMAN: Scott has the childcare issues. He's going to come Wednesday morning.

MR. RICKNER: I thought Shnayderman was being

called as part of your case.

MR. REISSMAN: Oh, part of my case? Okay. Well, we'll see how far we get.

MR. RICKNER: All right. Let's talk afterwards.

MR. REISSMAN: Okay.

THE COURT: I think we may have referred to Shnayderman alternatively as Sergeant and Lieutenant at different times.

MR. REISSMAN: Yes. If you noticed, he was a sergeant and he's a lieutenant now.

THE COURT: Okay.

MR. REISSMAN: Lieutenant Rothenberg is now Deputy Inspector, so they keep changing.

THE COURT: Okay.

MR. REISSMAN: Moving on.

THE COURTROOM DEPUTY: All rise.

(Jury enters)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: All right. The witness is, of course, still under oath. Mr. Rickner, you may proceed.

MR. RICKNER: Thank you, Your Honor.

BY MR. RICKNER:

Q. Now, after the strip search in the bathroom, where did you go next?

A. After that, we -- he walked me -- they walked me up the stairs into the -- a detective's area. It's almost a mirror image of the bottom floor, just the second floor.

Q. And just for point of description, about how big do you think it was?

A. Probably the same. 800 or so. What I saw, because I came up the stairs, made a -- a right into there. Probably about 800 feet, 1,000 feet maybe, that top floor.

Q. Okay. And is there a door between the stairs and the detective's area?

A. Yes.

Q. And after you go through that door, you know, what do you see in front of you?

A. I see -- I see desks lined up. Office setting. Desks lined up, soon as I walked in. Couple rows of desks.

Q. And to the right, would that be the wall or something else?

A. Well, when I walk in to that first -- walk into the detective's area, there's -- on the right is a wall with desks along it. I could see, going forward, a window.

Q. And what's to your left?

A. Left is a -- where you can go into another part of that upstairs. There was a door there with more offices. There was a few doors and offices and things like that.

Q. And were you taken any place particular?

A. Yes. Soon as I walked in the detective's area, we -- the officers walked me to the left through a door. Not sure if it was one door or -- a door. And there was a little holding cell, which I -- I didn't know it had a wooden door on it. They walked me in there. Soon as I got in there, there was a bench in there and I figured it was a holding cell.

Q. Okay. And can you describe that door for me?

A. It was a solid wood door. Hard wood. Light wood door. Had a triangle window on it on top that you could look out. But it had no glass in it. It just had the wire mesh in it, so you could hear or talk through it.

Q. And the bench, which wall was that on?

A. If I walked into the room, it was on my left.

Q. And was there anything else in that room?

A. There was a -- there was a bar with cuffs on it. You know, it was a -- a -- a bench -- wooden bench seat, like,

you know, just regular wood and it was a bar with cuffs on it. That's where they put me to sit down. There was also a window on the north wall. It was a window overlooking an office. I could look out that window at the -- the office that was front of the street, Merrick Road.
Q. Okay. And was there any furniture besides the bench?
A. No.
Q. And after you got into that room, what happened next?
A. The officers brought me in. They uncuffed me and then they -- I sat down. Then they re-cuffed me to the bench.
Q. When you say re-cuffed you, what parts of your body were cuffed?
A. They cuffed my left hand to the -- there was a bar with a chain on it. Probably like a two-foot handcuff. So they chained my arm to that and I sat down.
Q. And I think you're holding up your left. Is that the hand?
A. Yeah. Yes.
Q. Okay. And how long were you in there before anyone else came in?
A. After that, they walked out. They left the door open. I was probably there about -- probably at 10, 15 minutes, give or take.
Q. Could you hear anything from -- you know, that was happening outside that holding cell?

A. I did. There was -- there was a lot going on. It was -- there were officers in the office that I could see through the window. There was a lot of talking, doors opening, closing. It was just regular course of business. Right out my door, there was a -- it's actually a telephone right out the door. There was an officer on that telephone. I remember listening to his conversation. He was trying to get some days off, but whatever. He had a tattoo on his arm, too.

So yeah. It was just regular course of business.

Q. And at some point, did somebody come into the room?

A. Yes.

Q. Please tell me about that.

A. Probably, like I said, after about 10 minutes, someone walked into the room, closed the door, and introduced themself. I -- I don't remember. He definitely introduced himself as a detective.

Q. Okay. And could you describe this individual for me?

A. He was big, as my statement. I put faces to characters I know. I thought he looked like Cory Booker, the senator from New Jersey, and a cross between him and The Rock. He was built, had a tight shirt on, big built, probably 6', 6'2", you know. Big guy.

Q. And any distinctive clothing?

A. He had on -- well, yeah. He had a light button down

shirt. He had a bright blue tie. Almost like a neon colored blue tie, light slacks. He was plain clothes. He was in a button down like white or off white kind of t-shirt.
Q. And did he have any facial hair, distinctive hairstyle, anything like that?
A. No. He was clean shaven and had no hair. Clean shaven head as well.
Q. Okay.
A. Nice shine to it.
Q. And did he strike up a conversation, ask you questions, or something else?
A. He did.
Q. And please explain that to me.
A. Well, he first came in and -- and was very quick. He -- he came in a little -- a little gruff. Came in and was telling me -- sort of accusing me of stealing a car, and he was making accusations.

"Well, you're here. You're here for -- it could be a felony arrest. You stole a car. You stole this."

And I kept interrupting him, saying, "You don't understand. It's my car, and I didn't steal a car."

So every time he went into something else, I was -- I was interrupting him. I was being a little sarcastic. It's -- it's my humor sometimes, so I was definitely being a little sarcastic with him every time he stated, "Well, you

stole -- you stole your wife's groceries. You stole your wife's dry cleaning."

I said, "Listen, that's my car, and I didn't steal anything."

And he was getting definitely upset with me. He was using the disrespect word. He was being a little tough. You know, he was -- he had a -- he had a strong tone to him. He was being -- he was getting aggravated, and he was being real gruff with me.

Q. Okay. And did there come a point where this escalated?

A. Yes.

Q. And explain how that came out.

A. Well, after that dialogue went on back and forth, and I really wasn't responding to what he was -- what he wanted from me because it didn't happen, and I really didn't know why I was there. So I was kind of -- I was kind of giggling or just laughing about it.

He -- he got upset. He went out into the hallway, opened a door in the hallway, and he asked everyone to get out of the office. The one -- the window that could see in front, the hallway, he -- he asked for -- he says, "You boys, can everyone step out of the office?"

Guy hung up the phone. I think it was the guy with the tattoo hung up the phone. Everyone left, went out. He shut the door, and then he said out of the window -- he said, "Hey

guys. Can someone shut that door?"

He said it at a triangle window. So all the doors were shut. He came back into the -- into the cell I was in and shut that door, and -- you want me to keep going from what happened from there?

Q. Yeah. Well, so did he say anything to you, ask any questions, something else at this point?

A. He didn't say anything. He had a folder in his hand, and he flipped it down onto the floor like that. And he kind of said -- he was still getting upset. He was still asking me -- he was using the disrespect and -- and -- word and accusing me of things.

And I kept interrupting. I was like, "That's not what happened. I didn't steal."

You know, I was answering him back. I wouldn't -- wouldn't give into what he was trying to accuse me of.

And he said, "Okay."

He walks towards the corner towards the door -- that wooden door with the triangle, he flails himself into the corner. I mean, he -- like, he -- like someone pushed him or -- or you know, made a noise and pushed him.

And I'm laughing. I'm actually giggling to it. And he comes over to me, comes in my face, starts -- I mean, into my face. His nose actually touched my nose, and he's yelling at

me, and I'm laughing, and he headbutted me.
Q. And what was your reaction to that, if any?
A. I said -- I -- I know I used a curse word, and I apologize, but I said, "Are you fucking crazy?"
Q. And what happened after that?
A. He -- he smacks me across the face.
Q. And which side of your face did he smack you?
A. He smacked me on my left side of my face --
Q. Okay.
A. -- with his right hand.
Q. And then what happened next?
A. After he smacked me, I was stunned. I was probably in the middle of saying -- probably cursing or something, but it was bang, bang, and then he hits me on the right side of my face with his left hand.
Q. And was that an open --
A. It -- it was -- it was a fist. It was a shot. I just -- it was slap, bang, and that was it. That was lights. You know, I -- I don't remember anything after that.
Q. Now, where in your head did the fist actually make the impact?
A. Like, right over -- from like my temple to, like, right here on my head.
Q. Like --
A. Like over my ear, in my temple, like right in this

general area. I don't know what you call it, but temple area, above the ear area. It's a shot right to the side of the head.

Q. And what happened next?

A. Well, the next thing I remember, I was being woken up off the floor.

Q. Okay. What kind of things were being said?

A. I remember when I -- I remember someone saying, "Get up, Roger."

You know, they were -- I remember them -- someone was tapping me on the back, and they were -- they were trying to get me up. That was the first -- when I came kind of -- came kind of to.

Q. Okay. And were you saying anything after you came to?

A. When I came to, I was woozy, but yeah. Well, I was crying hysterically. I was -- I was -- I -- I really didn't know -- I was -- what was going on. I was -- I came to. I was crying. I was on the floor. I -- I remember spitting -- I remember tasting blood in my mouth. I spit it on the floor, and what else?

You know, I -- I was -- I was stunned, and I started -- I was crying. I was hysterical. I was yelling. I started yelling. I was crying. And all of the sudden, people started coming into the room.

I mean, just -- the room got flooded. It was a small

room, and it was probably like 10, 15 people came into that room.

Q. Okay. And do you remember the kind of things you were saying?

A. Yeah. "He hit me. Guy is effing crazy."

I was -- I was cursing. I was crazy. "You could have killed me," I said.

I was saying all kinds of things.

Q. Okay.

A. I was -- I was out of -- out of my mind a little bit.

Q. Okay. And was there a period of time between then and when EMS came?

A. Yes.

Q. About how long do you think that was?

A. Half hour, 20 -- 20 minutes.

Q. Okay. So in the interim, did you say anything to anybody?

A. I definitely was --

Q. Besides what you've described?

A. Definitely people were asking me questions. I was definitely telling people, "This guy hit -- beat me up. I was hit. I was beat up. You guys are crazy. Eff you. This, that."

People were telling me things. "Oh. You fell on the steps."

I was like -- I hate using the language, but, "Fuck you. I didn't fall on any steps."

Someone told me I had a seizure. I said get -- and then again, by then, I was conscious and I was raw, and I said, "Seizure" -- you know, again, I probably used the F-word again. Seizure, and they -- they were telling me all kinds of things.

Q. Did you remember saying anything specific to, I believe you called him, Minervini?

A. On the way out.

Q. What did you say to him?

A. I'm a little embarrassed, but again, my sarcastic ways, and I had that kind of sense of humor with things. But I -- I do remember saying it to him.

I said, "Listen." I said to him right in his face -- this was the arresting officer. I said -- I said, "I'm worth a couple million dollars."

I probably even used a number of 30 to 50. I said, "I'll give you $1 million if you just tell the truth."

And he said to me -- he looked down, and all the cops had their heads down because they -- whatever. They all felt bad because they were all nice guys.

He said, "I always do."

And that's -- that's the last I talked to him.

Q. And describe what happened after EMS arrived.

A. EMS arrived. They came into -- they came into the cell. I was still there. They started doing all the medical stuff. They put the cuff on. They -- you know, listening to me. Heart, this, that, taking my blood pressure, looking in my eyes, you know. He did all that emergency kind of triage stuff.

He told me my blood pressure was off the chart, and having -- "You're going to have a heart attack."

I remember he told -- I asked him what the bottom number was because I was -- I know from my mother who died of a heart attack that the bottom number shouldn't be over 100, and mine was.

Q. Okay.

A. So I got nervous.

Q. Do you need a sec?

A. No. I'm good.

Q. All right. And after they're taking the blood pressure and that routine, did there come a point where you left the precinct?

A. Yes.

Q. Just explain how that process happens.

A. They -- they wanted to take me to the hospital. The EMT said, "You've got to go to the hospital."

And I said fine. They were figuring out how to -- it was a very tight area to get stretchers in, hallways, a

couple turns. I toughed it -- I -- I got -- I said, "Listen. I can walk out of here. Just hold onto me."

So they stood me up, and I believe it was -- Garibotto was one of the officers, the original guy. Best guy of the whole day, nice guy. They -- they walked me out. It was like walking through a line with everyone's head down.

I walked into the detective's area. I looked at the far desk. I saw whom I now know was Detective Rothenberg. I looked at him. I said, "This is disgusting. Look at what happened to me."

And I walked -- I walked out, walked down -- they helped me walk down the stairs. We walked slowly. Went down the stairs, went out, and there was a -- the ambulance was there, and the stretcher, the gurney, was there. They put me on and put me in and off to the hospital.

Q. Okay. Did any officers join you on the way to the hospital?

A. Yeah.

Q. Okay. And do you happen to remember which officers those were?

A. Definitely Officer Garibotto.

Q. And what happened in the hospital?

A. We got to the hospital. They took me -- took me out, wheeled me in, you know. I was in the hallway for a little bit on the stretcher. They -- the hospital people were doing

all their, I guess, admitting stuff, so I was there for a little bit just right in the lobby, you know, in the emergency entrance.

They were just doing all kinds of stuff. Name, where do you live, age, this -- all that stuff. Then they finally brought me to a -- a room probably about -- I think about 20 yards down the hallway left. You make a left, and it's -- it was like a curtain room. No door. It was like a curtained room.

Q. Okay. And during the examination, did they provide you with any sort of diagnosis?
A. They did.
Q. Which was?
A. They told me I have a concussion, and I had bleeding in my -- my eye.
Q. Okay. Which eye was that?
A. My left eye.
Q. And about how long do you think you were at the hospital?
A. Oh. I was there -- got to be three, three plus hours maybe, I was there.
Q. Okay. And I guess we didn't really -- about --
A. Maybe four hours, even. It was --
Q. About what time were you arrested?
A. I was arrested probably at like -- I'd say it's got to

be like 11:30, 12:00-ish, somewhere along there in the afternoon.
Q. And about what time do you think you got up to the detective's room?
A. 2:30.
Q. And about what time --
A. 3:00.
Q. And about what time do you think you would have gotten out of the hospital?
A. What time did I get out of the hospital? I -- it was dark out. I -- I believe I got out of the hospital probably about 9 to 10-ish.
Q. And after that, where did you go?
A. Well, officers took me out of the hospital. They wheelchaired me out to a waiting police car, and they took me to Mineola, which is the -- I guess the central booking area.
Q. Okay. And were you arraigned the next day?
A. Yes.
Q. And were you released on your own recognizance?
A. I was.
Q. Okay. And at some point afterwards, did you put in a complaint about this incident?
A. I did.
Q. And when was that?
A. It was probably a couple days later. A day later, two

days later.

Q. A day after the incident or a day after you were --

A. Yes. Yeah. Probably a day or so. I made my initial phone call.

Q. And what age did you describe the officer as?

A. The -- which officer?

Q. The officer who assaulted you.

A. I -- I said he was young, built. I said -- I'm not -- I'm not exactly sure what I said, but I said he was young. I said -- I said in one discussion anywhere from thirties to his fifties, and --

Q. Now, following that complaint, did you hear back from anybody in Internal Affairs or an investigator, somebody like that?

A. I didn't.

Q. Okay. Did you do anything to try to spark an investigation at that point?

A. I did. I -- I put in -- I put in multiple calls to that Internal Affairs department that I had -- had this number. I did call -- probably called a couple of times through the course of maybe a week or two, heard nothing. So I took it upon myself to actually draft the letter and send some letters.

Well, with some advice, I drafted some letters to some officials in the county, a brief outline of what transpired

and that I want someone to investigate what happened to me.
Q. And could you tell me what date those letters were?
A. Well, let's see. Probably in -- I mean, I don't know the exact date, but it was probably mid-November, I would say.
Q. And after those letters were sent, did something else happen with respect to investigating the incident?
A. Well, those -- those letters were sent, and I did get -- I -- I wound up calling back, and I did get some sort of response then, so someone must have got -- I mean, I -- I understood it as someone must have got the message or something like that, but the District Attorney -- or not the District Attorney. The investigating officer, the Internal Affairs Office, I did speak to someone over there.
They said they assigned somebody to the case and I would be contacted to do an interview with them.
Q. And did there come a time when you were contacted to do that interview?
A. Yes.
Q. And who did you speak to?
A. Well, it was -- someone had called. They called me, and we started talking. And his name was Lieutenant Rothenberg. And soon as the phone call started, I recognized the -- he had told me that -- his phone call started out. It was like, "Oh, yeah. I was -- I was there that day. That was -- that

was me that was talking to you, taking the pictures, this, that, and the other thing."

So that was my first call. As soon as he told me it was him, I got upset. I had a brief conversation with him, but I got upset that he was the one interviewing me, and he works at the Seventh Precinct.

Just -- it just kind of -- like, kind of a clash, you know what I'm saying? He was investigating what happened there. He was there, so I didn't think it was on a good playing field.

Q. And at some point, did another investigator get assigned?
A. Yes.
Q. Okay. And did you have a chance to speak with that investigator?
A. I did.
Q. Do you remember their name?
A. I don't -- I don't remember his name. I went down to speak to him at Central in Mineola. We had -- we did an interview, and --
Q. All right. Now, at some point after the incident, did you make efforts to try to determine the name of the officer that had assaulted you?
A. Yes.
Q. What did you do?

A. I -- I have a friend who is a -- he's an ex-officer now, and I was telling him about the incident. He was -- he was helping me out a little bit of, you know, who to call, how to -- you know, told me to -- you know, "You should get internal investigation."
But I spoke to him. He -- I described him to him, who the person was. He says, "Let me call you back."
I was in Florida at the time. He called me back. He called me back within 10 minutes, and he told me, "I called a friend over at the Seventh Precinct. I described what you told -- told him. I was halfway through my description."
His friend told him, "Detective Perkins is the person you're talking about."
Q. And after that, did you do anything to sort of determine if he was right or not?
A. I did.
Q. What was that?
A. I -- well, I'm not too technical with the Facebook thing, but we -- my son, we went onto -- we looked at some pictures. We went on the internet. We -- we found, I believe it was, a Facebook page, and there were pictures up there, and I said, "Without a doubt, that's him."
Q. Okay. And just, whose Facebook page were you looking at?
A. That was Detective Perkins.

Q. Okay. Now, I'd like to go back to the time right after your release from custody putting aside the investigation. How did you feel at that time?

A. Just say that again? I'm sorry.

Q. So after you get released from custody, putting aside the investigation part of this, how did you feel right after you got released from custody?

A. I -- I was -- I was devastated. I was -- I was beat up. My -- my son came to get me. I was humiliated. I was hurting. I -- I was just -- I couldn't believe what was going on over a nothing, silly, stupid thing -- what happened to me.

I was -- I was devastated. I really was. I was -- I couldn't believe it.

Q. And how was your head feeling at that point?

A. I -- I was hurt. That -- that night, after the hospital laying on a bench in a central booking? I mean, I was in pain. My -- my body hurt. Every bone hurt. I was -- my head was killing me. I had a throbbing pain going through my head. My jaw hurt.

Q. Let's fast forward to a couple of days later. Did your symptoms change, if at all/

A. Well, the -- the symptom -- actually, the marks started coming out, you know? I was all red and bruised, whatever, but as the next day, and the next day, the blood started

filling up my eye under here, and my head started turning, you know, dark -- you know, I was bruised.

Wherever I was hit, I was bruised. So the bruising came out. I was in pain. The pain was getting -- the pain hurt. Headache. The throbbing in my head. I had ice on myself. I -- I had pain.

Q. And how about your cognition around this period of time?

A. My what?

Q. Your ability to think straight.

A. I -- like I said, I was -- I was probably -- I couldn't think straight. I was just -- I was a mess. I just didn't know what was going on. I -- I couldn't comprehend. I couldn't focus. I couldn't see. I mean, I was -- I was blurry. I couldn't -- couldn't hear. My right ear -- not that I couldn't hear at all, but I definitely -- it was less than it was, and again, I was hurting.

I was -- I was -- everything hurt me.

Q. So at this point, did you go somewhere besides New York?

A. I did. Under advice of counsel, he -- he had said, "Maybe you should -- do you have a place to stay?"

Because, because of this silly thing, someone issued a --

Q. Well, putting aside any conversations with your attorney, where did you go?

A. I went to Florida.

Q. And do you have a place that you stay down there?
A. I do.
Q. Okay. Where in Florida?
A. Fort Lauderdale area.
Q. Okay. Now, how did you get there?
A. I -- I took the Auto Train. I can explain it if you want me to.
Q. Please do. Explain how you got there.
A. Auto Train is a train that runs from -- from Lorton, Virginia to, like, Orlando area. You basically pull up in your car. You valet park it like you're going to a restaurant. You get on the train. You get your own room to sleep, which I did, and you get off. They bring your car, and you're -- and you're off, so it's a way to go.
I -- I definitely should -- I -- I don't -- you know, I couldn't fly, especially with the -- the damage I had. I -- the doctor at the hospital, I think, asked me because I said I travel. But I travel often like that anyway, and I went to Florida like a day after the incident or two days after the incident.
Q. And you mentioned that you get this Auto Train in Virginia. How did you get from Long Island to Virginia?
A. My son.
Q. You mean, you drove?
A. Yeah. He was my -- he was my -- he was my eyes and ears

for that week. He got me out of prison. He called me lawyer. He drove me around. He -- he did the right thing for me. He's a good boy.

They handcuffed him. They arrested my son.

Q. I understand. Now, did you visit any medical professional in Florida?

Do you need a second?

A. No. I'm good. I did. I -- under advice of a doctor at the hospital that night, he said -- he said, "You should -- you have to follow this up with a neurosurgeon."

You know, a neurosurgeon I think it was or a -- whatever they call it. He says, "You got to follow up because I don't like" -- the blood wasn't in my eye. It was actually in my cornea, which he didn't like.

And he saw welling. He says, "You got to follow up."

So when I got there, I -- I got recommended to a doctor, and I went right away.

Q. Okay. And did there come a time when you were treated again at NUMC?

A. Yes.

Q. And about how many weeks after the incident was that?

A. It could have been a couple of weeks after that. I -- I did go back and forth from Florida to New York. I traveled back and forth a bunch of times, but I went back to the -- the doctor at the hospital.

Q. And did there come a time when you started seeing a specialist?
A. Yes.
Q. And what was the name of that specialist?
A. Dr. Golzad. I don't know if I'm pronouncing that right, but that's what I call him.
Q. How do you spell it?
A. G-O-L-Z-A-D.
Q. Okay. And roughly when did you start going to see him?
A. I probably started seeing him, I would imagine, a month or so -- you know, give or take, I -- I went to see him.
Q. Okay. And about how many times do you think you saw him?
A. I saw him a handful of times.
Q. Okay. Over a period of how long?
A. A few years.
Q. And just talking about today, you mentioned that you had a period of time that you weren't driving. Do you drive today?
A. Did I drive today? No.
Q. Okay. No, no.
A. Oh.
Q. In general, do you drive?
A. Oh. Yeah. I do drive.
Q. Okay. And about when did you start driving again?

A. Probably, I would say -- I know I didn't go to that first doctor's appointment. My son drove me. Probably a month or better after that, I started driving.
Q. Okay. And talking about your hearing, how is your hearing in your right ear today?
A. Not good.
Q. Now, prior to this incident, was it better?
A. Yes.
Q. Okay. And just going through the time from the date of the assault to today, has it gotten better, worse, about the same, something else?
A. It's about the same.
Q. Okay. And just describing the way it was before and afterwards in your own words, how was it?
A. Well, I just can't hear as well out of that side. I -- I turn my head a lot this way with -- with this year, and you know, I just don't -- it's just -- it's just lower. I just -- I don't know how to explain it. It's just like a lower --
Q. And when you say you turn your head a lot, you mean you're -- you're turning so that --
A. I turn my ear, my -- my better hearing side. Like, you know, if I'm in a -- you know, just to hear better.
Q. That's your left? The better hearing side?
A. My left, yeah.

Q. Okay. Just clear for the record.
A. Yeah.
Q. We can't do gestures.
A. Yeah.
Q. Now, with respect to that spot on your cornea, is it still there?
A. Yes.
Q. And have you gotten treatment for that?
A. I did go see a -- I followed up with a -- they were -- second time, they recommended I go see an optometrist to see, you know, what or what could be done. He just said it's just something that's there. If it doesn't get bigger or whatever, you know. It's just some blood that was there. It's -- you know, it is what it is.
Q. Now, just going back to, you know, the criminal case. Did you ultimately get convicted of anything as a result of this?
A. No.
Q. Okay.
MR. RICKNER: Could I just confer briefly with my Co-Counsel before we wrap up?
THE COURT: Please.
BY MR. RICKNER:
Q. Mr. Basile, I have no further questions for you right now.

A. Okay.

THE COURT: All right. Let's start cross-examination. We'll go something like 10 to 15 minutes and then break for lunch.

MR. REISSMAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. REISSMAN:

Q. Mr. Basile, on October 11th, 2018, you were living in a house in Bellmore, Long Island; is that correct?

A. Yes.

Q. And you were living with your daughter and two sons?

A. My son and my two daughters.

Q. Son and two daughters. I'm sorry. At around 1:30 p.m., and you and your son, Brandon, drove in a car away from your house with your wife's pocketbook?

A. Not correct.

Q. Okay. And Brandon was driving, and you were in the passenger seat?

A. Not correct.

Q. Okay. And at about 2 p.m., you were driving. Actually, Brandon was driving, and you were in the passenger seat, and you realized you were followed by a Nassau County police officer in the car, correct?

A. That was definitely the story, but I don't believe it was 2 p.m. I think it was earlier than that when the police

officer first pulled us over, but just my thought that it was a little earlier than 2 p.m.

Q. Okay. And after some discussion with the officer, you were told to get out of the car; is that correct?

A. Yes.

Q. And after you got out of the car, one of the officers looked in the car and found your wife's pocketbook; is that correct?

A. Yes.

Q. Okay. And you were then placed in handcuffs and placed in a police car; is that correct?

A. Yes.

Q. And you were driven to the Seventh Precinct stationhouse, correct?

A. Yes.

Q. And when you arrived at the stationhouse, you went in the front door, and you were on the first floor?

A. Yes.

Q. And did you see Detective Perkins on the first floor?

A. I did not.

Q. Did you see Detective Lashinsky on the first floor?

A. I did not.

Q. You were then led up one flight of stairs. I think you said it was two flights of stairs to the squad --

A. It was -- it was --

Q. Go ahead.

A. There was a midsection. So it was up one, platform, up another.

Q. Okay. And that's where you were brought to the detective squad room; is that correct?

A. Yes.

Q. And you were placed in a small room with bars on it?

A. No bars. No bars on it. It was a bar on the wall where the handcuff was attached to it. It was just a regular room with a wooden door.

Q. Okay.

A. Cement walls.

Q. And your left hand was placed in one handcuff attached to the wall?

A. Yes.

Q. And the chain, you said, was about two feet long on your left?

A. I'm going to take an estimate. It was probably about two foot.

Q. Okay. Now, on October 12th, the next day, you filed a citizen complaint with the Nassau County Police Department in which you stated that on October 11th, 2018, a clean shaven, bald detective about 30 years old wearing a light blue shirt and bright blue tie beat you up in the seventh squad holding cell while processing your arrest.

Did you file that complaint?
A. Yes.
Q. Was that accurate?
A. Yes.
Q. And you complained in the complaint on October 12th that the detective headbutted you and slapped you across the head; is that correct?
A. Yes.
Q. Now, in that complaint on October 12th, did you state that the detective was a black male?
A. I don't believe so.
Q. Did you state that the detective was a white male?
A. I don't believe so.
Q. Did you state the name of that detective?
A. I don't think so.
Q. Did you know the name of the detective who hit you when you filed the complaint on October 12th?
A. I did not.
Q. Now, you gave two deposition sessions in this case, correct?
A. Yes.
Q. Now, one was called -- the first deposition was called a 50-H, which stands for, under New York civil procedure, it's an initial hearing before you file the complaint. Do you remember that deposition?

A. Yes.
Q. Okay. Now, do you recall at that deposition being questioned under oath by a deputy county attorney?
A. Yes.
Q. Now, that first examination was conducted on October 3rd, 2019. Do you recall that?
A. I do.
Q. And when you took the oath to tell the truth at the deposition, did you in fact tell the truth at that deposition?
A. Yes. I did.

Q. Do you recall being asked the following question and giving the following answer?

MR. RICKNER: Objection.

THE COURT: What's the objection? Just give me a number of a rule.

MR. RICKNER: Well, he's not telling us where in the testimony --

MR. REISSMAN: Oh. I'll tell you right now. I'm going to tell you right now. This is the 50-H conducted October 3rd, 2019, page 47, line 18, okay?

BY MR. REISSMAN:

Q. Do you remember being asked the following question and giving the following answer concerning your being in the holding cell?

"Q. Did there come a point in time when someone came to speak to you?

"A. Yes.

"Q. Can you describe what happened when they came to the holding area?

"A. The person that came into the holding area told me his name.

"Q. What was his name?

"A. Detective Perkins, who I now know is Jesse Perkins.

"Q. Can you describe Detective Perkins for me, please?

"A. Dark skin, could be African American or light skinned African American, tall, six feet, maybe 6'2", bald, clean shaved head. He had a white shirt on, no jacket. He had a white shirt on with a neon blue tie.

Q. Do you recall giving that testimony?

A. Yes.

Q. Was it accurate?

A. It was.

Q. Just a little earlier, you were asked by Mr. Rickner what this deductible was wearing, and you said, if I recall correctly, a t-shirt. Is that what you said?

A. I don't remember saying he was wearing a t-shirt.
Q. Oh. Do you recall what you told Mr. Basile [sic]?
A. Just recently talking --
Q. Yes.
A. -- to Mr. Rickner? I believe I said he was in a button, could have been white or off-white with a bright neon tie with slacks on.
Q. Okay. In the same deposition at page 48, line 23.
"Q. What do you recall Detective Perkins saying to you?
"A. The detective walked into the room, closed the door, had paperwork in his hand and introduced himself.
Q. So based on your testimony at your first deposition, you --
MR. RICKNER: Objection. That's not the whole statement.
THE COURT: Overruled.
BY MR. REISSMAN:
Q. Based on your testimony, is it the truth that Detective Perkins introduced himself and identifies himself as Detective Perkins?
A. I'm not sure if he identified himself as Detective Perkins, or he said, "I'm a detective at the seventh squad."
I didn't know his name then. I only learned of his name after we did a little investigating ourselves, so that's how I knew it at that first deposition. His name was Perkins.

Q. So at the first deposition, when you testified that he identified himself as Detective Perkins, was that true or false?

MR. RICKNER: Objection.

THE COURT: Can you read the testimony you're referring to again? Question and answer.

MR. REISSMAN: Yes.

THE COURT: And you said read the entire answer --

MR. REISSMAN: Yes.

THE COURT: -- if that's the issue.

MR. REISSMAN: Okay. Let's see. Okay.

BY MR. REISSMAN:

Q. Going back to page 47, line 18.

"Q. Did there come a point in time when someone came to speak to you?

"A. Yes.

"Q. Can you describe what happened when they came to the holding area?

"A. The person that came into the holding area told me his name.

"Q. What was his name?

"A. Detective Perkins, who I know now is Jesse Perkins.

Q. Now, is it true or not true that Detective Perkins identified himself to you as Detective Perkins on October 11th, 2018?

A. I'm not sure he said his name. If you're telling me he said that, it was -- it was a crazy kind of moment. I didn't remember his name. The only time I remembered -- why I remembered -- I said it was Perkins in my deposition is because I learned it between the time of the incident and the first deposition.

Someone had told me after I described him, whatever. It was Detective Perkins. I looked him up. I saw him. I said, "That's Detective Perkins."

So that's why I answered it was Detective Perkins.

Q. But did he tell you he was Detective Perkins when he came in?

A. I'm not entirely sure if he said his name was -- "Hi. I'm Detective Perkins," or, "Hi, I'm a Detective."

He -- I'm pretty sure he identified himself. So either way in the heat of the moment and what was going on, I don't recall. I certainly didn't remember his name or I would have said it in the police report. I didn't know his name, just like I didn't know everyone else's name, but I'm good at identifying faces with names, so after the fact when I see a picture, I can kind of identify him.

Q. And --

THE COURT: Mr. Reissman, we're looking for a moment at which to break for lunch. That can be now. It can be anytime in the next five minutes.

MR. REISSMAN: One more question on this section, Your Honor.

THE COURT: Please.

BY MR. REISSMAN:

Q. In your October 12th, 2018 complaint, why did you not include the name Jesse Perkins in your complaint?

A. I didn't know his name at that point.

MR. REISSMAN: May I continue, Your Honor?

THE COURT: Yes.

BY MR. REISSMAN:

Q. You just testified. You testified that in your first deposition, he did identify himself as Detective Perkins.

A. Well, October 12th was two days after the incident, right? So I didn't know -- I didn't know who he was. I only learned of him probably that next week or so when I was in Florida who Detective Perkins was.

The first deposition didn't happen until 2019. You know, it -- it was a year later, so that's why I identified it was Detective Perkins. I didn't know -- I didn't know his name on October 12th or a day after the incident. I had no idea.

Q. So is your testimony today that he did not identify himself as Detective Perkins?

A. I believe he did identify himself. I didn't recall his name. I don't know if he said, "Hi. I'm a detective," or,

"I'm Detective Perkins."

I'm not quite sure. If -- if he did, I -- you know, I just don't recall it.

MR. REISSMAN: I'm ready to take a break, Your Honor.

THE COURT: All right. Let's break for lunch now. We will reconvene at around 1:30.

THE CLERK: All rise.

THE COURT: A reminder for the jury, as always, please don't discuss the case among yourselves.

(Jury exits)

THE COURT: All right. Are we anticipating any exhibits in this case from the plaintiff?

MR. RICKNER: Yeah. I handed them up earlier. We have --

THE COURT: Okay.

MR. RICKNER: The only exhibits that I was planning --

THE COURT: I see. Okay.

MR. RICKNER: -- on putting in --

THE COURT: All right. It hadn't come to my attention that these exhibits had been handed up.

MR. RICKNER: Yeah.

THE COURT: I now know them to be here.

MR. RICKNER: Now that we've subpoenaed them and gotten a certification, I don't believe that there's any objection from Defense Counsel regarding authenticity and business record.

MR. REISSMAN: Correct.

MR. RICKNER: Great. So I'm just going to admit them right before I put the doctor on.

THE COURT: This is, I'm sorry, treatment records from a doctor?

MR. RICKNER: Yes. Well, there's two sets. There's NUMC, and then there's Dr. Golzad, who treated him

and is going to testify.

And just right before the doctor goes on, I'm going to ask to move these into evidence, and hopefully he continues saying no objection and no problem.

MR. REISSMAN: No objection.

THE COURT: Yeah. If there are objections to any of the exhibits, we should know by now. That's the point of the joint pre-trial order, and those exhibits should -- sorry. Those objections should surface --

MR. RICKNER: Yeah.

THE COURT: -- immediately.

MR. RICKNER: Yeah. Yes, Your Honor. And as I said, I do object to the police reports to -- when we did the joint pre-trial order, we still had malicious prosecution and false arrest claims. Those have been dismissed after Your Honor's working suggestion with Mr. Roper.

So the arrest records aren't all that relevant anymore. I think there are somewhere Mr. Basile made some statements that they're trying to attribute, which I suppose might have some minor relevance, but I think for the lion's share of them are no longer relevant, and I brought that up --

THE COURT: Oh. Mr. Roper being your Co-Counsel?

MR. RICKNER: Yes. He was --

THE COURT: Oh, okay. Yeah, yeah.

MR. RICKNER: He did the discovery nuts and bolts before I stepped in, and it was a slightly different case when we were making those objections.

THE COURT: Is there any intention on the part of Defense to put in those arrest records? And if so, why?

MR. REISSMAN: I would just introduce Exhibit C. I don't know if there's an objection. That's Nassau County Police Department arrest report, which identifies the charges as grand larceny.

I mean, there's been testimony about that. I just wanted that to get before the jury if there's no objection.

MR. RICKNER: There is an objection. I think that's exactly what I was talking about. I have a suggestion, Your Honor. Rather than doing this on the fly, why don't my colleague and I finish eating early, meet for 10 minutes outside the courtroom, and hash this out?

THE COURT: That colleague, you mean?

MR. RICKNER: Yeah.

THE COURT: Yeah. Perfect with me.

MR. RICKNER: I'm being friendly.

THE COURT: Yeah. I would like the parties to figure out everything you can figure out about what you're potentially objecting to that the other party is seeking to put in and to the extent you are stuck. After that, let me know.

Just to give you a little bit of a preview of my thinking, the mere fact that the police report reflects an arrest for grand larceny in and of itself does not, to me, establish relevance. I don't think it's disputed here that Mr. Basile was arrested for grand larceny, and I don't think it's that relevant to begin with, except as context and background, and I think we've got all the context and background we probably need on that, but I will leave it to you all to hash that out on the first instance.

MR. RICKNER: Yes. Thank you, Your Honor.

MR. REISSMAN: Well, Your Honor, I don't want to cut Mr. Rob's lunch short. I will withdraw all exhibits.

THE CLERK: They can't hear you.

THE COURT: Sir, when they're waving, that means you need to be closer to the microphone.

MR. REISSMAN: Oh. Sorry. Defendants will not be introducing any paper exhibits at trial, Your Honor.

THE COURT: Okay. Thank you.

MR. RICKNER: Oh.

THE COURT: Let's all regroup here at 20 minutes after the hour, so we can talk a little bit before the jury gets back and not keep them waiting. I'll see you all in about 40 minutes sharp. Thank you.

MR. RICKNER: So that's 1:20?

THE COURT: That's 1:20 by my math.

MR. RICKNER: Yep.

(Recess)

MR. RICKNER: I think it may be time for you to return to the hotseat?

THE COURT: I think so, unless there's some live --

MR. RICKNER: No.

THE COURT: -- evidentiary objection that is relevant to this testimony right now.

MR. RICKNER: Nope.

THE COURT: All right. Yeah. Let's bring the jury in as soon as we can.

THE COURTROOM DEPUTY: Are you ready for the jury, Judge?

THE COURT: We are ready for the jury. Thank you.

MS. PANOUSIERIS: Where's those sheets being --

THE COURT: We're short one.

MR. REISSMAN: He just went to the men's room.

THE COURT: Yeah. I think we just get everybody filing in. Everybody who has a cell phone is setting the ringer to the off setting, I'm sure.

I'm relying on the parties to notice who comes in and out and if they have any qualms about the need to exclude a witness. I know who the three people --

MR. RICKNER: I was going to say, I have a hunch --

THE COURT: Yeah.

MR. RICKNER: -- that they came out from chambers.

THE COURT: That's a tell, for sure. Otherwise, this is with the lawyers.

MR. RICKNER: Anybody under 30 is probably pretty safe.

THE COURTROOM DEPUTY: All rise.

(Jury enters)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: Okay. Mr. Basile, you remain under oath. I think we're in the midst of cross-examination.

The Defense may proceed.

MR. REISSMAN: Thank you, Your Honor.

BY MR. REISSMAN:

Q. Mr. Basile, when your attorney was questioning you a little while ago, he asked you what happened when you were in the room, and you said a detective walked in. Did you say that?

A. Yes.

Q. And what color was his skin?

A. Dark skin.

Q. And do you see that detective sitting in the courtroom today

A. I do.

Q. And where is he?

A. He's sitting on my left, dark button-down shirt.

Q. Okay.

MR. REISSMAN: And the witness is identifying Detective Perkins for the record.

BY MR. REISSMAN:

Q. Now, Mr. Basile, we talked about your first deposition. And now I'm going to ask you about the second deposition,

which took place on February 2nd, 2021.

Now, do you recall being asked the following question, and I'll tell you -- and giving the following answer at page 37, line 24.

"Q. Do you remember the first detective that came into the holding area?
"A. Yes. I do.
"Q. Do you remember that detective's name?
"A. I do.
"Q. What was that detective's name?
"A. Perkins."

Page 38, line 24.

"Q. When he entered the room, did he identify himself to you?
"A. I believe so."

And, at page 39, line 19, you were asked the following question and gave the following answer:

"Q. When Detective Perkins entered that room, what, if anything, did the officers do?
"A. He walked into the room. I believe he introduced himself."

Again, according to you, Detective Perkins walked into the room. Did he identify himself as Detective Perkins?

A. I believe he introduced himself as either a detective of the 7th Precinct, or he may have said his name. Again, with

all the hysteria that was going on, I -- I don't recall if he said his name -- he said Detective Perkins. He could have. I -- I just -- I don't remember.

Q. But before he entered the room, you said everything was calm. You were talking to the officers; is that correct?

A. Before the detective got into the room?

Q. Yes.

A. Yes. Everything was very calm.

Q. But there was no hysteria, was there, when you walked into the room?

A. No.

Q. Now, you said that you spoke to a New York City police officer. How long after October 11th, 2018, did you speak to that police officer?

A. It was probably two days, maybe, after the incident --

Q. And --

A. -- possibly three.

Q. Okay. And where is he assigned in the New York City police force?

A. I know he's retired, but I -- I don't know where he -- he worked. I don't --

Q. So --

A. I don't know him that well. I know I know him, but he's not, like, my best friend.

Q. And what's his name?

A. Robert Capozeziello.
Q. And when you spoke to this officer -- New York City police officer -- was he retired in 2018?
A. I'm not entirely sure. I don't want to guess.
THE COURT: Will you spell his name for the record, if you -- and tell us either this is how you know it to be spelled or that you're spelling phonetically.
THE WITNESS: It would be phonetically. I -- I think I can -- C -- C -- C-A-P-O-Z-E-Z-I-E-L-L-O, Capozeziello.
BY MR. REISSMAN:
Q. Now, what did you tell this officer when you spoke to him?
A. I talked to him about the incident. I told him what happened to me. We talked briefly, and then we -- we were just -- we were basically talking about the incident, not -- not too long of a phone call. And then he said, you know -- I -- I described him what he looked like. And he says -- he said, "Let me call you back." I was on the phone when he said, "Let me call you back."
And we hung up. And he called me back within -- I don't know -- like, 15 minutes or 20 minutes or so.
Q. And what did he tell you?
A. He told me, "You know the guy that you described to me?" He says, "I called my buddy over there at the 7th." This is

the exact -- "I called my buddy over there at the 7th. I started, 'Hey. You know you had a problem over there the other day, the fight, this, that, and the other thing?' I started describing." And he says, "Oh, that's Perkins."

And he called me back and told me that.

Q. Now, how many days after October 11th did this conversation with the officer occur?

MR. RICKNER: Asked and answered.

THE WITNESS: Yeah. Yeah.

THE COURT: Overruled.

THE WITNESS: Probably -- I'm going to say a couple days. It was definitely within that probably. I don't know. I'm going to say a couple days.

BY MR. REISSMAN:

Q. Okay. And after that conversation, which you say is a couple of days, was that the first time you ever heard of the name Jesse Perkins?

A. Yes.

Q. Then, why did you testify in two depositions that Detective Perkins introduced himself when he walked into the room?

A. Well, my answer to that -- I -- I think I remember someone introducing something. I don't know if he said, "Hi. My name is Jesse Perkins," or "Hi. I'm a detective."

I just in that heat of that moment, I don't recall just

like I didn't recall all the other officers' names until I put names to faces. So I -- I didn't remember.

Q. Okay. And, after you learned the name Jesse Perkins, you went on Facebook; is that correct?

A. Correct.

Q. And what did you see on Facebook?

A. I saw pictures of Mr. Perkins or Detective Perkins.

Q. And what was he wearing in the pictures?

A. If I recall the pictures I saw, one he had a suit and tie on. The other one he had a tight -- looked like a -- a thermal. It was tight. I remembered seeing his arms -- big guy. What else? I saw another one I think he was wearing a dark -- wasn't -- wasn't a great picture. It was a dark -- it was a dark picture. He had a dark, kind of tight shirt on. And I think there was one more. I'm trying to remember, but I'd -- I'd have to look at it again.

Q. Now, do you recall speaking on December 6th, 2018, with an internal affairs officer named Sergeant Schuh, S-C-H-U-H?

A. I definitely spoke to someone. I -- I just -- again, the name -- I don't know if I met him or not. It could have been. It could have -- that could have been his name. I can't tell you 100 percent though.

Q. And that was a telephone call?

A. Telephone call.

Q. And, subsequently, on December 11th, 2018, you met in

person with Sergeant Schuh; is that correct?
A. I definitely met someone in person. I -- I'm assuming it -- that was him. I -- I did meet with somebody.
Q. And when you met with Sergeant Schuh, you told him that about 15 minutes after arriving in the squad area, a light-skinned Black male, who resembled New Jersey Senator Cory Booker and Dwayne "The Rock" Johnson, entered the room and stated that he was approximately in his fifties, bald, and clean-shaven, fairly muscular, and well-built, and wearing a blue tie. Did you tell that to Sergeant Schuh?
A. I'm -- I'm not -- I don't have the deposition in front of me. I'll take your word for it.
Q. Okay. So let's go back a little.
You wrote a letter to Police Commissioner Patrick Ryder on November 21st, correct?
A. Yes.
Q. And you also wrote a letter to Nassau County District Attorney Madeline Singas; is that correct?
A. Yes. There was a third letter too.
Q. And who did that go to?
A. Don't recall, but I remember there were three to three separate officials. They were all the same letter.
Q. And in those three letters, you identified Jesse Perkins as the detective who assaulted you; is that correct?
A. I don't have the letter in front of me, but you have it,

and you see it. I definitely wrote it.
MR. REISSMAN: I didn't intend it to be an exhibit. If Your Honor would permit, I could show the witness the exhibit to refresh his recollection.
THE COURT: So we don't admit exhibits to refresh recollection. We show the witness the document, let him digest it internally, not read it out loud. And then you could ask him if his recollection has been refreshed.
MR. REISSMAN: Oh. May I do that, Your Honor?
THE COURT: You may.
MR. REISSMAN: Thank you.
THE COURT: And you may approach for that purpose.
THE WITNESS: Yes. Yes. I did say --
THE COURT: Well, let me ask you a question before you say what happened.
THE WITNESS: Okay.
THE COURT: Does that document refresh your recollection?
THE WITNESS: It does.
THE COURT: Okay. Next question or prior question.
BY MR. REISSMAN:
Q. In that letter, do you state that Detective Jesse Perkins was the detective who assaulted you, correct?
A. Yes. In the letter, I stated who I now know to be Detective Jesse Perkins.

Q. And how did you describe his physical description in that letter?
A. In this letter? Let me --
Q. Yeah.
A. Resembled New Jersey Senator Cory Booker, Dwayne "Rock" Johnson entered the detective's room dressed in suit clothing, no jacket, bright blue tie.
Q. May I take that back?
A. Sure.
Q. Thank you. Mr. Basile, the incident you described happened on October 11th, correct?
A. Yes.
Q. Of 2018. I'm sorry. And you first filed a complaint on October 12th, 2018, correct?
A. Yes.
Q. And, in that complaint, you did not name the detective who allegedly struck you, correct?
A. I don't believe so. I knew his name at that point.
Q. And, subsequently, a few days after the incident, you spoke with your police officer friend from New York City, and he helped you identify Jesse Perkins; is that correct?
A. Correct.
Q. And you saw Jesse Perkins' picture on his Facebook page, correct?
A. Correct.

Q. And on November 21st, 2018, you wrote letters to Commissioner Ryder, Madeline Singas, and the other person. And you described Jesse Perkins as the detective who assaulted you, correct?
A. Correct.
Q. And on December 6th and December 11th, you spoke to internal affairs, and you described Jesse Perkins as the only detective who assaulted you; is that correct?
A. Yes. It is.
Q. So why didn't you identify Detective Robert Lashinsky as the detective who assaulted you?
A. Because it wasn't Detective Lashinsky who assaulted me.
Q. Okay. At your deposition on February 2nd, 2021, you testified under oath, correct?
A. Yes.
Q. And you swore to tell the truth, correct?
A. Yes.
Q. And you were asked the following questions and gave the following answers at page 47, line 15:
"Q. At any point before this incident with Detective Perkins, had you ever talked to a Detective Lashinsky?
"A. I would have to see a picture. I don't recall, and I don't believe so. So I didn't talk to any detective beforehand."
At page 70, line 3:

"Q. When you initially made the complaint, was that against Detective Lashinsky or Detective Perkins or someone else?
"A. When I made the initial complaint, I never used the name Lashinsky. So, again, going back to my original complaint, if I used the name, it was Detective Perkins."

And at page 73, line 2, you were asked the following questions and gave the following answers:
"Q. Since this incident, have you had any contact with a Detective Lashinsky?
"A. No. I don't know a Detective Lashinsky.
"Q. But you don't know of any direct involvement from that day of a Detective Lashinsky; is that correct?
"A. No.
"Q. No, that's not correct? Or, no, you don't?
"A. No. I don't recall speaking with a Detective Lashinsky. Again, unless you show me a picture, but I don't recall the name alone or speaking to a Detective Lashinsky."

Is it your testimony today, before this jury, that Detective Lashinsky never assaulted you?
A. Never what with me?
Q. Assaulted you.
A. Detective Lashinsky never assaulted me.

Q. Can you explain why Detective Lashinsky is a defendant in this case?

MR. RICKNER: Objection.

THE COURT: Can you rephrase that question?

MR. REISSMAN: Yes.

BY MR. REISSMAN:

Q. After the incident, you filed a complaint in State court, correct? You had your attorneys file a complaint in State court, correct?

A. I -- I didn't -- I don't know what my attorney -- you know, my attorney did whatever. I didn't instruct him to do anything. I hired an attorney, and whatever he did, he did. I -- I am not --

Q. But when you contacted this attorney, you told him that Detective Lashinsky should be a defendant; is that correct?

A. I don't recall that.

Q. Well, isn't it a fact that Defendant Lashinsky is a defendant in this case?

A. He definitely is a defendant in the case. I can see that.

Q. But if you just testified that he never assaulted you, how can you explain that he is still a defendant in this case?

MR. RICKNER: Objection.

THE COURT: Sustained.

BY MR. REISSMAN:

Q. Mr. Basile, do you agree that Detective Lashinsky should not be a defendant in this case?

MR. RICKNER: Objection.

THE COURT: Sustained.

BY MR. REISSMAN:
Q. Mr. Basile, you stated that only Detective Perkins assaulted you, correct?
A. Correct.
Q. And that Detective Lashinsky never assaulted you, correct?
A. Correct.
Q. And, in fact, you never met Detective Lashinsky; is that correct?
A. I'm not sure if he was ever in my presence that day. There were a lot of officers there. He could have been in front of me. I just -- he wasn't the one that assaulted me. I know that.
Q. So would you agree -- I may have asked this already, but I'll try again.
Would you agree that Detective Lashinsky should be dismissed from this case?
THE COURT: Come to the sidebar, please.
MR. REISSMAN: Yes, Judge.
THE COURT: Don't ask --
MR. REISSMAN: Yes, Judge.

(Sidebar begins)

MR. REISSMAN: I hope you're not upset with me, Your Honor.

THE COURT: I'm not upset with anybody, but I think I can maybe sort this. It sounds to me like you're asking the witness to give legal conclusions when he's a fact witness, right?

MR. REISSMAN: That's correct.

THE COURT: Whether somebody should have been dismissed from this case or not is a legal question that I think we resolved at the summary judgment stage.

MR. REISSMAN: Well, I attempted that. I attempted partial summary judgment.

MR. RICKNER: Yeah, now we’re seeing it play out. He's given all the facts. He can make the closing argument, but as far as --

MR. REISSMAN: Yeah.

THE COURT: I don't think this is meaningful one way or the other. What's meaningful are the facts. We're going to move on.

MR. REISSMAN: I do want to ask Your Honor, based on this testimony, at the close of Plaintiff's case, I intend to make a Rule 50(a) motion to dismiss Detective Lashinsky at least. Would that be proper?

THE COURT: We'll talk about it --

MR. REISSMAN: Okay.

THE COURT: -- when the time comes. Everybody should be aware of and distinguishing as we go forward the difference between present recollection refreshed and past recollection recorded.

If you're giving him a document to refresh his recollection, the question is, does he have now a present recollection that’s been refreshed. The document doesn't come into evidence. You don't ask him questions about the contents of the document. You ask him, "Okay. Do you have a recollection now?"

If you want to put the document in evidence under 803(5), that's a different standard. When you show him something to refresh his recollection, make sure that the ensuing questions are about whether his recollection has been refreshed and, if so, what that recollection is now, not what does the document say.

MR. REISSMAN: Okay. I'll ask it that way.

THE COURT: Well, we're done with that, but --

MR. REISSMAN: Okay, If you say I’m done, I’m done. I'll say, "No further questions."

THE COURT: No. You may have questions on other subjects.

MR. REISSMAN: No. I know. Well, actually, I have a little follow up. I have a little follow up.

THE COURT: One witness per witness.

MR. REISSMAN: One attorney per witness.

THE COURT: That's a whole different thing. We're not going to have somebody else get to the dais and ask --

MR. RICKNER: No.

MS. PANOUSIERIS: No.

(Sidebar ends)

BY MR. REISSMAN:
Q. Mr. Basile, I have several more questions.
You stated that as a result of the -- shall we say "incident," -- you sustained blood in your left eye; is that correct?
A. Yes.
Q. But you were only slapped on the left side of your head. You were not punched on the left side of your head; is that correct?
A. Correct. It was an open hand to my left side.
Q. Okay. And you mentioned that you took some pictures of yourself; is that correct?
A. Yes, on the advisement of my counsel.
Q. And who took those pictures?
A. I took pictures.
Q. How did you take pictures of yourself?
A. With my cell phone camera. They wanted me to keep a log of that week of pictures.
Q. And you mentioned hearing loss. Have you ever seen a doctor for hearing loss?
A. I -- I believe I spoke to Dr. Golzad about my hearing issues.
Q. Dr. Golzad's not an audiologist; is that correct?
A. I'm not sure what's on his resume. But I remember doing hearing tests.

Q. And that was in 2018, correct?
A. I'm not sure what day I did the hearing tests, but I definitely was seeing him in '18.
Q. And since you saw Dr. Golzad, you had not seen any hearing doctor to this day, correct?
A. Any special hearing -- no -- besides him for hearing? No.
Q. Okay. Continuing. On October 11th, 2018, do you recall speaking with a Sergeant Shnayderman, S-H-N-A-Y-D-E-R-M-A-N, while you were in the cell?
A. Again, I -- I have to see pictures of Shnayderman. I could probably apply it to a face. I was talking to multiple people in the cell that day. There was 10, 15 people in that small little box.

Q. Okay. I’m going to represent to you that Sergeant Shnayderman gave a deposition under oath to tell the truth -- and a copy of that transcript your lawyer has -- and at page 24, line 5, he was asked the following questions and gave the following answers --

MR. RICKNER: Objection.

THE COURT: What's the objection?

MR. RICKNER: That's not proper impeachment. If he has a question for the witness, just ask the question about what he said to Shnayderman or what Shnayderman claims.

THE COURT: Sorry. Come to the sidebar for a moment.

(Sidebar begins)

THE COURT: Tell me more about the objection.

MR. RICKNER: It's not impeachment. It's not his own words being used against him. If he wants to put Shnayderman up on the stand to say something different, but reading Shnayderman's deposition into the record and asking what's inconsistent, that's not --

THE COURT: Oh, I see. Yeah. So a prior inconsistent statement has to be a prior inconsistent statement by the witness.

MR. REISSMAN: All right. Sergeant Shnayderman has testified that what the Plaintiff said to him is a prior inconsistent statement.

MR. RICKNER: Well, you can't prove an impeachment using ancillary sources, so I'm not sure that works at all. I mean, in any event, he hasn't said what the inconsistent statement is.

MR. REISSMAN: It will come out.

THE COURT: So imagine that Shnayderman had already testified, and he already said -- they'd have to go out of order, but I'm not sure where this gets us. Imagine Shnayderman had already said that Mr. Basile told him that, and that comes in through Shnayderman because it's a statement of a party. Had that happened, counsel could ask this witness did he tell Mr. Shnayderman asks. And you can

do that now even though it might be out of order or not.

MR. RICKNER: Well, it's not impeachment if he just says, did you ask this witness as --

MR. REISSMAN: No. I'm not --

MR. RICKNER: And he says, "Yes."

MR. REISSMAN: I'll ask the witness a direct question.

MR. RICKNER: Just reading from the prior -- a friendly witness's deposition admission on the stand.

THE COURT: Agreed. Yeah.

MR. REISSMAN: I'll ask a direct question.

(Sidebar ends)

THE COURT: The objection is sustained.
You may continue.

MR. REISSMAN: Thank you, Your Honor.

BY MR. REISSMAN:
Q. Mr. Basile, on October 11th, 2018, after you were allegedly assaulted, were you lying on the floor of that cell?
A. Yes.
Q. And do you recall a Sergeant Shnayderman coming to the cell and asking you what happened?
A. I know various people came into that cell and asked me what happened. I don't know if it was Shnayderman or whatever. The only detective I do know that was in that cell was Rothenberg.
Q. Okay. Did you tell Sergeant Shnayderman -- when Sergeant Shnayderman asked you, "What happened?" did you tell him, "He hit me"?
A. I definitely told somebody or multiple people that he hit me. I -- I don't know if it was Shnayderman or the other 10 people. I'm sure they all heard me. I was pretty loud about it.
Q. After you told that to Sergeant Shnayderman, did he tell you, "Nobody hit you. We don't do that here"? Do you recall that?
A. Well, you just --
Q. I'm just telling, did you recall that?
A. Oh, I didn't say I spoke to Shnayderman. So you just implied that I spoke to him. I -- I just told you I don't

know if it was Shnayderman. It could have been. I have no idea.

Q. Okay. Did you --

A. All right. Now, what's the rest of your question because I don't know --

Q. Well, okay --

A. I don't know that I definitely spoke directly to Shnayderman. Could have. Don't remember.

Q. Okay. I'll rephrase the --

A. Nobody told me his name.

Q. -- question. It's a fair objection.

Do you recall -- after you were on the -- while you were on the floor, do you recall any Nassau County police officer or detective ask you what happened?

A. Yes.

Q. And what did you tell him?

A. I said I was assaulted or hit or beat up or punched -- something that -- I -- I think I repeatedly was saying it.

Q. And did he -- whoever this person was -- did he tell you, "We don't do that here"?

A. I don't recall that. I remember Rothenberg asking me. I remember him telling me things that happened.

Q. And do you recall telling this person, after he said, "We don't do that here. Nobody hit you," did you smile at

him and say, "That's right. I just want to go to the hospital"?

A. Absolutely not.

Q. Did you tell a Nassau County police officer that you wanted to go to the hospital?

A. No.

Q. Were you brought to the hospital against your will?

A. No.

Q. Did you agree to go to the hospital?

A. Yes. I did.

Q. And, once at the hospital, where did you go?

A. I -- they took me to -- I think it's Nassau County Medical Center. We went through the emergency exit. They wheeled me in through the emergency doors. I was right in that little lobby for -- well, I guess they were processing me and stuff to get in, asked me some questions: name, address, age, this, that. And then they brought me down the hall to a room.

Q. And can you describe that room?

A. Yeah. It was probably -- I'm going to say it was probably -- I don't know -- 15 wide and maybe 10 feet deep. Could have had doors, but I remember just curtains across the whole room. It was like an emergency -- like, a triage type of setup.

Q. And were you lying in a bed?

A. They got me off the gurney into a bed. Yes.
Q. And while you were in that room in the hospital, was there any officer with you?
A. Yes.
Q. And who was that?
A. There were two officers with me.
Q. Can you tell us their names?
A. One was Garibotto -- Garibeeto, Garibotto. And the other one I believe was Officer Cow if that's the officer that has the spider web tattoos on his arm. That was who it is. I'm pretty sure it was him -- young kid, very nice. Very nice people too, by the way, guys.
Q. And did Officer Garibotto tell you, "This is a lot better than being at the precinct"?
A. Did Officer Garibotto tell me, "It's better than being at the precinct"?
Q. Yes, being in the hospital.
A. I -- I don't -- I don't know. Could have, you know. I -- I have no idea. I don't -- I don't know.
Q. Did you --
A. We -- we had a lot of dialogue going that day. He was very friendly.
Q. Is it an accurate statement that you told Officer Garibotto, "If I had known I could get this kind of treatment, I would have thrown myself on the floor when you

pulled me over"?
A. I -- I don't recall saying that. Again, like I said, I have a sense of humor. I'm very sarcastic at points. I make off-the-cuff remarks. But -- when did I say that?
Q. Well, you were in the hospital room and speaking with Officer Garibotto and Officer Lake (ph.), and --
A. And Officer who?
Q. That second officer with the tattoo.
A. Okay.
Q. And is it correct that Officer Garibotto told you words to the effect that you were better off in the hospital than in the precinct?
A. If he said it, he -- if he said he said it, then he said it. I -- I -- you know, again, we had a lot of dialogue going on. I had doctors around me. You know, we talked for three hours, Officer Garibotto and I. So he could have. I don't -- you know, if he says he said it, I guess he said it.
Q. Okay. And do you recall responding, "If I had known I could get this kind of treatment, I would have thrown myself on the floor when you pulled me over"?
A. I -- again, I don't recall saying something like that. Do I joke around and say things? But I don't think I said that. I -- I mean --
Q. Okay. I have no further questions.
MR. REISSMAN: Thank you, Your Honor.

THE COURT: Thank you.

Redirect?

MR. RICKNER: Yes. Can we have a very brief sidebar, Your Honor?

THE COURT: Please.

(Sidebar begins)

MR. RICKNER: I didn't do the JPTO, and photographs weren't on the JPTO. If they're going to disclose on their own photographs, I want to put the photographs in the documents.

MR. REISSMAN: I object. I've never seen those photographs.

MR. RICKNER: My understanding is they were turned over. There's actually an entire colloquy in the deposition. You took photos. And "Yeah. We turned them over." "Of course, I will." So I mean --

THE COURT: Can I see the photos?

MR. REISSMAN: These are the photos. Do you remember the name of deputy county attorney?

MR. RICKNER: He's the one on the front page of the deposition.

MR. REISSMAN: Who took the photos?

MR. RICKNER: He did. These are selfies. Some of these may have been taken by other people, but he can authenticate them --

MS. PANOUSIERIS: Do you want to see one of the packets?

THE COURT: Take a look and see if you object. My individual rules say that any exhibits not listed in a joint pretrial order are going to be presumptively excluded absent

for showing good cause.

MR. RICKNER: And to be clear, Your Honor, that's why you haven't heard about these photos yet before. On the other hand, bringing out that he took photos without letting me say, "Okay. Here they are, this is in the photos, that's in the photos," that, then I would say, is good cause because I believe it's a fundamental unfairness.

THE COURT: So the fact that he took photos is -- I think he said on the advice of counsel he took photos.

MR. REISSMAN: That's what he said.

THE COURT: That came in on cross.

MR. REISSMAN: Correct.

THE COURT: And so this is rebuttal evidence, sort of, regarding an inference that hasn't been drawn yet but may yet.

MR. RICKNER: I'm fine waiting until the end to bring him back on the stand with the photos to do a formal rebuttal, but it seems inefficient.

THE COURT: Yeah. The reason I ask if you object is, you know, you might conclude that these photos are not as shocking as what you may have been envisioning. Maybe that you want to put in the photos if you have them if they really were. But then they would have been -- had to be on the closing party's JPTO list.

MR. REISSMAN: Judge, after conferring with my

co-counsel, defendants will allow Mr. Rickner to see photos in evidence at whatever point he deems necessary.

THE COURT: Okay. You have no objections --

MR. REISSMAN: No objections.

THE COURT: -- with this coming on redirect in other words?

MR. REISSMAN: No.

MR. RICKNER: I mean, I am going to hand one of these -- Your Honor can keep a copy if you like since it's not really an exhibit. I'm just going to hand this one up to my client and deal with it if they admit it.

THE COURT: All right. And publish them, or --

MR. RICKNER: Well, I mean, I'll hand them to you as part of closing --

THE COURT: I would not --

THE CLERK: I'm sorry. You have to get closer to the microphone.

MR. RICKNER: I'm not asking them to be circulated right now. But we'll go into either partially into the closing or we'll talk about some of them. And also in --

THE COURT: Yeah. You’re going to put exhibit sticker on this.

MR. RICKNER: Yeah, on the back. I’ll mark one of them as Plaintiff's Exhibit whatever.

THE COURT: Yeah. This packet is --

MR. RICKNER: Exactly.

THE COURT: Thank you.

(Sidebar ends)

MR. RICKNER: If I may approach, Your Honor.

THE COURT: You may.

REDIRECT EXAMINATION

BY MR. RICKNER:

Q. Mr. Basile, I've just put in front of you a collection of photographs marked as Exhibit 3. Can you tell me if you recognize those photographs?

THE WITNESS: I do.

BY MR. REISSMAN:

Q. What are they photographs of?

A. Of me.

Q. Okay. Can you tell me who took those photographs?

A. I took them.

Q. Every single one of them? Please, look through them. A. I'm pretty sure but let me confirm. Yes.

Q. Okay. Now, can you tell me the time frame of when you took those photographs?

A. I know these ones were the following day. The ones I had the blue sweatshirt on were the following day.

Then, the rest of them -- I don't know if they're -- they might be in order. And then the rest of them I took the following days.

Q. Okay. So when you say the blue sweat --

A. I -- I know there was some pictures from Florida in

there because I recognize the background. I was there, like, the next day or two.

Q. Okay. And just so we have a clear record, the blue sweatshirt -- when you say, "the following day," do you mean the day after you got released or the --

A. Yeah. So --

Q. So the 13th?

A. Yeah. So I was -- I got arrested on the 11th. I was -- I got out -- no. I got out the 12th. Could have been the 12th. I -- I think it was when I got out. I think it was on the 12th.

Q. Okay.

A. 12th and 13th maybe. I could be -- some of them at my cousin's house where I stayed that night. I took some of them maybe in the morning when I woke up.

Q. And what in the background, just for reference, indicates the Florida ones that were taken later?

A. I could see my closet behind my head, that little bit of closet.

Q. And which page are you looking at just for those --

A. I'm looking at the second to the last page. And even on the last page, I see the ceiling. You know, it's a popcorn ceiling. Yeah, that my builders made. Yeah. Even the third to last page, the two bottom ones with the little bit of closet and the ceiling, those are in -- those are in Florida

as well.

Q. And can you tell me the Florida ones, roughly what dates those would be?

A. So I probably traveled on the -- I think I traveled on the -- I think I traveled on the 12th and maybe got to Florida on the 13th, give or take one day. But I -- I think I was in Florida on the 13th.

Q. And, at some point, did the bruise -- explain the sort of trajectory of your bruises.

A. Well, I had -- the original bruises I had, you know, I was red. And I had a -- you know, I had some mark on my on my eye. But as the -- the next day, it just got worse. And then the day after that, you know, more blood filled up in my -- you know, when you get a black eye, it -- it got a little more black.

And then, throughout the week, it started turning a little yellow, you know, on -- on this side. So it just progressed, you know, I guess went through its progression and then started healing, going away, I guess.

Q. Okay. Now, going back to a slightly different topic.

I think you testified on cross that you did not ask to go to the hospital. My question is: Did you want to go to the hospital?

A. I -- I wanted to go. I mean, after they -- they said I had to go to the hospital, and then when I -- again, I got

scared when they told me I was going to have a heart attack. So I -- I wasn't fighting anyone going to the hospital.

MR. RICKNER: Can I just confer with my co-counsel for one moment?

THE COURT: Please.

BY MR. RICKNER:

Q. If you had known the name of the officer who assaulted you, would you have put that as part of your complaint on October 12th?

A. Yeah. Yes.

Q. And that complaint you made, was that something you typed up, telephonic, something else?

A. The -- the complaint to the letters I -- I drew or the original complaint? I -- telephone. I phoned that in.

Q. Okay. Did they ever give you a copy of whatever complaint to confirm that this was what you put in?

A. No.

MR. RICKNER: No further questions.

THE COURT: Recross?

MR. REISSMAN: Nothing from defense, Your Honor. Thank you.

THE COURT: Thank you. All right. Well, you may step down.

THE WITNESS: Thank you.

THE COURT: And the Plaintiff should call their

next witness.

MS. PANOUSIERIS: Plaintiff calls Defendant Lashinsky, please.

If I may approach, Your Honor. I have a binder for the Court and a binder for the witness.

THE COURT: Of exhibits?

MS. PANOUSIERIS: It's just if we need him to open it, it will already be in front of him.

THE COURT: Okay.

MS. PANOUSIERIS: So I'll ask him not to open it --

THE COURT: Yes. Please. And that will make its way to me.

THE CLERK: Would you please raise your right hand?

ROBERT LASHINSKY, WITNESS, sworn

THE CLERK: You may be seated.

Would you please state and spell your name for the record?

THE WITNESS: Robert Lashinsky, L-A-S-H-I-N-S-K-Y.

MS. PANOUSIERIS: May I inquire, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION

BY MS. PANOUSIERIS:

Q. Detective, you're retired, correct?

A. Correct.

Q. What year did you retire?

A. July 2nd, 2020.
Q. Prior to your retirement, what rank did you hold with the Nassau Police Department?
A. As a detective.
Q. How long were you a detective?
A. Fourteen years.
Q. And prior to that, did you hold the rank of police officer?
A. Yes.
Q. For how long?
A. Thirteen.
Q. So, on October 11th of 2018, you were working as a detective in the 7th Precinct, correct?
A. Correct.
Q. And at that same time in October of 2018, you were about six feet tall, same as today, right?
A. Yes.
Q. And you weighed around 220 pounds at the time?
A. About 200.
Q. Was your physical appearance otherwise similar to the way that you appear today?
A. I'm a little heavier today.
Q. And you were clean-shaven at the time, correct?
A. Yes.
Q. At the 7th Precinct, the detective squad is on the

second floor, right?
A. Correct.
Q. Which is where you were located when you first became aware of my client, Mr. Basile's presence in the precinct; is that right?
A. Correct.
Q. And that was because you were on duty working on the second floor that day?
A. Correct.
Q. But you were not specifically assigned to Mr. Basile's case, right?
A. I was assisting.
Q. Okay. Did someone direct you to assist with the case?
A. The -- I was assisting the detective who was handling the case.
Q. And who was that?
A. Michael Capozezielle.
Q. And Michael Capozezielle asked you to assist him with his case?
A. I was assisting him. There was -- that was my job was to assist him. He was under my direction.
Q. So is that a yes or a no, detective? Did the assigned detective request your assistance?
A. No. He did not.
Q. You first became aware of Mr. Basile's presence in the

precinct because you heard noises coming from the cell; is that right?
A. No. That's not correct.
Q. Okay. Tell us. What was the first time that you became aware of Mr. Basile's presence in the precinct?
A. I was standing in the main squad room when the officers were bringing him up, and he was loud. And he drew my attention. And that's when I first saw him.
Q. Did you make eye contact with him when he first came up?
A. I don't remember if I made eye contact with him. No.
Q. Did you say anything to him?
A. No.
Q. How long after you saw Mr. Basile come up the stairs -- excuse me. Strike that. I will rephrase.
From the time you first saw Mr. Basile to the second time that you encountered him that day, what period of time passed?
A. There was absolutely no time passed. Once my attention was focused on him, I saw him giving the officers a hard time. I followed them into the holding cell area.
Q. So you actually followed the officers as they walked into the cell?
A. Correct.
Q. And you were taking it upon yourself to involve yourself in this interaction?

A. I was senior detective. Yes.
Q. So, yes, you took it upon yourself?
A. Yes.
Q. When you entered the holding cell where Mr. Basile and the officers had just walked in, was anyone else present?
A. It was myself and the two officers.
Q. And can you identify those officers?
A. I don't remember their names.
Q. Were they uniformed?
A. Yes.
Q. Were you in uniform?
A. No.
Q. As a detective you wear plain clothes or suit and tie, correct?
A. A suit and tie. Yes.
Q. So when you entered the cell, you followed the officers in. Mr. Basile is there. The two officers are there. You didn't know anything about his arrest at this point, right?
A. That's correct.
Q. So you didn't know anything about him. You had never seen him before he came into the precinct?
A. That's correct.
Q. So you just heard his loud demeanor and decided, "I'm going to go in there, see what's going on, take care of it"?
A. Yes.

Q. When you entered the cell, did you have the intention of interrogating Mr. Basile?
A. No, not at all.
Q. So you didn't have a Miranda card in your hand?
A. No.
Q. In fact, you were not aware if he had been Mirandized or been read his rights, correct?
A. No. I was not.
Q. But you went to talk to him anyway?
A. No. I did not -- my intentions were not to speak to him.
Q. Did you, in fact, speak to him?
A. Yes. I did.
Q. What was your intention?
A. To try to calm him down.
Q. So when you walked into the cell, was Mr. Basile on the bench?
A. He was -- at that point, they had him cuffed, and he was standing up.
Q. And the two uniformed officers, were they still present at this point?
A. Yes.
Q. At some point you asked those two police officers to step outside of the cell, didn't you?
A. Yes. I did.

Q. So that you could speak to Mr. Basile alone?
A. To try to calm him down. Yes.
Q. And did the officers leave when you asked them to?
A. They did what I directed them to do.
Q. And closed the cell door behind them?
A. No. That door was open.
Q. And you specifically recall that it was open?
A. They -- there was no way they were going to lock me in the cell with him alone. The door was --
Q. So you're --
A. -- open.
Q. You're speaking from typical practice, rather than your memory?
A. The door was open.
Q. Do you specifically recall that?
A. The door was open. Yes.
Q. So at this point you are now alone in the cell, and the only other person present is Mr. Basile?
A. That's correct.
Q. He's cuffed around one hand to a bar behind the bench, correct?
A. I believe the bar's above the bench but yes, that's correct.
Q. Thank you, above the bench. And Mr. Basile testified there's about a two-foot chain that connects the wrist to the

bar, correct?
A. I believe so. Yes.
Q. So this is why he's able to stand even though he's cuffed, right?
A. Yes.
Q. Okay. But during this entire interaction inside the cell, Mr. Basile remained cuffed the entire time, correct?
A. Yes.
Q. After the officers left, you engaged in a conversation with Mr. Basile to try to calm him down, right?
A. That's correct.
Q. He was agitated?
A. More than agitated. Yes.
Q. He was yelling?
A. Yes.
Q. He was pretty upset that he had been arrested, right?
A. I guess so. Yes.
Q. Is it uncommon for arrestees to be upset that they are cuffed and under arrest?
A. No. That's not uncommon.
Q. Something you deal with regularly?
A. Yes, ma'am.
Q. You spoke to Mr. Basile for only about a minute or two, correct?
A. Probably less than that.

Q. And then so you pretty quickly determined, "I'm just going to leave him in here and let him calm down and leave him alone," right?
A. I made an attempt to calm him down, but once he started flailing his hands and hitting himself on the wall, I knew that it was too dangerous to stay in there, and I exited.
Q. Okay. So you say that while you were in the cell, this first time, you saw Mr. Basile flailing his arms?
A. Yes, ma'am.
Q. Okay. And that's with his hands cuffed?
A. Yes. You're able to do that.
Q. Okay. You just mentioned that he also was hitting himself on the wall?
A. I believe at least once. Yes.
Q. Can you describe what you mean?
A. He was facing the door. The bench now would be to his right. He was cuffed to that pole. And he was agitated. I tried to calm him down. He's flailing his arms. And then he struck his head on the wall. And then that's when I exited.
Q. You gave a deposition in this case in February of 2022, didn't you?
A. Yes, ma'am.
Q. And during that deposition, you were asked about this first interaction in the cell with Mr. Basile, right?
A. Yes.

Q. And you were asked if he was irate, upset, something along those lines, correct?
A. I believe so. Yes.
Q. Did you, in your deposition, tell Counsel about him hitting himself against the wall during this first visit to the cell?
A. I don't remember.
Q. So you're in there just a minute or two, and you come back out. That's correct?
A. Less than a minute.
Q. Less than a minute. You're in there less than a minute, and you leave him in there alone?
A. At that time, I -- I exited and closed the door and went into the main room where the rest of the detectives were -- were in.
Q. Okay. And who do you recall was in the room with you?
A. Detective Capozezielle, some uniformed officers, and that's all I remember.
Q. Was Detective Perkins present?
A. I don't believe he was there.
Q. Did you see him at all that day?
A. I don't remember.
Q. How far outside the cell is this common area in which you were standing?
A. After the second door, five feet.

Q. It's a pretty small area, the whole second floor?
A. Yes. It is. It's pretty confined.
Q. Something caused you to go back into the cell, didn't it?
A. Yes.
Q. A second time?
A. Yes, ma'am.
Q. So, after you've exited, you're outside again for another 30 seconds or a minute; is that fair?
A. Yeah. That's fair.
Q. And then you hear noises inside the cell?
A. Yes, ma'am.
Q. And you, along with other officers, immediately went back inside to see what was going on?
A. Yes, ma'am.
Q. So, in this second time back inside the cell -- I'm sorry. I'm going to ask you one more question about the configuration of where you're standing.
You're standing outside. You say it's a few feet from the second door, correct?
A. There's a -- a door leading into the room that the cell is contained. And then the cell itself has a door.
Q. So from the common area outside the cell door and the area door, can you see into the cell?
A. You'd have to be positioned in such a manner to see in

there. It -- it's -- it's difficult. It would be difficult from that room.
Q. So is it fair to say that you entered, not because you saw something going on, but only because you heard something going on?
A. That's correct.
Q. Who went back into the cell with you the second time?
A. I believe it was the uniformed officers.
Q. The same two uniformed officers who brought him up originally?
A. I would only be guessing.
Q. Mr. Basile was still standing when you entered, correct?
A. The second time?
Q. Yes.
A. No. He was lying on the floor.
Q. What position did you see Mr. Basile in when you came in the second time?
A. Lying on the floor face up.
Q. Was he moving?
A. I don't recall.
Q. During your deposition in this case we were just discussing, you were asked what position Mr. Basile was in when you came into the room the second time. Do you recall that?
A. The -- the second time he was lying on the floor.

Q. Do you recall being asked about that at your deposition?
A. I don't remember.
Q. If I showed you your deposition transcript, would that refresh your recollection of whether you were asked that question?
A. It -- it might.
Q. You can turn to tab 1 in the binder there. And if you could just look at that first page first and confirm that this is your deposition testimony taken in this case on February 9th, 2022; is that right?
A. Yes.
Q. Okay. If you could go to page 46. Do you remember being asked on line 23:
"Q. So you walked back into the room and he" -- referring to Mr. Basile -- "is still standing?
"A. I believe so. Yes."
Q. Do you recall giving that answer -- being asked that question and giving that answer?
A. What line are you referring to?
Q. I'm starting at line -- on page 46, line 23, 24, and 25.
A. Okay. I see that.
Q. So would you like to correct your testimony today, or was that incorrect?
A. I -- I don't remember. It's been a -- it's been a while.

Q. As you sit here today, you can't recall if he was on the floor or standing?
A. I believe he was on the floor.
Q. What was the first thing you did when you saw Mr. Basile on the floor?
A. I don't remember what I did first.
Q. Did you see Mr. Basile fall to the floor?
A. No. I did not.
Q. You were asked about this as well in your deposition testimony, correct?
A. I -- I don't know.
Q. If I point you to that part of the deposition, will that refresh your recollection?
A. Sure.
Q. If you could turn to page 57 on tab 1. I'm sorry, 50 -- I went too far. I apologize. One second.
I apologize. Page 54.
THE COURT: So you're refreshing recollection here?
MS. PANOUSIERIS: Yes. I'll ask the witness to review the question and answer on page 54.
THE COURT: To yourself. Take a minute.
MS. PANOUSIERIS: Yes.
THE COURT: Look at page 54. Don't read it out loud.
THE WITNESS: Is there a specific line I'm to focus

my attention to or the whole page?
BY MS. PANOUSIERIS:
Q. I would go ahead and just review the whole page, Detective.
A. Okay.
Q. Does that testimony that you just reviewed refresh your recollection as to whether you witnessed Mr. Basile?
A. I don't believe I witnessed him fall. No.
Q. I would ask the witness just to read one other section of his testimony before I ask the question one last time, and that would be on page 44 beginning on line 12 to line 23. And you could just review that to yourself.
A. Sorry. Say the page again?
Q. Page 44 beginning on line 12 to line 23.
THE COURT: If you want to see the context, you can flip back a page or forward a page, obviously.
MS. PANOUSIERIS: Please do. If you need context, you're welcome to read earlier --
THE WITNESS: No.
MS. PANOUSIERIS: -- testimony.
THE WITNESS: That's okay.
BY MS. PANOUSIERIS:
Q. Does that change your testimony as to whether or not you witnessed Mr. Basile fall to the floor?
A. No. I don't.

Q. But during your deposition, you were asked what happened, and you testified and stated that he fake fainted onto the floor in your presence; did you not?

A. Well, I believed he faked when he was on the floor, and that was in the presence of myself and the AMT that was treating him. That was what I was referring to. I didn't say that I witnessed him fall. I -- I believed that he was faking and he was nonconscious.

Q. During your deposition, do you remember being asked that -- whether -- question, "You walk into the room and you recall him standing, but you believe he collapsed after you put him into cuffs? Do you remember being asked that question?

A. Could -- could you repeat that?

Q. Sure. The question on page 52, line 24. "You walk into the room," referring to the cell."

THE COURT: So this document's not in evidence yet, right?

MS. PANOUSIERIS: Correct. I'm impeaching the witness' testimony he just gave.

May I proceed, Your Honor?

THE COURT: Yes.

BY MS. PANOUSIERIS:

Q. You were asked,

"Q. You walk into the room. You recall seeing him standing,

but you believe he collapsed when you went to put him in cuffs?"
"A. He definitely at some point fell -- he fell to the ground."
"Q. Were you in the room when that happened?"
"A. Yes."
A. Well, first off, I never placed him in handcuffs. I never placed him in handcuffs. I never took handcuffs off. I never put handcuffs back on. I never did that.
Q. I would just direct you to your testimony 52, a few lines earlier. You were asked, question, line 6 --
"Q. When you went back into the room, your intention was to cuff him behind his back, correct?"
"A. For his safety. Yes."
"Q. Did you do that?"
"A. I don't remember how far we got."
A. I didn't cuff him --
Q. Did you --
A. -- if that's what you're asking. I didn't do that.
Q. Did you attempt to cuff him?
A. No, ma'am.
Q. Did you see him pass out?
A. I already stated; I did not.
Q. Why did you give that answer during your deposition testimony, an unequivocal yes, if you did not observe it?

A. I didn't observe him faint, Your -- ma'am.

Q. I understand that's your testimony today. My question is, why did you give a contradictory answer during your deposition?

A. I can't answer that.

MS. PANOUSIERIS: Okay.

THE COURT: Can I just ask you -- I think we're talking about both the fainting, whatever is to be made of that, and also there's this stuff about your intention to cuff him, and there's some distinction, it looks like, between cuffing to the bar and cuffing behind the back. Is --

THE WITNESS: But at what point are we talking about this?

THE COURT: When you went back into the room the --

THE WITNESS: The second --

THE COURT: -- second time.

THE WITNESS: -- time?

THE COURT: Was there any thought process, intention, about changing the way he was cuffed one way -- from one way to the other?

THE WITNESS: Not that I remember.

THE COURT: Okay.

BY MR. REISSMAN:

Q. So it's your testimony today, you walked in the room, Mr. Basile's already on the floor, right?
A. The second time? Yes.
Q. Correct. The second time you went?
A. Yes.
Q. And you saw blood on him, right?
A. I don't remember if it was on him or if it was on the bench.
Q. But you personally observed blood in the area where Mr. Basile was?
A. If I remember. Yes.
Q. Did you check Mr. Basile's vitals, render him any aid?
A. Oh. I don't remember who did that.
Q. But did you?
A. I did not. No.
Q. So you testified under oath during your deposition that Mr. Basile fake fainted in your presence. Either way, he's on the floor at this point. We can agree on that, right?
A. Yes.
Q. Okay. You stayed in the cell for the period of time until the paramedics arrived; is that right?
A. Yes.
Q. And that was somewhere between five minutes and a half-hour?
A. I -- I don't know.

Q. During that time, did Mr. Basile say anything in your presence?
A. Not that I remember.
Q. Did he make any noises?
A. I don't remember.
Q. Did he get up from the floor?
A. I don't believe he got up until after the AMT arrived, at some point.
Q. So in this period of time, somewhere between 5 minutes and 30 minutes, Mr. Basile is on the floor the whole time, not speaking, not moving?
A. I can't describe the details at this time. I don't remember.
Q. Detective, you know who Lieutenant Arnold Rothenberg is, don't you?
A. Yes, ma'am.
Q. He was the commanding officer or the ranking officer -- I am not sure of the correct terminology -- at the Seventh Precinct when this incident occurred; is that fair?
A. Yes.
Q. But you were only at the Seventh Precinct for about a year, right?
A. That's correct.
Q. Why were you transferred to the Seventh Precinct?
A. I had a difference of opinion with another detective at

the -- the precinct that I was assigned to.
Q. And it became physical, didn't it?
A. No. It did not.
Q. After Mr. Basile was taken away by paramedics, you were asked to have photographs taken of your hands, correct?
A. Yes.
Q. And that was by Lieutenant Rothenberg?
A. Yes.
Q. And was Lieutenant Rothenberg's relationship to you, in terms of your ranks?
A. He was the commanding officer of the Seventh Squad.
Q. And you understood that he wanted to take pictures of your hands because Mr. Basile had made an allegation that someone assaulted him, correct?
A. Yes.
Q. And that the next step would be to document, through photography, what your face and your hands looked like, correct?
A. Yes.
Q. But you don't recall ever giving a formal statement to the Lieutenant about what you had just observed or seen inside the cell, right?
A. I don't remember. No.
Q. There did come a time when you had to write a statement to Internal Affairs about this incident, correct?

A. Yes. I believe so.
Q. It was several months after the incident, right?
A. I don't remember when.
Q. If I showed you the statement, which contains the date, would that refresh your recollection as to when you authored it?
A. I'll look at it.
Q. It's in tab 2 of your binder. And if you could just review it to yourself?
Does viewing this document refresh your recollection as to when you authored it?
A. April 23rd, 2019.
Q. And just to confirm, that is your signature at the bottom of the statement, correct?
A. Yes. It is.
Q. You did author this statement?
A. Yes.
Q. So this was about eight months after this incident occurred that you authored the statement?
A. About. Yes.
Q. Okay. And you understood when you made this statement, when you wrote this up, that you had an obligation to tell the truth?
A. Yes.
Q. And include any relevant details?

A. Yes.
Q. You've given statements to IAB before this?
A. In regards to this case?
Q. No. In general.
A. In general? Yes.
Q. So you understand that what they're trying to do is investigate and that they need all the information you have to give them, right?
A. Yes.
Q. And you understood that this allegation that was being made was that Mr. Basile had been headbutted, correct?
A. That that was his allegation?
Q. Correct.
A. Yes.
Q. And slapped, correct?
A. His allegation. Yes.
Q. And also that he was punched, correct?
A. Yes. His allegation.
Q. You've been a detective -- you were a detective for a very long time, weren't you?
A. Yes.
Q. So when you speak to witnesses, you want to get as much information out of them as you can, right?
A. In regards to this case?
Q. In general, as a detective, when you're investigating.

A. Yes.
Q. Because small details can be very important in an investigation, can't they?
A. Yes.
Q. And you were honest in your statement when you said that you asked the police officers to step out of the cell before you spoke to Mr. Basile, right?
A. Yes.
Q. And you were also honest when you said you could hear him thrashing around or moving around when you were in the squad room, right?
A. Yes.
Q. But you never told Internal Affairs that you fake fainted, right -- you witnessed Mr. Basile fake faint, rather?
A. That -- well, I didn't witness him fainting. I just -- it was my belief that, when he was on the floor, he was faking.
Q. But you -- isn't it true that, in your sworn deposition testimony, you said you personally observed him, as we just looked, fake fainting onto the ground?
A. What I mean was, while he was on the ground, I believed he was faking.
Q. So the prior statement was not truthful?
A. Well, the statement meant that, while I was looking at

him on the ground and the AMT was treating him, I believed that he was faking.
Q. That's what you meant when you responded that "yes" to, "Did you see this? Did you see him fall?"
A. I misspoke then.
Q. You also never mentioned that you went into the cell twice in your IAB statement, or Internal Affairs statement, did you?
A. I don't know.
Q. Please feel free to read through the statement to yourself to refresh your recollection, and then we can talk about it.
A. Okay.
Q. Did that refresh your recollection as to whether you included a statement about entering the cell twice?
A. That's not in here.
Q. So you didn't include it?
A. It's not in here.
Q. You also did not include -- or isn't it true that you failed to include that Mr. Basile was laying without movement, seemingly faking unconsciousness, for 30 minutes before EMS arrived?
A. I did not observe him for 30 minutes.
Q. Okay.
A. I just said, the time that I observed him, when he was

lying on the ground, I believe that he was faking.
Q. And is that in your report?
A. It's not in here. I probably wasn't asked that. It's my opinion. I'm not a doctor.
Q. You also never told Internal Affairs that you saw blood, either on Mr. Basile or in the cell, did you?
A. I answered the questions that they posed to me, and that was it.
Q. As a detective, you would agree that it's -- if you have a victim come to you and say, I was assaulted, that it would be relevant if a witness saw blood near that victim, correct?
A. At this time, I'm the subject of -- of an investigation, and this -- there's an attorney present, and I'm guided by what advice he gives me.
Q. I --
A. I answered the questions that were posed to me, and those were the only questions I answered.
Q. I understand. I would just ask you to ask the -- answer the question I'm asking.
A. Which is?
Q. In your experience as a detective, you would agree that blood in the presence of an alleged victim is relevant to an investigation into an alleged assault?
A. Yes.
Q. But you didn't think that it was important enough to

share with Internal Affairs?
A. They evidently didn't ask me.
Q. You did, however, include information that any injuries Mr. Basile sustained didn't happen in your presence, right?
A. Yes. I did say that.
Q. But you left out the part about the blood?
A. It's not in here. That's correct.
Q. In your sworn testimony in your deposition, we've established that you testified that you witnessed this fake faint. Have you ever reported that fact to anyone else, either in the investigation, speaking with your colleagues? Did you ever tell anyone else, I saw this guy fake faint?
A. In regards to this specific --
Q. Correct.
A. The -- I had a conversation with the AMT that was treating him. Yes. And we both thought that.
Q. I would ask you only to testify to your own --
A. I'm sorry.
Q. -- observations and thoughts. Thank you.

MS. PANOUSIERIS: Your Honor, I would just ask to confer with my co-counsel briefly?

THE COURT: Please.

BY MS. PANOUSIERIS:
Q. Detective, you testified here today that you personally observed Mr. Basile -- I apologize. -- you personally

observed Mr. Basile hit himself against the wall at least once?
A. Yes.
Q. But you failed to include that in your Internal Affairs report, as well?
A. Again, I answered the questions that were posed to me.
Q. You would agree that it's relevant, if someone has injuries, that they were throwing themself against a concrete wall? As a detective, that would be relevant to an assault, right?
A. As a detective? Yes. Not as the subject of an investigation. Two different things.
Q. So in your duties as an investigating officer, you want more detail than when you're the subject of the investigation; is that right?
THE COURT: Sustained.
MS. PANOUSIERIS: Nothing further, Your Honor.
THE COURT: Okay. Cross-examination?
MR. REISSMAN: Briefly, Your Honor.

CROSS-EXAMINATION

BY MR. REISSMAN:
Q. Detective Lashinsky, why did you believe that Mr. Basile was faking his fainting spell on the floor?
A. Why did I believe, or what --
Q. What led you to believe?

A. When the AMT arrived, we conducted a little test that I've witnessed hundreds of time, where the AMT took Mr. Basile's arm, lifted it, placed it over his head, and when he let go of Mr. Basile's arm, it went to the side. The AMT did that three times. Someone who's unconscious is going to let their hand hit their either torso or head. That never happened with him. He -- conveniently, his went to the side and dropped to the side. We did that two or three -- the AMT did that two or three times, and that's why I believed he was faking when he was on the floor.

Q. Did the -- but for the jury's -- what does AMT stand for?

A. You know what? I don't remember. He's a medical technician. Ambulance medical technician.

Q. Thank you. Now, you stated on direct that you saw Mr. Basile banging his head against the concrete wall; is that correct?

A. The first time I was in the cell. Yes.

Q. And what part of his head struck the wall?

A. The wall -- I'm sorry. The -- he was facing me. I was in the doorway. So the wall would have been to his right.

Q. And what part of his head struck the wall?

A. You know what? I don't know if it was his right -- his right side or if he turned his head. I don't remember.

Q. But you're certain he did hit his head against the wall?

A. Yes. He did.
Q. Okay. On October 11, 2018, did you headbutt Mr. Basile?
A. I'm not a headbutter.
Q. Did you slap Mr. Basile?
A. No.
Q. Did you punch Mr. Basile on that day?
A. No, sir.
Q. Now, you were sitting at that table when Mr. Basile testified that you never assaulted him. Did you hear that?
A. Yes, sir.
Q. Was that a correct statement?
A. Yes. It is.
MR. REISSMAN: Okay. No further questions. Thank you, Your Honor.
THE COURT: Any redirect? ff
MS. PANOUSIERIS: No, Your Honor. No redirect.
THE COURT: All right. Thank you. You may step down.
The Plaintiff will call his next witness.
Actually, why don't we break here?
MR. RICKNER: Thank you, Your Honor.
THE COURT: We'll take 10 minutes --
MR. REISSMAN: Thank you, Your Honor.
THE COURT: -- and begin --
THE COURTROOM DEPUTY: All rise.

(Jury exits)

THE COURT: Yeah. All right. We are going to reconvene -- let's call 3:10 p.m.

MR. RICKNER: Thanks, Your Honor.

(Recess)

THE COURT: You can bring the jury back in, please.

You guys are on a live microphone, if that matters.

MS. PANOUSIERIS: Oh. Sorry.

MR. RICKNER: Sorry, Judge.

MR. REISSMAN: Tell me when.

THE COURT: Good to go.

MR. REISSMAN: Okay. Your Honor, I did talk about the list of witnesses with Plaintiff's attorney. I just want to note that Wednesday, on -- when he calls his -- I will present Detective Lashinsky for a very brief time, on my direct, and Lieutenant Shnayderman. And that will conclude Defendant's witnesses.

THE COURT: Okay.

MR. REISSMAN: Thank you, Your Honor.

THE COURTROOM DEPUTY: All rise.

(Jury enters)

THE CLERK: You may be seated.

THE COURT: Okay. Does the Plaintiff have another witness?

MR. RICKNER: Yes, Your Honor. Plaintiff calls Retired Detective Jesse Perkins.

And per our practice, I have a binder for you.

MR. REISSMAN: Thank you.

MR. RICKNER: And if I may approach, a binder for you and the witness?

THE COURT: Please. You can hand it to Ms. Guy.

MR. RICKNER: Okay.

THE CLERK: Please stand.

JESSE PERKINS, WITNESS, sworn

THE CLERK: You may be seated.

Would you state and spell your name for the record?

THE WITNESS: My name is Jesse Perkins, J-E-S-S-E, P-E-R-K-I-N-S.

DIRECT EXAMINATION

BY MR. RICKNER:

Q. Hello, Retired Detective Perkins.

A. Hello.

Q. Is it correct to say that you were employed at the Nassau County Police Department from 1994 to sometime in 2018?

A. Actually, I'm employed by Nassau County Police Department from 1986 to 2019.
Q. From 1986 to 2019. At some point, did you become a detective?
A. In 1994.
Q. Okay. So I apologize. So you were a detective from 1994 to 2018?
A. 2019.
Q. 2019. Got it. Now, when in 2019 did you retire?
A. January.
Q. January of 2019?
A. January 17th gave me 32-1/2 years exactly.
Q. That maxes out your pension?
A. Thirty-two does. Yes. Yes, sir.
Q. Now, prior to your retirement, would it be correct to say that you worked at the Detective Squad in the Seventh?
A. Yes, sir.
Q. And that's on the second floor of the Seventh Precinct?
A. Yes. It is.
Q. And would it be correct that you were there 11 years?
A. Eleven-twelve years. Yes.
Q. Okay. And there are detectives in the Nassau County PD who handle homicides; is that right?
A. Homicide Squad.
Q. Right. Were you part of the Homicide Squad?

A. Negative.
Q. Okay. Did you -- were you part of the squad that handled things like burglaries, robberies, grand larceny?
A. Burglaries, robberies, grand larcenies, assaults, et cetera, et cetera. Anything that came to the squad. Even we do preliminary investigations with homicide cases.
Q. Right. But just to be clear, the types of cases you would be assigned to include allegations of grand larceny, when you were working at the Seventh Precinct, right?
A. Yes. Yes.
Q. Now, is it true that sometimes you would work on other people's cases?
A. Sure. We assist other detectives on other cases. Yes.
Q. Right. And you assist on another detective's case, you don't necessarily appear on the paperwork, right?
A. If you assist someone in -- in another case, you actually would be included in testimonials. Yes.
Q. Okay. If you actually questioned a witness, right?
A. If you did anything, you know, relevant. Yes. You're included as an assisting detective. Yes.
Q. Okay.
A. We don't leave that stuff out.
Q. Now, were you in the Seventh Precinct on October 11th of 2018?
A. I believe I was working that day. Yes.

Q. Okay. And did you have a standard shift back then?
A. Yes.
Q. What was your time that you were generally working?
A. That day, I believe I was working the day -- excuse me -- a day tour.
Q. So is the day tour 9 to 5? 11 to 7? Something else?
A. 7 to 3.
Q. 7 to 3.
A. Or 4.
THE COURT: 7 a.m. to 3 p.m., obviously?
MR. RICKNER: Right.
THE WITNESS: 7 a.m. to 3 p.m. Sorry.
MR. RICKNER: Thank you.
BY MR. RICKNER:
Q. Now, just to be clear, you don't remember Roger Basile, who's sitting here in this courtroom, from that day, whatsoever; is that right?
A. I -- I don't know him at all.
Q. Okay.
A. I've never seen him before, until today or -- I'm sorry -- last Monday, walking through the hall.
Q. Well, you testified under oath in this case; isn't that correct?
A. Yes.
Q. And you were over a Zoom link, because of the COVID

pandemic?
A. Yes.
Q. And you actually saw Mr. Basile in --
A. Yeah. On the Zoom. Right. I might have seen him on the Zoom. Yes.
Q. Okay. But to be clear, you never -- at least as of February of 2021, you never discussed Roger Basile with anyone; is that correct?
A. Correct.
Q. Okay. You have absolutely no interaction with him whatsoever; is that correct?
A. I don't remember having any interaction with Roger Basile, ever. I can tell you for sure that the day of this incident I didn't even know he existed.
Q. Now, would it be correct to say that Lieutenant Rothenberg was the ranking detective in the Sevent Squad around October of 2018?
A. He was the commanding officer to Seventh Squad. Yes.
Q. Okay. He wasn't the chief, but he was the commanding officer of that detective squad?
A. He's commanding officer to Seventh Squad. Yes.
Q. Okay. When you say Seventh Squad, are you referring to the Seventh Detective Squad?
A. Yes.
Q. Okay. You're not referring to, let's say, the officers

downstairs, who are just police officers?
A. Correct.
Q. Okay. Now, you started working, I believe, in 1985?
A. 1986.
Q. '86. I apologize. And from 1986 to 1994, what was your role at the Nassau County Police Department?
A. I was a uniform -- uniform officer.
Q. Okay. And did you have a particular part of Nassau County that you were patrolling, for example?
A. I worked within the confines of the First Precinct, which covered Baldwin, Uniondale, East Meadow, South Hempstead, Merrick -- rather, North Belmar, North Merrick. Yes.
Q. Now, during your time as a patrolman, did you make any arrests?
A. Yes.
Q. How many arrests do you think you made?
A. I don't know. I have no idea.
Q. Do you think it was over a hundred?
A. Yes. I'm sure.
Q. Did some of those people resist arrest?
A. I've never had an encounter where I had to, you know, really physically restrain anybody like that. So --
Q. Okay. So I just want to understand. Your testimony is, your eight years as a patrolman at the Nassau County PD, you

never had to strike anyone, even with justification, during an arrest?
A. I've never struck anyone during my arrests. No. Worst I've ever done was, when I was a uniform cop, probably in the early eighties, after I chased a guy, I forearmed him. That's all I have -- ever remember doing in my entire career.
Q. Okay. Did you ever do any amateur boxing?
A. No.
Q. Did you ever train in any mixed martial arts?
A. Yes.

Q. Okay. Did you have a mixed martial arts bout against Kevin Lane, in 2004, that you lost by rear naked chokehold?
A. I didn't --
MR. REISSMAN: Objection, Your Honor.
THE COURT: Sustained.
MR. REISSMAN: Thank you.
BY MR. RICKNER:
Q. Did you ever compete as a mixed martial artist?
A. No.
MR. REISSMAN: Objection, Your Honor.
THE COURT: Sustained.
MR. REISSMAN: This is -- sorry.
THE COURT: If you want to come to the side, you can.
MR. RICKNER: Yeah. I would, actually.

(Sidebar begins)

THE COURT: Wait until everybody's here. We're all set?

MR. RICKNER: Yeah. He said he trained as a mixed partial artist. I want to know what he did.

THE COURT: Why is it relevant?

MR. RICKNER: Because the particular way that Mr. Basile was hit shows -- and I'm going to close on this -- shows a really practiced maneuver. The slap, a light tap on one side, followed by a hammer blow on the other, that's something that somebody practices.

THE COURT: Is it --

MS. LAGRECA: Your Honor, I think that's speculative at best, but --

MR. REISSMAN: I don't see the connection. Detective --

THE CLERK: I'm sorry.

MS. LAGRECA: I'm sorry.

THE CLERK: Ladies, if you're going to speak, you have to come closer to the mic.

MR. REISSMAN: Okay. Detective --

MS. LAGRECA: Sorry. I was trying to be --

MR. REISSMAN: Detective Perkins --

MS. PANOUSIERIS: -- quiet.

MR. REISSMAN: Detective Perkins said he never met

Mr. Basile, and it's like, how can Mr. Perkins --

THE COURT: So that was my question, was just --

MR. REISSMAN: How does it connect?

MR. RICKNER: Well, it connects to my client's testimony. I'm allowed to put the pieces together later.

THE COURT: That's true. You are saying that something about the injuries inflicted here, as testified to by Mr. Basile, requires special training that he has?

MR. RICKNER: No. I'm saying, special training is a circumstantial evidence that he would be able to put together those moves in a quick manner, exactly the way Mr. Basile described them.

THE COURT: Mr. Basile, I don't think, said anything about how quick --

MR. RICKNER: He did.

THE COURT: Did he?

MR. RICKNER: He said --

THE COURT: What did he say about how -- the time --

MR. RICKNER: He said it was a matter of --

THE COURT: -- elapsed was?

MR. RICKNER: -- a second.

THE COURT: Seconds?

MR. RICKNER: Not seconds. Second. Like immediate.

THE COURT: Okay.

MR. RICKNER: Very fast.

THE COURT: But you're not saying that was -- that that is some -- that there's a specific move, like the Queen's Gambit --

MR. RICKNER: No.

THE COURT: -- or something, in mixed martial arts --

MR. RICKNER: No. But I am saying --

THE COURT: -- that this --

MR. RICKNER: -- that if you're somebody who doesn't practice a maneuver -- I mean, look. I'm happy to close on this. But if you're saying that you're somebody who -- you don't just whip that out. That's something that requires time on a heavy bag, time training, to really get those moves together, to be able to do them quickly, do them --

MS. LAGRECA: To do a slap and a punch?

THE COURT: I mean, that's -- well, let me -- if that's the key to the relevance, then it feels like we're bleeding a little bit into the realm of expert testimony --

MS. LAGRECA: Correct.

THE COURT: -- here about, you know, kind of specific techniques or something.

MR. RICKNER: Well, I'm fine closing. I got my

answer. I can move on.

THE COURT: Okay.

MR. REISSMAN: Thank you.

(Sidebar ends)

BY MR. RICKNER:

Q. Retired Detective Perkins, about how much did you weigh in 2018?

A. Probably about anywhere between 220 and 230.

Q. Okay. Were you a bit skinnier than you are now?

A. No. I'm skinny now.

Q. And were you clean shaven at the time?

A. When I report to work, I'm always clean shaven.

Q. Okay. And by clean shaven, I mean, did you have a -- your head shaved, along with your face?

A. Yes.

Q. And would you shave it frequently, so you didn't have any stubble on your head?

A. I just like to be clean.

Q. And I'd just like you to look -- go to tab 1, and it's going to be page 6, at the bottom righthand corner, and then parentheses pages 18 through 21.

A. You said page 6?

Q. It's page 6, on tab 1. There's four pages per page, as you'll see. So if you look at the bottom right, it's page 6, with a parentheses pages 18 through 21.

A. Okay.

Q. And then I'm going to direct you to page 19.

A. Okay.

Q. Line 16 through line 23.

A. Okay.
Q. And it says -- and to be clear, you testified under oath; is that correct?
A. Yes.
Q. And you had to tell the truth?
A. The whole truth and nothing but the truth, so help me God.
Q. Exactly. Just like you're testifying in court, right?
A. Yes.
Q. And it says --
"Q. Can you give us a description of yourself back on October 11th, 2018? I can't see you very well. I mean, could you tell us your race? Could you tell us your height and weight?"
"A. I'm a male. Black. 6'2". I'm 6'2". I weigh 215-220 pounds. I'm bald headed, good looking."
Q. Were you asked that question, and did you give that answer?
A. Yes.
Q. Now, in 2018, did you have a bright neon blue tie that we'd wear to work sometimes?
A. I have no idea. I have -- I have a lot of ties. I don't remember.
MR. RICKNER: No further questions.
THE COURT: Cross-examination?

MR. REISSMAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. REISSMAN:

Q. Detective Perkins, when was the first time in your life that you heard the name Roger Basile?

A. When I received the information that I was a subject of this investigation.

Q. And are you talking about -- what year was that?

A. I -- what? Two years ago. 2021, I believe. Whenever -- whenever I received it. I don't remember exactly when it was.

Q. Okay. This lawsuit -- the docket number to this lawsuit is 2020.

A. Okay.

Q. Which indicates that the action -- this lawsuit was commenced in 2020. Does that refresh your recollection as to when you --

A. Sounds about right.

Q. -- first heard the name Roger Basile?

A. Yes.

Q. And when was the first time you physically saw Roger Basile?

A. Well, I actually thought it was in the hallway last Monday, but I do remember having a Zoom meeting and see him and telling them pretty much the same thing I'm saying right

now. I don't -- I've never seen this man a day in my life.
Q. When you had the Zoom deposition and Mr. Basile appeared, do you -- did you recognize him from prior to that day?
A. No.
Q. Now, Detective Perkins, in your 32-1/2-year career, did you ever headbutt anybody?
A. I've never headbutted anybody in my career or in my personal life. I have a pretty face.
Q. In your 32-1/2-year career, as an officer, did you ever punch anybody?
A. No.
Q. In your personal life, other than Mr. Rickner's reference to martial arts, did you ever punch anybody?
A. No.
Q. And --
A. I -- I studied karate. I did not participate in mixed martial arts never in my life.
Q. Thank you. In your 32-1/2-year career as a police officer and detective, did you ever slap any suspect?
A. No.
Q. In your 32-1/2-year career as a police officer and detective, were you ever the subject of any disciplinary action related to excessive force?
A. Never.

MR. REISSMAN: Thank you. I have no further questions.

THE COURT: Redirect?

MR. RICKNER: One question, Your Honor.

REDIRECT EXAMINATION

BY MR. RICKNER:

Q. With respect to the allegations made by Roger Basile, were you ever questioned by anyone at Internal Affairs or anywhere else at the Nassau County Police Department about the incident?

A. I don't recall ever being questioned by anyone prior to this -- this case that we have going on right here. No.

Q. Just to be clear, you were questioned under oath by attorneys in this case, right?

A. Yeah.

Q. What I'm wondering is, were you questioned by anyone else from Nassau County Police Department, such as Internal Affairs, about this incident?

A. I don't ever remember being questioned by Internal Affairs about Roger Basile. No.

Q. Okay. Nobody called you up after your name surfaced and asked you anything; is that a correct statement?

A. Other than this? No.

MR. RICKNER: No further questions.

MR. REISSMAN: Nothing from Defendants, Your Honor.

THE COURT: All right. Thank you. You may step down.

Does the Plaintiff have a witness ready to go?

MR. RICKNER: I don't. The doctor is tomorrow.

THE COURT: Okay. All right. Ladies and gentlemen, we are going to break for the day today. tomorrow will surely be a longer trial day than this one was, but we're going to get you home a little bit early today.

It's looking like this trial will conclude in the next several days, and I don't know exactly what you were told during jury selection, but I hope that's good news.

We'll see you tomorrow morning. If you could be in the jury room at 9:15, please, we will start, hopefully, at 9:30 sharp. Have a good evening.

Don't discuss the case with each other or anyone else. Don't do any research on it, and we'll look forward to seeing you tomorrow. Thank you.

THE COURTROOM DEPUTY: All rise.

(Jury exits)

THE COURT: Where does that leave us?

MR. RICKNER: I believe we have an agreement that doctor tomorrow, followed by Lieutenant Detective Retired -- no. -- Deputy Inspector Rothenberg, followed by either Officer or Detective Scott and Officer or --

MS. PANOUSIERIS: No. Scott will go Wednesday.

MR. RICKNER: No. Scott's Wednesday.

MS. PANOUSIERIS: Minervini and Garibotto.

MR. RICKNER: She's correct.

THE COURT: Okay.

MR. RICKNER: And then Scott has been asked to put on Wednesday morning due to childcare issues. Obviously, I'm absolutely fine with that. At which point I'll close, and I understand he's already said which witnesses he's going to call.

THE COURT: So we're summing up on Wednesday?

MR. REISSMAN: Yes, Your Honor.

THE COURT: And the jury may even have the case on Wednesday? But either way, like, we need jury instructions to be finalized by -- yeah -- Wednesday at lunch, at the latest.

You're all -- you will all be working tonight on the list of jury instructions that you think need to be added to what I have so far. To the extent you're asking for any

instruction that does not appear in Sand, I need your input on what that instructions should say. But to the extent there's a Sand instruction, we'll just use that, unless there's some reason it doesn't make sense in this context.

I have a -- everybody can be seated. I have a law clerk looking into the question of how the operative charge on the actual liability elements might or might not vary from Sand on this subject.

I don't actually know for a fact if Sand has a jury instruction -- a pattern instruction on 1983 excessive force or state common law battery. But if there is a Sand pattern instruction, my inclination is to start with that, rather than even what the parties submitted jointly, just because we would expect that the Sand instructions have been vetted by the Second Circuit.

And I think, correct me if I'm wrong, that what you submitted is a District Court charge from a fairly recent case, recent enough that it may not even have been up to the Second Circuit. I'm not suggesting that anybody would have any basis to challenge those instructions one way or the other, but it's better, generally speaking, if we know we're using instructions that the Circuit has signed off on.

Anything to add on that subject?

MR. RICKNER: Well, yes, Your Honor. I don't know how recently Sand's been updated. With respect to excessive

force while somebody is in handcuffs, there's been some very recent jurisprudence that Your Honor might not be aware of.

In sum and substance, most of the excessive force charges where you see the mishmash about, you know, what -- all the things the officer faced and --

THE COURT: Proportional to? Yeah.

MR. RICKNER: Exactly. There is a more recent Second Circuit case, which I can cite to in my letter today --

THE COURT: Please.

MR. RICKNER: -- that effectively says, once somebody's restrained, you are done using any force that isn't necessary to get them from one place to another effectively.

THE COURT: Okay.

MR. RICKNER: So I don't know --

THE COURT: Yeah. Point us to that and let us know what part of the opinion you say corresponds to what part of the proposed instructions, and maybe it'll be obvious anyway.

MR. RICKNER: Yes. And one thing that I'm -- the reason I'm bringing it up is that I have no problem with the -- there's a bunch of different formulations of roughly the same thing about proportionality and all of those things that you've mentioned. However, I do think it's appropriate -- and I can give you an example of where Judge

Kovner did it. I believe also Judge Morrison did it in the one I provided. -- simply to say, hitting somebody in handcuffs is unconstitutional. There's --

THE COURT: Right.

MR. RICKNER: -- the debate there. And so --

THE COURT: Yeah. And I agree that anything about the use of reasonable or proportional force sufficient, but not excessive, when it comes to subduing a suspect who's actively resisting arrest would not map well onto the case we have here. But, you know, this is the kind of thing I'm trying to flesh out is how we get to the instructions that you've -- there weren't a lot of footnotes or citations in what you --

MR. RICKNER: That's true.

THE COURT: -- sent me, I don't think.

MR. RICKNER: And, Judge, just to be clear about what I'm getting at here is I don't mind including that standard stuff, if for no other reason than it insulates me from an appeal. I don't want somebody to turn around and say it was supposed to be part of it, even though the facts didn't map to it. I'm just safer if that kind of stuff is in.

However, I also think it's appropriate to instruct the jury, you had somebody in handcuffs, that's not okay. And so that's sort of how I'm trying to frame this up.

THE COURT: Yeah. Send me a letter that quotes the -- or, you know --

MR. RICKNER: Oh yeah.

THE COURT: -- points me to the exact language from the Second Circuit that you are invoking.

MR. RICKNER: Right. And it's more -- less than language, but more the principle that I think it's clearly established -- not that actually matters in that analysis, but it is clear from the law that if you hit somebody in handcuffs, who's not resisting, didn't take a swing at you, whatsoever --

THE COURT: Didn't take a swing. Yeah. That's the --

MR. RICKNER: That's --

MR. REISSMAN: We're losing you, Counsel.

MR. RICKNER: That's going to be excessive. And then the way -- and I don't know, again, if Judge Sand has looked at this, although you can see it from the pattern jury instructions, which you're more familiar with --

THE COURT: What pattern jury instructions?

MR. RICKNER: Oh. New York State has pattern jury instructions.

THE COURT: Oh. The State, on -- not on the 1983 claim?

MR. RICKNER: Actually, they do, but I'm not asking

you to use those.

THE COURT: Oh. Okay.

MR. RICKNER: There are 1983 claims in state court sometimes.

What I'm saying is that, and I hope counsel agrees, it's the same analysis as far as the battery is concerned. I don't -- I get -- when we use excessive force and battery in different places in jury instructions, I believe there's an opportunity for confusion when the concept is identical, except one's coming from the common law and one's coming from Section 183 and the Fourth Amendment.

THE COURT: Is that right? The Venn diagram is perfectly coterminous on 1983 excessive force and state assault and battery?

MR. RICKNER: For this case? Yes. There are certain incidents of -- for example, if you have a case where --

THE COURT: Like, putting somebody's handcuffs on too tight might be a 1983 violation, but not assault; I would have thought.

MR. RICKNER: Unless --

THE COURT: Or --

MR. RICKNER: -- there's no -- well, battery. But unless there's no probable cause. There is a unique feature of New York State law, which is any offensive contact.

Handcuffing somebody in a way that doesn't hurt, at all, is still offensive conduct. You don't want it. That would actually be a New York State tort absolutely dead out on a Fourth Amendment.

So there are --

THE COURT: Okay.

MR. RICKNER: -- some differences. I think the Venn diagram on this fact pattern is coterminous.

THE COURT: Okay. All right. We're going to -- I'm going to have a law -- you know, while we're in court tomorrow, a law clerk will be compiling what we think are the final jury instructions here, and I'll circulate them as soon as we close tomorrow.

And if you have any comments, you'll get me them before the open on Wednesday.

MR. REISSMAN: Judge, do you want the -- tonight, do you want it on ECF or Word, by email, or both?

THE COURT: Both.

MR. REISSMAN: Both. Okay.

THE COURT: Both.

Okay. Anything else to accomplish before we adjourn for the day?

MR. RICKNER: Can we leave our stuff on the table?

THE COURT: That's to be negotiated with Ms. Guy. I don't know if this room is locked. It's fine with me. I

don't think we have anything else going on tomorrow morning, do we?

THE CLERK: No. We don't.

THE COURT: Okay. All right. Thank you.

MR. REISSMAN: Thank you, Judge.

MR. RICKNER: And if Your Honor -- unless you're fascinated, can I get the binders that we handed up to the Court? Just because --

THE COURT: Yes.

MR. RICKNER: -- we're going to recycle.

THE COURT: Oh. Actually, one of the -- you don't mean the exhibit binder?

MR. RICKNER: No. No. No. No.

No. No.

THE COURT: Okay.

MR. RICKNER: Just the cross binders.

THE COURT: Yeah. Thank you.

THE CLERK: You're welcome.

(Proceedings adjourned at 3:49 p.m.)

TRANSCRIBER'S CERTIFICATE

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Tracey Hamilton* October 30, 2023
______________________________ ____________________
Tracey Hamilton DATE
Legal Transcriber

*Laura Hunt* October 30, 2023
______________________________ ____________________
Laura Hunt DATE
Legal Transcriber

*Faith Vance* October 30, 2023
______________________________ ____________________
Faith Vance DATE
Legal Transcriber

*Rhonda Duell* October 30, 2023
______________________________ ____________________
Rhonda Duell DATE
Legal Transcriber

*Andrea Waldridge* October 30, 2023
______________________________ ____________________
Andrea Waldridge DATE
Legal Transcriber

# Keyword Index


## $

$1 [1] 83:19

## 1

1 [6] 46:13,18 167:7 168:15 198:15,19
1,000 [2] 70:2 73:16
1:00 [1] 20:7
1:20 [2] 114:24,25
1:30 [3] 13:22 99:13 110:7
10 [17] 11:7 39:2 65:25 66:6 67:20 70:8 71:2 75:22 76:14 82:1 91:9 99:3 113:15 136:13 141:17 143:21 184:22
100 [2] 84:11 122:22
10005 [1] 1:19
10-ish [1] 87:12
11 [3] 184:2 187:20 189:6
11:30 [1] 87:1
11501 [1] 1:25
11th [22] 49:17 54:16 55:19 56:4,17 59:5 61:20 63:11 99:8 101:22 107:25 119:13 121:6 122:25 125:11 126:6 136:8 141:2 152:8 156:12 188:23 199:12
12 [4] 20:4 71:6 169:11,14
12:00-ish [1] 87:1
12:30 [6] 20:4,6,7 46:12,13,18
12th [17] 56:5,18 58:19 101:20 102:5,9,17 109:5,13,20 125:14 152:9,10,11,13 153:5 154:9
13th [4] 152:7,13 153:6,7
14 [1] 1:17
15 [8] 75:22 82:1 99:3 120:22 123:5 126:19 136:13 143:21
151 [2] 2:9,18
155 [1] 2:11
16 [1] 198:25
1603 [1] 1:18
17th [1] 187:12
18 [5] 104:10 107:13 136:3 198:17,21
182 [1] 2:12
183 [1] 209:11
186 [1] 2:14
19 [2] 118:16 198:23
1983 [5] 205:10 208:23 209:3,13,19
1985 [1] 191:3
1986 [4] 187:2,3 191:4,5
1994 [4] 186:24 187:5,7 191:5

## 2

2 [5] 99:20,25 100:2 127:6 176:8
2:20-cv-00576-ek-lb [1] 1:3
2:30 [1] 87:5
20 [7] 59:20 62:11 82:15,15 86:6 114:20 120:22
200 [2] 2:15 156:19
2004 [1] 193:2
2007 [2] 11:5 21:21
2008 [1] 64:9
2018 [36] 9:12 49:18,22 54:16 55:20 56:4,5 59:5 61:20 62:3 63:11 64:16 99:8 101:22 107:25 109:5 119:13 120:3 122:17,25 125:13,14 126:1 136:1,8 141:2 156:12,15 184:2 186:25 187:7 188:24 190:17 198:3 199:12,20
2019 [12] 56:25 58:14 103:6 104:10 109:17 176:12 187:2,3,8,9,9,11
202 [1] 2:16
2020 [6] 57:15 58:2,3 156:1 200:13,16
2021 [5] 58:14 118:1 126:13 190:7 200:9
2022 [2] 163:20 167:10
2023 [8] 1:6 58:2,3 212:9,13,18,24,30
20-cv-00576 [1] 3:3
21 [2] 198:17,21
212-300-6506 [1] 1:20
215-220 [1] 199:15
21st [3] 56:25 123:15 126:1
22 [1] 62:11
220 [2] 156:18 198:4
23 [6] 106:8 167:13,20 169:11,14 198:25
230 [1] 198:4
23rd [1] 176:12
24 [6] 62:10 118:4,12 137:4 167:20 170:15
25 [1] 167:20
2nd [3] 118:1 126:13 156:1

## 3

3 [8] 2:18 126:25 151:6,8 189:7,8,10,12
3:00 [1] 87:7
3:10 [1] 185:3
3:30 [1] 14:22
3:49 [1] 211:19
30 [17] 1:6 29:22 43:7 48:14 59:20 83:18 101:23 116:4 165:9 174:10 179:21,23 212:9,13,18,24,30
32-1/2 [1] 187:12
32-1/2-year [4] 201:6,10,19,22
33-year [1] 57:19
37 [1] 118:4
38 [1] 118:12
39 [1] 118:16
3rd [2] 103:6 104:10

## 4

4 [1] 189:9
4:00 [1] 14:22
40 [2] 70:9 114:23
403 [1] 22:16
44 [2] 169:11,14
45 [2] 46:12 70:9
46 [2] 167:12,20
47 [3] 104:10 107:13 126:19
48 [1] 106:8
49 [1] 2:3

## 5

5 [4] 14:15 137:4 174:9 189:6
5:00 [2] 14:15 47:13
5:30 [3] 14:15 19:22 47:13
50 [2] 83:18 168:16
50(a [1] 132:23
50-h [2] 102:23 104:9
516-571-3046 [1] 1:26
52 [3] 2:4 170:15 171:10
54 [3] 168:17,20,23
57 [1] 168:15

## 6

6 [6] 71:6 171:11 198:16,18,19,20
6' [1] 76:22
61 [1] 2:7
611 [4] 16:21,21,22,24
6'2 [5] 57:6 76:23 105:16 199:15,15
6th [2] 122:17 126:6

## 7

7 [5] 189:6,7,8,10,12
70 [1] 126:25
73 [1] 127:6
7th [5] 118:25 120:25 121:1 156:13,25

## 8

8 [2] 65:25 66:6
800 [3] 70:3 73:14,16
803(5 [1] 133:13
86 [1] 191:5
865-344-3150 [1] 1:30

## 9

9 [3] 4:7 87:12 189:6
9:00 [3] 4:4 17:16 45:21

# Keyword Index


9:15 [2] 46:6 203:13
9:30 [4] 1:7 20:4 45:16 203:14
911 [1] 54:20
99 [1] 2:8
9th [1] 167:10

_

_ [1] 148:8

A

a.m [3] 1:7 189:10,12
abilities [2] 14:7 20:11
ability [4] 42:13 53:19 68:1 93:9
able [7] 30:3,15,22 162:3 163:11 195:10 196:16
above [3] 81:2 161:22,24
above-entitled [1] 212:4
absent [1] 147:25
absolutely [6] 16:13 143:3 158:18 190:10 204:14 210:3
absurd [1] 50:13
accept [4] 31:4,7,7 34:10
access [1] 5:18
accomplish [2] 8:5 210:21
according [3] 25:1 71:7 118:22
account [1] 4:5
accountant [2] 64:25 65:4
accurate [3] 102:3 105:21 144:23
accusations [1] 77:17
accuse [1] 79:16
accused [1] 11:25
accusing [2] 77:16 79:12
acknowledge [1] 43:20
across [3] 80:6 102:6 143:22
act [1] 35:20
acting [2] 59:18 60:2
action [5] 4:13 48:1,3 200:15 201:24
actions [1] 12:14
active [1] 63:10
actively [1] 207:9
activities [1] 62:16
activity [1] 8:10
acts [1] 11:11
actual [3] 41:14 66:8 205:7
actually [36] 7:4 10:19 21:11 31:24 39:23 46:20 51:6,7 52:6 63:1 65:15 68:5 70:4 76:5 79:23,25 80:20 88:22 92:23 95:13 99:20 133:24 147:9 158:21 184:20 187:1 188:17,18 190:3 193:15 200:23 205:9 208:8,25 210:3 211:11
acutely [1] 45:17
add [1] 205:23
added [1] 204:24
addition [3] 47:10 52:11 59:2
address [1] 143:17
adjourn [1] 210:22
adjourned [1] 211:19
administer [1] 24:25
admissible [2] 35:3,3
admission [1] 139:9
admit [5] 11:15 60:19 111:20 124:5 149:11
admitted [1] 60:21
admitting [1] 86:1
adopting [1] 18:17
advance [1] 17:14
adverse [3] 16:13,17 17:3
advice [5] 88:24 93:19 95:8 148:9 180:14
advisement [1] 135:13
affairs [15] 56:16 88:13,19 89:14 122:18 126:7 175:25 178:13 179:7 180:5 181:1 182:4 202:8,18,20
affected [1] 42:16
affects [1] 42:13
affirmative [4] 6:17 15:11 17:20,22
african [5] 56:1,11 57:25 105:15,16
afternoon [3] 47:1,12 87:2
afterwards [5] 13:18 63:18 72:4 87:21 97:14
age [3] 86:5 88:5 143:17
aggravated [1] 78:8
aggressive [1] 22:6
aggressively [2] 59:18 60:2
agitated [3] 162:12,13 163:17
ago [5] 29:7,7,23 117:9 200:9
agree [13] 7:24 16:3 31:2 52:1 130:7 131:14,16 143:9 173:18 180:9,21 182:7 207:6
agreed [4] 13:20 31:5,10 139:10
agreement [2] 12:8 204:3
agrees [2] 51:23 209:5
ahead [3] 13:9 101:1 169:3
aid [1] 173:12
al [2] 1:8 3:3
all/ [1] 92:22
allegation [7] 7:16 22:3 175:13 177:10,12,16,18
allegations [3] 25:6 188:8 202:7
alleged [6] 8:9 10:16 27:12,17 180:22,23
allegedly [4] 49:25 58:15 125:17 141:3
alleges [1] 27:7
allow [3] 17:1 35:22 149:1
allowed [2] 17:8 195:5
allows [1] 30:11
almost [3] 9:9 73:10 77:1
alone [8] 51:22 55:22 127:17 161:1,9,17 163:3 164:12
already [11] 24:19 26:25 38:18 131:14 138:19,20,22 155:8 171:23 173:2 204:15
altercation [1] 9:10
alternatively [1] 72:7
although [4] 6:23 7:3 42:18 208:18
amateur [1] 192:7
ambulance [2] 85:13 183:14
amendment [2] 209:11 210:4
american [6] 49:4 56:2,11 58:1 105:15,16
among [6] 39:8,14 41:2,18 42:17 110:10
amongst [2] 40:21 41:22
amount [1] 30:8
amounted [1] 27:12
ample [1] 30:24
amt [9] 170:5 174:7 179:1 181:15 183:1,2,4,8,11
analysis [2] 208:8 209:6
ancillary [1] 138:15
andrea [2] 212:27,31
angry [2] 50:12,23
another [15] 22:3 34:3 40:25 44:1 58:9 74:5 90:11 101:3 122:12 165:9 174:25 186:3 188:14,16 206:13
answer [29] 31:17,17,21 35:8,15,16,18,20 40:13,14 48:20 58:8 67:25 104:2 105:3 107:6,8 118:3,17 121:22 167:17,18 168:20 171:24 172:3,5 180:18 197:1 199:18
answered [7] 35:11 108:10 121:8 180:7,16,17 182:6
answering [3] 67:15,16

# Keyword Index


79:15
answers [4] 50:11 126:19 127:7 137:5
anticipating [2] 15:11 111:2
anybody [19] 38:24 43:11 57:21,21,22,24,24,24 63:14 82:17 88:13 116:4 132:4 191:23 201:7,8,11,14 205:19
anytime [1] 108:25
anyway [4] 12:22 94:18 160:9 206:19
apologize [6] 80:4 168:16,17 181:25 187:6 191:5
appeal [1] 207:19
appear [3] 156:21 188:15 205:1
appearance [3] 3:4 43:9 156:20
appearances [1] 1:13
appeared [1] 201:3
applicable [1] 33:2
apply [5] 15:23 26:11 35:4 37:22 136:12
appointment [4] 63:19,25 64:1 97:2
appreciate [2] 20:21 67:22
approach [5] 42:1 124:12 151:1 155:4 186:9
appropriate [2] 206:25 207:23
appropriately [1] 42:7
approximately [1] 123:8
april [1] 176:12
area [33] 50:20 59:14 66:16 69:4,14,14,21,24 70:2 73:10,18 74:2,9 81:1,2,2 84:25 85:7 87:16 94:4,10 105:9,10 107:18,19 118:6 123:5 158:20 164:23 165:1,23,24 173:9
areas [4] 7:25 22:22 33:12 67:1
aren't [1] 112:17
argue [2] 32:22,23
arguing [1] 17:13
argument [8] 32:15,21 36:13,14 54:19 63:13,16 132:15
arguments [10] 32:17 33:1 34:4,6 36:17,18 40:5 41:5,23 47:16
arises [1] 12:23
arm [5] 75:15 76:8 144:10 183:3,4
arms [3] 122:11 163:8,18
arnold [1] 174:14
around [19] 20:1 46:12,17 50:22 55:17 65:21 66:14 93:7 95:2 99:13 110:7 145:15,22 156:18 161:20 178:10,10 190:17 207:19
arraigned [1] 87:17
arrest [20] 8:22 9:7 10:10,13,14,15,21 66:8 77:19 101:25 112:15,17 113:5,8 114:3 159:18 162:19 191:21 192:2 207:9
arrested [25] 9:3,11,11,12,13,23 10:6 12:15,25 22:7 49:24 55:5 65:15,19 66:6,21,23 68:12,16 86:24,25 95:4 114:5 152:8 162:16
arrestees [1] 162:18
arresting [2] 55:4 83:16
arrests [3] 191:15,17 192:3
arrive [2] 46:5,6
arrived [7] 83:25 84:1 100:16 173:21 174:7 179:22 183:1
arriving [1] 123:5
article [2] 37:1 38:11
artist [2] 193:8 194:5
arts [5] 192:9 193:1 196:8 201:14,18
aside [3] 92:2,5 93:23
asks [1] 138:25
aspects [2] 33:17 62:14
assault [10] 11:5 21:20 22:2 27:12,17 97:10 180:23 182:9 209:14,19
assaulted [23] 27:11 56:8 88:7 90:23 123:24 124:23 126:4,8,11,12 127:19,21,22 130:1 131:3,5,12 141:3 142:17 154:7 175:14 180:10 184:9
assaults [1] 188:4
assert [1] 6:10
asserts [2] 27:12,15
assess [1] 4:18
assessment [3] 33:24 36:12 49:20
assigned [7] 89:15 90:12 119:18 157:10,22 175:1 188:8
assist [6] 157:13,18,21 188:13,14,16
assistance [1] 157:23
assisting [5] 47:20 157:12,14,20 188:20
assume [2] 11:14 34:20
assuming [1] 123:2
attach [2] 34:10 35:24
attached [2] 101:9,13
attack [3] 84:8,11 154:1
attempt [2] 163:4 171:20
attempted [2] 132:12,12
attempting [1] 28:4
attention [8] 40:12 42:10 44:4 47:16 111:12 158:8,18 169:1
attorney [19] 3:19,20 53:2,4 57:2 89:12,13 93:24 103:3 117:8 123:18 129:5,6,7,9 134:2 147:14 180:13 185:13
attorneys [7] 28:3 30:19 34:24 35:2 42:21 129:3 202:14
attorneys' [1] 39:12
attorney's [2] 1:21 53:3
attribute [1] 112:19
audiologist [1] 135:23
authenticate [1] 147:20
authenticity [1] 111:17
author [1] 176:16
authored [3] 176:5,11,19
auto [3] 94:6,9,21
avail [1] 59:20
available [2] 44:18,21
avoid [2] 15:17 45:25
aware [8] 43:25 45:17 133:3 157:4,25 158:5 160:6 206:2
away [6] 43:7 63:24 95:17 99:14 153:19 175:4
awhile [1] 38:10


## B


back [56] 10:13 11:4 20:19 29:6 43:14 45:2,25 46:16,25 62:3 63:11 64:22 65:7 66:7 68:7 78:13 79:3,15 81:11 88:12 89:9 91:7,8,9 92:1 95:23,24,24 98:15 107:13 114:22 120:19,20,21 121:5 123:13 125:8 127:4 148:17 149:23 153:20 164:9 165:3,14,16 166:7 167:14 169:16 171:9,12,13 172:11,15 185:6 189:1 199:11
background [4] 114:7,8 152:1,16
bad [2] 11:11 83:22
bag [1] 196:15
balance [1] 26:20
bald [4] 101:23 105:16 123:8 199:16
baldwin [1] 191:11
bang [3] 80:14,14,18
banging [3] 60:2,3 183:16
bank [3] 65:6,9,11
banter [1] 68:6

# Keyword Index


**bar** [8] **50:**7 **74:**24 **75:**1,13 **101:**8 **161:**20 **162:**1 **172:**11
**barring** [1] **12:**2
**bars** [3] **101:**7,8,8
**bar's** [1] **161:**22
**base** [1] **36:**22
**based** [6] **32:**7 **40:**7 **53:**18 **106:**12,18 **132:**21
**basele** [1] **27:**15
**basically** [4] **31:**5 **67:**14 **94:**10 **120:**16
**b-a-s-i-l-e** [1] **61:**13
**basile's** [9] **27:**13 **157:**4, 10,25 **158:**5 **173:**2,12 **183:**3, 4
**basis** [4] **10:**12 **38:**7 **55:**3 **205:**20
**bathroom** [3] **69:**6,9 **73:**7
**battery** [7] **27:**12 **48:**16 **205:**11 **209:**6,7,14,23
**bearing** [1] **25:**25
**beat** [5] **82:**21,22 **92:**8 **101:** 24 **142:**17
**beaten** [1] **22:**4
**became** [4] **157:**3,25 **158:** 4 **175:**2
**become** [2] **43:**25 **187:**3
**becomes** [1] **22:**23
**bed** [2] **143:**25 **144:**1
**beforehand** [1] **126:**24
**begin** [12] **24:**19,25 **39:**13, 23 **40:**1,2 **41:**2,3 **47:**6 **48:**10 **114:**6 **184:**24
**beginning** [4] **20:**4 **40:**25 **169:**11,14
**begins** [6] **24:**21 **47:**23 **132:**1 **138:**1 **147:**1 **194:**1
**behalf** [5] **2:**3,4 **45:**18 **53:**5, 10
**behind** [5] **152:**18 **161:**5, 20 **171:**13 **172:**11
**beings** [1] **31:**20
**belief** [1] **178:**17
**believable** [2] **41:**12,12
**believe** [50] **11:**3 **13:**14 **33:**18 **34:**9 **52:**16 **67:**5 **83:**8 **85:**3 **87:**11 **91:**21 **92:**10,14 **99:**24 **102:**11,13 **106:**5 **109:** 24 **111:**16 **118:**15,20,24 **125:** 18 **126:**23 **135:**21 **144:**9 **148:** 7 **161:**22 **162:**2 **163:**14 **164:** 3,20 **166:**8 **167:**16 **168:**3 **169:**8 **170:**11 **171:**1 **174:**7 **176:**1 **180:**1 **182:**22,24,25 **188:**25 **189:**4 **191:**3 **200:**9 **204:**3 **207:**1 **209:**8
**believed** [5] **170:**4,7 **178:** 22 **179:**1 **183:**9
**bellmore** [2] **65:**7 **99:**9
**belmar** [1] **191:**12
**bench** [20] **50:**6,7 **52:**8 **55:** 15,16 **66:**15 **69:**25 **74:**14,21, 25,25 **75:**6,10 **92:**17 **160:**17 **161:**20,22,24 **163:**16 **173:**8
**benches** [1] **21:**11
**besides** [5] **71:**19 **75:**6 **82:** 19 **93:**18 **136:**6
**best** [8] **5:**24 **33:**17 **66:**2,4 **68:**1 **85:**4 **119:**24 **194:**14
**better** [15] **13:**25 **33:**12,21, 25 **44:**25 **97:**3,7,10,22,23,24 **144:**14,15 **145:**11 **205:**21
**between** [26] **14:**15 **20:**7 **27:**20 **29:**19 **30:**10 **36:**16 **46:** 13 **47:**13 **49:**8 **50:**19 **51:**25 **54:**15 **57:**7 **58:**2,8 **70:**9 **71:**6 **73:**17 **76:**21 **82:**11 **108:**5 **133:**4 **172:**11 **173:**23 **174:**9 **198:**4
**beyond** [1] **26:**9
**bias** [1] **25:**3
**big** [7] **47:**2 **69:**23 **73:**12 **76:** 19,22,23 **122:**11
**bigger** [1] **98:**12
**binder** [7] **155:**4,5 **167:**7 **176:**8 **186:**7,9 **211:**12
**binders** [2] **211:**7,16
**bit** [19] **9:**7,20 **27:**4 **30:**5 **40:** 19 **46:**17 **63:**4 **68:**7 **82:**10 **85:** 25 **86:**2 **91:**3 **114:**1,21 **152:** 18,24 **196:**21 **198:**5 **203:**8
**black** [5] **102:**10 **123:**6 **153:**14,15 **199:**15
**bleeding** [2] **86:**14 **196:** 21
**blissful** [1] **12:**8
**blog** [1] **38:**3
**blood** [15] **81:**19 **84:**4,7,17 **92:**25 **95:**13 **98:**13 **135:**4 **153:**13 **173:**6,9 **180:**5,11,22 **181:**6
**bloom** [1] **15:**25
**blow** [2] **51:**12 **194:**10
**blue** [11] **77:**1,2 **101:**23,24 **105:**18 **123:**10 **125:**7 **151:**20, 24 **152:**3 **199:**20
**blunt** [1] **5:**18
**blurry** [1] **93:**14
**body** [2] **75:**11 **92:**18
**bolts** [1] **113:**1
**bone** [1] **92:**18
**book** [2] **4:**23 **16:**19
**booker** [4] **57:**7 **76:**20 **123:**7 **125:**5
**booking** [2] **87:**16 **92:**17
**boots** [1] **64:**6
**both** [17] **26:**20 **27:**18 **29:** 16 **30:**12 **32:**14 **51:**13 **55:**25 **57:**4 **58:**14,16 **59:**3 **172:**8 **181:**16 **210:**17,18,19,20
**bottom** [7] **73:**11 **84:**9,11 **152:**24 **176:**14 **198:**16,20
**bout** [1] **193:**1
**boxing** [1] **192:**7
**boy** [1] **95:**3
**boys** [1] **78:**21
**brain** [1] **31:**24
**brakes** [1] **70:**6
**brand-new** [1] **49:**22
**brandon** [7] **54:**17 **62:**10 **64:**14,15 **99:**14,17,21
**break** [18] **39:**3,5 **41:**7 **46:** 11,16,17 **47:**10,11,11 **67:**20 **70:**8 **71:**10 **99:**4 **108:**24 **110:** 4,6 **184:**20 **203:**6
**breaking** [1] **18:**14
**brief** [7] **49:**6 **52:**18 **54:**13 **88:**25 **90:**4 **146:**3 **185:**15
**briefly** [5] **49:**15 **98:**20 **120:**15 **181:**21 **182:**19
**bright** [5] **77:**1 **101:**24 **106:** 6 **125:**7 **199:**20
**bring** [20] **8:**21 **9:**7 **10:**11 **11:**16 **12:**11 **13:**5 **15:**4 **16:**1 **23:**6,10 **36:**8 **37:**17 **42:**10 **44:** 4 **46:**22 **56:**15 **94:**13 **115:**10 **148:**17 **185:**6
**bringing** [6] **10:**19 **11:**10 **14:**19 **148:**4 **158:**7 **206:**21
**brings** [2] **13:**4 **40:**23
**brooklyn** [1] **1:**5
**brought** [13] **27:**17 **33:**8 **36:**9 **48:**2 **66:**13,13 **75:**9 **86:** 6 **101:**4 **112:**21 **143:**7,17 **166:**9
**bruise** [1] **153:**8
**bruised** [3] **92:**24 **93:**2,3
**bruises** [2] **153:**9,10
**bruising** [1] **93:**3
**buddy** [2] **120:**25 **121:**1
**buffer** [1] **47:**3
**builders** [1] **152:**23
**building** [2] **62:**24 **63:**1
**built** [3] **76:**22,22 **88:**8
**bunch** [2] **95:**24 **206:**22
**burden** [10] **25:**6,24,25 **26:** 3,6,17,18,23 **32:**23,24
**burglaries** [2] **188:**3,4
**business** [6] **46:**3 **62:**13 **64:**19 **76:**4,10 **111:**18
**busy** [1] **53:**12
**button** [3] **76:**25 **77:**3 **106:** 5
**button-down** [1] **117:**19
**buy** [1] **62:**13

# Keyword Index


## C

**c2** [4] **16:**21,22,24 **17:**2
**cafeteria** [2] **46:**19,24
**call** [33] **15:**18 **16:**14 **18:**9,10,20,22 **20:**14 **30:**5,21 **32:**16 **51:**7 **52:**5 **55:**10 **61:**3 **81:**1 **88:**4,20 **89:**23,24 **90:**3 **91:**3,7 **95:**12 **96:**6 **120:**17,19,20 **122:**23,24 **154:**25 **184:**19 **185:**3 **204:**16
**called** [25] **14:**10 **16:**17 **19:**19 **25:**17 **31:**16 **38:**4 **53:**24 **54:**20 **56:**18 **72:**1 **83:**9 **88:**20 **89:**21,21 **91:**8,9,9 **95:**1 **102:**22,22 **120:**21,25 **121:**1,5 **202:**21
**calling** [6] **9:**6 **18:**2,7,8,14 **89:**9
**calls** [8] **3:**2 **17:**2 **18:**12 **61:**6 **88:**18 **155:**2 **185:**14 **186:**5
**calm** [10] **59:**16,19 **119:**5,8 **160:**15 **161:**2 **162:**10 **163:**2,4,18
**came** [46] **13:**24 **29:**6,7,21,24 **35:**24 **41:**13 **58:**17 **64:**14,17,19 **69:**3 **73:**15 **75:**20 **77:**14,15,15 **78:**12 **79:**3 **81:**12,12,14,15,17 **82:**1,12 **84:**1,1 **92:**9 **93:**3 **105:**5,8,10 **107:**14,17,19 **108:**12 **116:**1 **118:**5 **141:**8 **148:**11 **158:**9 **159:**21 **166:**16,23 **188:**5
**camera** [1] **135:**17
**cannot** [2] **39:**24 **42:**4
**capacity** [1] **33:**9
**capozezielle** [3] **157:**17,18 **164:**17
**capozeziello** [2] **120:**1,10
**c-a-p-o-z-e-z-i-e-l-l-o** [1] **120:**9
**car** [36] **8:**20 **9:**14,19 **10:**24 **12:**15,22 **49:**25 **54:**20,21,24,25 **55:**1,3 **64:**6,8,15,17,20,21 **68:**9,20,23 **77:**16,19,21,21 **78:**3 **87:**15 **94:**11,13 **99:**14,23 **100:**4,6,7,11
**card** [1] **160:**4
**care** [1] **159:**24
**career** [7] **57:**20 **192:**6 **201:**6,8,10,19,22
**cargo** [3] **49:**21,21 **64:**5
**carpenter** [1] **63:**7
**carried** [1] **26:**16
**carry** [1] **71:**10
**cars** [2] **66:**9,9
**cases** [11] **7:**6 **33:**15,16 **35:**1,18,23 **47:**21 **188:**6,7,12,13
**caucasian** [1] **56:**11
**cause** [4] **10:**16 **148:**1,6 **209:**24
**caused** [5] **55:**23 **59:**25 **60:**1,20 **165:**3
**causes** [3] **4:**12 **48:**1,3
**caution** [1] **44:**12
**ceiling** [3] **152:**22,23,25
**cell** [71] **8:**23 **9:**4,5 **20:**16 **51:**22,24 **56:**7 **57:**10 **58:**17,17,23 **59:**1,14,15,16,21,23 **60:**7,8 **67:**2,3,6,8 **69:**1 **74:**12,15 **75:**25 **79:**3 **84:**1 **101:**25 **105:**4 **115:**19 **135:**17 **136:**10,13 **141:**4,7,8,10 **158:**1,20,22 **159:**4,16 **160:**1,16,24 **161:**5,9,17 **162:**7 **163:**7,24 **164:**6,23 **165:**3,11,16,21,22,23,24 **166:**7 **170:**16 **173:**20 **175:**22 **178:**6 **179:**6,15 **180:**6 **183:**18
**cement** [1] **101:**12
**center** [2] **55:**21 **143:**13
**central** [3] **87:**16 **90:**19 **92:**17
**certain** [10] **24:**22 **28:**24 **31:**2,3 **33:**7 **34:**25 **35:**1 **67:**1 **183:**25 **209:**16
**certainly** [2] **52:**1 **108:**17
**certificate** [1] **212:**1
**certification** [1] **111:**16
**certified** [1] **58:**11
**certify** [1] **212:**2
**cetera** [2] **188:**5,5
**chain** [4] **55:**17 **75:**14 **101:**16 **161:**25
**chained** [1] **75:**15
**challenge** [1] **205:**20
**chambers** [1] **116:**1
**chance** [3] **20:**21 **49:**5 **90:**14
**chances** [1] **20:**4
**change** [3] **32:**12 **92:**22 **169:**23
**changing** [2] **72:**13 **172:**21
**characters** [1] **76:**19
**charge** [5] **12:**18 **55:**5 **68:**14 **205:**6,17
**charged** [1] **9:**16
**charges** [3] **13:**4 **113:**8 **206:**4
**chart** [1] **84:**7
**chased** [1] **192:**5
**chat** [1] **48:**20
**check** [1] **173:**12
**checked** [1] **69:**8
**checkpoint** [1] **47:**2
**chief** [4] **15:**23 **16:**15,18 **190:**19
**childcare** [4] **19:**16,18 **71:**23 **204:**13
**children** [1] **62:**7
**chitchat** [1] **50:**3
**choice** [1] **50:**25
**chokehold** [1] **193:**2
**choose** [1] **30:**20
**chooses** [1] **28:**20
**chose** [1] **14:**9
**circuit** [7] **6:**23,23 **205:**15,19,22 **206:**8 **208:**5
**circulate** [1] **210:**12
**circulated** [1] **149:**18
**circumstances** [1] **33:**7
**circumstantial** [7] **6:**2 **29:**10,12,19 **30:**5,11 **195:**10
**citations** [1] **207:**12
**cite** [2] **7:**3 **206:**8
**citizen** [2] **56:**5 **101:**21
**city** [7] **15:**16 **56:**19,22 **119:**12,18 **120:**2 **125:**20
**civil** [5] **24:**19 **25:**5 **26:**11 **33:**16 **102:**23
**civilian** [1] **57:**23
**claim** [2] **25:**14 **208:**24
**claimed** [1] **9:**7
**claiming** [1] **55:**24
**claims** [13] **10:**14 **26:**7,19 **27:**1,1,2,6,18,19,20 **112:**15 **137:**10 **209:**3
**clarify** [1] **21:**19
**clash** [1] **90:**7
**classic** [2] **7:**13 **29:**18
**clean** [8] **77:**6,6 **101:**22 **105:**16 **198:**7,8,9,14
**cleaning** [1] **78:**2
**clean-shaven** [2] **123:**9 **156:**23
**clear** [14] **13:**11 **22:**17 **34:**19 **46:**7 **98:**1 **148:**2 **152:**3 **188:**7 **189:**15 **190:**6 **199:**2 **202:**13 **207:**16 **208:**9
**clearly** [4] **7:**1 **56:**1 **58:**16 **208:**7
**clerk** [22] **3:**2 **19:**17 **24:**3,5,7,10 **61:**7,10 **110:**8 **114:**13 **149:**16 **155:**13,15 **186:**2,13,15 **194:**17,19 **205:**6 **210:**11 **211:**3,18
**client** [7] **9:**3,10 **10:**17,24 **11:**4 **149:**11 **157:**4
**clients** [2] **13:**14 **22:**10
**client's** [1] **195:**4
**close** [10] **8:**4 **13:**15 **41:**4 **47:**16 **53:**15 **132:**22 **194:**8

# Keyword Index

196:13 204:14 210:13
closed [4] 76:15 106:10 161:5 164:13
closer [3] 114:15 149:16 194:20
closet [3] 152:18,19,25
closing [11] 32:15 33:1 36:13,18 47:24 76:4 132:15 148:24 149:14,20 196:25
clothes [4] 49:21 64:4 77:2 159:13
clothing [3] 28:11 76:24 125:7
co-counsel [6] 21:14 98:21 112:23 149:1 154:3 181:21
cognition [1] 93:7
collapsed [2] 170:11 171:1
colleague [5] 16:19 19:2 53:4 113:15,17
colleagues [1] 181:11
collection [2] 2:18 151:5
collective [1] 33:25
colloquy [1] 147:9
color [1] 117:13
colored [1] 77:1
come [42] 5:3,13 7:9 10:22 18:21,22 28:24 33:25 34:5 35:23 36:23 38:24 39:11 40:16 41:3,5 42:16 45:24 46:16 48:6,19 65:7 71:24 76:11 78:10 84:18 89:17 95:18 96:1 105:5 107:14 111:11 131:18 133:9 137:11 138:18 158:13 164:8 175:24 180:10 193:13 194:20
comes [16] 9:8 33:5 35:5 37:14 38:17,20,23 43:1 50:9 51:24 79:24,24 115:21 133:2 138:23 207:8
coming [11] 10:19 44:9 49:3 71:19 81:24 92:24 141:6 149:5 158:1 209:10,10
commanding [5] 174:17 175:11 190:18,19,21
commenced [1] 200:16
comment [2] 34:15 36:3
comments [1] 210:14
commercial [2] 62:14 63:24
commissioner [4] 57:1,2 123:14 126:2
common [5] 40:24 164:23 165:23 205:11 209:10
commonsense [1] 41:17
commotion [1] 59:14
communicate [1] 42:14
community [1] 33:8
company [4] 49:18,25 63:6 64:1
compete [1] 193:8
compiling [1] 210:11
complained [2] 57:8 102:5
complaint [32] 25:7 26:24,25 27:6 56:6,7,12 57:16 58:3,20 87:22 88:12 101:21 102:1,5,9,17,24 109:5,6 125:13,16 127:1,3,4 129:2,3 154:8,11,13,14,16
complaints [1] 62:21
complete [1] 25:2
complicated [1] 62:25
comply [1] 43:22
comprehend [1] 93:12
concept [2] 26:13 209:9
concepts [1] 29:15
concerned [1] 209:6
concerning [2] 34:14 105:3
conclude [4] 29:13 148:20 185:16 203:9
concluded [2] 32:9 47:6
conclusion [1] 39:10
conclusions [3] 32:19 41:4 132:6
concrete [2] 182:8 183:16
concussion [4] 51:3,5,17 86:14
conduct [7] 5:11 24:24 37:7 39:2,4 42:19 210:2
conducted [3] 103:5 104:9 183:1
confer [3] 98:20 154:3 181:21
conferring [1] 148:25
confidence [1] 31:25
configuration [1] 165:18
confined [1] 165:2
confines [2] 38:9 191:10
confirm [4] 151:16 154:16 167:8 176:13
confirmation [2] 6:18 7:24
confuse [1] 10:20
confusion [1] 209:9
connect [1] 195:3
connection [2] 44:13 194:15
connects [2] 161:25 195:4
conscious [1] 83:4
consequences [1] 51:13
consider [7] 25:15 29:16 30:12 33:2 35:19,25 60:23
consideration [1] 26:19
considered [4] 17:22 31:19 35:8,9
considering [1] 26:15
consistent [2] 6:19 7:20
constitute [2] 4:11 49:9
constitution [2] 33:5,6
constitutional [1] 27:13
consult [1] 37:9
contact [4] 127:8 158:9,10 209:25
contacted [3] 89:16,17 129:9
contained [1] 165:22
contains [2] 26:25 176:4
contemplated [1] 8:13
contemplates [1] 8:8
contention [1] 52:13
contents [1] 133:10
contesting [1] 10:4
context [8] 10:2 12:22 47:18 114:6,7 169:15,17 205:4
continue [3] 42:13 109:8 140:2
continues [1] 112:4
continuing [2] 47:8 136:8
contradictory [2] 53:18 172:3
contrary [2] 39:16 40:22
contrast [1] 52:1
controls [4] 34:17 36:12,16,17
conveniently [1] 183:7
conversation [13] 9:8 40:13 42:21 43:4 48:24 67:10 76:7 77:10 90:4 121:7,15 162:9 181:15
conversations [3] 43:10 67:13 93:23
convicted [1] 98:16
conviction [1] 11:5
cop [1] 192:4
cops [2] 55:11 83:20
copy [5] 5:17 30:17 137:3 149:9 154:15
cornea [2] 95:14 98:5
corner [3] 79:19,21 198:16
cornerstone [1] 53:9
correctly [2] 27:8 105:25
corresponds [1] 206:18
cory [4] 57:7 76:20 123:7 125:5

# Keyword Index


**coterminous** [2] **209:**13 **210:**8
**couldn't** [11] **70:**2 **92:**10, 14 **93:**10,12,13,13,14,14,15 **94:**16
**counsel** [13] **19:**17 **21:**15 **23:**3 **40:**6 **41:**5 **93:**19 **111:**17 **135:**13 **138:**24 **148:**9 **164:**4 **208:**15 **209:**5
**counterintuitive** [2] **39:**16 **40:**22
**country** [1] **40:**11
**county** [40] **1:**8,21 **3:**3,19, 20,24 **27:**15,16 **49:**12 **50:**9 **52:**11,14 **53:**3,4,7,10 **54:**22, 24 **56:**6 **57:**1,3,20 **88:**25 **99:**22 **101:**21 **103:**3 **113:**7 **123:**17 **142:**13 **143:**4,12 **147:**14 **186:**24 **187:**1,22 **191:**6,9,25 **202:**9,17
**couple** [15] **17:**19 **44:**13, 24 **50:**2 **69:**9 **73:**23 **83:**17 **85:**1 **87:**25 **88:**20 **92:**21 **95:**22 **121:**11,13,16
**course** [11] **28:**6 **30:**13 **34:**24 **36:**4 **44:**2,12 **73:**3 **76:**4,10 **88:**21 **147:**11
**courthouse** [4] **42:**23 **46:**19,21,23
**courtroom** [25] **21:**5 **24:**2 **32:**5,8 **36:**20 **38:**9,17,19,19, 24 **41:**19 **42:**22 **54:**7 **70:**10 **72:**16 **73:**2 **113:**16 **115:**12 **116:**6 **117:**2,15 **184:**25 **185:**20 **189:**16 **203:**18
**court's** [1] **44:**4
**cousin's** [1] **152:**14
**covered** [4] **29:**2,5 **31:**4 **191:**11
**covid** [1] **189:**25
**cow** [1] **144:**9
**cracks** [1] **50:**12
**crazy** [5] **80:**4 **82:**5,6,22 **108:**2
**credible** [1] **25:**20
**crime** [1] **11:**6
**criminal** [4] **8:**10 **26:**11 **33:**15 **98:**15
**cross** [8] **2:**8 **11:**16 **15:**19 **57:**7 **76:**21 **148:**11 **153:**21 **211:**16
**cross/direct** [1] **15:**20
**cross-examination** [15] **2:**12,15 **12:**13 **15:**23 **16:**5 **22:**24 **28:**21,25 **99:**3,6 **117:**4 **182:**18,20 **199:**25 **200:**2
**cross-examine** [1] **32:**12
**cross-examined** [1] **28:**18
**crying** [4] **81:**16,18,22,23
**cuff** [5] **84:**3 **171:**13,17,20 **172:**10
**cuffed** [10] **75:**12,13 **160:**18 **161:**20 **162:**4,7,19 **163:**10, 17 **172:**21
**cuffing** [2] **172:**11,11
**cuffs** [6] **67:**1,2 **74:**24 **75:**1 **170:**12 **171:**2
**curious** [1] **17:**6
**curse** [1] **80:**3
**cursing** [2] **80:**13 **82:**6
**curtain** [1] **86:**8
**curtained** [1] **86:**8
**curtains** [1] **143:**22
**custody** [3] **92:**2,5,7
**cut** [2] **13:**7 **114:**12
**cutting** [1] **27:**4


## D


**dais** [1] **134:**4
**damage** [1] **94:**16
**dangerous** [1] **163:**6
**dark** [9] **87:**11 **93:**2 **105:**15 **117:**14,19 **122:**13,14,14,14
**dark-skinned** [1] **57:**5
**date** [10] **17:**22 **89:**2,4 **97:**9 **176:**4 **212:**10,14,19,25,31
**dates** [1] **153:**2
**daughter** [1] **99:**11
**daughters** [2] **99:**12,13
**day** [70] **4:**4 **12:**15 **13:**15,24 **14:**4,11,15 **15:**5 **17:**15 **41:**21 **45:**13,16,16,21 **46:**6,18 **47:**11,12 **54:**18 **56:**5 **59:**14 **60:**6 **62:**17,18,18 **68:**13 **69:**8 **85:**5 **87:**17,25 **88:**2,2,3 **89:**25 **92:**25,25 **94:**19 **101:**20 **109:**20 **121:**3 **127:**12 **131:**10 **136:**2, 5,13 **144:**21 **151:**19,20 **152:**2, 4,5 **153:**6,12,13 **157:**8 **158:**16 **164:**21 **184:**6 **188:**25 **189:**4,4,5,6,16 **190:**13 **201:**1,4 **203:**6,7 **210:**22
**days** [16] **14:**17 **63:**9 **76:**8 **87:**25 **88:**1 **92:**21 **94:**19 **109:**13 **119:**15 **121:**6,12,13,16 **125:**19 **151:**23 **203:**10
**day-to-day** [2] **42:**19 **62:**16
**dead** [1] **210:**3
**deal** [3] **42:**6 **149:**11 **162:**21
**dealing** [1] **62:**20
**debate** [1] **207:**5
**december** [4] **122:**17,25 **126:**6,6
**decide** [8] **25:**23 **31:**8 **36:**5 **48:**5 **52:**9 **54:**4,9 **55:**23
**decided** [3] **7:**1 **36:**21 **159:**23
**decision** [5] **31:**11 **36:**22 **37:**13 **38:**7 **53:**20
**decisions** [3] **33:**21 **34:**1 **47:**20
**deck** [1] **19:**21
**deduce** [1] **29:**13
**deductible** [1] **105:**24
**deems** [1] **149:**2
**deep** [1] **143:**21
**defendant** [15] **2:**4 **6:**10 **26:**22,23 **27:**15 **28:**25 **59:**11 **128:**1 **129:**10,12,13,14 **130:**2, 8 **155:**2
**defendants** [23] **1:**9,21 **3:**13,18 **8:**15,19 **25:**4 **27:**7,10 **32:**11,22 **41:**19 **51:**20 **53:**5, 10,22 **54:**13,16,23 **61:**2 **114:**16 **149:**1 **202:**25
**defendants'** [1] **28:**1
**defendant's** [2] **52:**24 **185:**17
**defense** [19] **6:**17 **8:**11,13 **11:**13 **15:**10,18 **17:**23,24 **18:**17 **23:**3 **28:**19 **32:**12 **47:**24 **52:**21 **53:**5 **111:**17 **113:**5 **117:**5 **154:**20
**defensive** [1] **6:**10
**define** [1] **27:**1
**definitely** [22] **63:**13 **68:**10,25 **76:**16 **77:**24 **78:**5 **82:**18,20,21 **85:**21 **93:**15 **94:**15 **99:**24 **121:**12 **122:**19 **123:**2 **124:**1 **129:**14 **136:**3 **141:**15 **142:**7 **171:**3
**deliberate** [3] **30:**18 **41:**1 **48:**7
**deliberating** [1] **48:**19
**deliberations** [12] **5:**11 **30:**16 **31:**1,25 **35:**19 **37:**16 **39:**11,24 **41:**15 **45:**11 **47:**6,9
**demeanor** [2] **68:**3 **159:**23
**department** [15] **49:**12 **50:**9 **52:**12 **56:**6,19 **58:**20 **88:**19 **101:**21 **113:**8 **156:**3 **186:**24 **187:**2 **191:**6 **202:**9,17
**depends** [2] **11:**22 **46:**13
**deposed** [1] **58:**9
**deposition** [43] **58:**7,7 **59:**3 **102:**19,22,25 **103:**2,9, 10 **106:**8,12,25 **107:**1 **108:**4, 6 **109:**12,17 **117:**24,25 **123:**11 **126:**13 **137:**2 **138:**6 **139:**9 **147:**9,16 **163:**20,23 **164:**4 **166:**21 **167:**1,3,9 **168:**9,12

# Keyword Index

170:1,9 171:24 172:4 173:16 178:19 181:8 201:2
depositions [5] 58:6,13,14,16 121:19
deprives [1] 40:7
deputy [18] 3:18,20 24:2 38:19 53:4 70:10 72:12,16 73:2 103:3 115:12 116:6 117:2 147:14 184:25 185:20 203:18 204:5
describe [12] 27:5 74:16 76:18 83:25 88:5 105:8,14 107:17 125:1 143:19 163:15 174:12
described [11] 69:2 82:19 91:6,10 108:7 120:18,24 125:10 126:3,7 195:12
describing [2] 97:13 121:4
description [4] 73:12 91:11 125:1 199:11
desk [1] 85:8
desks [5] 66:17 73:22,22,23 74:3
destroyed [1] 45:14
detail [2] 11:2 182:14
details [4] 10:16 174:12 176:25 178:2
detectives [13] 17:7 50:5 51:20 55:10,12,12,25,25 59:22 69:14 164:14 187:22 188:13
detective's [12] 69:14 70:5 73:10,18 74:2,9 85:7 87:4 118:8,10 125:6 188:14
determination [2] 36:6 40:8
determine [3] 34:9 90:22 91:14
determined [1] 163:1
determining [1] 25:14
devastated [2] 92:8,13
develop [2] 16:25 62:14
dge [1] 212:30
diagnosed [2] 51:19 55:22
diagnosis [2] 51:15 86:11
diagram [2] 209:12 210:8
dialogue [3] 78:13 144:21 145:14
dictate [2] 31:10 35:4
died [1] 84:10
difference [3] 29:19 133:4 174:25
differences [2] 27:20 210:7
different [14] 15:2 21:24 53:16,17 62:18 72:8 113:2 133:13 134:3 138:5 153:20 182:12 206:22 209:8
difficult [2] 166:1,1
digest [1] 124:7
direct [31] 2:7,11,14 16:6,8,9,9,10,25 20:16 28:13,17,19 29:10,11,11,19,20,24 30:10 61:16 127:11 139:6,11 155:21 157:13 171:10 183:15 185:16 186:19 198:23
directed [1] 161:4
direction [2] 50:18 157:21
directly [3] 49:5,7 142:7
disagreement [1] 7:25
discern [1] 53:20
disciplinary [3] 8:14 11:21 201:23
disclose [1] 147:3
discovery [2] 58:4 113:1
discuss [10] 27:19 39:6,22 41:25 42:1,4,4,8 110:10 203:15
discussed [2] 43:6 190:7
discussing [4] 40:1,21 42:17 166:22
discussion [3] 41:1 88:10 100:3
discussions [1] 39:8
disgusting [1] 85:9
dishonesty [1] 11:6
dismiss [1] 132:23
dismissed [5] 13:5 57:17 112:15 131:17 132:10
dispute [4] 54:15,18 55:19 63:12
disputed [1] 114:4
disregard [6] 31:17,18 32:2 34:16,23 35:10
disregarded [1] 32:6
disrespect [2] 78:6 79:11
distance [1] 43:4
distinction [2] 30:10 172:10
distinctive [2] 76:24 77:4
distinguishing [1] 133:3
distract [1] 45:5
district [10] 1:1,2,12 24:14,15 57:2 89:12,13 123:17 205:17
divided [1] 25:21
docket [3] 1:3 3:3 200:12
doctor [14] 19:6 51:8 94:17 95:8,16,25 111:21,23 112:2 135:20 136:5 180:4 203:4 204:4
doctors [1] 145:15
doctor's [1] 97:2
doctrine [1] 6:13
document [9] 124:6,17 133:6,8,10,12,17 175:16 176:10
documentary [2] 25:19 37:15
documents [6] 25:13 28:12 33:14 54:12 58:5 147:5
document's [1] 170:17
doing [12] 9:2 20:3 47:15 52:13 67:14,16 84:2 85:25 86:4 113:14 135:24 192:6
dollars [1] 83:17
done [12] 13:16 15:20 37:23 39:1 46:15 64:2 98:11 133:19,20,20 192:4 206:12
door [38] 11:22 73:17,20 74:6,10,11,11,12,16,17,17 75:21 76:5,6,15 78:19,25 79:1,4,19,20 86:8 100:17 101:10 106:10 161:5,6,9,14,16 163:16 164:13,25 165:20,21,22,23,24
doors [5] 74:7 76:3 79:2 143:14,22
doorway [1] 183:21
doubt [3] 26:10,13 91:22
down [32] 30:22 44:15 45:2 58:11 59:16,19 65:7 75:2,10,15 76:25 77:3 79:9 83:20,21 85:6,11,12,12 86:7 90:18 94:1 143:17 154:23 160:15 161:2 162:10 163:2,4,18 184:18 203:2
downstairs [7] 46:7 47:3 50:2 68:3 69:21,24 191:1
downtime [1] 13:23
draft [1] 88:22
drafted [1] 88:24
draw [2] 30:9 32:20
drawn [2] 33:19 148:14
dressed [3] 49:20 64:3 125:6
drew [2] 154:13 158:7
dri [1] 212:29
drive [4] 96:18,20,23,24
driven [2] 54:21 100:13
driving [14] 12:16 49:22 54:17,24 64:15,16,17,24 96:18,25 97:3 99:17,20,21
dropped [1] 183:8
drove [5] 54:19 94:24 95:2 97:2 99:14
dry [1] 78:2
due [1] 204:13

# Keyword Index


**duel** [1] **212:**22
**duell** [1] **212:**25
**dull** [1] **62:**23
**during** [38] **8:**17 **9:**9 **24:**20, 24 **30:**13,15,25 **31:**13 **36:**4 **37:**20,24 **38:**6,20 **39:**2,4,5,6, 10 **41:**7 **44:**12 **45:**11 **46:**21 **47:**5 **86:**10 **162:**6 **163:**23 **164:**5 **166:**21 **170:**1,9 **171:** 24 **172:**3 **173:**16 **174:**1 **191:** 14 **192:**1,3 **203:**11
**duties** [2] **62:**19 **182:**13
**duty** [1] **157:**7
**dwayne** [3] **57:**7 **123:**7 **125:**5

## E

**each** [25] **14:**15 **18:**13 **20:** 10 **26:**17 **27:**1 **28:**12,17 **29:**3 **30:**22 **32:**14 **37:**15 **39:**8,9,22 **41:**11,11 **42:**11 **44:**11 **45:**13, 16 **47:**11 **48:**1,5 **65:**8 **203:**15
**ear** [6] **50:**20 **80:**25 **81:**2 **93:** 14 **97:**5,22
**earlier** [7] **21:**20 **99:**25 **100:**2 **105:**23 **111:**4 **169:**18 **171:**11
**early** [3] **113:**15 **192:**5 **203:** 8
**ears** [1] **94:**25
**east** [1] **191:**11
**eastern** [2] **1:**2 **24:**15
**easy** [1] **5:**18
**eat** [1] **47:**7
**eaten** [1] **46:**19
**eating** [1] **113:**15
**ecf** [1] **210:**17
**e-class** [1] **64:**16
**eff** [1] **82:**22
**effect** [1] **145:**11
**effectively** [2] **206:**11,14
**efficient** [3] **45:**19 **46:**4 **47:**8
**effing** [1] **82:**5
**effort** [1] **42:**1
**efforts** [1] **90:**22
**eight** [2] **176:**18 **191:**25
**eighties** [1] **192:**5
**either** [21] **5:**20 **6:**6,13 **7:** 18 **22:**10,17 **25:**3 **42:**9 **52:**11, 14 **64:**5 **108:**15 **118:**24 **120:** 6 **149:**19 **173:**17 **180:**6 **181:** 11 **183:**6 **204:**6,20
**elapsed** [1] **195:**21
**electronic** [3] **1:**31 **44:**17 **212:**3
**element** [2] **26:**2,7
**elements** [5] **27:**1,19 **48:** 2,3 **205:**7
**elevator** [6] **43:**12,13,14 **46:**7,8,9
**elevators** [1] **42:**23
**eleven-twelve** [1] **187:** 21
**else's** [1] **108:**19
**email** [1] **210:**17
**embarrassed** [1] **83:**12
**emergency** [5] **84:**5 **86:** 3 **143:**13,14,23
**employed** [2] **186:**23 **187:**1
**ems** [5] **51:**1 **82:**12 **83:**25 **84:**1 **179:**22
**emt** [1] **84:**22
**encounter** [1] **191:**22
**encountered** [1] **158:**16
**end** [17] **4:**14 **5:**7 **29:**15 **30:** 17 **37:**5,22 **39:**24 **41:**15 **44:**9 **45:**13,14 **47:**12 **49:**7 **52:**19 **54:**3 **65:**15 **148:**16
**ends** [4] **134:**7 **139:**12 **150:** 3 **197:**4
**engaged** [3] **34:**3 **58:**4 **162:**9
**enough** [5] **46:**7,10 **53:**23 **180:**25 **205:**18
**ensuing** [1] **133:**15
**entered** [10] **118:**13,18 **119:**4 **123:**7 **125:**6 **159:**4,16 **160:**1 **166:**3,12
**entering** [1] **179:**15
**enters** [4] **24:**1 **73:**1 **117:**1 **186:**1
**entire** [9] **38:**13,14 **44:**7 **57:** 23 **107:**8 **147:**9 **162:**6,7 **192:** 6
**entirely** [3] **37:**13 **108:**13 **120:**4
**entitled** [1] **30:**6
**entrance** [1] **86:**3
**environmental** [3] **49:** 20 **64:**1,2
**envisioning** [1] **148:**21
**equality** [1] **26:**1
**equally** [2] **25:**21 **26:**20
**equipped** [1] **40:**17
**eric** [2] **1:**11 **24:**14
**errands** [1] **64:**20
**escalated** [1] **78:**10
**especially** [1] **94:**16
**esq** [4] **1:**15,16,22,23
**essential** [1] **26:**17
**essentially** [5] **6:**25 **9:**9 **15:**19 **25:**23 **26:**21
**establish** [2] **25:**8 **114:**4
**established** [2] **181:**9 **208:**8
**estate** [3] **49:**18 **62:**13,14
**estimate** [1] **101:**18
**estimation** [1] **19:**24
**et** [4] **1:**8 **3:**3 **188:**4,5
**evaluated** [1] **51:**8
**evaluating** [1] **45:**7
**even** [46] **6:**16 **11:**9,15,16 **15:**4 **16:**6,14,14 **34:**22 **39:**8, 13 **40:**3,4,5,19 **41:**2,5,11,18 **42:**8,15,24 **43:**2,9,16,20 **44:**3, 20 **45:**11 **46:**8,23 **57:**15 **68:** 24 **83:**18 **86:**23 **139:**1 **152:** 21,23 **162:**3 **188:**5 **190:**14 **192:**1 **204:**19 **205:**13,18 **207:** 20
**evening** [1] **203:**14
**evenly** [1] **25:**21
**event** [3] **6:**13 **45:**6 **138:**16
**events** [1] **17:**21
**everybody** [5] **14:**20 **115:** 18,19 **133:**2 **205:**5
**everybody's** [2] **13:**16 **194:**2
**everyone** [5] **51:**23 **78:**19, 22,24 **108:**19
**everyone's** [1] **85:**6
**everything** [9] **4:**13 **5:**6 **6:** 7 **44:**16 **47:**16 **93:**17 **113:**22 **119:**4,8
**evidentiary** [2] **17:**13 **115:**7
**evidently** [1] **181:**2
**exact** [3] **89:**4 **121:**1 **208:**4
**exactly** [16] **7:**14,14 **9:**2 **13:**22 **37:**16 **51:**9,18 **88:**9 **113:**13 **150:**1 **187:**12 **195:**11 **199:**8 **200:**10 **203:**10 **206:**7
**examination** [21] **2:**7,8, 9,11,14,16 **16:**25 **28:**13,17,19, 22 **29:**3,4,6 **61:**16 **86:**10 **103:** 5 **151:**3 **155:**21 **186:**19 **202:** 5
**examine** [2] **30:**23,25
**example** [6] **7:**21 **15:**18 **29:**18 **191:**9 **206:**25 **209:**16
**except** [5] **16:**25 **22:**22 **41:** 10 **114:**6 **209:**10
**excessive** [10] **27:**13 **49:** 10 **201:**24 **205:**10,25 **206:**3 **207:**8 **208:**16 **209:**7,13
**exchange** [2] **39:**14 **58:**5
**excludable** [1] **23:**1
**exclude** [7] **8:**13 **21:**4,6,7, 21,23 **115:**22
**excluded** [2] **22:**22 **147:** 25
**excuse** [2] **158:**14 **189:**4
**exhibit** [14] **30:**14,21 **31:** 21 **45:**1,2 **113:**6 **124:**2,4 **149:**

# Keyword Index


10,21,24 **151:**6,8 **211:**12
**exhibits** [20] **2:**17 **10:**11 **25:**17,19 **30:**13,15,25 **49:**9 **51:**3 **53:**14 **111:**3,7,12 **112:**7, 8 **114:**12,17 **124:**5 **147:**24 **155:**6
**exist** [1] **29:**14
**existed** [1] **190:**14
**exit** [1] **143:**13
**exited** [4] **163:**6,19 **164:**13 **165:**8
**exits** [4] **71:**1 **111:**1 **185:**1 **204:**1
**ex-officer** [1] **91:**1
**expect** [5] **28:**5 **43:**24 **44:** 2 **50:**15 **205:**14
**expensive** [1] **5:**19
**experience** [5] **33:**22 **39:** 17,18,18 **180:**21
**experiences** [2] **38:**5 **53:** 19
**expert** [4] **13:**16 **14:**21 **51:** 18 **196:**21
**explain** [13] **29:**18 **51:**8,18 **68:**9 **77:**13 **78:**12 **84:**21 **94:**6, 8 **97:**18 **128:**1 **130:**2 **153:**8
**express** [1] **34:**14
**extent** [8] **14:**7 **17:**5,14 **18:** 11 **20:**8 **113:**24 **204:**25 **205:** 2
**extremely** [6] **33:**13 **37:**2 **39:**9 **45:**16 **47:**15 **49:**4
**eye** [12] **14:**16 **50:**19 **86:**15, 16,17 **93:**1 **95:**13 **135:**4 **153:** 12,14 **158:**9,10
**eyes** [2] **84:**5 **94:**25
**eyewitness** [1] **29:**12

## F

**face** [12] **79:**24,25 **80:**6,7,8, 15 **83:**16 **136:**12 **166:**18 **175:** 17 **198:**10 **201:**9
**facebook** [7] **56:**23 **91:**18, 21,23 **122:**4,6 **125:**23
**faced** [1] **206:**5
**faces** [4] **65:**22 **76:**19 **108:** 20 **122:**2
**facial** [1] **77:**4
**facing** [2] **163:**16 **183:**20
**fact** [28] **25:**9,10 **29:**11 **30:** 7 **31:**6,11,24 **35:**24 **36:**1 **42:**2, 8,9,9,15 **45:**25 **57:**22 **103:**9 **108:**20 **114:**2 **129:**12 **131:**8 **132:**6 **148:**8 **160:**6,12 **181:** 10 **205:**9 **210:**8
**facts** [25] **7:**10 **29:**13,14 **31:** 3,4,7 **33:**9,16 **34:**8,12,13,14, 15,16,21,23 **36:**6,10 **38:**2 **47:** 21 **54:**8,9 **132:**15,19 **207:**20
**fai** [1] **212:**16
**failed** [3] **26:**22 **179:**20 **182:**4
**fails** [1] **11:**8
**faint** [4] **172:**1 **178:**14 **181:** 10,12
**fainted** [3] **170:**2 **173:**17 **178:**14
**fainting** [4] **172:**8 **178:**16, 21 **182:**23
**fair** [5] **142:**11 **165:**9,10 **166:**3 **174:**19
**fairly** [3] **42:**13 **123:**9 **205:** 17
**fairness** [2] **25:**2 **44:**6
**faith** [3] **33:**19 **34:**4 **212:**19
**fake** [7] **170:**2 **173:**17 **178:** 13,14,21 **181:**9,12
**faked** [1] **170:**4
**faking** [8] **170:**8 **178:**18,23 **179:**2,21 **180:**1 **182:**23 **183:** 10
**fall** [6] **83:**2 **168:**7 **169:**8,24 **170:**7 **179:**4
**falling** [1] **60:**3
**false** [5] **10:**10,13,21 **107:**3 **112:**15
**falsus** [2] **5:**10,10
**familiar** [1] **208:**19
**family** [5] **39:**20 **53:**13 **62:** 5 **63:**14,15
**far** [12] **11:**4,7,17,21 **72:**3 **85:**7 **132:**16 **164:**23 **168:**16 **171:**16 **204:**25 **209:**6
**fascinated** [1] **211:**7
**fast** [2] **92:**21 **196:**2
**favor** [3] **26:**5 **53:**21 **54:**13
**favors** [1] **26:**21
**feature** [1] **209:**24
**february** [5] **118:**1 **126:**13 **163:**20 **167:**10 **190:**7
**federal** [6] **16:**12 **21:**8,24 **27:**18,20 **47:**21
**feel** [6] **37:**24 **42:**9 **44:**24 **92:**3,6 **179:**10
**feeling** [1] **92:**15
**feels** [1] **196:**20
**feet** [11] **57:**6 **70:**2,3 **73:**16, 16 **101:**16 **105:**16 **143:**21 **156:**16 **164:**25 **165:**19
**fell** [3] **82:**24 **171:**3,3
**fellow** [3] **34:**6 **42:**8,15
**felony** [2] **9:**23 **77:**19
**felt** [1] **83:**21
**few** [9] **44:**9 **45:**15 **50:**8 **63:** 24 **74:**7 **96:**16 **125:**19 **165:** 19 **171:**10
**ff** [1] **184:**15
**field** [1] **90:**10
**fifties** [2] **88:**11 **123:**8
**fifty-five** [1] **61:**21
**fifty-four** [1] **61:**21
**fifty-nine** [1] **61:**19
**fight** [1] **121:**3
**fighting** [1] **154:**2
**figure** [2] **113:**22,22
**figured** [1] **74:**14
**figuring** [1] **84:**24
**file** [3] **102:**1,24 **129:**3
**filed** [10] **56:**5,12,25 **57:**16 **58:**3,19 **101:**20 **102:**17 **125:** 13 **129:**2
**filing** [1] **115:**19
**fill** [2] **13:**15 **15:**5
**filled** [1] **153:**13
**filling** [1] **93:**1
**final** [4] **30:**17 **39:**11 **47:**25 **210:**12
**finalized** [1] **204:**21
**finally** [2] **45:**10 **86:**5
**find** [20] **25:**20 **26:**5,18,19, 21,23 **32:**20 **33:**9,16 **35:**22 **48:**4,4 **51:**3 **53:**21 **54:**12 **60:** 24 **61:**1 **67:**21 **68:**14,16
**finders** [1] **30:**7
**fine** [9] **13:**6 **14:**1,23 **18:**10 **84:**24 **148:**16 **196:**25 **204:**14 **210:**25
**fingerprinted** [1] **55:**8
**finish** [1] **113:**15
**finished** [2] **48:**18 **64:**19
**first** [58] **7:**11 **11:**4 **13:**17 **16:**10 **27:**11,24 **32:**22 **39:**5 **53:**8 **55:**8 **61:**3 **64:**25 **66:**14 **67:**3,6 **68:**16 **69:**5 **74:**1 **77:** 14 **81:**12 **90:**3 **97:**2 **100:**1,17, 19,21 **102:**22 **103:**5 **106:**12, 25 **107:**1 **108:**6 **109:**11,17 **114:**9 **117:**24 **118:**5 **121:**16 **125:**13 **157:**3,25 **158:**4,8,9, 15 **163:**8,24 **164:**5 **167:**8,8 **168:**4,6 **171:**7 **183:**18 **191:** 10 **200:**4,19,21
**fist** [2] **80:**17,20
**fit** [1] **30:**12
**five** [7] **20:**13,15,25 **46:**14 **108:**25 **164:**25 **173:**23
**flailing** [3] **163:**5,8,18
**flails** [1] **79:**20
**flesh** [1] **207:**11
**flight** [1] **100:**23
**flights** [2] **69:**13 **100:**24
**flip** [1] **169:**16
**flipped** [1] **79:**9
**flooded** [1] **81:**25
**floor** [40] **50:**22 **55:**8 **66:**14 **68:**20,20 **73:**11,11,16 **79:**9

# Keyword Index


81:6,18,20 100:17,19,21 141:3 142:13 144:25 145:20 157:1,8 165:1 166:15,18,25 168:2,3,5,7 169:24 170:3,4 173:2,18 174:6,10 178:17 182:23 183:10 187:18
**florida** [13] 91:8 93:25 94:3,19 95:6,23 109:16 151:25 152:17,25 153:2,6,7
**fly** [2] 94:16 113:14
**focus** [2] 93:13 168:25
**focused** [1] 158:19
**folder** [1] 79:8
**follow** [8] 28:23 31:15 38:12 95:10,12,15 133:25,25
**followed** [8] 98:9 99:22 158:20,21 159:16 194:10 204:4,5
**following** [22] 27:24 29:1 60:13 88:12 104:1,2 105:2,3 118:2,3,16,17 126:18,19 127:6,7 137:4,5 151:19,20,23 152:4
**follows** [2] 27:6 29:20
**food** [2] 46:20,22
**foot** [1] 101:19
**footnotes** [1] 207:12
**force** [15] 7:17 22:11 27:13 31:23 49:10,11 119:19 201:24 205:10 206:1,3,12 207:7 209:7,13
**forearmed** [1] 192:5
**foregoing** [1] 212:2
**forget** [2] 31:23 36:1
**form** [3] 7:22 38:5 56:15
**formal** [4] 22:16 39:23 148:17 175:20
**former** [1] 8:19
**forms** [1] 7:6
**formulations** [1] 206:22
**fort** [1] 94:4
**forth** [5] 20:10 68:7 78:13 95:23,24
**forward** [9] 20:8 48:22 51:14 52:18 74:3 92:21 133:3 169:16 203:16
**found** [3] 46:20 91:20 100:7
**founding** [1] 33:14
**four** [2] 86:23 198:19
**four-foot** [1] 55:17
**fourteen** [1] 156:6
**fourth** [2] 209:11 210:4
**frame** [3] 63:7 151:17 207:25
**free** [4] 27:14 37:24 55:18 179:10
**frequently** [1] 198:12
**friend** [7] 56:18,19 91:1,10,12 119:24 125:20
**friendly** [3] 113:20 139:9 144:22
**friends** [2] 39:20 40:14
**front** [16] 4:3 10:22 51:11 64:22,23 69:25 73:21 75:5 78:21 100:17 123:11,25 131:12 147:15 151:5 155:8
**fuck** [1] 83:1
**fucking** [1] 80:4
**full** [2] 4:11 14:3
**fuller** [1] 4:9
**fulsome** [1] 48:5
**function** [1] 53:10
**fundamental** [1] 148:7
**fundamentally** [1] 40:6
**furniture** [1] 75:6
**further** [14] 11:2 16:7,7 27:19 29:14 98:24 133:21 145:24 154:18 182:17 184:13 199:24 202:1,24
**furtive** [1] 10:17
**future** [1] 19:25
**f-word** [1] 83:5

## G

**gambit** [1] 196:5
**garibeeto** [1] 144:8
**garibotto** [16] 19:11 65:24 66:3 69:17 71:20 85:3,21 144:8,8,13,15,24 145:6,10,16 204:9
**g-a-r-i-b-o-t-t-o** [1] 66:3
**gated** [1] 66:17
**gave** [11] 39:15 66:2 102:19 118:17 126:18 127:7 137:2,5 163:20 170:20 187:12
**gc** [1] 63:7
**general** [6] 27:5 81:1 96:23 177:4,5,25
**generally** [5] 4:17,21 67:12 189:3 205:21
**gentlemen** [5] 24:13 40:20 52:25 53:1 203:6
**genuinely** [1] 33:18
**gestures** [1] 98:3
**gets** [8] 4:6 49:24,24 50:12 51:1,1 114:22 138:21
**getting** [13] 9:19 12:4,20 14:16 40:11 50:11 65:15 70:5 78:5,8 79:10 93:4 207:17
**giant's** [1] 41:9
**giggling** [2] 78:16 79:23
**girl** [1] 62:10
**give** [40] 5:23 16:20 18:23 24:17 27:22 28:4 29:14 30:7,8,16 31:9,12 36:10 43:9,16 46:6 47:25 48:14 49:6 51:15 52:17 54:1,2,13 69:22 75:23 79:16 83:19 96:11 104:4 114:1 132:6 153:6 154:15 171:24 172:3 177:8 199:11,17 206:25
**given** [8] 4:23 22:16 25:20 35:20 44:10 62:17 132:15 177:2
**gives** [2] 33:6 180:14
**giving** [11] 40:2 41:17 104:2 105:3,19 118:3 133:6 158:19 167:17,18 175:20
**glass** [1] 74:19
**glovebox** [1] 10:17
**god** [1] 199:7
**golzad** [4] 96:5 111:25 135:21 136:4
**g-o-l-z-a-d** [1] 96:8
**golzad's** [1] 135:23
**google** [3] 37:21,23 38:1
**got** [49] 5:4 8:7 14:17 50:24 55:2 66:11 68:23 69:3,5 74:13 75:8 78:18 81:25 84:14,23 85:1,23 86:20,25 87:3,11 89:10,11 90:4,5 92:7 94:8 95:1,12,15,16,16 100:6 114:7 119:6 144:1 152:5,8,9,9,10 153:5,12,14,25 171:16 174:7 187:9 196:25
**gotten** [4] 87:8 97:10 98:8 111:16
**govern** [1] 39:4
**government** [3] 33:9,10,12
**grab** [1] 20:21
**grand** [8] 9:16 55:5 113:9 114:3,5 188:3,4,8
**great** [2] 111:20 122:13
**greater** [1] 25:11
**groceries** [1] 78:1
**ground** [7] 60:4,9 171:4 178:21,22 179:1 180:1
**group** [1] 33:23
**groups** [1] 33:18
**gruff** [2] 77:15 78:9
**guess** [10] 9:25 86:1,22 87:16 120:4 143:15 145:17 153:18,19 162:17
**guessing** [1] 166:11
**guide** [1] 24:18
**guided** [1] 180:13
**gun** [1] 7:11
**gurney** [2] 85:14 144:1
**guy** [20] 5:21 10:2 38:18 42:6,11,16 76:23 78:23,23 82:5,21 85:4,4,5 120:24 122:12 181:12 186:11 192:5 210:24

# Keyword Index


guys [6] 63:10 79:1 82:22 83:22 144:12 185:7

## H

hair [2] 77:4,6
hairstyle [1] 77:4
half [1] 82:15
half-hour [1] 173:24
halfway [1] 91:11
hall [2] 143:18 189:21
halls [1] 43:20
hallway [6] 78:18,19,21 85:24 86:7 200:23
hallways [2] 42:23 84:25
hami [1] 212:6
hamilton [1] 212:10
hammer [3] 63:2,9 194:10
hand [25] 24:8 26:3 30:10 35:21 50:16 55:18,18 61:8 75:13,17 79:8 80:10,15 101:13 106:11 135:10 148:4 149:8,10,13 155:13 160:4 161:20 183:6 186:11
handcuff [4] 50:7 75:14 101:9,13
handcuffed [3] 52:8 55:16 95:4
handcuffing [1] 210:1
handcuffs [15] 7:2 49:13 55:6 66:22,25 100:10 171:7,8,8,9 206:1 207:3,24 208:10 209:18
handed [3] 111:4,12 211:7
handful [1] 96:14
handle [2] 63:10 187:23
handled [1] 188:3
handling [1] 157:14
hands [6] 50:7 163:5,10 175:5,13,17
handsome [2] 56:2,3
hang [1] 43:14
happen [10] 5:17 31:13 44:2 51:11 60:16 78:15 85:19 89:7 109:17 181:4
happened [42] 6:13 7:19 9:4,18 12:17 22:9 42:12 51:9,16,25 60:10,14 65:13 66:12 69:2 75:8 79:5,14 80:5,11 81:4 83:25 85:10,22 89:1 90:8 92:11 105:8 107:17 117:9 120:15 124:15 125:11 138:24 141:7,9,13 142:14,23 170:2 171:5 183:7
happening [2] 44:3 75:25
happens [3] 34:2 47:16 84:21
happy [3] 50:11,16 196:12
hard [8] 31:20 47:17,18 51:11 65:22 71:8 74:17 158:19
hash [2] 113:16 114:9
hashing [1] 46:2
hate [3] 8:1 15:4 83:1
head [37] 50:17,19 51:10,12 55:20,22,23 60:1,2,3 77:7 80:20,23 81:3 85:6 92:15,19,20 93:1,5 97:16,20 102:6 105:17 135:7,8 152:18 163:19 183:3,6,16,19,22,24,25 198:10,13
headache [1] 93:5
headbutt [2] 184:2 201:7
headbutted [7] 57:9,21,24 80:1 102:6 177:11 201:8
headbutter [1] 184:3
headbutts [1] 50:14
headed [3] 65:1,9 199:16
heads [2] 18:23 83:21
healing [1] 153:19
hear [34] 10:21 12:21 24:11 32:5 35:6 37:3 41:19 49:8,9 50:4 51:2,4,18 52:4 53:16 54:8,11,12 57:11 59:12,21 60:22,22 74:20 75:24 88:12 93:14,15 97:15,23 114:13 165:11 178:9 184:9
heard [23] 7:17 26:9,25 31:21 33:1 35:16 36:20 39:12 40:4,5,8 57:14 59:14 60:7 88:21 121:16 141:17 148:3 158:1 159:23 166:4 200:5,19
hearing [14] 12:24 97:4,5,22,24 102:24 135:19,20,21,25 136:2,5,6,6
heart [5] 10:8 84:4,8,11 154:1
heat [2] 108:16 121:25
heavier [1] 156:22
heavy [1] 196:15
height [1] 199:13
held [1] 56:7
hello [2] 186:21,22
help [5] 24:22 28:15 37:12 45:3 199:6
helped [2] 85:11 125:21
helpful [1] 5:22
helping [1] 91:3
hempstead [1] 191:12
hi [5] 108:13,14 109:25 121:23,24
high [1] 20:5
himself [23] 58:18,18 76:17 79:20 106:11,19,19,21 107:2,24 108:15 109:12,23,24 118:13,21,23,24 121:20 163:5,13 164:5 182:1
hired [1] 129:7
histories [1] 11:21
history [1] 8:14
hit [27] 49:12 51:22 52:2 56:20 58:15 59:24 60:10,11,15,16,21 70:6 82:5,21,22 93:3 102:16 141:14,16,20 142:17,25 182:1 183:6,25 194:8 208:9
hits [2] 50:18 80:14
hitting [5] 7:2 163:5,12 164:5 207:2
hold [4] 3:14 85:2 156:2,7
holding [23] 16:19 29:25 66:16,17,18,19 67:2,3,6,8 74:12,14 75:16,25 101:24 105:4,9,10 107:18,19 118:6 158:20 159:4
home [2] 63:16 203:8
homework [1] 14:24
homicide [3] 187:24,25 188:6
homicides [1] 187:23
honest [2] 178:5,9
honor [73] 3:6,9,15,21 5:8 8:17 12:10,19 15:9 17:11,19,25 18:20 20:13 21:19 23:2,8,9 27:9 49:3 52:22 61:5 67:23 70:4 71:3,4,12 73:5 99:5 109:2,8 110:5 112:12 113:14 114:10,11,17 117:6 124:3,9 132:3,21 140:3 145:25 146:4 148:2 149:9 151:1 154:20 155:4,19 170:21 181:20 182:17,19 184:14,16,21,23 185:4,12,19 186:5 193:4,10 194:13 200:1 202:4,25 204:18 205:24 206:2 211:6
honorable [1] 1:11
honor's [2] 17:5 112:16
hope [5] 22:24 24:22 132:2 203:11 209:5
hopefully [2] 112:3 203:13
hoping [1] 13:16
hospital [31] 51:1 60:18 84:22,23 85:15,17,22,23,25 86:19 87:9,10,11,14 92:16 94:17 95:9,25 143:2,5,7,9,11 144:2,17 145:5,11 153:22,23,25 154:2
host [2] 62:22 65:25
hostile [1] 17:2
hotseat [1] 115:4
hour [4] 46:12 70:9 82:15 114:21
hours [6] 50:2 67:7 69:2

# Keyword Index


86:20,23 145:16
house [6] 12:15 54:18 65:8 99:9,15 152:14
however [7] 24:21 26:5 54:7 58:19 181:3 206:24 207:23
human [3] 31:20 39:16 40:22
humiliated [1] 92:9
humor [3] 77:24 83:13 145:3
hunch [1] 115:24
hundred [1] 191:19
hundreds [1] 183:2
hung [3] 78:23,24 120:21
hunt [2] 212:13,14
hurt [9] 51:24,25 92:16,18,18,20 93:4,17 210:1
hurting [2] 92:10 93:16
hysteria [2] 119:1,9
hysterical [1] 81:22
hysterically [1] 81:16

I

i'll [2] 139:11 149:23
i'm [3] 133:20,20 137:1
iab [2] 177:2 179:7
ice [1] 93:5
idea [7] 43:8 69:22 109:21 142:2 144:19 191:18 199:22
identical [3] 22:23 57:4 209:9
identification [1] 151:8
identified [9] 52:2 58:15,18 106:21 107:2,24 108:15 109:18 123:23
identifies [2] 106:19 113:8
identify [9] 108:21 109:12,22,24 118:13,23 125:21 126:10 159:7
identifying [3] 59:2 108:20 117:21
image [1] 73:11
imagine [5] 47:17,18 96:10 138:19,21
immediate [1] 195:25
immediately [5] 29:6 42:3,6 112:11 165:13
immunity [5] 6:11,13,16,24 7:6
impact [1] 80:21
impartiality [1] 25:2
impartially [2] 34:13 42:14
impeaching [1] 170:19
impeachment [6] 11:8,11 137:8 138:3,14 139:2
implied [1] 141:25
importance [1] 33:4
important [24] 31:11 32:4 33:13,17,20 34:5,19 36:19,21 37:2,6 38:6,15 39:9 41:13,14 44:4 45:1,18 47:15,21 49:4 178:2 180:25
impression [1] 13:24
improper [3] 43:6 44:3,3
improperly [1] 43:25
impropriety [2] 43:9,17
inches [1] 71:6
incident [30] 56:4,17 87:22 88:2 89:7 90:21 91:2 94:19,20 95:21 97:7 108:5 109:13,20 119:15 120:14,16 125:10,19 126:20 127:8 129:2 135:4 174:19 175:25 176:2,18 190:14 202:10,18
incidents [1] 209:16
inclination [1] 205:12
include [9] 22:15 109:6 176:25 179:17,19,20 181:3 182:4 188:8
included [3] 179:15 188:17,20
including [2] 33:21 207:17
inconsistent [5] 138:7,9,9,13,16
incorrect [1] 167:23
independent [1] 37:7
indicate [2] 36:4,9
indicated [2] 36:7 54:7
indicates [2] 152:17 200:15
indifferent [1] 18:12
indirect [1] 30:5
individual [5] 5:9 44:11 45:11 76:18 147:24
individuals [2] 33:18 37:9
inefficient [1] 148:18
infer [2] 29:13 30:3
inference [1] 148:14
inferences [1] 32:19
inflicted [1] 195:7
influence [1] 36:6
influenced [1] 36:19
inform [1] 43:24
information [7] 37:12 38:8 67:15 177:7,23 181:3 200:6
initial [4] 16:9 88:3 102:24 127:3
initially [2] 50:1 127:1
injuries [4] 51:19 181:3 182:8 195:7
injury [6] 55:20,22,23 60:1,1,20
input [1] 205:1
inquire [2] 61:14 155:19
inside [6] 66:19 162:6 165:11,14,16 175:22
inspector [2] 72:13 204:5
instance [3] 7:21 16:10 114:9
instances [1] 46:3
instead [2] 36:15 39:23
instinct [1] 13:22
instruct [6] 5:6 31:14,17 33:1 129:6 207:23
instructed [2] 8:4 32:2
instructing [1] 6:16
instruction [17] 4:16,20,22,25 5:1,3 6:2 31:16,16 38:12,14 39:15 205:1,3,10,10,12
instruction-related [1] 8:1
instructions [36] 4:8,10,11,12,13,15,23 5:5 7:1,4,23 14:24 24:17 27:2 29:14 30:17 39:13 40:6 41:6 44:1 47:25 48:6,7 204:20,24 205:2,14,20,22 206:19 207:11 208:19,20,22 209:8 210:12
insulates [1] 207:18
intelligence [1] 53:19
intend [2] 124:2 132:22
intended [1] 36:4
intention [6] 113:4 160:1,14 171:12 172:9,21
intentions [1] 160:10
interaction [6] 10:25 158:25 162:6 163:24 190:10,12
interesting [1] 39:18
interfere [1] 45:7
interim [2] 56:13 82:16
internal [16] 56:15 88:13,19 89:13 91:5 122:18 126:7 175:25 178:13 179:7 180:5 181:1 182:4 202:8,17,19
internally [1] 124:7
internet [3] 37:10 38:5 91:20
interrogate [1] 50:9
interrogating [2] 10:23 160:2
interrogation [3] 10:3,5 55:15
interrogatories [2] 7:16,23
interrupting [3] 77:20,23 79:13
interview [3] 89:16,18 90:20

# Keyword Index


**interviewing** [1] **90:**5
**introduce** [3] **8:**12,16 **113:**6
**introduced** [12] **25:**18 **30:**2 **32:**7 **36:**24 **58:**18 **76:**15, 16 **106:**11,19 **118:**20,24 **121:**20
**introducing** [2] **114:**17 **121:**23
**introduction** [4] **28:**4 **37:**15 **48:**9 **52:**18
**intuition** [1] **7:**22
**intuitive** [2] **16:**3,4
**investigate** [2] **89:**1 **177:**7
**investigating** [6] **89:**7, 13 **90:**8 **106:**24 **177:**25 **182:**13
**investigation** [11] **88:**17 **91:**5 **92:**2,6 **178:**3 **180:**12, 23 **181:**11 **182:**12,15 **200:**7
**investigations** [1] **188:**6
**investigator** [6] **56:**16, 16,21 **88:**13 **90:**11,15
**investment** [1] **49:**18
**invoke** [1] **16:**5
**invoking** [1] **208:**5
**involve** [2] **63:**1 **158:**24
**involved** [5] **8:**19 **37:**9 **38:**1,2 **63:**14
**involvement** [1] **127:**11
**irate** [1] **164:**1
**irrelevant** [1] **21:**22
**island** [2] **94:**22 **99:**9
**isn't** [7] **50:**11,16 **129:**12 **178:**19 **179:**19 **189:**22 **206:**13
**issue** [11] **6:**24,25 **7:**10 **21:**3 **25:**21,23 **26:**2 **46:**2 **48:**5 **68:**8 **107:**10
**issued** [1] **93:**21
**issues** [11] **4:**5 **8:**1 **17:**13 **19:**16,19 **22:**16 **45:**21,24 **71:**23 **135:**22 **204:**13
**item** [3] **8:**6 **30:**19 **31:**14
**items** [1] **28:**11
**it'll** [2] **47:**8 **206:**19
**itself** [6] **28:**7 **37:**25 **51:**5 **52:**14 **114:**3 **165:**22

## J

**jacket** [2] **105:**17 **125:**7
**january** [4] **56:**25 **187:**10, 11,12
**jaw** [1] **92:**20
**jeans** [1] **49:**21
**jeopardizes** [1] **44:**6
**jersey** [4] **57:**7 **76:**21 **123:**6 **125:**5
**jesse** [35] **2:**13 **3:**23 **27:**10 **53:**5,6 **56:**9,22,23,24 **57:**5,9, 11 **58:**15,18,21,21,22 **59:**2 **60:**11 **105:**13 **107:**22 **109:**6 **121:**17,24 **122:**3 **123:**23 **124:**22,25 **125:**21,23 **126:**3,7 **186:**6,14,17
**j-e-s-s-e** [1] **186:**17
**job** [4] **34:**8 **52:**12 **53:**18 **157:**20
**jobs** [2] **53:**12 **63:**8
**jobsite** [1] **64:**14
**johnson** [3] **57:**8 **123:**7 **125:**6
**join** [1] **85:**16
**joint** [4] **6:**9 **112:**8,14 **147:**24
**jointly** [2] **5:**5 **205:**13
**joke** [1] **145:**22
**jokes** [1] **50:**12
**jpto** [6] **6:**17 **8:**7 **10:**12 **147:**2,3 **148:**24
**judge** [27] **1:**12 **4:**23 **24:**14 **28:**14 **31:**22 **34:**11,12,12 **38:**21 **40:**10 **53:**8 **54:**6,6,7,8 **71:**8 **115:**13 **131:**19,21 **148:**25 **185:**9 **206:**25 **207:**1,16 **208:**17 **210:**16 **211:**5
**judges** [4] **34:**8 **54:**2,3,4
**judgment** [5] **22:**9 **34:**16 **53:**14 **132:**11,13
**judicial** [2] **45:**18 **49:**4
**july** [1] **156:**1
**jump** [1] **11:**3
**jumped** [1] **64:**21
**jurisprudence** [1] **206:**2
**juror** [7] **38:**6,12 **42:**13,14 **43:**4 **44:**5,11
**jurors** [13] **24:**24 **31:**25 **33:**14 **34:**2 **36:**21 **37:**13,23,25 **40:**8 **42:**8,15,20 **45:**12
**jurors'** [1] **34:**6
**juror's** [1] **44:**1
**jury** [78] **1:**10,12 **4:**6,9,9,11, 12,17 **5:**5,7,11 **6:**16,24 **7:**1,3 **8:**1,3 **10:**20,22 **12:**11 **14:**16, 24 **20:**11,12 **23:**7 **24:**1,4,9,20 **30:**15,22,25 **31:**12 **33:**5,5,7,7, 16,20 **39:**17 **45:**13,23 **46:**1,6 **47:**7,19 **48:**18,19 **53:**2,8 **57:**13 **71:**1 **73:**1 **110:**9 **111:**1 **113:**11 **114:**21 **115:**10,12,14 **117:**1 **127:**18 **185:**1,6 **186:**1 **203:**11,13 **204:**1,19,20,24 **205:**9 **207:**24 **208:**18,20,21 **209:**8 **210:**12
**jury's** [3] **14:**6 **17:**13 **183:**11
**justice** [2] **24:**25 **53:**9
**justification** [1] **192:**1

## K

**karate** [1] **201:**17
**keep** [11] **9:**1 **29:**16 **64:**6,6, 9 **71:**18 **72:**13 **79:**4 **114:**22 **135:**17 **149:**9
**keeping** [1] **13:**12
**keeps** [1] **39:**10
**kept** [2] **77:**20 **79:**13
**kevin** [1] **193:**2
**key** [2] **60:**5 **196:**20
**kick** [1] **48:**15
**kid** [1] **144:**11
**kids** [1] **62:**8
**killed** [1] **82:**7
**killing** [1] **92:**19
**kind** [23] **7:**13 **12:**22 **71:**8 **77:**3 **78:**16,16 **79:**9 **81:**7,12, 13 **82:**3 **83:**13 **84:**5 **90:**7,7 **108:**2,21 **122:**14 **144:**24 **145:**19 **196:**23 **207:**10,21
**kinds** [5] **29:**9,16 **82:**8 **83:**6 **86:**4
**knocked** [1] **50:**24
**knowing** [1] **56:**17
**knowledge** [1] **9:**4
**known** [5] **38:**25 **58:**4 **144:**24 **145:**18 **154:**7
**komitee** [3] **1:**11 **24:**14 **54:**6
**kovner** [1] **207:**1

## L

**ladies** [6] **24:**13 **40:**20 **52:**25 **53:**1 **194:**19 **203:**5
**lagreca** [9] **1:**23 **3:**20,21 **53:**4 **194:**13,18,22 **196:**18,22
**lake** [1] **145:**6
**lane** [1] **193:**2
**language** [3] **83:**1 **208:**4, 7
**larcenies** [1] **188:**4
**larceny** [7] **9:**17 **55:**5 **113:**9 **114:**3,5 **188:**3,8
**lashinsky** [51] **2:**10 **4:**1,1 **13:**14 **15:**19 **27:**11,16 **52:**6 **53:**6,11 **56:**2,10 **57:**17 **58:**1 **59:**5,6,9,11,13,17,19,20,23 **60:**12,24 **100:**21 **126:**10,12, 21 **127:**2,4,9,10,12,15,17,19, 22 **128:**1 **129:**10,12 **130:**7 **131:**5,8,16 **132:**23 **155:**3,14, 18 **182:**22 **185:**15
**l-a-s-h-i-n-s-k-y** [1] **155:**18

# Keyword Index


**last** [12] **6:**21 **8:**18 **29:**8 **32:**25 **57:**12 **83:**24 **152:**21,22,24 **169:**10 **189:**21 **200:**23
**late** [1] **18:**14
**later** [12] **41:**5 **45:**2,3 **46:**17 **57:**15 **87:**25,25 **88:**1 **92:**21 **109:**18 **152:**17 **195:**5
**latest** [1] **204:**22
**latin** [1] **5:**10
**lauderdale** [1] **94:**4
**laughing** [3] **78:**17 **79:**23 **80:**1
**laughs** [2] **50:**12 **69:**9
**laura** [2] **212:**12,14
**law** [25] **6:**16,25,25 **17:**8 **25:**1 **27:**18 **30:**6,11 **33:**1 **34:**12 **35:**2,7 **37:**8 **39:**13 **40:**6 **41:**6 **47:**21 **48:**1 **205:**5,11 **208:**9 **209:**10,25 **210:**10,11
**lawsuit** [3] **200:**12,12,15
**lawyer** [9] **27:**25 **28:**1,18,19 **32:**12 **43:**5 **58:**8 **95:**2 **137:**3
**lawyers** [21] **4:**4 **28:**2,6 **30:**24 **31:**2 **32:**17 **36:**13,18 **37:**21,24 **43:**1,12 **45:**20,22 **46:**1,9,24 **48:**23 **58:**5 **62:**22 **116:**3
**lawyers'** [1] **36:**16
**laying** [2] **92:**17 **179:**20
**lead** [1] **16:**13
**leading** [4] **16:**24 **17:**2,6 **165:**21
**learned** [6] **24:**20 **57:**15 **106:**23 **108:**5 **109:**15 **122:**3
**least** [10] **8:**18 **14:**9,14 **15:**16 **17:**6 **19:**22 **132:**24 **163:**14 **182:**1 **190:**6
**leave** [16] **13:**23 **45:**13,23 **46:**10,21,23 **47:**3 **67:**20 **114:**8 **161:**3 **163:**2,2 **164:**12 **188:**22 **204:**2 **210:**23
**leaving** [3] **12:**15 **16:**10 **54:**18
**led** [3] **55:**9 **100:**23 **182:**25
**left** [36] **46:**14 **48:**11 **50:**16 **55:**16,18 **63:**19,19,21 **64:**20 **66:**15,16 **74:**4,5,10,22 **75:**13,16,21 **78:**24 **80:**8,15 **84:**18 **86:**7,7,17 **97:**24,25 **101:**13,17 **117:**19 **135:**4,7,8,10 **162:**9 **181:**6
**legal** [11] **6:**14 **35:**22 **45:**21 **62:**21 **132:**6,10 **212:**11,15,20,26,32
**legitimate** [1] **49:**13
**less** [7] **33:**11 **93:**15 **162:**25 **164:**10,11,11 **208:**6
**let's** [1] **15:**6
**letter** [15] **57:**1,4,8 **88:**22 **123:**14,17,19,22,25 **124:**22,24 **125:**2,3 **206:**8 **208:**1
**letters** [11] **8:**2 **17:**15 **57:**4 **88:**23,24 **89:**2,6,8 **123:**23 **126:**1 **154:**13
**letting** [2] **52:**17 **148:**4
**lexis** [2] **5:**20,21
**liability** [1] **205:**7
**liable** [3] **27:**16 **41:**20,20
**lieutenant** [17] **18:**7 **19:**8 **59:**15 **60:**5,13,15 **72:**7,10,12 **89:**22 **174:**14 **175:**7,9,21 **185:**16 **190:**15 **204:**4
**life** [11] **33:**19 **48:**16 **53:**18 **57:**12,23 **59:**9 **200:**4 **201:**1,9,13,18
**lifetime** [1] **39:**19
**lifted** [1] **183:**3
**light** [6] **74:**17 **76:**25 **77:**2 **101:**23 **105:**15 **194:**9
**lights** [1] **80:**18
**light-skinned** [1] **123:**6
**likelihood** [1] **43:**17
**likely** [2] **25:**10 **26:**7
**limine** [6] **8:**7,7,8,13 **11:**13 **22:**16
**limited** [3] **16:**6 **31:**15 **48:**24
**limiting** [1] **31:**16
**line** [26] **30:**22 **47:**2 **85:**6 **104:**10 **106:**8 **107:**13 **118:**4,12,16 **126:**19,25 **127:**6 **137:**4 **167:**13,19,20,20 **168:**25 **169:**11,11,14,14 **170:**15 **171:**11 **198:**25,25
**lined** [3] **71:**12 **73:**22,23
**lines** [3] **42:**12 **164:**2 **171:**11
**link** [1] **189:**25
**lion's** [1] **112:**20
**list** [5] **4:**15 **15:**15 **148:**24 **185:**13 **204:**24
**listed** [1] **147:**24
**listen** [6] **34:**6 **44:**24 **53:**13 **78:**3 **83:**15 **85:**1
**listened** [1] **34:**2
**listening** [4] **45:**6,8 **76:**7 **84:**3
**little** [40] **13:**23 **17:**12 **27:**4 **30:**4 **46:**17 **63:**4 **66:**16,16 **68:**5,6 **74:**11 **77:**15,15,23,25 **78:**6 **82:**10 **83:**12 **85:**24 **86:**2 **91:**3 **100:**2 **105:**23 **106:**24 **114:**1,21 **117:**9 **123:**13 **133:**25,25 **136:**14 **143:**15 **152:**18,24 **153:**15,17 **156:**22 **183:**1 **196:**21 **203:**8
**live** [5] **65:**8 **67:**15 **86:**5 **115:**5 **185:**7
**lives** [1] **53:**12
**living** [3] **62:**12 **99:**8,11
**lobby** [2] **86:**2 **143:**15
**located** [1] **157:**3
**lock** [1] **161:**8
**locked** [1] **210:**25
**log** [1] **135:**17
**logan** [1] **62:**11
**logistical** [2] **13:**11 **15:**15
**long** [17] **13:**21 **26:**4 **48:**12 **67:**6 **75:**19 **82:**14 **86:**18 **94:**22 **96:**15 **99:**9 **101:**16 **119:**13 **120:**17 **156:**5,10 **158:**13 **177:**20
**longer** [3] **54:**23 **112:**21 **203:**7
**look** [18] **16:**3 **30:**20 **48:**21 **52:**18 **67:**19 **74:**18 **75:**4 **85:**9 **122:**16 **147:**23 **151:**15 **167:**8 **168:**23 **176:**7 **196:**12 **198:**15,20 **203:**16
**looked** [14] **56:**23 **57:**6 **76:**20 **83:**20 **85:**7,9 **91:**19 **100:**7 **108:**8 **120:**18 **122:**10 **175:**17 **178:**21 **208:**18
**looking** [9] **84:**4 **91:**23 **108:**23 **152:**20,21 **178:**25 **199:**16 **203:**9 **205:**6
**looks** [1] **172:**10
**lorton** [1] **94:**9
**losing** [1] **208:**15
**loss** [2] **135:**19,20
**lost** [2] **41:**9 **193:**2
**lot** [18] **38:**20 **49:**19 **65:**21 **66:**9,9,9,10 **69:**8 **76:**1,3 **97:**16,20 **131:**11 **144:**13,21 **145:**14 **199:**22 **207:**12
**loud** [5] **124:**7 **141:**17 **158:**7 **159:**23 **168:**24
**lower** [2] **97:**17,19
**lowest** [1] **14:**16
**lunch** [13] **20:**1 **46:**11,16,22,23 **47:**7,7,10 **99:**4 **108:**24 **110:**6 **114:**12 **204:**21
**lunchbreak** [1] **20:**8
**lying** [6] **141:**3 **143:**25 **166:**15,18,25 **180:**1

## M

**ma'am** [9] **162:**22 **163:**9,22 **165:**7,12,15 **171:**21 **172:**1 **174:**16
**made** [18] **38:**7 **56:**15 **73:**15 **79:**22 **88:**3 **112:**18 **127:**1,3 **152:**23 **154:**11 **158:**10 **163:**4 **172:**8 **175:**13 **176:**21 **177:**11 **191:**17 **202:**7

# Keyword Index


**madeline** [3] **57:**3 **123:**18 **126:**2
**magistrate** [1] **15:**25
**main** [3] **45:**6 **158:**6 **164:**14
**male** [9] **56:**2,3 **57:**6 **58:**1,1 **102:**10,12 **123:**6 **199:**15
**malicious** [1] **112:**14
**man** [2] **22:**3 **201:**1
**manage** [1] **62:**19
**manager** [1] **38:**18
**maneuver** [2] **194:**9 **196:**12
**manner** [2] **165:**25 **195:**11
**manual** [1] **71:**7
**many** [6] **18:**5 **62:**7 **95:**21 **96:**12 **121:**6 **191:**17
**map** [2] **207:**9,21
**marginal** [1] **22:**18
**mark** [2] **149:**23 **153:**11
**marked** [3] **2:**17 **151:**6,8
**marks** [1] **92:**23
**married** [3] **61:**22,24 **62:**3
**martial** [6] **192:**9 **193:**1,8 **196:**7 **201:**14,18
**marvin** [1] **64:**25
**material** [1] **25:**6
**materials** [1] **37:**10
**math** [1] **114:**25
**matter** [4] **9:**24 **10:**1 **195:**20 **212:**4
**mattered** [1] **10:**1
**matters** [5] **29:**15 **36:**8 **37:**8 **185:**7 **208:**8
**maxes** [1] **187:**13
**maximum** [2] **14:**7 **20:**10
**meadow** [1] **191:**11
**mean** [35] **11:**17 **16:**16 **39:**3 **42:**25 **43:**21 **45:**19 **48:**3 **68:**4,24 **70:**1 **79:**21,24 **81:**25 **89:**3,10 **92:**17 **93:**13 **94:**24 **97:**20 **113:**10,17 **138:**16 **145:**23 **147:**11 **149:**8,13 **152:**4 **153:**24 **163:**15 **178:**22 **196:**12,19 **198:**9 **199:**12 **211:**12
**meaning** [1] **35:**18
**meaningful** [2] **132:**18,19
**means** [9] **14:**17 **25:**8,9,11 **31:**5 **35:**7,22 **39:**7 **114:**14
**meant** [3] **15:**15 **178:**25 **179:**3
**meantime** [1] **48:**22
**mechanics** [1] **51:**9
**media** [1] **40:**12
**medical** [6] **55:**21 **84:**2 **95:**5 **143:**13 **183:**13,14
**medically** [1] **51:**16
**meet** [3] **64:**11 **113:**15 **123:**3
**meeting** [2] **49:**19 **200:**24
**members** [3] **33:**8 **58:**24 **63:**16
**memory** [2] **31:**24 **161:**13
**mena** [2] **69:**20,20
**m-e-n-c-h** [1] **69:**20
**men's** [1] **115:**17
**mentioned** [11] **4:**20 **17:**20 **37:**19 **53:**8 **94:**21 **96:**17 **135:**11,19 **163:**12 **179:**6 **206:**24
**mercedes** [6] **9:**12 **49:**23,25 **50:**10 **54:**17 **64:**16
**mere** [1] **114:**2
**merrick** [4] **65:**7 **75:**5 **191:**12,12
**mesh** [1] **74:**19
**mess** [1] **93:**11
**message** [2] **38:**21 **89:**11
**messy** [1] **9:**19
**met** [15] **38:**18 **57:**12,13 **59:**5,8,12 **64:**14,19 **65:**4 **122:**20,25 **123:**2,4 **131:**8 **194:**25
**metal** [1] **66:**17
**mic** [1] **194:**20
**michael** [2] **157:**17,18
**microphone** [8] **19:**17 **24:**11 **27:**4 **48:**13,16 **114:**15 **149:**17 **185:**7
**microphones** [1] **71:**7
**middle** [3] **48:**17 **62:**10 **80:**13
**mid-november** [1] **89:**4
**midsection** [1] **101:**2
**midst** [1] **117:**4
**might** [21] **4:**14 **5:**3 **10:**6 **16:**7 **30:**2 **35:**11 **41:**4 **43:**5,6 **46:**14,15 **112:**20 **139:**1 **148:**20 **151:**22 **167:**6 **190:**4 **205:**7,7 **206:**2 **209:**19
**miles** [1] **63:**24
**military** [1] **47:**18
**million** [2] **83:**17,19
**mind** [11] **17:**17 **20:**24 **26:**12 **29:**16 **31:**23 **34:**3,7 **39:**10 **41:**4 **82:**10 **207:**17
**mine** [2] **34:**17 **84:**12
**mineola** [3] **1:**25 **87:**16 **90:**19
**minervini** [6] **19:**12 **65:**23 **66:**4 **71:**20 **83:**9 **204:**9
**minerviri** [1] **65:**23
**minimize** [1] **46:**3
**m-i-n-i-v-i-n-i** [1] **66:**4
**minor** [1] **112:**20
**minute** [8] **40:**15 **162:**23 **164:**8,10,11,11 **165:**9 **168:**21
**minutes** [29] **20:**13,15 **21:**1 **39:**2 **46:**12,14 **50:**8 **67:**20 **70:**8,9 **71:**2 **75:**22 **76:**14 **82:**15 **91:**9 **99:**3 **108:**25 **113:**16 **114:**20,23 **120:**22,22 **123:**5 **173:**23 **174:**9,10 **179:**21,23 **184:**22
**miranda** [1] **160:**4
**mirandized** [1] **160:**6
**mirror** [1] **73:**10
**misdemeanor** [4] **9:**23 **10:**6 **11:**5,7
**mishmash** [1] **206:**4
**misspoke** [1] **179:**5
**mistrial** [1] **44:**6
**mixed** [6] **192:**9 **193:**1,8 **194:**4 **196:**7 **201:**17
**mo** [1] **22:**23
**moment** [10] **6:**21 **21:**1 **33:**4 **62:**23 **108:**2,16,24 **121:**25 **137:**12 **154:**4
**monday** [4] **1:**6 **57:**12 **189:**21 **200:**24
**month** [2] **96:**10 **97:**3
**months** [2] **176:**2,18
**morning** [26] **3:**6,8,9,12,15,17,21,22,25 **4:**2 **17:**16 **19:**20 **24:**13 **47:**11 **49:**2,17 **52:**25 **53:**1 **63:**11 **64:**8 **70:**7 **71:**24 **152:**15 **203:**12 **204:**13 **211:**1
**morrison** [1] **207:**1
**most** [11] **12:**8 **22:**18,22 **27:**5 **33:**17 **39:**18 **45:**19 **46:**3 **62:**19 **63:**7 **206:**3
**mother** [1] **84:**10
**motion** [5] **8:**13 **11:**13,14 **22:**16 **132:**23
**motions** [3] **8:**6,7,8
**mouth** [2] **10:**22 **81:**19
**move** [7] **50:**17 **55:**17 **69:**10 **112:**3 **132:**20 **196:**4 **197:**1
**movement** [1] **179:**21
**movements** [2] **9:**5 **10:**17
**moves** [2] **195:**11 **196:**16
**moving** [6] **11:**15 **13:**12 **72:**15 **166:**19 **174:**11 **178:**10
**ms** [41] **2:**11 **3:**9,20 **16:**20,23 **38:**18 **42:**6,11,16 **115:**15 **134:**6 **147:**21 **155:**2,7,10,19,22 **168:**19,22 **169:**2,17,20,22 **170:**19,23 **172:**6 **181:**20,23 **182:**17 **184:**16 **185:**8 **186:**11 **194:**13,18,22,24 **196:**18,22 **204:**7,9 **210:**24
**much** [10] **6:**12 **10:**25 **40:**

# Keyword Index

19 **47:**19 **48:**5 **49:**3 **52:**17 **177:**22 **198:**2 **200:**25
**multiple** [4] **49:**12 **88:**18 **136:**12 **141:**15
**murder** [1] **12:**24
**muscular** [1] **123:**9
**must** [17] **25:**23,25 **26:**1,18, 23 **31:**8,15 **32:**6,6 **33:**3 **37:**5, 6 **38:**1 **42:**2 **43:**10 **89:**10,11
**myself** [7] **4:**9 **88:**22 **93:**5 **144:**25 **145:**19 **159:**6 **170:**5

## N

**naked** [1] **193:**2
**name** [63] **4:**19 **12:**24 **24:** 13 **53:**2 **56:**8,10,18,20 **58:**21 **61:**11,12 **69:**18 **86:**4 **89:**22 **90:**17,18,22 **96:**4 **102:**14,16 **105:**11,12 **106:**23,23,25 **107:** 20,21 **108:**1,3,13,17,18,19 **109:**6,7,20,25 **118:**8,10,25 **119:**2,25 **120:**5 **121:**17,24 **122:**3,20,21 **125:**16,18 **127:**3, 5,17 **142:**10 **143:**16 **147:**14 **154:**7 **155:**16 **186:**16,17 **200:** 5,19 **202:**21
**named** [1] **122:**18
**names** [10] **62:**9 **65:**19,21, 22 **66:**1 **108:**20 **122:**1,2 **144:** 7 **159:**8
**nassau** [36] **1:**8,21 **3:**3,24 **27:**16,16 **49:**11 **50:**9 **52:**11, 14 **53:**3,7,10 **54:**22,24 **55:**21 **56:**6 **57:**1,3,20 **99:**22 **101:**21 **113:**7 **123:**17 **142:**13 **143:**4, 12 **156:**3 **186:**24 **187:**1,22 **191:**6,8,25 **202:**9,17
**natural** [2] **39:**21 **67:**21
**naturally** [1] **39:**20
**nature** [2] **39:**16 **40:**22
**navigator** [1] **64:**9
**near** [1] **180:**11
**necessarily** [3] **5:**14 **6:** 23 **188:**15
**necessary** [6] **10:**25 **11:** 3 **16:**25 **42:**10 **149:**2 **206:**13
**need** [27] **4:**13 **7:**5 **15:**4 **18:** 12,24 **19:**3 **20:**9 **21:**23 **26:**4 **30:**16 **38:**21 **44:**21 **47:**3 **48:**4, 4 **64:**7 **84:**15 **95:**7 **114:**8,15 **115:**22 **155:**7 **169:**17 **177:**7 **204:**20,24 **205:**1
**needing** [1] **21:**4
**needless** [3] **37:**18 **38:**2 **41:**24
**negative** [1] **188:**1
**negotiated** [1] **210:**24
**neither** [1] **8:**15
**neon** [4] **77:**1 **105:**18 **106:** 6 **199:**20
**nervous** [1] **84:**14
**neurosurgeon** [2] **95:** 10,11
**never** [49] **7:**5 **10:**21 **35:**20 **57:**12,14,14,14,21,23 **58:**22, 25 **59:**5,8,12,24,24 **60:**19 **62:** 23 **68:**13 **127:**3,19,20,22 **130:** 1 **131:**5,8 **147:**6 **159:**20 **171:** 7,8,8,9,9 **178:**13 **179:**6 **180:**5 **183:**6 **184:**9 **189:**20 **190:**6,7 **191:**22 **192:**1,3 **194:**25 **201:** 1,8,18,25
**new** [27] **1:**2,5,19,19,25 **15:** 16 **24:**15 **27:**18 **29:**4 **56:**19, 21 **57:**7 **62:**24,24 **76:**21 **93:** 18 **95:**23 **102:**23 **119:**12,18 **120:**2 **123:**6 **125:**5,20 **208:** 21 **209:**25 **210:**3
**news** [2] **37:**1 **203:**11
**newspaper** [1] **38:**10
**next** [30] **7:**7 **13:**24 **32:**4 **43:**14 **56:**5 **65:**6,8,9 **67:**20 **68:**13 **69:**2,6 **73:**8 **75:**8 **80:** 11 **81:**4,5 **87:**17 **92:**25,25 **101:**20 **108:**25 **109:**15 **124:** 20 **152:**2 **153:**12 **155:**1 **175:** 16 **184:**19 **203:**10
**nice** [8] **12:**8 **68:**4,7 **77:**9 **83:**22 **85:**5 **144:**11,12
**night** [3] **92:**16 **95:**9 **152:** 14
**nine** [1] **5:**4
**nobody** [5] **60:**21 **141:**20 **142:**10,25 **202:**21
**nobody's** [3] **11:**15,25 **37:** 17
**noise** [2] **60:**7 **79:**22
**noises** [3] **158:**1 **165:**11 **174:**4
**nonconscious** [1] **170:** 8
**none** [2] **10:**18 **21:**12
**nonparties** [1] **21:**10
**non-parties** [2] **15:**5 **21:** 16
**non-party** [4] **13:**18 **14:** 10 **17:**7,20
**nope** [1] **115:**9
**normal** [2] **42:**18 **62:**19
**north** [3] **75:**3 **191:**12,12
**nose** [3] **71:**9 **79:**25,25
**note** [2] **22:**21 **185:**14
**notebooks** [1] **45:**14
**notepad** [3] **44:**11,23 **45:** 13
**notes** [7] **44:**13,14,20,25 **45:**9,10,12
**note-taking** [3] **44:**10 **45:** 5,7
**nothing** [11] **9:**10 **38:**5,22 **40:**9 **55:**4 **88:**21 **92:**11 **154:** 20 **182:**17 **199:**6 **202:**25
**notice** [1] **115:**21
**noticed** [2] **54:**24 **72:**9
**november** [2] **123:**15 **126:**1
**number** [12] **3:**3 **14:**17 **25:** 13 **44:**14 **45:**3 **47:**14 **83:**18 **84:**9,11 **88:**19 **104:**5 **200:**12
**numbers** [3] **19:**4 **20:**17 **30:**14
**numc** [2] **95:**19 **111:**25
**nuts** [2] **11:**25 **113:**1

## O

**oath** [14] **37:**25 **58:**10 **59:**3, 8 **73:**4 **103:**3,8 **117:**4 **126:**14 **137:**2 **173:**16 **189:**22 **199:**3 **202:**13
**object** [6] **10:**19 **34:**25 **112:**13 **147:**6,23 **148:**19
**objected** [2] **10:**12 **36:**2
**objecting** [1] **113:**23
**objection** [27] **19:**20 **35:** 6,16,17,21,25 **104:**3,4 **106:**14 **107:**4 **111:**17 **112:**4,5 **113:**7, 11,12 **115:**7 **128:**3 **130:**4,9 **137:**6,7 **138:**2 **140:**1 **142:**11 **193:**4,10
**objections** [5] **112:**6,9 **113:**3 **149:**3,4
**obligation** [1] **176:**22
**obligations** [1] **53:**13
**observation** [1] **17:**21
**observations** [1] **181:** 19
**observe** [3] **171:**25 **172:**1 **179:**23
**observed** [6] **173:**9 **175:** 21 **178:**20 **179:**25 **181:**25 **182:**1
**obtain** [1] **37:**12
**obvious** [1] **206:**19
**obviously** [9] **10:**23 **13:** 13 **18:**16 **23:**1 **34:**4 **54:**6 **169:** 16 **189:**10 **204:**13
**occasions** [2] **31:**13 **59:** 3
**occur** [1] **121:**7
**occurred** [3] **56:**4 **174:**19 **176:**19
**occurs** [1] **42:**12
**october** [42] **1:**6 **49:**17 **54:** 16 **55:**19 **56:**4,5,17,18 **58:**19 **59:**5 **61:**20 **63:**11 **99:**8 **101:** 20,22 **102:**5,9,17 **103:**5 **104:**

# Keyword Index


10 **107:**24 **109:**5,13,20 **119:**13 **121:**6 **125:**11,14 **136:**8 **141:**2 **154:**9 **156:**12,15 **184:**2 **188:**23 **190:**17 **199:**12 **212:**9,13,18,24,30

**offensive** [2] **209:**25 **210:**2

**offered** [2] **28:**12 **31:**15

**office** [9] **1:**21 **53:**3 **73:**22 **75:**4,4 **76:**2 **78:**20,22 **89:**14

**officer** [61] **7:**18 **8:**14 **50:**8,22 **52:**2,5,9 **56:**22 **57:**20,23 **69:**17,18 **76:**6 **83:**16 **85:**21 **88:**5,6,7 **89:**13 **90:**22 **99:**23 **100:**1,3 **119:**13,14 **120:**2,3,12 **121:**7 **122:**18 **125:**20 **142:**13 **143:**4 **144:**3,9,9,13,15,23 **145:**6,6,7,8,10,16 **154:**7 **156:**8 **174:**17,18 **175:**11 **182:**13 **190:**18,20,21 **191:**7 **201:**10,20,22 **204:**6,6 **206:**5

**officers** [56] **8:**19 **9:**2,3 **13:**19,24 **14:**1,10 **50:**3,25 **52:**12,15 **54:**22,25 **55:**10,11 **57:**17 **59:**22 **65:**19,25 **66:**6,9,10 **67:**8 **68:**3 **69:**17 **74:**10 **75:**9 **76:**2 **85:**4,16,19 **87:**14 **100:**6 **118:**19 **119:**5 **131:**11 **144:**6 **158:**6,19,21 **159:**5,6,7,16,17 **160:**20,23 **161:**3 **162:**9 **164:**17 **165:**13 **166:**8,9 **178:**6 **190:**25 **191:**1

**officers'** [2] **67:**25 **122:**1

**offices** [2] **74:**6,7

**official** [2] **44:**15 **45:**9

**officials** [2] **88:**25 **123:**22

**offline** [2] **20:**10 **48:**24

**off-the-cuff** [1] **145:**4

**off-white** [1] **106:**6

**often** [2] **40:**10 **94:**18

**old** [6] **11:**7 **49:**21 **53:**23 **61:**18,20 **101:**23

**older** [1] **53:**23

**oldest** [1] **62:**10

**olivia** [1] **62:**11

**once** [13] **15:**17 **32:**13 **37:**23 **38:**10 **39:**19 **40:**1 **71:**11 **143:**11 **158:**18 **163:**4,14 **182:**2 **206:**11

**one** [86] **1:**24 **5:**18 **6:**22 **10:**11 **13:**19 **15:**14 **19:**16,19 **25:**22 **26:**12 **30:**10 **31:**13 **33:**17,21,22,22 **34:**1,3,21 **35:**12 **36:**16 **39:**9 **40:**24,24 **41:**21 **42:**16 **44:**14,24 **47:**14 **50:**7 **54:**1,1,25 **55:**24,25 **58:**14,14 **63:**23 **68:**13 **69:**18,25 **74:**11 **78:**20 **85:**4 **88:**10 **90:**5 **100:**6,23 **101:**2,13 **102:**22 **109:**1 **115:**16 **122:**9,10,12,15 **131:**12 **132:**18 **134:**1,2 **144:**8,9 **147:**15,21 **149:**8,10,23 **151:**15 **153:**6 **154:**4 **161:**20 **165:**17 **168:**16 **169:**9,10 **172:**21,22 **194:**10 **202:**4 **203:**7 **205:**20 **206:**13,20 **207:**2 **211:**11

**ones** [6] **14:**8 **151:**19,19 **152:**17,24 **153:**2

**one's** [2] **209:**10,10

**only** [35] **7:**9 **10:**5 **11:**7,11 **13:**20 **22:**18 **29:**1,4 **31:**15 **32:**1 **33:**16 **34:**11 **39:**10,13,19 **42:**25 **43:**24 **55:**25 **59:**21 **70:**1 **106:**23 **108:**3 **109:**14 **111:**7 **126:**7 **131:**2 **135:**7 **141:**10 **161:**18 **162:**23 **166:**4,11 **174:**21 **180:**17 **181:**17

**open** [14] **34:**3,7 **39:**10 **75:**21 **80:**16 **135:**10 **155:**7,10 **161:**6,7,11,14,16 **210:**15

**opened** [1] **78:**19

**opening** [17] **2:**2 **8:**3 **27:**25 **28:**1,2,3,8 **36:**14,18 **47:**23 **48:**10,15,17 **49:**1 **52:**21,24 **76:**4

**openings** [1] **13:**13

**opens** [1] **11:**22

**operations** [1] **47:**22

**operative** [1] **205:**6

**opinion** [11] **34:**14,21,23 **36:**5,9 **40:**2,17 **41:**20 **174:**25 **180:**4 **206:**18

**opinions** [2] **33:**11 **41:**3

**opportunity** [6] **27:**24 **28:**20,23 **30:**24 **32:**15 **209:**9

**opposed** [1] **4:**18

**opposing** [1] **15:**24

**optometrist** [1] **98:**10

**order** [10] **6:**9 **27:**24 **47:**22 **48:**4 **112:**8,14 **138:**21 **139:**1 **147:**25 **151:**22

**ordinarily** [1] **17:**1

**original** [5] **58:**20 **85:**4 **127:**4 **153:**10 **154:**14

**originally** [1] **166:**10

**orlando** [1] **94:**10

**other** [70] **4:**18 **8:**6 **13:**24 **14:**1,10 **15:**14 **18:**13 **19:**21 **20:**10 **22:**16 **25:**19,22 **26:**3 **29:**14,15 **30:**11 **34:**22 **35:**12,21 **36:**1,24 **37:**12 **39:**8,23 **41:**4,11,11,24 **42:**9,11,15 **45:**12 **50:**18 **52:**4,5 **54:**2 **57:**17 **58:**6,24 **59:**21 **64:**20 **65:**8 **69:**18 **90:**2 **113:**23 **121:**3,3 **122:**1,10 **126:**2 **132:**19 **133:**22 **141:**16 **144:**9 **147:**19 **148:**4 **149:**6 **161:**18 **165:**13 **169:**9 **172:**22 **188:**11,13,13 **194:**10 **201:**13 **202:**23 **203:**15 **205:**21 **207:**18

**others** [3] **20:**3 **40:**2,14

**otherwise** [4] **9:**20 **21:**15 **116:**2 **156:**20

**ourselves** [1] **106:**24

**out** [97] **5:**15 **7:**25 **9:**5 **10:**19,22 **11:**6,19 **12:**14 **13:**4,5 **14:**16,21 **15:**4 **26:**12 **27:**4 **28:**14 **31:**23 **33:**25 **34:**5 **35:**5 **36:**8,9 **46:**2,22 **47:**1 **48:**16 **51:**3,25 **53:**12 **55:**1,2 **59:**21,23 **63:**8,8 **68:**14 **71:**11 **74:**18 **75:**4,21 **76:**5,6 **78:**12,18,20,22,24,25 **82:**10,10 **83:**10 **84:**24 **85:**2,5,11,13,23 **87:**9,10,11,11,14,15 **89:**24 **91:**3 **92:**24 **93:**4 **95:**1 **97:**15 **100:**4,6 **113:**16,22,22 **114:**9 **115:**22 **116:**1 **124:**7 **132:**14 **138:**18,20 **139:**1 **148:**4 **152:**9,9,10 **164:**9 **168:**23 **171:**22 **177:**23 **178:**6 **181:**6 **187:**13 **188:**22 **196:**14 **207:**11 **210:**3

**outcome** [2] **38:**13 **40:**18

**outline** [2] **49:**6 **88:**25

**outset** [1] **40:**25

**outside** [24] **9:**5 **13:**23 **15:**21 **21:**11,17 **29:**21,22 **30:**4 **32:**5 **36:**20 **37:**18 **38:**9 **39:**7 **40:**14 **42:**24 **47:**17 **67:**8 **75:**25 **113:**16 **160:**24 **164:**23 **165:**8,19,23

**outsiders** [1] **40:**3

**outweighed** [1] **22:**19

**over** [32] **6:**8 **8:**20 **11:**7 **12:**16,17 **24:**16 **35:**25 **44:**8 **49:**15,24 **54:**25 **60:**7 **65:**14 **79:**24 **80:**22,25 **84:**11 **89:**14 **91:**10 **92:**11 **96:**15 **100:**1 **120:**25 **121:**1,2 **145:**1,20 **147:**9,10 **183:**3 **189:**25 **191:**19

**overlooking** [1] **75:**3

**overrule** [2] **35:**15,21

**overruled** [2] **106:**16 **121:**10

**overview** [2] **28:**5 **54:**14

**overwhelming** [1] **22:**17

**own** [18] **9:**11,14 **22:**6 **45:**10 **46:**22 **52:**15 **53:**19 **60:**1,20 **62:**13,13,20 **87:**19 **94:**12 **97:**14 **138:**4 **147:**4 **181:**17

**owned** [1] **68:**9

## P

**p.m** [10] **46:**13,13 **99:**13,20,

# Keyword Index


25 **100**:2 **185**:3 **189**:10,12 **211**:19
**pack** [1] **14**:11
**packet** [1] **149**:25
**packets** [1] **147**:22
**packing** [1] **13**:12
**page** [41] **2**:2,5 **91**:21,23 **104**:10 **106**:8 **107**:13 **118**:3, 12,16 **125**:23 **126**:19,25 **127**: 6 **137**:4 **147**:15 **152**:20,21,22, 24 **167**:8,12,20 **168**:15,17,20, 23 **169**:1,3,11,13,14,16,16 **170**:15 **198**:16,18,19,19,20, 23
**pages** [4] **5**:5 **198**:17,19,21
**pain** [6] **92**:18,19 **93**:4,4,4,6
**pandemic** [1] **190**:1
**panel** [3] **54**:2,3,3
**panousieris** [31] **1**:16 **2**: 11 **3**:9,10 **16**:20,23 **115**:15 **134**:6 **147**:21 **155**:2,7,10,19, 22 **168**:19,22 **169**:2,17,20,22 **170**:19,23 **172**:6 **181**:20,23 **182**:17 **184**:16 **185**:8 **194**:24 **204**:7,9
**paper** [1] **114**:17
**paperwork** [2] **106**:11 **188**:15
**paramedics** [2] **173**:21 **175**:4
**parentheses** [2] **198**:17, 21
**park** [1] **94**:11
**part** [25] **9**:12 **10**:7 **18**:17 **33**:14 **36**:10 **49**:24 **51**:11,12 **72**:1,2 **74**:5 **92**:6 **113**:4 **149**: 14 **154**:8 **168**:12 **181**:6 **183**: 19,22 **187**:25 **188**:2 **191**:8 **206**:18,18 **207**:20
**partial** [2] **132**:13 **194**:5
**partially** [1] **149**:19
**participate** [1] **201**:17
**participation** [1] **24**:18
**particular** [5] **9**:24 **36**:11 **74**:8 **191**:8 **194**:7
**particularly** [1] **5**:22
**parties** [33] **4**:4,10,15,20 **5**: 5 **6**:18 **7**:24 **13**:13 **15**:24 **21**: 6,7 **25**:16,21 **26**:20 **27**:24 **29**: 4 **31**:5,9 **32**:17 **37**:21,23 **40**:7 **42**:21 **43**:1 **46**:10,25 **52**:1 **58**: 3,5,6 **113**:21 **115**:21 **205**:13
**parts** [1] **75**:11
**party** [21] **4**:18 **8**:15 **16**:13, 17 **17**:2,3 **25**:24,25 **26**:1,3,6, 6 **32**:14 **36**:2 **43**:4 **54**:1,1 **58**: 8,9 **113**:23 **138**:24
**party's** [1] **148**:24
**pass** [3] **30**:22 **43**:19 **171**: 22
**passed** [2] **158**:17,18
**passenger** [6] **10**:18 **49**: 22 **64**:18,21 **99**:18,21
**past** [3] **4**:21 **51**:13 **133**:4
**patrick** [2] **57**:2 **123**:14
**patrolling** [1] **191**:9
**patrolman** [2] **191**:14,25
**pattern** [8] **4**:22,23 **205**:10, 11 **208**:18,20,21 **210**:8
**paying** [1] **47**:15
**pd** [2] **187**:22 **191**:25
**pen** [3] **66**:17,18,19
**pendency** [1] **37**:20
**pension** [1] **187**:13
**people** [28] **33**:6,7,23 **38**:1, 10 **39**:18 **42**:15,18 **43**:20 **44**: 24 **45**:17 **49**:19 **60**:16 **81**:24 **82**:1,20,21,24 **85**:25 **115**:23 **136**:13,13 **141**:8,15,17 **144**: 12 **147**:19 **191**:21
**people's** [1] **188**:12
**per** [4] **134**:1,2 **186**:7 **198**: 19
**percent** [1] **122**:22
**perfect** [1] **113**:19
**perfectly** [2] **43**:23 **209**: 13
**perform** [1] **25**:2
**perhaps** [2] **28**:25 **50**:13
**period** [8] **46**:1 **82**:11 **93**:7 **96**:15,18 **158**:16 **173**:20 **174**: 9
**perkins** [96] **2**:13 **3**:23,23 **13**:14 **27**:10,17 **51**:22 **52**:3 **53**:6,6,11 **56**:1,9,22,23,24 **57**: 5,9,11,13,19,22,25 **58**:15,17, 19,21,21,22,23,25 **59**:2 **60**:11, 24 **91**:12,25 **100**:19 **105**:13, 13,14 **106**:9,19,20,22,25 **107**: 2,22,22,23,24 **108**:4,8,9,10,11, 14 **109**:6,12,16,19,23 **110**:1 **117**:22 **118**:11,18,22,23 **119**: 2 **121**:4,17,20,24 **122**:3,7,7 **123**:23 **124**:23,25 **125**:21 **126**:3,7,21 **127**:2,5 **131**:2 **164**:19 **186**:6,14,17,21 **194**: 23,25 **195**:1 **198**:2 **200**:4 **201**:6
**perkins'** [1] **125**:23
**p-e-r-k-i-n-s** [1] **186**:18
**permit** [3] **35**:7 **41**:24 **124**: 3
**permits** [1] **62**:21
**permitted** [1] **16**:13
**perpetrator** [1] **58**:15
**person** [20] **22**:25 **30**:23 **33**:21,22,22 **34**:1 **38**:13 **41**: 25 **42**:1,3 **91**:7,12 **105**:10 **107**:19 **123**:1,2 **126**:2 **142**: 20,24 **161**:18
**personal** [2] **201**:9,13
**personally** [6] **14**:1 **18**: 24 **173**:9 **178**:20 **181**:24,25
**persuasive** [1] **32**:21
**persuasiveness** [1] **25**: 12
**ph** [2] **38**:18 **145**:6
**phone** [9] **78**:23,24 **88**:4 **89**:23,24 **115**:19 **120**:17,19 **135**:17
**phoned** [1] **154**:14
**phonetically** [2] **120**:7,8
**photographed** [1] **55**:8
**photographs** [12] **2**:18 **28**:11 **147**:2,4,4,7 **151**:6,7,11, 13,18 **175**:5
**photography** [1] **175**:17
**photos** [13] **147**:10,12,13, 17 **148**:3,4,5,8,9,17,20,22 **149**:1
**photos,”** [1] **148**:6
**phrase** [3] **5**:11 **12**:21 **69**: 15
**physical** [6] **22**:2,11 **28**: 10 **125**:1 **156**:20 **175**:2
**physically** [3] **51**:9 **191**: 23 **200**:21
**physician** [1] **13**:17
**picked** [1] **51**:1
**picture** [8] **56**:24 **59**:7 **108**:21 **122**:13,14 **125**:23 **126**:22 **127**:16
**pictures** [14] **90**:1 **91**:20, 21 **122**:7,8,9 **135**:11,14,15,16, 18 **136**:11 **151**:25 **175**:12
**piece** [1] **30**:7
**pieces** [1] **195**:5
**place** [10] **45**:9 **63**:22 **65**: 22 **68**:21 **70**:5 **74**:8 **93**:20 **94**: 1 **118**:1 **206**:13
**placed** [10] **8**:23 **66**:19,21 **100**:10,10 **101**:7,13 **171**:7,8 **183**:3
**places** [3] **37**:19 **38**:2 **209**: 8
**plain** [2] **77**:2 **159**:13
**plaintiff** [47] **1**:4,14 **2**:3 **3**: 5,7,11,16 **8**:10,20 **12**:14,25 **18**:3 **19**:5 **22**:4,5,11 **25**:4,5 **26**:16,18,22 **27**:6 **28**:8,9,23 **32**:9,10,22,23,24 **48**:2 **53**:21 **54**:15,16 **55**:24 **59**:11 **61**:3,5, 6 **111**:3 **138**:12 **154**:25 **155**: 2 **184**:19 **186**:3,5 **203**:3
**plaintiff's** [14] **8**:8 **15**:18 **18**:6 **27**:25 **28**:18,21 **32**:11

# Keyword Index

47:24 48:10 49:1 132:22 149:24 151:8 185:13
plan [4] 9:2,19 13:13 17:6
planned [1] 6:7
planning [4] 12:16 18:8, 21 111:8
plans [1] 62:24
platform [1] 101:2
play [1] 132:14
playing [1] 90:10
please [35] 3:4 17:14 20: 23 24:7 37:20 42:20 45:8 53: 1 61:4,10,15 63:4 76:13 77: 13 94:8 98:22 105:14 109:3 110:10 131:18 146:5 151:15 154:5 155:3,11,13,16 169:17 179:10 181:22 185:6 186:11, 13 203:13 206:10
pllc [3] 1:14 3:7,10
plus [1] 86:20
pocketbook [3] 9:17 99: 15 100:7
podium [1] 48:11
point [44] 7:7 10:15 21:19 26:17,23 32:10 38:16 50:22 52:21 64:11 66:24 67:21 73: 12 76:11 78:10 79:7 84:18 87:21 88:17 90:11,21 92:15 93:18 105:5 107:14 109:7 112:7 125:18 126:20 149:2 153:8 159:18 160:18,21,23 161:17 168:12 171:3 172:13 173:18 174:8 187:3 204:14 206:17
points [4] 28:24 29:1 145: 3 208:4
pole [1] 163:17
police [43] 49:12 50:9 52: 12 54:22 56:6,19,22 57:1,1, 20,23 58:20 66:9 69:17 87: 15 99:22,25 100:11 101:21 108:18 112:13 113:8 114:2 119:12,14,19 120:3 123:14 125:20 142:13 143:4 156:3, 7 160:23 178:6 186:24 187: 1 191:1,6 201:19,22 202:9, 17
popcorn [1] 152:22
popping [1] 6:20
portion [1] 34:9
portions [1] 59:4
posed [3] 180:7,16 182:6
position [2] 166:16,22
positioned [1] 165:25
possibility [2] 4:5 43:16
possible [3] 14:17 17:13 37:4
possibly [4] 34:1 45:20 46:4 119:17
post [1] 38:4
post-concussion [1] 51:17
posture [1] 15:2
potential [2] 7:25 22:20
potentially [2] 45:1 113: 23
pounds [2] 156:18 199: 16
practice [5] 4:21 15:15 161:12 186:7 196:12
practiced [1] 194:9
practices [1] 194:11
practicing [1] 13:17
precinct [37] 9:3 10:2 50: 1 52:15 55:6,7,11,21 56:8 58: 25 65:18 66:7,11,24 69:22 84:19 90:6 91:10 100:13 118:25 144:14,16 145:12 156:13,25 157:4 158:1,5 159:21 174:19,21,24 175:1 187:18 188:9,23 191:10
predict [1] 19:25
prefer [1] 21:11
preference [1] 21:16
prejudice [2] 22:20 25:3
prejudicial [3] 12:18 13: 1 21:22
preliminary [4] 4:8 8:6 24:17 188:6
preponderance [8] 25: 7,8,9,11,15 26:2,4,8
presence [12] 41:25 43: 21 131:10 157:4,25 158:5 170:3,5 173:17 174:2 180: 22 181:4
present [12] 28:9 32:11, 15 49:16 133:4,7 159:5 160: 20 161:18 164:19 180:13 185:15
presentation [3] 27:3, 21 49:9
presented [4] 24:23 32:7, 14 38:8
presenting [1] 32:18
preside [1] 34:13
pressure [3] 84:4,7,17
presumption [1] 4:24
presumptions [1] 6:1
presumptive [2] 20:7,8
presumptively [1] 147: 25
pretrial [2] 6:9 147:25
pre-trial [3] 58:4 112:8,14
pretty [17] 13:15 15:6 17: 3 18:18 20:5 50:23 108:15 116:4 141:17 144:11 151:16 162:16 163:1 165:1,2 200: 25 201:9
preview [2] 27:22 114:1
pride [1] 55:12
primarily [1] 29:9
principle [1] 208:7
prior [16] 9:9 11:11 21:20 54:18 97:7 124:20 138:8,9, 12 139:8 156:2,7 178:24 187:15 201:3 202:11
prison [1] 95:1
probable [4] 10:16 25:22 26:20 209:24
probably [43] 40:17 43: 14 64:4 65:25 73:14,15 75: 14,22,22 76:14,22 80:12,13 82:1 83:5,18 86:6,25 87:11, 25 88:3,20 89:3,4 93:10 96: 10 97:1,2 101:18 109:15 114:8 116:4 119:15 121:11, 12 136:12 143:20,21 153:4 162:25 180:3 192:4 198:4
probative [2] 22:19,24
problem [7] 6:4 18:17 40: 1 41:9 112:4 121:2 206:21
procedure [1] 102:23
proceed [5] 27:23,23 73: 4 117:5 170:21
proceedings [4] 1:31 44:6 211:19 212:4
process [4] 24:20 44:7 84:21 172:20
processed [2] 50:3 55:7
processing [2] 101:25 143:15
produced [3] 1:32 25:18 28:5
professional [2] 68:8 95:6
progressed [1] 153:18
progression [1] 153:18
promptly [1] 4:7
pronouncing [2] 27:7 96:5
proof [10] 25:24 26:4,6,9, 10,18 29:11,12 32:23,24
propensity [1] 22:21
proper [4] 26:10 30:8 132: 24 137:8
properly [1] 32:1
properties [2] 62:20 63: 23
property [2] 63:24 64:2
proportional [2] 206:6 207:7
proportionality [1] 206: 23
proposed [3] 4:10,13 206:19
prosecution [1] 112:14

# Keyword Index


**prove** [5] **25:**9,25 **26:**1,4 **138:**14
**proved** [2] **25:**14 **26:**8
**provide** [3] **17:**7 **47:**6 **86:**10
**provided** [2] **7:**1 **207:**2
**provides** [1] **33:**15
**proving** [1] **25:**6
**provoked** [1] **22:**6
**public** [3] **33:**20 **38:**23 **47:**19
**publicity** [1] **36:**25
**publish** [1] **149:**12
**publishing** [1] **30:**21
**pull** [2] **7:**11 **94:**10
**pulled** [9] **12:**16,17 **49:**24 **54:**24 **64:**20 **65:**14 **100:**1 **145:**1,20
**pulling** [1] **8:**20
**punch** [4] **184:**6 **196:**18 **201:**11,14
**punched** [6] **57:**10,21,24 **135:**8 **142:**18 **177:**17
**purpose** [3] **31:**15 **44:**23 **124:**12
**purposes** [1] **44:**24
**purse** [4] **54:**20,21 **55:**3 **68:**17
**push** [1] **19:**22
**pushed** [2] **79:**21,22
**put** [36] **10:**14 **11:**13 **13:**16 **15:**15 **26:**12 **28:**9,15 **31:**22 **50:**6 **55:**14 **75:**2 **76:**19 **84:**3 **85:**14,15 **87:**21 **88:**18,18 **111:**21 **113:**5,24 **122:**2 **133:**12 **138:**4 **147:**4 **148:**22 **149:**21 **151:**5 **154:**8,16 **170:**12 **171:**1,9 **195:**5,10 **204:**12
**putting** [7] **15:**17 **32:**9 **92:**2,5 **93:**23 **111:**10 **209:**18

## Q

**qualified** [5] **6:**10,13,16,23 **7:**6
**qualitative** [1] **30:**9
**quality** [1] **25:**12
**qualms** [1] **115:**22
**queen's** [1] **196:**5
**question** [49] **9:**22 **11:**4 **17:**22 **31:**21 **34:**21 **35:**1,8,8,10,12,15,16,17 **55:**22 **58:**8 **104:**1 **105:**2 **107:**6 **109:**1 **118:**2,17 **124:**14,20,20 **128:**4 **132:**10 **133:**7 **137:**9,9 **139:**7,11 **142:**4,11 **153:**22 **165:**17 **167:**5,18 **168:**20 **169:**10 **170:**10,13,15 **171:**11 **172:**2 **180:**19 **195:**2 **199:**17 **202:**4 **205:**6
**questionable** [1] **10:**7
**questioned** [8] **17:**9 **103:**3 **188:**18 **202:**8,11,13,16,19
**questioning** [1] **117:**8
**questions** [37] **10:**24 **16:**24 **17:**2,7,19 **20:**9 **22:**25 **28:**21 **34:**18,20 **36:**7 **48:**21 **67:**16,25 **77:**10 **79:**7 **82:**20 **98:**24 **126:**18 **127:**7 **133:**9,15,21,22 **135:**2 **137:**4 **143:**16 **145:**24 **154:**18 **180:**7,16,17 **182:**6 **184:**13 **199:**24 **202:**2,24
**quick** [3] **77:**14 **195:**11,14
**quickly** [3] **14:**20 **163:**1 **196:**16
**quiet** [1] **194:**24
**quite** [4] **33:**10 **51:**6 **56:**2 **110:**2
**quiz** [2] **53:**25 **54:**1
**quotes** [1] **208:**1

## R

**race** [1] **199:**13
**raining** [3] **29:**21,23 **30:**4
**raise** [3] **24:**7 **61:**7 **155:**13
**raised** [1] **7:**21
**ralph** [3] **1:**22 **3:**19 **53:**2
**rank** [2] **156:**2,7
**ranking** [2] **174:**17 **190:**16
**ranks** [1] **175:**10
**rather** [10] **10:**3 **20:**11 **28:**3 **42:**17 **51:**11 **113:**14 **161:**12 **178:**15 **191:**12 **205:**12
**raw** [1] **83:**4
**reach** [2] **39:**14 **48:**8
**reaching** [1] **39:**10
**react** [1] **50:**14
**reaction** [2] **22:**6 **80:**2
**reactions** [1] **33:**24
**reacts** [1] **50:**15
**read** [13] **17:**15 **34:**20 **37:**2 **38:**10 **59:**4 **107:**5,8 **124:**7 **160:**7 **168:**23 **169:**9,18 **179:**10
**reading** [2] **138:**6 **139:**8
**ready** [6] **12:**5 **14:**18 **110:**4 **115:**12,14 **203:**3
**real** [5] **44:**23 **49:**18 **62:**13,14 **78:**8
**realized** [1] **99:**22
**really** [17] **4:**24 **5:**18 **10:**8 **13:**15 **20:**15 **36:**21 **37:**6 **78:**14,15 **81:**16 **86:**22 **92:**13 **148:**22 **149:**10 **191:**23 **194:**9 **196:**15
**realm** [1] **196:**21
**rear** [1] **193:**2
**reason** [11] **8:**22 **35:**22 **42:**10 **43:**3 **46:**5 **49:**13 **58:**22 **148:**19 **205:**4 **206:**21 **207:**18
**reasonable** [3] **26:**10,13 **207:**7
**reasons** [1] **8:**21
**rebuttal** [2] **148:**13,18
**recall** [45] **68:**24 **103:**2,6 **104:**1 **105:**19,24 **106:**2,9 **108:**17 **109:**24 **110:**3 **118:**2 **119:**1 **121:**25 **122:**1,9,17 **123:**21 **126:**22 **127:**15,16 **129:**11 **136:**8 **141:**6,20,23 **142:**12,13,22,24 **145:**2,18,21 **161:**7,15 **164:**16 **166:**20,23 **167:**1,17 **168:**1 **170:**11,25 **175:**20 **202:**11
**received** [7] **2:**17 **25:**17 **30:**14,19,21 **200:**6,10
**recent** [4] **205:**17,18 **206:**2,7
**recently** [2] **106:**3 **205:**25
**recess** [6] **21:**2 **39:**5,7 **71:**5 **115:**2 **185:**5
**recesses** [2] **39:**3,3
**recognizance** [1] **87:**19
**recognize** [6] **38:**16,20 **59:**7 **151:**7 **152:**1 **201:**3
**recognized** [1] **89:**23
**recognizing** [1] **38:**23
**recollection** [24] **36:**16,17 **44:**22 **124:**4,6,8,18 **133:**4,5,7,8,11,14,15,16 **167:**4 **168:**13,18 **169:**7 **176:**5,10 **179:**11,14 **200:**16
**recommended** [2] **95:**16 **98:**10
**reconvene** [4] **20:**25 **70:**8 **110:**7 **185:**3
**record** [15] **3:**5 **11:**24 **21:**1 **22:**9 **44:**15 **45:**9 **61:**11 **98:**1 **111:**18 **117:**22 **120:**5 **138:**6 **152:**3 **155:**17 **186:**16
**recorded** [2] **1:**31 **133:**5
**recording** [3] **1:**31 **44:**17 **212:**3
**records** [3] **111:**22 **112:**17 **113:**5
**recross** [1] **154:**19
**recross-examination** [1] **29:**1
**re-cuff** [1] **67:**1
**re-cuffed** [2] **75:**10,11
**recycle** [1] **211:**10
**red** [2] **92:**24 **153:**11
**redirect** [11] **2:**9,16 **28:**22 **29:**2 **146:**2 **149:**5 **151:**3 **184:**15,16 **202:**3,5
**redone** [2] **38:**11,14

# Keyword Index


**reference** [6] **8:**9,14 **9:**20 **37:**10 **152:**16 **201:**14
**referred** [2] **40:**9 **72:**6
**referring** [7] **107:**6 **167:**14,19 **170:**6,16 **190:**22,25
**refers** [1] **25:**12
**refinances** [1] **62:**21
**reflect** [1] **44:**19
**reflects** [1] **114:**2
**refresh** [13] **124:**4,5,17 **133:**6,14 **167:**4 **168:**13 **169:**6 **176:**5,10 **179:**11,14 **200:**16
**refreshed** [5] **44:**22 **124:**8 **133:**4,8,16
**refreshing** [1] **168:**18
**regarding** [2] **111:**17 **148:**14
**regardless** [2] **25:**16,18
**regards** [3] **177:**3,24 **181:**13
**regina** [2] **54:**19 **62:**2
**regroup** [1] **114:**20
**regular** [4] **75:**1 **76:**4,10 **101:**9
**regularly** [1] **162:**21
**reissman's** [1] **18:**9
**related** [1] **201:**24
**relationship** [2] **19:**4 **175:**9
**relatively** [1] **50:**6
**release** [1] **92:**2
**released** [4] **87:**19 **92:**5,7 **152:**5
**relevance** [7] **6:**12 **10:**13 **22:**18,18 **112:**20 **114:**4 **196:**20
**relevant** [15] **22:**1 **25:**15,17 **26:**13 **112:**17,21 **114:**6 **115:**8 **176:**25 **180:**11,22 **182:**7,9 **188:**19 **194:**6
**rely** [2] **37:**13 **45:**8
**relying** [3] **32:**1 **37:**16 **115:**21
**remain** [2] **61:**7 **117:**3
**remained** [1] **162:**7
**remark** [1] **36:**3
**remarks** [1] **145:**4
**remember** [69] **47:**1 **63:**25 **65:**19 **68:**10 **69:**19 **76:**7,16 **80:**19 **81:**5,8,8,10,18,19 **82:**3 **83:**8,14 **84:**9 **85:**19 **90:**17,18 **102:**25 **105:**2 **106:**1 **108:**3,17 **118:**5,8 **119:**3 **121:**22 **122:**2,16 **123:**21 **135:**24 **142:**8,22,23 **143:**22 **147:**14 **158:**10 **159:**8 **164:**7,18,22 **167:**2,12,24 **168:**6 **170:**9,12 **171:**16 **172:**23 **173:**7,11,13 **174:**3,5,13 **175:**23 **176:**3 **183:**13,24 **189:**15 **190:**12 **192:**6 **199:**23 **200:**10,24 **202:**19
**remembered** [3] **108:**3,4 **122:**11
**reminder** [1] **110:**9
**remove** [1] **31:**24
**removed** [2] **66:**25 **67:**1
**render** [3] **40:**17 **53:**14 **173:**12
**rendered** [1] **58:**11
**repairs** [1] **62:**21
**repeat** [1] **170:**14
**repeatedly** [2] **68:**11 **142:**18
**rephrase** [3] **128:**4 **142:**9 **158:**14
**report** [8] **42:**2 **54:**20 **108:**18 **113:**8 **114:**2 **180:**2 **182:**5 **198:**8
**reported** [1] **181:**10
**reporter** [1] **58:**11
**reporters** [1] **44:**15
**reports** [5] **10:**15,15 **67:**14,17 **112:**13
**represent** [1] **137:**1
**representing** [1] **53:**5
**request** [1] **157:**23
**require** [1] **44:**7
**required** [1] **30:**9
**requirement** [1] **26:**11
**requires** [3] **49:**19 **195:**8 **196:**15
**rereading** [1] **6:**8
**research** [2] **37:**7 **203:**16
**resembled** [2] **123:**6 **125:**5
**reside** [1] **55:**13
**residential** [1] **62:**14
**residing** [1] **24:**16
**resist** [1] **191:**21
**resisting** [2] **207:**9 **208:**10
**resolve** [1] **51:**5
**resolved** [1] **132:**11
**resource** [1] **5:**2
**respect** [10] **7:**2 **13:**11 **21:**10 **34:**15 **40:**21 **69:**21 **89:**7 **98:**5 **202:**7 **205:**25
**respectable** [1] **46:**20
**respectful** [2] **68:**5 **69:**8
**respectfully** [1] **33:**13
**responded** [1] **179:**3
**responding** [4] **29:**5,8 **78:**14 **145:**18
**response** [2] **7:**18 **89:**10
**responsible** [1] **52:**14
**rest** [6] **19:**9 **32:**10 **142:**4 **151:**21,22 **164:**14
**restaurant** [1] **94:**12
**restrain** [1] **191:**23
**restrained** [1] **206:**12
**restrictions** [1] **44:**5
**rests** [1] **18:**3
**result** [3] **44:**7 **98:**16 **135:**3
**resume** [1] **135:**24
**retire** [4] **33:**2 **41:**1 **155:**25 **187:**9
**retired** [8] **3:**23 **119:**20 **120:**3 **155:**23 **186:**6,21 **198:**2 **204:**5
**retirement** [2] **156:**2 **187:**15
**return** [1] **115:**4
**returned** [1] **48:**19
**review** [5] **30:**15 **168:**20 **169:**3,12 **176:**9
**reviewed** [1] **169:**6
**rhonda** [2] **212:**21,25
**rickner's** [1] **201:**13
**riding** [1] **64:**18
**righthand** [1] **198:**16
**rightly** [1] **43:**5
**rights** [1] **160:**7
**ringer** [1] **115:**20
**rise** [9] **24:**2 **43:**16 **70:**10 **72:**16 **110:**8 **116:**6 **184:**25 **185:**20 **203:**18
**road** [1] **75:**5
**rob** [2] **3:**6 **53:**6
**robberies** [2] **188:**3,4
**robert** [9] **1:**15 **2:**10 **4:**1 **27:**11 **56:**10 **120:**1 **126:**10 **155:**14,18
**rob's** [1] **114:**12
**rock** [4] **57:**8 **76:**21 **123:**7 **125:**5
**roger** [16] **1:**3 **2:**6 **3:**15 **27:**6 **61:**6,9,12 **81:**9 **189:**15 **190:**7,12 **200:**5,19,21 **202:**7,20
**r-o-g-e-r** [1] **61:**12
**role** [3] **7:**15 **49:**4 **191:**6
**roles** [1] **43:**22
**room** [74] **10:**3,5 **20:**12 **30:**15,25 **45:**13,23 **46:**1,6 **47:**7 **48:**20 **50:**6 **51:**24 **52:**7 **55:**9,10,13,15,15 **70:**1,1,5 **74:**22,23 **75:**8 **76:**11,15 **81:**24,25 **82:**1,2 **86:**6,8,9 **87:**4 **94:**12 **101:**5,7,9 **106:**10 **115:**17 **117:**10 **118:**13,18,20,23 **119:**4,6,10 **121:**21 **123:**7 **125:**6 **143:**18,19,23 **144:**2 **145:**5 **158:**6 **164:**14,16 **165:**21 **166:**2,23 **167:**14 **170:**10,16,25 **171:**5,12 **172:**15 **173:**1 **178:**11 **203:**13 **210:**25

# Keyword Index


**roper** [3] **21:**14 **112:**16,23
**rothenberg** [12] **13:**19 **19:**8 **71:**19 **72:**12 **85:**8 **89:**22 **141:**11 **142:**22 **174:**14 **175:**7 **190:**16 **204:**5
**rothenberg's** [1] **175:**9
**roughly** [3] **96:**9 **153:**2 **206:**22
**round** [1] **29:**8
**rounds** [2] **29:**7,7
**route** [1] **65:**14
**routine** [2] **69:**9 **84:**18
**rows** [1] **73:**23
**rude** [2] **43:**15,21
**rule** [5] **16:**21,21 **41:**17 **104:**5 **132:**23
**ruler** [1] **71:**10
**rules** [13] **5:**9 **12:**19 **15:**22 **16:**13 **21:**8,24 **35:**4 **37:**22 **39:**4 **43:**13,15 **48:**23 **147:**24
**ruling** [3] **23:**4 **35:**2 **36:**3
**run** [2] **14:**21 **48:**16
**runs** [1] **94:**9
**ryder** [3] **57:**2 **123:**14 **126:**2

## S

**sacrifices** [1] **45:**17
**safe** [1] **116:**5
**safer** [1] **207:**21
**safety** [1] **171:**14
**sake** [1] **14:**6
**same** [20] **5:**25 **12:**21 **37:**16 **40:**13,20 **46:**5 **48:**23 **59:**22 **65:**8 **73:**14 **97:**11,12 **106:**8 **123:**22 **156:**15,16 **166:**9 **200:**25 **206:**23 **209:**6
**same-day** [1] **8:**2
**sand** [8] **5:**1 **205:**1,3,8,9,11,14 **208:**17
**sand’s** [1] **4:**23
**sand's** [4] **4:**25 **5:**13,18 **205:**25
**sarcastic** [4] **77:**23,25 **83:**12 **145:**3
**sat** [4] **21:**11 **58:**13 **75:**10,15
**satisfied** [1] **26:**16
**save** [1] **41:**14
**saw** [31] **55:**3 **56:**23 **57:**14 **59:**18 **60:**8 **69:**25 **73:**14 **85:**8 **95:**15 **96:**12,14 **108:**8 **122:**7,9,12 **125:**23 **136:**4 **158:**8,13,15,19 **163:**8 **166:**4 **168:**4 **173:**6 **180:**5,11 **181:**12 **183:**15 **190:**3 **200:**21
**saying** [23] **16:**4 **77:**20 **80:**13 **81:**8,14 **82:**4,8 **83:**8,14 **90:**8 **106:**1,9 **112:**4 **142:**19 **145:**2,21 **195:**6,9 **196:**3,9,13 **200:**25 **209:**5
**says** [21] **9:**21 **10:**23 **11:**24 **12:**5 **17:**8 **52:**6 **59:**11 **68:**11 **78:**21 **91:**7 **95:**12,15 **120:**19,25 **121:**4 **139:**3,5 **145:**17 **199:**2,10 **206:**11
**scales** [1] **26:**5
**scared** [1] **154:**1
**scene** [1] **66:**8
**schedule** [1] **45:**15
**scheduled** [1] **21:**5
**schuh** [4] **122:**18 **123:**1,4,10
**s-c-h-u-h** [1] **122:**18
**scope** [2] **15:**21 **16:**5
**scott** [9] **19:**13,14,15,18 **71:**22,23 **204:**6,7,12
**scott's** [1] **204:**8
**scouting** [1] **62:**24
**scratch** [1] **38:**15
**seaford** [1] **55:**6
**search** [4] **37:**10 **69:**7,10 **73:**7
**searches** [1] **10:**6
**seat** [7] **9:**18 **49:**22 **64:**21 **68:**20 **74:**25 **99:**18,21
**seated** [9] **24:**3,10 **61:**10 **73:**2 **117:**2 **155:**15 **186:**2,15 **205:**5
**sec** [1] **84:**15
**second** [35] **27:**15 **28:**8 **32:**24 **46:**8 **73:**11 **95:**7 **98:**10 **117:**25 **145:**8 **152:**21 **157:**1,8 **158:**15 **164:**25 **165:**1,6,16,20 **166:**7,13,17,23,25 **168:**16 **172:**17,18 **173:**3,4 **187:**18 **195:**22,24 **205:**15,19 **206:**8 **208:**5
**seconds** [6] **29:**23 **48:**14 **59:**20 **165:**9 **195:**23,24
**secret** [2] **9:**1 **71:**18
**section** [3] **109:**1 **169:**9 **209:**11
**security** [2] **46:**7 **47:**2
**see** [76] **5:**1 **8:**3 **15:**6 **17:**14 **18:**4 **21:**13 **30:**12,25 **32:**5 **36:**23 **39:**8 **43:**11,13 **44:**2,25 **45:**4 **51:**3 **53:**14 **54:**12 **56:**1 **57:**25 **59:**15 **67:**8 **71:**2 **72:**3 **73:**21,22,22 **74:**3 **76:**2 **78:**20 **89:**3 **93:**13 **96:**9,11 **98:**9,10,11 **100:**19,21 **107:**11 **108:**20 **111:**9 **114:**22 **117:**15 **122:**6 **124:**1 **126:**22 **129:**14 **136:**11 **138:**8 **147:**12,21,23 **149:**1 **152:**18,22 **159:**24 **164:**21 **165:**14,24,25 **166:**16 **167:**21 **168:**7 **169:**15 **171:**22 **179:**4,4 **194:**15 **198:**20 **199:**12 **200:**24 **203:**12 **206:**4 **208:**18
**seeing** [8] **39:**22 **96:**1,10 **122:**11 **132:**14 **136:**3 **170:**25 **203:**17
**seek** [2] **8:**12 **38:**8
**seeking** [4] **8:**9,15 **11:**13 **113:**23
**seem** [3] **4:**11 **34:**22 **53:**17
**seemed** [1] **67:**7
**seemingly** [2] **44:**3 **179:**21
**seems** [5] **6:**11 **17:**3 **18:**18 **22:**17 **148:**18
**seen** [12] **31:**21 **36:**20 **40:**15 **48:**6 **135:**19 **136:**4 **147:**6 **159:**21 **175:**21 **189:**20 **190:**4 **201:**1
**sees** [1] **43:**3
**seizure** [3] **83:**3,5,6
**seizures** [1] **27:**14
**selection** [3] **24:**21 **57:**13 **203:**11
**self-defense** [1] **22:**11
**selfies** [1] **147:**18
**senator** [4] **57:**7 **76:**20 **123:**6 **125:**5
**send** [3] **19:**2 **88:**22 **208:**1
**senior** [1] **159:**1
**sense** [4] **17:**25 **83:**13 **145:**3 **205:**4
**sent** [3] **89:**6,8 **207:**15
**sentence** [1] **69:**16
**separate** [1] **123:**22
**sergeant** [15] **60:**17,21 **72:**7,10 **122:**18 **123:**1,4,10 **136:**9 **137:**1 **138:**11 **141:**6,12,13,19
**serve** [2] **33:**9 **42:**13
**served** [1] **8:**18
**service** [9] **1:**27,32 **33:**5,5,20 **45:**18 **47:**15,19 **48:**20
**serving** [4] **39:**17 **42:**20 **47:**18,19
**session** [2] **47:**1 **58:**8
**sessions** [1] **102:**19
**set** [5] **4:**8,9,11 **48:**14 **194:**3
**sets** [1] **111:**24
**setting** [3] **73:**22 **115:**19,20
**setup** [1] **143:**24
**seven** [1] **55:**6
**sevent** [1] **190:**16
**seventh** [28] **50:**1 **55:**7 **56:**7 **58:**24,25 **59:**13 **60:**6 **65:**18 **66:**11,24 **69:**22 **90:**6 **91:**10 **100:**13 **101:**24 **106:**22 **174:**19,21,24 **175:**11 **187:**16,

# Keyword Index


18 **188:**9,23 **190:**18,21,22,23
**several** [5] **13:**18 **39:**4 **135:**2 **176:**2 **203:**10
**shaking** [2] **29:**25 **30:**1
**shall** [1] **135:**3
**shape** [1] **71:**15
**share** [5] **33:**23 **39:**20 **45:**12 **112:**21 **181:**1
**sharp** [4] **45:**16 **51:**25 **114:**23 **203:**14
**shave** [1] **198:**12
**shaved** [2] **105:**17 **198:**10
**shaven** [6] **77:**6,6 **101:**22 **198:**7,8,9
**sheets** [1] **115:**15
**she's** [3] **62:**11,11 **204:**10
**shift** [1] **189:**1
**shine** [1] **77:**9
**shirt** [7] **76:**22 **77:**1 **101:**23 **105:**17,18 **117:**19 **122:**15
**shnayderman** [31] **18:**7 **60:**6,9,14,15,17,21 **71:**21,25 **72:**7 **136:**9,11 **137:**2,10,10 **138:**5,11,19,22,23,25 **141:**6,9,12,13,16,19,24 **142:**1,8 **185:**16
**s-h-n-a-y-d-e-r-m-a-n** [1] **136:**9
**shnayderman's** [1] **138:**6
**shocking** [1] **148:**21
**short** [4] **47:**10,11 **114:**12 **115:**16
**shorter** [1] **29:**3
**shorts** [3] **49:**21 **64:**5,5
**shot** [2] **80:**17 **81:**2
**shouldn't** [1] **84:**11
**should've** [1] **22:**15
**show** [16] **13:**20 **22:**5 **36:**14,15 **49:**16 **52:**17 **53:**24,25 **54:**1,3,14 **59:**7 **124:**3,6 **127:**16 **133:**13
**showed** [3] **36:**15 **167:**3 **176:**4
**showing** [1] **148:**1
**shown** [1] **32:**19
**shows** [2] **194:**8,9
**shut** [4] **78:**24 **79:**1,3,4
**sic** [1] **106:**2
**side** [25] **8:**9 **10:**18 **25:**22,22 **32:**24 **50:**19 **51:**10 **54:**2 **80:**7,8,14 **81:**2 **97:**15,22,24 **135:**7,8,10 **153:**17 **183:**4,7,8,24 **193:**13 **194:**10
**sidebar** [11] **131:**18 **132:**1 **134:**7 **137:**11 **138:**1 **139:**12 **146:**4 **147:**1 **150:**3 **194:**1 **197:**4
**sides** [1] **32:**14
**signature** [1] **176:**13
**signed** [1] **205:**22
**significant** [1] **47:**19
**silly** [2] **92:**11 **93:**21
**similar** [2] **64:**5 **156:**20
**simon** [1] **60:**6
**simple** [1] **26:**1
**simply** [10] **10:**2 **28:**4 **32:**18 **35:**12,20,25 **36:**8 **43:**10,18 **207:**2
**since** [6] **13:**17 **18:**9 **70:**4 **127:**8 **136:**4 **149:**9
**singas** [3] **57:**3 **123:**18 **126:**2
**single** [1] **151:**15
**sir** [5] **114:**14 **184:**7,10 **187:**14,17
**sit** [4] **53:**13 **55:**14 **75:**2 **168:**1
**sites** [1] **62:**24
**sitting** [8] **10:**18 **21:**15 **33:**20 **45:**25 **117:**15,19 **184:**8 **189:**16
**situation** [2] **12:**23 **50:**13
**six** [3] **57:**6 **105:**16 **156:**16
**skin** [4] **51:**10 **105:**15 **117:**13,14
**skinned** [1] **105:**15
**skinnier** [1] **198:**5
**skinny** [1] **198:**6
**slacks** [2] **77:**2 **106:**7
**slap** [5] **80:**18 **184:**4 **194:**9 **196:**18 **201:**20
**slapped** [7] **50:**18 **57:**9,21,24 **102:**6 **135:**7 **177:**15
**sleep** [1] **94:**13
**slightly** [3] **26:**5 **113:**2 **153:**20
**slowly** [1] **85:**12
**smack** [1] **80:**7
**smacked** [2] **80:**8,12
**smacks** [2] **50:**16 **80:**6
**small** [10] **50:**6 **55:**14,15 **68:**6 **69:**24 **81:**25 **101:**7 **136:**14 **165:**1 **178:**2
**smaller** [1] **29:**4
**smile** [1] **142:**25
**smoke** [1] **7:**25
**smooth** [1] **50:**17
**sneakers** [1] **64:**6
**socks** [1] **69:**7
**sole** [1] **34:**11
**solely** [3] **32:**7 **36:**22 **38:**7
**solid** [1] **74:**17
**solute** [1] **8:**9
**somebody** [31] **7:**2 **11:**22 **12:**5 **15:**4 **18:**13 **38:**16,20,23,25 **42:**5,7 **43:**3,25 **49:**19 **64:**11 **76:**11 **88:**13 **89:**15 **123:**3 **132:**9 **134:**4 **141:**15 **194:**11 **196:**11,13 **206:**1 **207:**2,19,24 **208:**9 **210:**1
**somebody's** [2] **206:**12 **209:**18
**someone** [24] **76:**14 **79:**1,21 **81:**8,10 **83:**3 **89:**1,10,11,14,21 **93:**21 **105:**5 **107:**14 **108:**7 **121:**23 **122:**19 **123:**2 **127:**2 **157:**13 **175:**14 **182:**7 **183:**5 **188:**16
**sometime** [4] **20:**1,7 **47:**12 **186:**24
**sometimes** [9] **30:**21 **32:**16 **38:**13 **45:**24 **47:**2 **77:**24 **188:**11 **199:**21 **209:**4
**somewhat** [1] **31:**20
**somewhere** [9] **14:**15 **40:**11 **65:**5 **70:**8 **87:**1 **93:**18 **112:**18 **173:**23 **174:**9
**son** [11] **54:**17 **55:**1 **64:**14 **91:**19 **92:**9 **94:**23 **95:**4 **97:**2 **99:**12,13,14
**sons** [1] **99:**11
**soon** [9] **37:**3 **68:**14 **73:**23 **74:**9,13 **89:**23 **90:**3 **115:**11 **210:**13
**sorry** [23] **15:**14 **24:**7 **92:**4 **99:**13 **111:**22 **112:**9 **114:**16 **125:**13 **137:**11 **149:**16 **165:**17 **168:**15 **169:**13 **181:**18 **183:**20 **185:**8,9 **189:**12,21 **193:**12 **194:**17,18,22
**sort** [9] **62:**15 **77:**16 **86:**11 **89:**9 **91:**14 **132:**5 **148:**13 **153:**8 **207:**25
**sound** [3] **1:**31 **32:**21 **212:**3
**sounds** [4] **12:**7,20 **132:**5 **200:**18
**source** [1] **38:**9
**sources** [1] **138:**15
**south** [1] **191:**11
**spark** [1] **88:**16
**speaking** [13] **4:**17,22 **29:**10 **51:**16 **122:**17 **127:**15,17 **136:**9 **145:**5 **161:**12 **174:**11 **181:**11 **205:**21
**special** [6] **7:**5,16 **35:**24 **136:**6 **195:**8,9
**specialist** [2] **96:**2,4
**specialists** [1] **51:**7
**specific** [9] **7:**10 **22:**22 **63:**22,22 **83:**8 **168:**25 **181:**13 **196:**4,24
**specifically** [4] **16:**1 **157:**10 **161:**7,15
**speculate** [1] **35:**11

# Keyword Index


**speculative** [1] **194:**14
**spell** [7] **61:**11 **66:**1 **96:**7 **120:**5 **155:**16 **182:**23 **186:**16
**spelled** [1] **120:**7
**spelling** [1] **120:**7
**spider** [1] **144:**10
**spit** [1] **81:**19
**spitting** [1] **81:**19
**spoke** [13] **91:**6 **119:**12 **120:**2,12 **122:**19 **125:**20 **126:**6 **135:**21 **141:**24,25 **142:**7 **162:**23 **178:**7
**spot** [1] **98:**5
**squad** [27] **55:**9,9,10,13 **58:**24 **59:**13 **60:**6 **100:**24 **101:**5,24 **106:**22 **123:**5 **156:**25 **158:**6 **175:**11 **178:**11 **187:**16,24,25 **188:**2,5 **190:**16,18,20,21,22,23
**square** [1] **70:**3
**squeaky-clean** [1] **11:**24
**stage** [2] **6:**11 **132:**11
**stages** [1] **27:**22
**stairs** [11] **55:**9 **69:**12,13 **73:**10,15,17 **85:**12,13 **100:**23,24 **158:**14
**stairways** [1] **69:**13
**stand** [12] **24:**7 **29:**22,25 **34:**25 **36:**23 **37:**14 **138:**5 **139:**9 **148:**17 **162:**3 **183:**11 **186:**13
**standard** [5] **18:**18 **26:**10 **133:**13 **189:**1 **207:**18
**standing** [12] **43:**7 **61:**7 **158:**6 **160:**19 **164:**24 **165:**18,19 **166:**12 **167:**15 **168:**2 **170:**11,25
**stands** [1] **102:**23
**start** [14] **4:**6 **12:**9,14 **19:**5 **44:**8 **45:**16 **47:**4 **64:**17,24 **96:**9,25 **99:**2 **203:**13 **205:**12
**started** [25] **7:**17 **58:**2 **63:**3,5,5 **69:**19 **81:**22,23,24 **84:**2 **89:**22,23,24 **92:**23,25 **93:**1 **96:**1,10 **97:**3 **121:**2,4 **153:**16,19 **163:**4 **191:**3
**starting** [4] **3:**5 **15:**1 **17:**16 **167:**20
**starts** [1] **79:**24
**state** [20] **3:**4 **6:**1 **27:**18,20 **61:**10 **102:**9,12,14 **124:**22 **129:**2,4 **155:**16 **186:**16 **205:**11 **208:**21,23 **209:**3,13,25 **210:**3
**stated** [12] **57:**5 **58:**16 **59:**4 **77:**25 **101:**22 **123:**8 **124:**24 **131:**2 **135:**3 **170:**2 **171:**23 **183:**15
**statement** [32] **2:**2 **28:**1,2 **36:**3 **48:**10 **49:**1 **52:**21,24 **76:**19 **106:**15 **138:**9,10,13,17,24 **144:**23 **175:**20,24 **176:**4,14,16,19,21 **178:**5,24,25 **179:**7,7,10,15 **184:**11 **202:**22
**statements** [11] **27:**25 **28:**3,8 **47:**23,25 **48:**15,17 **56:**15 **58:**10 **112:**19 **177:**2
**states** [5] **1:**1,12 **24:**14 **33:**6,10
**stationhouse** [2] **100:**14,16
**stay** [3] **93:**20 **94:**1 **163:**6
**stayed** [2] **152:**14 **173:**20
**stays** [1] **35:**5
**steal** [4] **10:**24 **77:**21 **78:**3 **79:**14
**stealing** [4] **9:**14,17 **49:**25 **77:**16
**step** [7] **78:**22 **154:**23 **160:**24 **175:**16 **178:**6 **184:**17 **203:**1
**stephanie** [2] **1:**16 **3:**10
**stepped** [1] **113:**2
**steps** [4] **69:**6 **70:**1 **82:**25 **83:**2
**sticker** [1] **149:**22
**still** [21] **31:**8,12 **38:**25 **61:**24 **63:**6,7,9,10 **68:**12,12 **73:**4 **79:**10,10 **84:**2 **98:**6 **112:**14 **130:**2 **160:**20 **166:**12 **167:**15 **210:**2
**stipulate** [1] **31:**2
**stipulation** [2] **31:**3,4
**stole** [6] **50:**10 **77:**19,19 **78:**1,1,1
**stolen** [1] **12:**22
**stood** [1] **85:**3
**stop** [5] **16:**16 **46:**11 **64:**25 **65:**6,10
**stopping** [1] **67:**21
**story** [3] **54:**1,2 **99:**24
**straight** [3] **42:**16 **93:**9,11
**straightforward** [1] **17:**3
**street** [3] **1:**17,24 **75:**5
**stretcher** [2] **85:**14,25
**stretchers** [1] **84:**25
**stricken** [1] **32:**3
**strike** [5] **31:**17 **35:**18 **77:**10 **158:**14 **192:**1
**striking** [1] **31:**22
**strip** [2] **10:**6 **73:**7
**striving** [1] **43:**22
**strong** [3] **4:**24 **7:**22 **78:**7
**struck** [6] **55:**25 **125:**17 **163:**19 **183:**19,22 **192:**3
**stubble** [1] **198:**13
**stuck** [1] **113:**24
**studied** [1] **201:**17
**stuff** [16] **5:**12 **6:**20 **7:**13 **9:**6 **12:**21 **84:**2,6 **86:**1,4,5 **143:**16 **172:**9 **188:**22 **207:**18,21 **210:**23
**stunned** [2] **80:**12 **81:**21
**stupid** [1] **92:**11
**subduing** [1] **207:**8
**subject** [12] **4:**23 **11:**12 **22:**15 **35:**13 **48:**22 **180:**12 **182:**11,14 **200:**6 **201:**23 **205:**8,23
**subjects** [3] **17:**17 **29:**5 **133:**23
**submit** [4] **33:**13 **54:**11 **60:**1,22
**submitted** [2] **205:**13,17
**subpoenaed** [2] **13:**18 **111:**15
**subpoenas** [1] **8:**18
**subsection** [1] **16:**21
**subsequently** [2] **122:**25 **125:**19
**substance** [1] **206:**3
**substantive** [1] **4:**12
**substitute** [1] **44:**14
**sudden** [1] **81:**23
**suffer** [1] **59:**25
**suffered** [1] **55:**20
**sufficient** [1] **207:**7
**sufficiently** [1] **22:**19
**suggest** [1] **22:**9
**suggested** [1] **22:**10
**suggesting** [2] **32:**19 **205:**19
**suggestion** [3] **43:**17 **112:**16 **113:**14
**suit** [4] **122:**9 **125:**6 **159:**13,15
**suite** [1] **1:**18
**sum** [3] **47:**14,22 **206:**3
**summary** [4] **22:**8 **26:**15 **132:**11,13
**summation** [1] **32:**16
**summations** [2] **39:**12 **47:**5
**summing** [1] **204:**17
**summons** [1] **62:**21
**suppose** [1] **112:**19
**supposed** [2] **10:**5 **207:**20
**surely** [1] **203:**7
**surface** [1] **112:**9
**surfaced** [1] **202:**21
**surprises** [2] **6:**20 **18:**15
**suspect** [2] **201:**20 **207:**8
**sustain** [4] **26:**22 **35:**6,15,

# Keyword Index


17
**sustained** [9] **35:**6 **130:**5, 10 **135:**4 **140:**1 **181:**4 **182:** 16 **193:**5,11
**swearing** [1] **50:**24
**swears** [2] **50:**15 **58:**9
**sweat** [1] **151:**24
**sweatshirt** [2] **151:**20 **152:**4
**swift** [1] **15:**6
**swing** [3] **63:**8 **208:**10,12
**swinging** [1] **63:**2
**switch** [1] **64:**7
**swore** [1] **126:**16
**sworn** [9] **24:**4,9,16 **37:**25 **61:**9 **155:**14 **178:**19 **181:**8 **186:**14
**sympathy** [1] **25:**3
**symptom** [1] **92:**23
**symptoms** [1] **92:**22
**syndrome** [1] **51:**17
**system** [7] **33:**17 **37:**6 **45:** 19 **47:**20 **48:**21 **49:**4 **53:**9

## T

**tab** [5] **167:**7 **168:**15 **176:**8 **198:**15,19
**table** [4] **21:**15 **60:**3 **184:**8 **210:**23
**tainted** [1] **38:**12
**talked** [8] **21:**20 **68:**6 **83:** 24 **117:**24 **120:**14,15 **126:**21 **145:**15
**talks** [3] **6:**9 **43:**25 **50:**25
**tall** [2] **105:**16 **156:**16
**tap** [1] **194:**10
**tapping** [1] **81:**11
**task** [1] **25:**2
**tasting** [1] **81:**19
**tattoo** [3] **76:**8 **78:**24 **145:** 8
**tattoos** [1] **144:**10
**taxes** [1] **62:**22
**technical** [1] **91:**18
**technician** [2] **183:**14,14
**techniques** [1] **196:**24
**telephone** [5] **76:**5,6 **122:** 23,24 **154:**14
**telephonic** [1] **154:**12
**tells** [1] **31:**22
**temple** [5] **50:**19,20 **80:**22, 25 **81:**1
**tendency** [1] **22:**5
**tentative** [1] **41:**3
**terminology** [1] **174:**18
**terms** [5] **27:**5 **46:**11 **47:**22 **48:**23 **175:**10
**terribly** [1] **12:**18
**terrific** [1] **71:**14
**test** [1] **183:**1
**testified** [21] **29:**22 **59:**6,7, 8 **107:**1 **109:**11,11 **126:**14 **130:**1 **138:**12,20 **153:**21 **161:** 24 **170:**2 **173:**16 **181:**9,24 **184:**9 **189:**22 **195:**7 **199:**2
**testifies** [2] **28:**13,17
**testify** [14] **8:**24,24 **17:**21 **21:**5 **50:**23 **51:**21 **54:**25 **55:**2 **56:**14 **57:**11 **60:**8 **112:**1 **121:** 19 **181:**17
**testifying** [2] **54:**23 **199:**8
**testimonials** [1] **188:**17
**testimony** [54] **4:**18 **15:**7 **17:**1 **25:**16 **26:**16,19 **28:**10 **29:**12,23 **31:**3,7,18 **32:**3 **34:** 10,11 **36:**11,22 **40:**15 **45:**8 **46:**15 **50:**4 **51:**2,5 **53:**16,17 **54:**8,12 **104:**7 **105:**19 **106:** 12,18 **107:**5 **109:**22 **113:**10 **115:**8 **127:**18 **132:**22 **167:**9, 22 **168:**10 **169:**6,10,20,23 **170:**20 **171:**10,25 **172:**2 **173:** 1 **178:**20 **181:**8 **191:**24 **195:** 5 **196:**21
**tests** [2] **135:**25 **136:**2
**th** [1] **212:**17
**thanks** [1] **185:**4
**that's** [2] **133:**8 **148:**5
**themself** [2] **76:**16 **182:**8
**themselves** [4] **30:**23 **45:** 12 **55:**10,12
**thereabouts** [1] **46:**12
**therefore** [2] **32:**25 **43:**10
**there's** [39] **4:**24 **6:**12 **7:**3, 5,16 **21:**3 **36:**25 **38:**22 **40:**10 **47:**2 **62:**23,23 **66:**15,16 **74:**2 **111:**16,24,25,25 **113:**7,10,11 **115:**5 **147:**9 **161:**25 **165:**21 **172:**9,10 **180:**13 **196:**4 **198:** 19 **205:**3,4 **206:**1,22 **207:**3 **209:**8,23,24
**thermal** [1] **122:**11
**they'd** [1] **138:**20
**they'll** [1] **43:**13
**they've** [1] **40:**4
**thing?'** [1] **121:**3
**thinking** [1] **114:**2
**thinks** [1] **50:**13
**third** [3] **42:**18 **123:**19 **152:** 23
**thirteen** [1] **156:**11
**thirties** [1] **88:**11
**thirty-two** [1] **187:**14
**though** [9] **6:**17 **16:**6 **40:**3, 4,5 **122:**22 **139:**1 **162:**3 **207:** 20
**thoughts** [1] **181:**19
**thrashing** [1] **178:**10
**three** [17] **15:**5 **21:**24 **29:**7 **62:**8 **67:**7 **69:**2 **86:**20,20 **115:** 23 **119:**17 **123:**21,21,23 **145:** 16 **183:**5,8,9
**throbbing** [2] **92:**19 **93:**5
**throughout** [2] **34:**2 **153:** 16
**throwing** [1] **182:**8
**thrown** [3] **42:**19 **144:**25 **145:**19
**tie** [14] **25:**23 **26:**21 **41:**21 **77:**1,2 **101:**24 **105:**18 **106:**6 **122:**10 **123:**10 **125:**7 **159:**13, 15 **199:**20
**ties** [1] **199:**22
**tight** [6] **76:**22 **84:**25 **122:** 10,11,14 **209:**19
**timing** [1] **19:**5
**tiny** [2] **9:**7,20
**tip** [2] **26:**5 **71:**9
**titles** [2] **5:**23,25
**today** [28] **13:**13 **14:**20,20, 23 **37:**5 **49:**3 **53:**13 **61:**18 **96:** 17,19,20 **97:**5,10 **109:**22 **117:** 16 **127:**18 **156:**16,21,22 **167:** 22 **168:**1 **172:**2 **173:**1 **181:** 24 **189:**20 **203:**6,8 **206:**9
**together** [10] **33:**19,23,25 **35:**25 **40:**23 **47:**8 **53:**3 **195:**5, 11 **196:**16
**tomorrow** [15] **8:**3 **13:**15 **14:**21 **15:**1 **18:**22 **21:**16 **71:** 13 **203:**4,6,12,17 **204:**4 **210:** 11,13 **211:**1
**ton** [2] **40:**12 **212:**8
**tone** [1] **78:**7
**tonight** [3] **17:**8 **204:**23 **210:**16
**took** [28] **64:**9 **69:**5,12 **85:** 23,23 **87:**14,15 **88:**21 **94:**6 **103:**8 **118:**1 **135:**11,14,15 **143:**12 **147:**10,17 **148:**4,8,9 **151:**13,14,18,23 **152:**14 **159:** 2 **171:**8 **183:**2
**tools** [2] **37:**12 **64:**10
**top** [2] **73:**16 **74:**18
**topic** [3] **4:**25 **41:**10 **153:** 20
**topics** [3] **8:**3 **11:**3 **67:**12
**torso** [1] **183:**6
**tort** [1] **210:**3
**touched** [2] **59:**24 **79:**25
**tough** [1] **78:**6
**toughed** [1] **85:**1
**tour** [2] **189:**5,6
**towards** [5] **10:**17 **14:**16 **44:**9 **79:**19,19
**tracey** [2] **212:**5,10

# Keyword Index


**trade** [1] **63:**6
**train** [6] **94:**6,9,9,12,21 **192:**9
**trained** [3] **59:**17,17 **194:**4
**training** [3] **195:**8,9 **196:**15
**trajectory** [1] **153:**9
**transcriber** [5] **212:**11,15,20,26,32
**transcriber's** [1] **212:**1
**transcript** [8] **1:**10,32 **44:**19 **58:**12 **59:**4 **137:**3 **167:**3 **212:**3
**transcription** [2] **1:**27,32
**transcripts** [3] **44:**18,18,21
**transferred** [1] **174:**24
**transpired** [1] **88:**25
**transported** [1] **55:**6
**travel** [2] **94:**18,18
**traveled** [4] **95:**23 **153:**4,4,5
**treat** [1] **31:**6
**treated** [3] **51:**2 **95:**18 **111:**25
**treating** [3] **170:**6 **179:**1 **181:**16
**treatment** [4] **98:**8 **111:**22 **144:**25 **145:**19
**triage** [2] **84:**5 **143:**23
**trial** [52] **1:**10 **14:**3,15,17 **17:**15 **24:**16,18,19,21,24 **26:**11,14 **27:**23 **28:**6 **30:**13 **31:**14 **33:**7 **34:**2,24 **35:**3,5 **36:**4,24,25 **37:**1,3,5,14,19,20,25 **38:**6,11,14,20 **39:**5,21 **40:**11,12,18,24 **44:**7,12,19 **45:**16 **46:**21 **47:**5,12,23 **114:**17 **203:**7,9
**triangle** [3] **74:**18 **79:**2,20
**tried** [3] **59:**16,19 **163:**18
**tries** [3] **42:**3,5,7
**troubled** [1] **51:**6
**truck** [1] **64:**9
**true** [19] **25:**10,10 **26:**7,7 **31:**5,6,6,10 **40:**18,19,20 **107:**2,23,23 **178:**19 **179:**19 **188:**11 **195:**6 **207:**14
**trust** [2] **46:**2 **53:**25
**truth** [19] **53:**20 **54:**4,5,10,10 **58:**10 **60:**23,25 **61:**1 **83:**19 **103:**8,9 **106:**18 **126:**16 **137:**3 **176:**23 **199:**5,6,6
**truthful** [1] **178:**24
**try** [13] **7:**25 **19:**22 **28:**16 **34:**13,19 **37:**18 **46:**5 **88:**16 **90:**22 **131:**15 **160:**15 **161:**2 **162:**10
**trying** [10] **37:**17 **76:**7 **79:**16 **81:**11 **112:**19 **122:**15 **177:**6 **194:**22 **207:**11,25
**t-shirt** [5] **49:**21 **64:**4 **77:**3 **105:**25 **106:**1
**tuesday** [4] **13:**19,20 **14:**10 **19:**5
**turn** [7] **10:**20 **97:**16,20,22 **167:**7 **168:**15 **207:**19
**turnarounds** [1] **8:**2
**turned** [3] **147:**8,10 **183:**24
**turning** [3] **93:**1 **97:**21 **153:**16
**turns** [1] **85:**1
**tv** [1] **53:**24
**tweet** [1] **38:**3
**twice** [4] **15:**4 **39:**19 **179:**7,15
**twitter's** [1] **38:**3
**two** [50] **6:**22 **8:**18 **14:**9 **19:**21 **20:**3,14 **26:**25 **29:**7,9 **44:**25 **51:**20 **54:**22 **57:**15 **58:**13 **65:**8 **66:**1 **67:**7 **69:**2,13,13,17,17 **87:**25 **88:**21 **94:**19 **99:**11,12,13 **100:**24 **101:**16,19 **102:**19 **109:**13 **111:**24 **119:**15 **121:**19 **144:**6 **152:**2,24 **159:**6,17 **160:**20,23 **162:**23 **164:**8 **166:**9 **182:**12 **183:**8,9 **200:**9
**two-foot** [2] **75:**14 **161:**25
**type** [3] **22:**25,25 **143:**23
**typed** [2] **58:**12 **154:**12
**types** [3] **4:**15 **62:**16 **188:**7
**typical** [1] **161:**12
**typically** [3] **46:**11,12 **47:**12


## U


**ultimately** [2] **52:**9 **98:**16
**umbrella** [4] **29:**25 **30:**1,1,3
**unanimous** [1] **33:**3
**uncommon** [2] **162:**18,20
**unconscious** [3] **50:**21,24 **183:**5
**unconsciousness** [1] **179:**21
**unconstitutional** [1] **207:**3
**uncontested** [1] **8:**11
**uncuffed** [1] **75:**9
**under** [23] **9:**18 **16:**12 **27:**18 **58:**10 **59:**3,8 **73:**4 **93:**1,19 **95:**8 **102:**23 **103:**3 **116:**4 **117:**3 **126:**14 **133:**12 **137:**2 **157:**21 **162:**19 **173:**16 **189:**22 **199:**2 **202:**13
**underlying** [1] **8:**9
**underneath** [1] **51:**10
**understand** [15] **8:**17 **10:**14,25 **18:**1 **19:**15,18 **23:**2 **24:**23 **77:**21 **95:**5 **172:**2 **177:**6 **180:**18 **191:**24 **204:**15
**understanding** [3] **5:**8 **21:**8 **147:**8
**understandings** [2] **6:**19,19
**understands** [1] **23:**3
**understood** [5] **15:**3 **89:**11 **175:**12 **176:**21 **177:**10
**undress** [1] **69:**7
**unequivocal** [1] **171:**25
**unfairness** [1] **148:**7
**unforeseeable** [1] **45:**24
**unforeseen** [1] **45:**24
**unfortunately** [1] **51:**4
**unidentified** [2] **27:**9 **28:**14
**uniform** [4] **159:**11 **191:**7,7 **192:**4
**uniformed** [5] **159:**9 **160:**20 **164:**17 **166:**8,9
**uniondale** [1] **191:**11
**unique** [2] **39:**17 **209:**24
**united** [5] **1:**1,12 **24:**14 **33:**6,10
**university** [1] **55:**21
**unless** [8] **12:**18 **40:**15 **115:**5 **127:**16 **205:**3 **209:**21,24 **211:**6
**unlikely** [1] **6:**11
**uno** [1] **5:**10
**unreasonable** [2] **27:**14 **49:**11
**until** [15] **14:**14 **37:**5,22 **39:**23 **49:**7 **57:**12,15 **68:**13 **109:**17 **122:**1 **148:**16 **173:**21 **174:**7 **189:**20 **194:**2
**updated** [1] **205:**25
**upset** [10] **78:**5,18 **79:**10 **90:**4,5 **132:**2,4 **162:**16,18 **164:**1
**upstairs** [5] **50:**5 **55:**13 **69:**4,4 **74:**6
**useful** [1] **40:**17
**user** [1] **71:**7
**using** [9] **4:**25 **17:**6 **66:**2 **78:**6 **79:**11 **83:**1 **138:**15 **205:**22 **206:**12


## V


**valet** [1] **94:**11
**value** [2] **11:**8 **22:**19
**vance** [2] **212:**18,19

# Keyword Index


**various** [1] **141:**8
**vary** [1] **205:**7
**vehicle** [1] **55:**5
**venn** [2] **209:**12 **210:**8
**verdict** [12] **7:**6,22 **32:**6 **33:**3,3 **39:**14 **40:**7 **48:**8,19 **53:**15,21 **61:**1
**versus** [1] **3:**2
**vetted** [1] **205:**14
**victim** [3] **180:**10,11,22
**victoria** [3] **1:**23 **3:**20 **53:**4
**view** [3] **6:**15 **7:**20 **32:**18
**viewing** [2] **5:**6 **176:**10
**views** [1] **39:**14
**violates** [2] **38:**14 **44:**5
**violating** [1] **27:**13
**violation** [3] **6:**14 **44:**1 **209:**19
**violent** [1] **22:**5
**virginia** [3] **94:**10,22,22
**visit** [3] **37:**18 **95:**5 **164:**5
**vitals** [1] **173:**12
**voice** [2] **27:**9 **28:**14

## W

**wait** [5] **21:**16 **43:**14,18 **46:**8 **194:**2
**waiting** [9] **20:**11 **39:**23 **43:**12,13 **45:**23 **48:**17 **87:**15 **114:**22 **148:**16
**waits** [1] **50:**24
**wakes** [2] **49:**17 **50:**21
**wal** [1] **212:**28
**waldridge** [1] **212:**31
**walk** [10] **48:**1 **66:**14 **69:**24 **74:**1,1 **85:**2,12 **170:**10,15,25
**walked** [30] **59:**16,20,23 **69:**5 **73:**9,9,23 **74:**9,10,13,22 **75:**21 **76:**15 **85:**5,7,11,11,11,12 **106:**10 **117:**10 **118:**20,22 **119:**9 **121:**20 **158:**21 **159:**5 **160:**16 **167:**14 **173:**1
**walking** [2] **85:**6 **189:**21
**walks** [2] **33:**19 **79:**19
**wall** [21] **1:**17 **60:**3 **69:**14 **73:**24 **74:**2,21 **75:**3 **101:**8,14 **163:**5,13,19 **164:**5 **182:**1,9 **183:**16,19,20,21,22,25
**walls** [1] **101:**12
**wanted** [10] **18:**10 **19:**16,19 **78:**14 **84:**22 **113:**11 **135:**17 **143:**5 **153:**24 **175:**12
**wanting** [1] **6:**10
**wants** [5] **8:**21,24 **10:**14 **38:**24 **138:**4
**waste** [1] **17:**12
**watch** [1] **38:**24
**water** [4] **20:**22 **30:**1,2,3
**waving** [1] **114:**14
**way** [38] **6:**1 **7:**9 **11:**7 **12:**9 **30:**6 **34:**5,21 **35:**12 **36:**6,9 **37:**15 **38:**22 **48:**9 **52:**11,14 **65:**9 **83:**10 **85:**16 **94:**14 **97:**13,16 **108:**16 **132:**19 **133:**18 **144:**12 **155:**12 **156:**21 **161:**8 **172:**21,22,22 **173:**17 **194:**7 **195:**11 **204:**20 **205:**20 **208:**17 **210:**1
**ways** [1] **83:**12
**we're** [1] **132:**14
**wear** [2] **159:**13 **199:**21
**wearing** [7] **41:**21 **101:**23 **105:**24 **106:**1 **122:**8,12 **123:**10
**weather** [3] **41:**8 **43:**3,7
**web** [1] **144:**10
**wednesday** [12] **14:**1 **18:**22 **19:**20 **71:**24 **185:**14 **204:**7,8,13,17,20,21 **210:**15
**week** [7] **8:**18,18 **88:**21 **95:**1 **109:**15 **135:**18 **153:**16
**weekend** [1] **6:**9
**weeks** [2] **95:**21,22
**weigh** [2] **198:**2 **199:**15
**weighed** [1] **156:**18
**weight** [10] **5:**9 **25:**11 **30:**8,8 **31:**9,11 **34:**10 **35:**24 **36:**10 **199:**14
**weinstein** [1] **65:**1
**welcome** [2] **169:**18 **211:**18
**well-built** [2] **57:**6 **123:**9
**welling** [1] **95:**15
**west** [1] **1:**24
**westbury** [1] **65:**1
**westlaw** [2] **5:**20,21
**what's** [1] **138:**7
**whatever** [20] **5:**10 **17:**16 **29:**5 **30:**7 **35:**8 **38:**3 **40:**17 **76:**8 **83:**21 **92:**24 **95:**11 **98:**13 **108:**7 **129:**6,7 **141:**10 **149:**2,24 **154:**15 **172:**8
**whatsoever** [3] **189:**17 **190:**11 **208:**11
**wheelchaired** [1] **87:**15
**wheeled** [2] **85:**24 **143:**14
**whenever** [2] **200:**10,10
**where's** [1] **115:**15
**wherever** [1] **93:**3
**whether** [15] **6:**25 **9:**22 **25:**14 **30:**23 **35:**2 **41:**19 **42:**22 **56:**11 **132:**9 **133:**15 **167:**4 **169:**7,23 **170:**10 **179:**14
**whichever** [1] **10:**23
**whip** [1] **196:**14
**white** [12] **9:**12 **49:**22 **54:**17 **56:**3 **58:**1 **64:**16 **77:**3,3 **102:**12 **105:**17,18 **106:**6
**whoever** [1] **142:**20
**whole** [13] **12:**23 **38:**11 **47:**17 **62:**22 **85:**5 **106:**14 **134:**3 **143:**23 **165:**1 **169:**1,3 **174:**10 **199:**6
**whom** [2] **42:**19 **85:**8
**who's** [8] **21:**14,14 **51:**18 **62:**1 **183:**5 **189:**16 **207:**8 **208:**10
**wide** [1] **143:**21
**wife** [3] **54:**19 **62:**1 **63:**12
**wife's** [6] **9:**17 **68:**17 **78:**1,2 **99:**15 **100:**7
**willing** [1] **34:**6
**window** [9] **74:**3,18 **75:**3,3,4 **76:**3 **78:**20,25 **79:**2
**wire** [1] **74:**19
**wish** [2] **24:**22 **30:**25
**withdraw** [1] **114:**12
**within** [4] **91:**9 **120:**21 **121:**12 **191:**10
**without** [6] **25:**3 **53:**9 **67:**13 **91:**22 **148:**4 **179:**20
**witness** [76] **14:**18 **17:**2,21 **18:**12,14 **20:**9 **28:**13,17,22 **29:**21,22,24,25 **31:**8 **35:**11,14 **36:**11,23 **37:**14 **43:**5 **44:**22 **45:**6,7 **46:**15 **51:**7 **58:**9 **61:**4,9,12 **66:**3 **73:**3 **115:**23 **117:**21 **120:**8 **121:**9,11 **124:**3,6,13,16,19 **132:**6,7 **134:**1,1,2 **137:**9 **138:**10,25 **139:**3,6 **151:**9 **154:**24 **155:**1,5,14,18 **168:**19,25 **169:**9,19,21 **172:**13,17,19,23 **178:**16 **180:**11 **184:**19 **186:**4,10,14,17 **188:**18 **189:**12 **203:**3
**witness'** [2] **17:**1 **170:**20
**witnessed** [7] **169:**7,8,24 **170:**7 **178:**14 **181:**9 **183:**2
**witnesses** [34] **2:**5 **13:**11,21 **15:**17 **18:**2,21 **19:**9 **20:**14 **21:**4 **25:**13,16 **28:**10 **32:**13 **34:**9,18 **36:**7 **41:**12 **42:**22 **43:**2,11 **44:**16 **46:**25 **48:**23 **49:**8 **52:**5 **53:**14,17 **58:**6 **60:**23 **71:**13 **177:**22 **185:**13,17 **204:**15
**witness's** [4] **29:**23 **36:**22 **46:**14 **139:**9
**woke** [1] **152:**15
**woken** [1] **81:**5
**wondering** [1] **202:**16
**wood** [4] **74:**17,17,17 **75:**1
**wooden** [4] **74:**12,25 **79:**20 **101:**10
**woozy** [1] **81:**15
**word** [7] **26:**24 **32:**25 **78:**6 **79:**11 **80:**3 **123:**12 **210:**17

# Keyword Index


**words** [8] **10:**22 **44:**10 **45:**15 **50:**25 **97:**14 **138:**4 **145:**10 **149:**6
**work** [16] **7:**23 **37:**22 **49:**19,20 **52:**13 **63:**19,20,21 **64:**2,4,4,6,9 **188:**11 **198:**8 **199:**21
**worked** [3] **119:**21 **187:**16 **191:**10
**working** [10] **33:**25 **112:**16 **156:**12 **157:**7 **188:**9,25 **189:**3,4 **191:**3 **204:**23
**works** [4] **30:**6 **48:**21 **90:**5 **138:**15
**world** [1] **39:**7
**worry** [1] **13:**1
**worse** [2] **97:**10 **153:**12
**worst** [1] **192:**3
**worth** [2] **15:**25 **83:**17
**wound** [1] **89:**9
**wrap** [1] **98:**21
**wrist** [2] **55:**16 **161:**25
**write** [4] **5:**15 **17:**15 **45:**2 **175:**24
**written** [4] **4:**9 **30:**17 **37:**1 **58:**12
**wrongly** [1] **43:**5
**wrote** [5] **123:**14,17 **124:**1 **126:**1 **176:**22

## Y

**yards** [2] **43:**7 **86:**7
**year** [5] **97:**16 **109:**18 **155:**25 **174:**22 **200:**8
**years** [10] **11:**7 **57:**15 **96:**16 **101:**23 **156:**6 **187:**12,20,21 **191:**25 **200:**9
**yelling** [4] **79:**25 **81:**22,23 **162:**14
**yellow** [1] **153:**17
**yep** [1] **115:**1
**yesterday** [1] **41:**9
**york** [20] **1:**2,5,19,19,25 **15:**16 **24:**15 **27:**18 **56:**19,22 **93:**18 **95:**23 **102:**23 **119:**12,18 **120:**2 **125:**20 **208:**21 **209:**25 **210:**3
**you're** [1] **149:**21
**young** [4] **63:**5 **88:**8,10 **144:**11
**younger** [2] **53:**24 **63:**10
**youngest** [1] **62:**11
**yourself** [13] **31:**23 **46:**6,10 **135:**12,16 **158:**24,24 **159:**2 **168:**21 **169:**12 **176:**9 **179:**11 **199:**11
**yourselves** [9] **24:**24 **39:**8,14 **40:**21 **41:**3,18,22 **42:**17 **110:**10

## Z

**zoom** [5] **189:**25 **190:**4,5 **200:**24 **201:**2