UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

ROGER BASILE, Plaintiff, v. COUNTY OF NASSAU ET AL, Defendants.

Docket No. 2:20-CV-00576-EK-LB

Brooklyn, New York
Tuesday, October 31, 2023
9:30 a.m.

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ERIC R. KOMITEE
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Plaintiff: Rickner PLLC
ROBERT H. RICKNER, ESQ.
STEPHANIE PANOUSIERIS, ESQ.
14 Wall Street
Suite 1603
New York, New York 10005
212-300-6506

For the Defendants: Nassau County Attorney's Office
RALPH J. REISSMAN, ESQ.
VICTORIA LAGRECA, ESQ.
One West Street
Mineola, New York 11501
516-571-3046

Transcription Service: Superior Reporting Services LLC
P.O. Box 5032
Maryville, TN 37802
865-344-3150

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

# INDEX


| WITNESSES: | Page |
|---|---|
| MEHRDAD GOLZAD | |
| Direct Examination by Mr. Rickner | 255 |
| Cross-Examination by Mr. Reissman | 288 |
| ARNOLD ROTHENBERG | |
| Direct Examination by Mr. Rickner | 296 |
| Cross-Examination by Mr. Reissman | 314 |
| Redirect Examination by Mr. Rickner | 314 |
| THOMAS GARIBOTTO | |
| Direct Examination by Ms. Panousieris | 315 |
| Cross Examination by Mr. Reissman | 331 |
| Redirect Examination by Ms. Panousieris | 340 |
| DANIEL MINERVINI | |
| Direct Examination by Ms. Panousieris | 357 |
| Cross Examination by Mr. Reissman | 377 |
| Redirect Examination by Ms. Panousieris | 381 |

| EXHIBITS: | Marked | Received |
|---|---|---|
| 1 - Documents | -- | 254 |
| 2 - Documents | -- | 254 |
| 3 - Documents | -- | 254 |

P R O C E E D I N G S

THE COURT: Good morning, everybody. Please be seated. So I got the jury instruction submissions that came in overnight. I don't know that they answer the -- or at least a particular question on my mind, which is, you know, I instructed the jury in my preliminary instructions yesterday that they needed to be unanimous in their verdict. One question in the vein of jury unanimity might be the following.

Let's say the jurors go back and deliberate -- and I'm just speaking hypothetically here, I'm not, you know, saying anything about my views of the evidence because I don't have a view of the evidence. This is just in the vein of questions, not answers. Let's say, for the sake of argument, that half the jurors believe and have concluded at the end of their deliberations that Detective A, let's call him Detective Perkins, is liable on the state common law claim. And let's say the other half of the jurors believe that Detective B, we'll call him Detective Lashinsky, is liable.

So not only is there no unanimity on the question of which employee of the county engaged in the tortious conduct at issue, there's not even a majority of the jury. Neither unanimity in my hypo nor even a majority. But they all agree that somebody -- somebody committed an assault. I don't think either party here has hit bedrock in their search for

legal authority on the question of whether the jury can hold the County of Nassau liable under the doctrine of respondeat superior in that situation with no unanimity and not even a majority in agreement on which individual committed that tortious act.

MR. RICKNER: Well, if I may, Your Honor?

THE COURT: Yeah.

MR. RICKNER: Actually, can I remain seated if you don't mind?

THE COURT: Yeah. Be close to the microphone. That's the --

MR. RICKNER: Yeah. Excellent. Okay. Thank you. Well, that's where the unidentified officers come in. And so taking your hypothetical, one, we'd have a hung jury as to two out of the three claims.

THE COURT: Right.

MR. RICKNER: I'm not disputing that. As far as the 43 USC 1983 claim --

THE COURT: 42.

MR. RICKNER: Right. I should know this. And we're dead, right? However, you don't even have to identify the specific officer. And so I would see my burden of proof as to respondeat it has to be an employee, they have to be within the scope of their employment, and they'd have to have committed a tort.

THE COURT: I mean this with the most respect, and I really do.

MR. RICKNER: I'm wrong.

THE COURT: I appreciate your assertions, but I need to see a case.

MR. RICKNER: Yeah.

THE COURT: Yeah. There is an analog here that I realize is a pretty distant analog to the world that I mostly grew up in, which is the world of securities enforcement and mostly on the criminal side. Where corporations are criminally liable, as you may know, under the doctrine of respondeat superior, for the securities fraudulent conduct of their employees. But I think juries get instructed in that arena. That if you're going to hold the corporation liable, you need to be unanimous on which employee committed the crime that is the basis of the corporate liability. That's securities fraud, not civil rights. That's criminal, not civil. That's different for a whole universe full of reasons.

But I bring it up just to say, I don't think it's written in the sky that the jury just needs to find someone liable and they can disagree on who. I think it is going to be the subject of some legal authority one way or the other and so far I haven't seen it. And we're on a very tight timetable here. All of which is to say, I think -- I don't

know what kind of resources you have back at the home front -- both of you --

MR. RICKNER: Not many. But --

THE COURT: If somebody's telling me that a lawyer here is going to step out for the rest of the day to drill down on this issue, I'm fine with that. I'm not telling you to do that. I'm telling you we need some way of getting to a definitive answer on this question before I charge the jury, and I'm not there yet.

MR. RICKNER: Understood, Your Honor. And, well, two points, one, if you don't mind, I'll get you a letter by 9 a.m. tomorrow morning with more authority. I briefed four things yesterday. I didn't quite get as deep into it as I could have.

THE COURT: Yeah. Did you see the docket order I put up?

MR. RICKNER: Which one?

THE COURT: We put it up at like 6:30 p.m. last night. People may not --

MR. RICKNER: Oh, yeah. I thought I covered it.

THE COURT: Oh, that last sentence -- maybe it was the second to last sentence or the last sentence was designed to get at this issue. Maybe I could have been hyper specific compared to where I was. But --

MR. RICKNER: Understood. And --

THE COURT: Your submission came a bit closer to the question I'm asking, the County not as much. But, again, I don't think either letter actually cited authority responsive to my question.

MR. RICKNER: Understood. I got sort of as close as I could with materials at hand. I just pause at two things. One, I'll try to get better authority. And two -- and you might not love this idea, but it does have some logical sense, which is if you charge the jury my way and I'm wrong, I just lose eventually. Either it's a rule 59 motion or it's an appeal, but I lose. However, if you charge it your way and I'm right, we try the case a second time.

THE COURT: So, first of all, I don't have a way. Did you say my way?

MR. RICKNER: Well, sorry, I'm being to colloquial. If we say the jury instruction I want and I'm right, then we're fine. If I'm wrong, I just lose and I lost and there's no retrial. If we do it the opposite way --

THE COURT: Right.

MR. RICKNER: -- and I happen to be correct, we try the case a second time. So I'm just throwing that out there.

THE COURT: Let me just think about that.

MR. RICKNER: Logically, if you're not satisfied with the legal answer that we ultimately come up with -- and to be clear, I'm going to --

THE COURT: Why is that? There's no retrial if you win, but based on jury instructions that are too favorable to you the case gets reversed for a second trial, either way.

MR. RICKNER: No. No. No. Because if they don't identify either officer, I missed my burden on picking which officer it is, but I win the respondeat argument, I just lose.

THE COURT: Oh, okay. All right. But everyone agrees on the high level general proposition that as to liability on a given count, the jury has to be unanimous?

MR. RICKNER: No question. Unless we agree otherwise, which I suspect they will.

THE COURT: Okay. I share that suspicion.

MR. REISSMAN: Your Honor, I spent a lot of time last night on Lexis trying to come up with something to address your concern, and all I really found was the basic law that -- as I cited on page 14 of my additional -- I mean, this municipality may be vicariously liable on a state law assault and battery claim for torts committed by a police officer. And then the second sentence I wrote -- and this is from Second Circuit Triolo case -- a municipal employer cannot be vicariously liable in the absence of unlawful conduct. And I really didn't focus on the split liability question. And I really don't know where to look. I can go back to my office and keep looking, but I really wouldn't

know where to start.

THE COURT: Really?

MR. REISSMAN: Well, I mean, I think Mr. --

THE COURT: Do you agree with me, just by way of example, that this is a question about what it means to require jury unanimity? I mean, I'm more sympathetic to suggestions about time constraints from the Plaintiff here. You, having the Nassau County district attorney's office behind you, right?

MR. REISSMAN: County attorney.

THE COURT: County attorney. What's the difference?

MR. REISSMAN: District attorney tries criminal cases. County attorney represents the county in civil cases.

THE COURT: And it's two different people?

MR. REISSMAN: Two different -- yeah. County attorney is retired Judge Thomas Adams. And the district attorney is --

THE COURT: Oh, yeah. Yeah. Okay. How many people work in the county attorney's office?

MR. REISSMAN: Not enough. But I will tell you that this is my case for all purposes and Ms. LaGreca came on to help me at trial. So there's nobody else in the office that can help me.

THE COURT: Really?

MR. REISSMAN: I could call my supervisor and say, get somebody on this issue --
THE COURT: Yeah. You could.
MR. REISSMAN: -- I could do that in five minutes.
THE COURT: Let's do that.
MR. REISSMAN: Okay.
THE COURT: While we're working today, somebody at the county attorney's office, maybe in the appeals section, somebody who --
MR. REISSMAN: Yeah. We have an appeal section.
THE COURT: -- is going to be the most well placed to do, you know, sophisticated connoisseurship-level legal research should be working on this question all day today at the county attorney's office.
MR. REISSMAN: Okay.
THE COURT: Think about it as a direct order.
MR. REISSMAN: I will make that call right now.
THE COURT: Okay.
Let's break for five minute while Mr. Reissman makes that phone call and you all --
MR. RICKNER: I'm going to go call in a favor from a friend.
THE COURT: -- do whatever you want to do during that five minutes. And we will regroup.
MR. RICKNER: Well, I don't have a county, but I'm

going to go call a friend.

THE COURT: There you go. It's like the game show where you get one phone call.

MR. RICKNER: I might make three.

THE COURT: I'll be back, call it 9:30 sharp.

(Recess)

THE COURT: We can bring in the jury, please.

THE COURTROOM DEPUTY: Yes, sir.

THE COURT: Thank you.

So Mr. Reissman, you have a private law firm, but do you work for the County on -- how does this all work?

MR. REISSMAN: I am a government employee.

THE COURT: Okay.

MR. REISSMAN: A deputy county attorney. I am not a union member. We are assigned at will by ordinate. So I'm a government employee, paid by the taxpayers of Nassau County, so is Ms. LaGreca.

THE COURT: Okay. And your employer is the --

MR. REISSMAN: Nassau County.

THE COURT: -- county attorney's office?

MR. REISSMAN: My office is county attorney's office. It's an agency created by Charter -- a Nassau County Charter.

THE COURT: Okay. For some reason I thought that the county attorney had contracted with you to do this.

MR. REISSMAN: It does sometimes --

THE COURTROOM DEPUTY: All rise.

(Jury enters)

THE COURTROOM DEPUTY: You may be seated.

THE COURT: All right. Good morning, ladies and gentlemen. Thank you all for being with us. I hope you're all well rested. We are going to resume this morning with the continuation of the Plaintiff's case in chief.

And so, Mr. Rickner, you may call your next witness.

MR. RICKNER: Yes. May we actually go outside and grab him?

THE COURT: Yes.

MR. RICKNER: Thank you, Ms. Panousieris. Of course I have to find my notes --

Also just as a housekeeping matter because I don't know that we did this formally, I would just like to move to have Exhibits 1, 2, and 3 admitted into evidence. I believe we have consent on all three.

MR. REISSMAN: Yes. We do.

THE COURT: All right. Without objection, Plaintiff's Exhibits 1, 2, and 3 are received in evidence.

(Plaintiff's Exhibits 1, 2, 3 received in evidence.)

MR. RICKNER: And if I may approach just in case the witness wants to reference them.

THE COURT: Please.

THE CLERK: Would you please raise your right hand?

MEHRDAD GOLZAD, WITNESS, sworn

THE CLERK: You may be seated. Can you state your name for the record, please?

THE WITNESS: Mehrdad Golzad.

THE CLERK: Can you spell your name?

THE WITNESS: G-O-L-Z-A-D.

THE CLERK: I appreciate you looking at me, but it's actually more important that you're on the microphone. Sorry.

THE WITNESS: Okay. Last name is G-O-L-Z-A-D. First name, M-E-H-R-D-A-D.

THE CLERK: Thank you.

DIRECT EXAMINATION

BY MR. RICKNER:

Q. Good morning, Doctor. I'd just like to get a little bit of information about your background and experience. Starting just with your college education, can you tell me where you went to college, what you majored in, and what you studied?

A. So I completed a combined premedical and medical program at the University of Paris in France.

Q. And which particular university in Paris was that?

A. University of Paris.

Q. Okay. And what degree did you receive?

A. MD. Medical Degree. Medical doctorate degree.

Q. Okay. And how many years was that?
A. Eight years.
Q. Eight years of study?
A. Yes.
Q. Was that university sometimes called the Sorbonne?
A. Yes. That's what it's called.

Q. With respect to the level of prestige, for those people who may not be familiar with foreign universities, what would that be sort of the equivalent of a of a university here?

THE COURT: Sustained.

MR. RICKNER: Okay.

BY MR. RICKNER:

Q. After you graduated from the Sorbonne, where did you go next?

A. Then I moved to the United States. I completed my first year of postgraduate residency at the Graduate Hospital of University of Pennsylvania in internal medicine. And then I completed a residency in the specialty of neurology.

Q. Okay. And where did you do your residency?

A. I did my first year residency at the New York Medical College. And the second and third year at the Mount Sinai Hospital.

Q. Understood. And after Mount Sinai, where did you go next?

A. I completed one additional year of training focused on traumatic brain injury.

Q. Okay. And where did you do that?

A. At the New Jersey Neuroscience Institute.

Q. Okay. And what year did you finish that?

A. 1997.

Q. Now, can you just please explain roughly what the field of neurology and traumatic brain injury covers with respect to your studies?

A. The field of neurology specializes in the diagnostic and evaluation of diseases that involve the brain, the spinal cord, and the nerves in the arms and the legs, as well as

muscles.

THE COURT: I'm sorry. I may have missed this because it went by very quickly. But did we hear about your qualifications specifically with respect to neurological injuries or whatever it is we're now talking about?

MR. RICKNER: Well, I'm having him discuss his education in traumatic brain injuries right now.

THE COURT: Okay. The question is just what is the field?

MR. RICKNER: Well, what was he studying specifically at that time.

THE COURT: Okay.

BY MR. RICKNER:

Q. And I believe you covered neurology. Can you also explain the traumatic brain injury studies that you were doing?

A. So I completed subspecialty training in brain injury medicine and that focuses on traumatic brain injury.

Q. Okay. And can you go into a little bit more detail as to what types of things traumatic brain injury constituted in that study?

A. So that -- the initial part of any medical evaluation is the diagnostics. So the first part is the evaluation of the degree of injury suffered as a result of application of physical force to the brain. The subsequent portion is the

consequences for the individual. And the last part is the treatment that the doctor could provide to help the individual recover.

Q. Okay. And was that all part of your residency?

A. Correct. Residency and post residency training.

THE COURT: Sorry. Were you a resident in a particular subject?

THE WITNESS: In neurology.

THE COURT: You are a neurology resident?

THE WITNESS: I was a neurology resident, and I completed an additional year of training at the New Jersey Neuroscience Institute that was focused on traumatic brain injury.

THE COURT: The entire year?

THE WITNESS: The entire year. Yes.

THE COURT: Okay. Thank you.

BY MR. RICKNER:

Q. And when you say the entire year, just for timing purposes, what year was that?

A. From July 1996 to July 1997.

Q. Okay. And following that training, did you ever become board certified in any areas?

A. Yes. I became board certified in the specialty of neurology and in the subspecialty of brain injury medicine.

Q. And after you finished your additional residency in

1997, did you begin to practice medicine?
A. Yes.
Q. And have you continued to practice medicine from 1997 to present?
A. Yes. I have.
Q. And can you tell me a little bit about the private practice you've had over those years?
A. So I have had a private practice since 1997, and for about 10 years also I was chief of neurology at Saint Vincent Catholic Medical Centers in Brooklyn and Queens that started in 1999 and it ended in 2009 when those hospitals declared bankruptcy.
Q. And following, I guess, that period in 2009, did you also continue into private practice?
A. Yes.
Q. And what types of injuries do you treat on your day-to-day basis in private practice?
A. More than 90 percent of my practice is dedicated to traumatic brain injury.
Q. And tell me if I'm right about this, is traumatic brain injury a collection of different injuries or is it one thing or is it something else?
A. Traumatic brain injury is -- is the result of application of a physical force to the brain. But the consequences are multiple. So the consequences, you can call

that a collection of various complications, but the original mechanism happens to be relatively identical.

Q. Okay. And specifically, that mechanism, you said, is some sort of physical trauma?

A. Correct.

Q. Can you explain what that would mean?

A. So physical trauma, as -- as defined by the Center for Disease Control, consists of either a direct blow to the head, an object hitting the head or the head hitting an object. And the second mechanism is a sudden flexion and extension of the head that results in a quick movement of the brain that moves forward and hits the bone, the inner aspect of the skull. And then usually it rebounds back and hits the other side -- the opposite side. In layman term, we could call that whiplash-induced concussion. So these are the two mechanisms. Either a direct impact or an indirect caused by flexion extension.

Q. And just for clarity, and those are the types of injuries you've been treating since 1997?

A. Correct.

MR. RICKNER: Your Honor, I'd like to have this witness qualified to testify to opinions under, I believe it's Federal Rule 702?

MR. REISSMAN: No objection, Your Honor.

THE COURT: That request is granted.

MR. RICKNER: Thank you, Your Honor.

BY MR. RICKNER:

Q. So I'd like to go into a little bit more detail. If we use the term concussion, what does that mean in your practice?

A. So traumatic brain injury has three grades. They qualify that by mild, moderate, and severe. A mild traumatic brain injury also means a concussion. So it's a different way of calling the first-degree -- you can classify traumatic brain injury or TBI into three different levels. Concussion is the first level.

Q. Okay. And just so we can be more organized, what are the other two levels?

A. The second grade would be moderate, and the third would be severe.

Q. And what would be the qualifications or criteria for a concussion the way you're using the term?

A. So, once again, based on the Center for Disease Control criteria, you need to have a plausible mechanism of injury to be able to talk about a traumatic injury. So you need to have a credible history of either a blow to the head or a significant whiplash, flexion extension -- that's what happens more active to contact sports situations in which they may be protected by a helmet but the flexion extension causes the brain injury. So that's condition number one.

You need to have a credible history of a traumatic event that has caused injury to the head.

Subsequent to that, when the brain suffers a physical injury, there's either a change in mental status -- in layman term, confusion -- or further the person may lose consciousness. In some cases, there's also the occurrence -- along with the loss of consciousness, a convulsion of the body, and they call it a seizure. This is called an impact seizures. That means that it's caused as a result of a trauma to the brain. It's a very impressive picture. It's very scary because the person may collapse and you may think that the person actually has died. But what's also just as impressive is that within a few minutes, they come back. They come back. They start talking to you. They remain confused for several minutes, and within probably an hour or so they can be totally interactive and be coherent. So it's a very dramatic picture.

Q. And were those two or three criteria there? I want to make sure we're at the end of the list.

A. So the first criteria is the mechanism of injury -- physical injury. The second one you see a change in mental status. That means that they are not totally clear anymore. That could start from confusion, being dazed, all the way to a loss of consciousness, they pass out, and then within a short period of time, they come back.

Q. Okay. So if I'm understanding, then the third criteria is coming back out of a short period of time rather than some sort of lingering similar symptom?

A. Right. So if the loss of consciousness exceeds 30 minutes, then this is not a mild traumatic brain injury or concussion, that would be either a moderate or severe TBI.

Q. Understood. Now, I'd like to sort of talk about a blow to -- you talked about a traumatic injury, and I'd like you to at least consider, you know, as a hypothetical, a blow to the temple area -- for example, the area between the eye and the ear. Can you tell me a little about the physiology there and what would occur when somebody's struck in that area?

A. So any -- any impact to the head causes movement of the head, either as a direct flexion extension or rotational. Rotational movements result in more serious injuries because the nerve fibers in the brain twist, and they're subject to more serious injuries. So a significant blow to the side of the head can have -- can induce both mechanisms of injury. One is the direct impact. The other one is the movement of the neck in a rotational plane, and that can cause a twisting of nerve fibers in the brain and result in different severities and degrees of injuries.

Q. And I'd also like you to consider, what would happen if somebody were struck in different areas in a relatively short period of time, let's say something in the area of 15 to 45

seconds?
A. So if the head goes in one direction -- so let's say somebody hits me first on the left side. My head, as a reflex, moves to the right. If I get a second blow to the right side, it's like a head-on collision. The speed of the two objects add up. And as a result, it causes more serious degree of physical injury.
Q. Now, is a bruise or some kind of damage to the skin a necessary component of a concussion?
A. No. And even this particular aspect has been described in the Center for Disease Control explanations on concussion and brain injury in that the degree of external injury is not predictive of internal injury. Both ways. That means that you could have severe injuries to the face with zero injury to the brain. That's possible.
It's also possible to have no visible injury -- absolutely none -- and have deadly brain injuries. That happens in cases of shaken infant syndrome. A parent brings a child to the emergency room and the child looks very lethargic, very confused. When you look at the child, there's no external sign of injury. Doctors are trained to have a degree of suspicion, and they send the child for a CAT scan, and they see that the child is bleeding inside the brain. So there's not a good correlation between what is visible externally and what's happening internally.

THE COURT: So you just said two very different things. One was, it's possible to have one without the other. And the other was, there's not a good correlation. What is the correlation?

THE WITNESS: Well, what I'm trying to say is that, you could have external sign of injury and internal injury. You could have no external sign of injury and very severe internal injury.

THE COURT: I understand the possibilities.

THE WITNESS: The three possibilities --

THE COURT: I'm asking you a different question which is to what extent are these two things correlated? External injury and internal injury. Are you saying the correlation is zero or are you saying the correlation is low or what?

THE WITNESS: I would say the correlation probably is valid in a third of cases. In a third of cases you have both. In one-third of cases you may see -- and I've seen several case of significant external injuries with zero brain injury.

THE COURT: This is based on your personal experience.

THE WITNESS: And based on published literature.

THE COURT: So what does the literature say, if anything, specific about correlation?

THE WITNESS: The literature basically tell you that do not rely on the external appearance to make a conclusion as to the presence or absence of brain injury.

THE COURT: Okay. But you don't know, or do you, of any study that expresses a coefficient of correlation on this issue?

THE WITNESS: The -- in term of numbers, no. I don't. If you want me to give you specific numbers, I do not.

THE COURT: Okay.

BY MR. RICKNER:

Q. Going back, so I think you used the phrase of impact seizure. What is that with respect to a concussion or can you explain that phrase for us?

A. So an impact seizure is a provoked seizure. That's -- that's as opposed to a condition called epilepsy which results in unprovoked seizures. Somebody who has -- who suffers from epilepsy suffers from recurrent episodes of unprovoked seizures. That means that they happen spontaneously. There are situations that can provoke a seizure in healthy individuals. That means that that could happen to any of us. And one of those is called an impact seizure. A significant blow to the head causing a brain injury may result in a seizures. And that's called an impact seizure. And that's different from the condition called

epilepsy in which the person experiences recurrent episodes of unprovoked seizure.

Q. All right. And what would be some of the outward signs of an impact seizure if a layperson were to witness it?

A. That's a seizure that must occur after a blow to the head. So the fundamental important criteria is that there must be a blow to the head. Subsequent to that, there's loss of consciousness and convulsion.

Q. And could that also include loss of consciousness or are they different?

A. Yeah. I just mentioned -- yes. There is loss of consciousness plus convulsion.

Q. Okay. Understood.

MR. RICKNER: Can we turn on the ELMO? I'd like to display a photograph if that's all right.

THE COURT: Sure.

MR. RICKNER: And actually, I'd like to see it just to make sure I zoom on the right thing before I embarrass myself.

THE CLERK: Do you want this displayed to the witness?

MR. RICKNER: I'd like this displayed to the witness and also it's in evidence. This is on the fourth page. It is the bottom right-hand photograph in the collection of photos.

And Doctor, it does look slightly more clear with the colors if you want to look at the one in your binder. It would be on the fourth page on the right.

THE CLERK: I'm sorry. Is this for the witness only?

MR. RICKNER: I'd also like to publish it to the jury with the Court's permission, of course. It's in evidence.

THE COURT: If it looks different on the paper from the screen, maybe we can both publish the screen to the jury, and do you want to also circulate the exhibit itself?

MR. RICKNER: Yes. I'm fine with that as well. It's not a drastic difference. I was just sort of noting for the witness.

BY MR. RICKNER:

Q. Now, I'd like to direct you to the area you sort of see if you were to go upwards diagonally from the eye. You see the bruising area that goes into the hairline?

A. Yes. I do.

Q. Okay. And I'm going to represent to you that this is a photograph one or several days after the incident of Roger Basile. Now, looking at that specific area, what can you tell me physiologically about what happens with respect to the skull, the brain, the ears, and the other things that are going on beneath the skin?

A. So that's a bruise and that indicates that small blood vessels have been broken. When small vessels break, obviously there is a bleed under the skin and subsequent to that the blood breaks down and changes the appearance. The color changes, becomes darker, and then over several weeks it disappears.
Q. Right. I'd like you to go a little deeper into the body, so to speak, to also talk about what's going with the brain, the ear, and other things in that area.
A. So as I mentioned earlier, this is indication of a head injury. Now, imagine the chest, we can have chest injury but not necessarily lung injury, right? But in some cases you have chest injury and a collapsed lung. Now, the head contains the brain. You could have head injury without brain injury. So as I tried to mention earlier, we clearly here see there is evidence of head injury, that's undeniable. Beyond that, you can't say.
Q. Okay. Now, at some point, did you have an opportunity --
MR. RICKNER: And we can take this down.
BY MR. RICKNER:
Q. You had an opportunity to evaluate Mr. Basile on several different occasions. Is that fair to say?
A. It is correct.
Q. Okay. I'd just like to walk through them. And going to

the first time that you met up with him. What evaluations did you make, what inquiries did you make, and what did you determine?

A. So Mr. Basile came to see me the first time in December of 2018, about two months after his injury. And at that point, he complained of headaches. He said that he felt dizzy. He said that his memory and cognitive function was not as good as before. He told me that he was assaulted in October, the same year -- about two months prior.

And when I examined him, I started a neurological examination with a test of mental status. That's -- that's a test of memory, attention span, and so on. So I used an instrument called the Montreal Cognitive Assessment. It's a standard test for that purpose. The range of scores is from 0 to 30. And I believe his initial score was 23. Anything from 26 and above is considered normal, less than 26 is abnormal. So his score was slightly below what was considered normal.

I checked his eye movements that were normal. But when I placed him in a dark room and looked at his eyes with infrared light, he remained in total darkness, I could see his eyes, I realized that his eyes were not stable and had a tendency to beat to the left side. This is almost like somebody who loses their balance in the dark. And he also had some difficulty with balance. He could walk without

problems. He could stand with no difficulties. But with eyes closed, when I asked him to place one foot in front of the other, he started to sway. He had difficulty holding his balance, which was a challenging position. And I think that's -- that's about the problems that he had had at that point.

Q. Now, from the eye movements and the balance, were you able to draw any conclusions?

A. So balance problems are extremely common after a concussion. They can also happen after neck injury. The eyes movements, also there's a technical term for that. It's called nystagmus, N-Y-S-T-A-G-M-U-S. A large part of the brain is involved in coordination of eye movements. Seventy to eighty percent of the brain is involved. It's very difficult, because both eyes have to be constantly aligned; otherwise, we would see fuzzy or double-vision. This has nothing to do with the vision through each eye. This is the vision -- the teaming of both eyes.

So it's a very common problem that we do see in concussion. And when there's predominance of the eye beating to one side as opposed to the other, that happens from inner ear injuries. And when there's injury to one ear, the eyes have a tendency to beat to the opposite side. So the fact that his eyes were beating to the left, that indicated that he may have suffered more injury to the right ear.

Q. And did you make any impressions with respect to Mr. Basile on that day?
A. My diagnostic impression was that he had suffered a concussion and post-concussion syndrome describes the situation of somebody who continues to have symptoms. About 80 percent of people fully recover. About 20 percent continue to have symptoms.
Q. And when you say symptoms, could you just describe typical symptoms of post-concussion syndrome?
A. The most common is headaches; dizziness; blurry vision; and issues with balance, equilibrium; anxiety; depression, PTSD; and cognitive problems, meaning mainly memory problems and impaired attention span.
Q. Now, I'd like you to go to the next time that you had an opportunity to evaluate Mr. Basile. I believe that would've been October of 2019?
A. Correct. So the first time he came to see me in December of 2018, and then in October of 2019.
Q. Okay. Now, can you tell me, you know, what kind of inquiries you made in that visit and what you saw and, you know, what changed, if anything?
A. There was hardly any changes. He still had the same symptoms. And he told me he was taking over-the-counter medications for his headaches. And his anxiety and depression were still the same. Overall, no significant

changes.

Q. Okay. And did he say whether or not the over-the-counter medication was helping with his medication [sic]?

A. He did say that it was, and he kept taking them. Yes.

Q. Okay. And did your impression change on that day?

A. No.

Q. Okay. Now, I'd like to move you ahead again approximately another year or two to December of 2020. Did you have an opportunity to examine Mr. Basile again?

A. Yes. I did.

Q. And can you tell me about that?

A. Almost identical picture. He still had similar symptoms. And the overall picture had not changed.

Q. And just to continue on, I believe you saw him again in 2021; is that correct?

A. Yes. I did see him in 2021. The one thing that -- in subsequent cognitive examinations, his score did go up from 23, which was in the abnormal range, to 26, which is just at the border of normal. And that -- you do see that in people with concussion. There's some improvement. So that -- his -- his scores on the Montreal Cognitive Assessment reached a border of normal range. But his balance issues were still present up until that date, and his symptoms were the same. The symptoms are the complaints. So

he kept complaining of residual headaches, dizziness, issues with memory, anxiety, and depression.

Q. And just to be clear, when you talk about balance, is this something that you're observing personally through your examination?

A. So on observation, he appeared normal. So when I watched him walk, it was okay. In a challenging position, like when I would ask him to stand up, place one foot in front of the other and close his eyes, something that a normal person should be able to do, he could not do. And that means in day-to-day life, that if he is ever challenged -- that means if he slips on ice, his reflexes are not fast enough, and he has a higher change of falling. To my knowledge, it has not happened, but he did have this residual weakness.

Q. Okay. And, you know, ultimately you, I believe, provided a report in this case. Did you come to any ultimate conclusions about Mr. Basile's condition?

A. My ultimate conclusion is that he had residual post-concussion syndrome. You can also call that chronic post-concussion syndrome.

Q. Okay. And did you determine that this was caused by a traumatic injury like a blow to the head?

A. Yes. I did.

Q. Okay. And within a reasonable degree of medical

certainty, do you believe that the post-concussion syndrome was in fact caused by being struck on the right side of his head among other strikes that day?

A. Yes. My impression was that from both sides. Because he did have hits apparently on both sides. Probably more severe on the right side, but not only the right side.

Q. Understood. Now, I'd like to talk about -- I understand that you can't necessarily predict the future, but with respect to the literature, would somebody who presents with post-concussion syndrome that you diagnosed in Mr. Basile, what does the literature find is likely to happen in the future? And what are those chances, to the extent they can be quantified?

A. So there -- there was a question asked whether people who suffer a concussion or mild traumatic brain injury are at the higher risk of developing dementia early in life. The best study was performed at the VA hospitals. And it was published in the journal -- journal of American Medical Association, just a few years ago.

They looked at 300,000 veterans, half of whom had suffered concussion in Iraq and Afghanistan. And then they followed them over several years. They realized that the chance of developing chronic cognitive problems and early dementia is about twice as much as the normal population who have not suffered a mild concussion. What was remarkable is

that even people who had suffered the concussion without loss of consciousness were at higher risk of developing dementia.

Q. And just to be clear, was this study just people with the first level of TBI that we've discussed before or did it also include parts 2 and 3?

THE COURT: Hold on a second. Let's meet at the sidebar for a moment here.

MR. RICKNER: Sure.

(Sidebar begins)

THE COURT: So like every plaintiff in federal court, your client is standing to sue for concrete injuries, which are either present now or imminent. And it feels like we're getting into the realm of far off possibilities. Just curious whether you actually are seeking damages for, you know, some elevated possibility of dementia far off in the future. And if so, what's the law on that question?

MR. RICKNER: You can absolutely sue for things that have a determinable chance to happen in the future. I think he said that it's twice as likely. I think that is damage that the jury can consider in future pain and suffering.

THE COURT: Don't they need to know what the baseline risk of dementia is, then, to understand the change?

MR. RICKNER: Yeah. I'm happy to get into -- happy to get that in just for the quantitative analysis. And you know, look, I'll pull some cases for you tonight, as always. And if you tell me I can't close on it, I won't close it. To be blunt, this is pretty stock stuff in a TBI case, so I didn't consider myself on weak footing, but I'm happy to show her that.

MR. REISSMAN: There's one problem. The doctor did diagnose no traumatic brain injury. He said post-concussion, rule out traumatic brain injury. Why is Mister --

THE COURT: That'll go in cross, but that's a different -- oh, you're saying --

MR. REISSMAN: He's saying there's a traumatic brain injury and he's going to connect it to future dementia. And the doctor did not -- he said rule out traumatic brain injury.

MR. RICKNER: This is -- we'll have to clear that up. This is a terminology question. When he says rule out traumatic brain injury, he's talking about the second and third levels, not the first. And I'm happy to --

THE COURT: Okay. But then is he shifting apples versus oranges when he says that there's an elevated risk of dementia? Are you sure that that elevation is a function of the first level concussion, not the second or third level TBI?

MR. RICKNER: It is. And that was actually just the question that we stopped on, was me focusing in that the study was, in fact, triple blind.

THE COURT: Okay. This may be a remedial question, but why are you so confident that a plaintiff has to sue in federal court for injuries that have not materialized and the chance of which may be less than one percent?

MR. RICKNER: As I say, why am I so confident? Because we do a lot. It's --

THE COURT: I do a lot of things a lot that were

totally wrong.

MR. RICKNER: Fair point. But you know, for example, somebody gets a knee injury, say, look, you know, I can't tell you if they're going to need their knee replacement, but I would say they have an excellent chance that this knee is going to degrade further and they won't need one. No one can predict the future, but juries are allowed to consider future pain and suffering.

THE COURT: I mean, I guess we can clean this up in the jury instructions and before closing argument. But --

MR. RICKNER: I'm asking him two more questions here.

THE COURT: Okay. And you see the question I have, which is you say you're going to be asking for damages based on potential consequences that have not materialized and that you don't know what --

MR. RICKNER: I think you'll find there's a state court -- and to be clear, I do think 1983 State Court causation approximate cause of damages questions. I think you'll find that this present and I'll go pull something.

THE COURT: So this is a question of federal law that I'm asking. Because even when we're dealing with state common law causes of action, the standing rules are still governed by federal constitutional law, right? And if the question is: Can he sue for injuries that are not

concretized or even imminent, we're looking at federal law to answer that question, I would've thought.

MR. RICKNER: The standing question, I think, comes purely from Section 1983 that gives him standing to bring in for federal court.

THE COURT: Yeah. But for what injuries?

MR. RICKNER: It doesn't -- so 1983 essentially uses state court law. It's a gap filling provision. When you look at things like proximate cause, if you look at the statute, there's literally nothing about proximate cause in there. If you look at damages, Section 1983 has almost nothing on damages and the rest of the whole body, if that -- what is it? 81 through 88 or whatever it is. You don't see it. And if you look at the Supreme Court cases, same with statute of limitations. The reason is different in every state, which is annoying, because they're adopting state law statute of limitations for court.

THE COURT: Well, I think we're talking about two different questions here. You know, think about Lujan versus Defenders of Wildlife, right? Three irreducible elements of standing are that the plaintiff has an injury that is concrete or that is likely to materialize imminently, whatever that exactly language is, that was caused by the defendant, that is re-addressable by a favorable decision in federal court. I'm focused on question 1 of that analysis,

which is, are we outside the realm now of injuries that are concretized now or imminent in talking about other stuff?

MR. RICKNER: I think the answer is no, because the Supreme Court has deliberately incorporated -- as a federal matter, the Supreme Court said, "Look, we don't have enough in section 1983 at all to actually make a complete cause of action." When you read the statute, it is an issue. The Supreme Court says, "No. What we're going to do, as a matter of federal law, is incorporate state law as the gap filling provision."

THE COURT: I think that's not correct. I mean, I understand what you're saying. I think I disagree with it in the sense of standing is a separate analysis driven by the Constitution. And the idea that whether the injury is sufficiently concrete and imminent, we answer that question somehow by looking to state law. You may be right, but I doubt it. But I don't know how we --

MR. RICKNER: I understand we have a research problem. Here's my proposal: I want to finish up on what the study says. I'll get a baseline of dementia and I'll say thank you and take him off the stand because I'm basically done. I understand his cross-examination will then begin. With respect to what the jury can and can't consider, Your Honor can instruct them. And if you decide I'm plumb wrong, you'll give the curative instruction, and we'll be done.

THE COURT: We'll sort it over the next day or so. Got a lot of moving parts here for the jury instructions.

MR. RICKNER: These are fast trials. Okay.

THE COURT: Exactly.

MR. RICKNER: All right.

THE COURT: Very good.

(Sidebar ends)

BY MR. RICKNER:

Q. Sorry about that, Doctor. Going back to the question about the study that you were talking about, this cohort of 300,000 people, did they have a specific -- you said there are three different stages. Did those 300,000 people have one of the stages? Two of the stages? Three of the stages? What was included in the cohort?

A. Exclusively, the mild form. The mild form after a brain injury, which is also called the concussion.

Q. Okay. Now, with respect to dementia, you expressed that the report said it was double. Just for quantitative purposes, what would the baseline be that they're saying? If it's four, and the double then would be eight. So what do the numbers look like?

A. They -- they do not mention the baseline. Because what they did is not -- they compared the 300,000, half of them, had concussion. The other half did not. The number of the occurrence of dementia was exactly double the number of -- among the people who have suffered the concussion, the ratio was double, as compared to people who had not suffered the concussion. Obviously, it -- certain number of people suffer dementia. And the older who live, the higher the chance. It goes per person with age.

This study showed two things: That the dementia occurs earlier and with a frequency doubled the number, as compared

to people who have not suffered a concussion.

Q. And I guess what I'm wondering is that for people who haven't suffered a concussion, do you have any information with regard to the baseline for dementia?

A. It's probably 10 to 15 percent.

Q. Okay. Now, in your report, I think it was -- this shows up in one of the first --

THE COURT: Sorry. Ten to fifteen percent of all humans will get dementia at some point in their life?

THE WITNESS: If they live long enough. Yes.

THE COURT: How long is long enough?

THE WITNESS: For the most cases of -- of all dementia, the most common in Alzheimer. And even though there are cases that start very early, even sometimes in the 30s, the majority start after 60. But as they go beyond 70, 80, 90, then the chance goes higher and higher.

THE COURT: Okay.

THE WITNESS: So the -- the concept of dementia actually was not even known before when the -- the age expectancy was significantly lower.

THE COURT: Right. First you say 10 to 15 percent is the baseline for dementia. But then you qualified that by saying if you live long enough. So is the 10 to 15 percent of everyone or only of people who live past a certain age?

THE WITNESS: I think it's -- it's a -- to my best

recollection, I think it's a combined. But average for the age expectancy at a given time. But this number is not the same, because as the age -- age expectancy of the population grows, so does the rate of dementia. That means that this number was not the same probably 40 or 50 years ago when the age expectancy was significantly lower.

THE COURT: Okay. But if the question right now is what percent of the population as a whole is expected, based on today's life expectancy --

THE WITNESS: To the best of my recollection, I believe it's the 10, 15 percent.

THE COURT: Okay. But you're not --

THE WITNESS: I'm not certain.

THE COURT: -- sure. Okay.

BY MR. RICKNER:

Q. And just going back to one of the notations that you made, I think this was after the first exam in 2018, you wrote, I believe it was, "Rule out traumatic brain injury." Can you explain to me what that meant with respect to the post-concussion syndrome?

A. What I meant is I referred to the moderate and severe forms in which the imaging studies, the CAT scan and MRI, are positive. If a CAT scan and MRI are positive, then usually you're dealing with a more severe type of traumatic brain injury that falls into the moderate or severe.

In the -- my type of traumatic brain injury, imaging studies, meaning CAT scan or MRI, are usually negative. They don't show anything. And the reason is that the brain components are extremely small. And they are beneath the -- the resolution of MRI and CAT scan. So the lesions cannot be observed. Cannot be visualized.

Q. Thank you very much, Doctor. I have no further questions at this time.

CROSS-EXAMINATION

BY MR. REISSMAN:

Q. Doctor, my name is Ralph Reissman. I'm an attorney representing the defendants in this case and I'm going to ask you some follow-up questions on what they call cross-examination. When you examined Mr. Basile the first time in December of 2018, did he tell you that prior to that date, he was taking anxiety medication?

A. No. He did not.

Q. Did you ask him?

A. I did ask him about any prior medical condition of any type. So I'm not sure if I specifically asked him whether he was suffering from anxiety disorder, but in more general terms, I asked him if he was suffering from any previous medical problem. I believe he -- he -- the answer was negative.

Q. Did he tell you that prior to October 2018 he had

suffered from depression?
A. No. I did not get this information.
Q. Did he tell you that prior to 2018 he was taking medication for depression?
A. No.
THE COURT: Did you ask specifically about what medications he was taking?
THE WITNESS: So, Your Honor, I usually ask in very general terms the existence of any previous traumatic injury, which I believe he did -- he had suffered some type of traumatic injury that had required surgery. And -- but then I ask in general any medical problems, psychological, psychiatric, broadly. But I don't go through one by one by name.
THE COURT: I think I'm asking you a different question, which is: Put aside medical conditions for the moment. I'm asking whether you inquire of your patients, including Mr. Basile, whether they are taking any medications.
THE WITNESS: Yes. I do.
THE COURT: Okay.
THE WITNESS: And if I may answer further, I believe he did give me the name of a few pain medications, over the counter, that he was taking at that point. And I did put it in my report.

THE COURT: Okay. But he didn't mention antianxiety or antidepressive medications?

THE WITNESS: No.

BY MR. REISSMAN:

Q. Thank you. Doctor, you mentioned on direct examination that, that a traumatic brain injury could be caused by a direct blow; is that correct?

A. Correct.

Q. And you also testified that a traumatic brain injury could be caused by an object hitting the head?

A. Correct.

Q. Now, is it possible that these injuries could be caused by self-infliction?

A. It is possible.

Q. Now, Doctor, you're testifying today on behalf of the plaintiff. Have you testified before in court cases?

A. Yes. I have.

Q. And how many times?

A. I don't remember exactly, but probably 10 to 12 times.

Q. And have you spoken on behalf of plaintiffs only or defendants only or both?

A. Both.

Q. And are you being paid for your time today?

A. Yes. I am.

Q. And how much are you being paid?

A. $750 per hour. So it depends on the total amount of time I spent.
Q. Okay. Thank you, Doctor. I have no further questions.
THE COURT: Redirect?
MR. RICKNER: I'm good.
THE COURT: Thank you, Doctor. You may step down.
THE WITNESS: Thank you.
THE COURT: The plaintiff should call their next witness when ready.
MR. RICKNER: Hold on. I was going to say could we actually get a two, three-minute break?
THE COURT: Sure. Let's take a 10-minute break just because otherwise by the time I get back to my office, I'll have to come back here. We will reconvene at 11 a.m.
MR. REISSMAN: Thank you, Judge.
THE COURT: Ladies and gentlemen, thank you. As always, do not discuss the case amongst yourselves and we'll see you very soon. The lawyers, let's try to meet back five minutes before 11, because I just want to ask some additional questions about jury instructions and verdict forms.
MR. REISSMAN: Yes, Judge.
(Jury exits)
(Recess)
THE COURT: Please be seated. I think the Supreme Court has spoken to the question that I posed at the sidebar

about damages for the risk of future harms that have not materialized yet in the asbestos context. I was looking a little bit at the Ayres case. A-Y-R-E-S. Group of plaintiffs who have asbestos as diagnoses, but have not developed lung cancer or other chronic lung problems. I think a majority of the Supreme Court says you can collect damages for the fear associated with the risk of future harm.

I don't know how much you're going to sum up on this, but --

MR. RICKNER: Not much, honestly.

THE COURT: Okay. The question I have is, and it really is a question: Do I need to go one level deeper with maybe one sentence or two on the subject of how the jury is allowed and not allowed to think about the risk of future harm in crafting a damages award.

MR. RICKNER: I don't have a good -- as a former asbestos lawyer, I should remember the answer to this because, unfortunately, I did the work for several years.

THE COURT: Unfortunately.

MR. RICKNER: But I don't have a ready answer now and since we're writing to you anyway, I'll come up with the best I've got.

THE COURT: Okay.

MR. RICKNER: I really hated that job.

THE COURT: I would imagine.

MR. RICKNER: So depressing.

THE COURT: You were on the plaintiff side of that job?

MR. RICKNER: No. I was on the defense side just questioning people dying. It was just terrible.

THE COURT: At a insurance defense firm or what was the --

MR. RICKNER: That's actually at Schiff Hardin, which is now ArentFox Schiff. Yeah. We had some of the big -- the large companies that hadn't gone bankrupt yet because of their asbestos liability. So the insurance companies hadn't taken over the thing yet.

THE COURT: I think today's equivalent is the Roundup Monsanto cases. And I know some people involved on both sides of that.

MR. RICKNER: 175 million yesterday.

THE COURT: Saga. Yeah.

MR. RICKNER: I'll be interested in reading the remittitur decision.

THE COURT: Yeah. Or the bankruptcy court. Well, I shouldn't even make jokes. Okay. All right.

MR. REISSMAN: Judge, I'd like to, if I may, bring up an issue that will arise tomorrow.

THE COURT: Well, let's bring the jury in and we can talk about this at the lunch break.

MR. REISSMAN: Okay.

THE COURT: If it's a tomorrow kind of issue.

THE CLERK: Hold on. Want me to go get Perkins?

THE COURT: Yes, please.

MR. RICKNER: I'd also like you to go get Rothenberg.

THE COURT: I didn't hear what was just said.

MR. RICKNER: Rothenberg. Next witness.

THE COURT: Oh, yes. Thank you.

THE CLERK: You're welcome.

MR. RICKNER: Oh. Before we get the witness in, I do think that there is an issue that we should talk about either at sidebar that I think was addressed in my letter, which is I plan on at least lightly using leading questions with respect to this non-party witness. I think that the evidence shows that he is sufficiently affiliated with both the county and the defendants that he falls into the identification category exception in 611(c). And I cited case law on that. And there's a pretty good Chicago case Seventh Circuit. There isn't a ton of case law on this issue, but I cited what I thought was the good stuff.

I think as you've seen, I'm not like statement, statement, statement kind of cross-examiner, but I would like permission to do some leading questions.

MR. REISSMAN: I don't have any objection, Your

Honor.

THE COURT: Okay.

MR. RICKNER: Oh. That's great.

THE COURT: There we go.

MR. RICKNER: No problem.

MR. REISSMAN: Lead away.

THE COURTROOM DEPUTY: All rise.

(Jury enters)

THE COURTROOM DEPUTY: You may be seated.

MR. RICKNER: Your Honor, Plaintiff calls the next witness, which is now Deputy Inspector Rothenberg.

THE COURT: Deputy Inspector Rothenberg, in case you were too far from the microphone over there.

MR. RICKNER: Sorry.

THE COURT: We're bringing in the witness?

MR. REISSMAN: I'll get him.

THE CLERK: Raise your right hand.

ARNOLD ROTHENBERG, WITNESS, sworn

THE CLERK: You may be seated.

MR. RICKNER: May I approach with the binders, Your Honor?

THE COURT: Please.

THE CLERK: State and spell your name for the record.

THE WITNESS: Arnold Rothenberg, A-R-N-O-L-D, last name Rothenberg, R-O-T-H-E-N-B-E-R-G.

THE CLERK: Thank you.

THE COURT: Thank you.

DIRECT EXAMINATION

BY MR. RICKNER:

Q. Now, Inspector Rothenberg, is it?

A. Deputy Inspector.

Q. Deputy Inspector. Nice to meet you. When did you start working for the Nassau County Police Department?
A. October 17th, 1997.
Q. And you said 1997?
A. Yes, sir.
Q. Okay. And you started out as patrolman?
A. Yes.
Q. At some point you became a detective?
A. No.
Q. Okay. Tell me how you advanced in the ranks, please.
A. I -- I went from a police officer. In 2005 I was promoted to sergeant. In 2015 I was promoted to a lieutenant. 2016, detective lieutenant. 2019, captain, and then deputy inspector.
Q. Understood. At some point were you assigned to the Seventh Precinct in Nassau County?
A. Yes.
Q. Okay. When did you first receive that assignment?
A. I think in 2016 or early '17. I forget.
Q. About the time that you became a detective lieutenant?
A. Yes.
Q. And did you have a particular role at the Seventh Precinct at that time?
A. Yes. I was the commanding officer of the detective squad.

Q. And how many officers did you supervise? Detectives, that is.
A. Anywhere from 12 to 15, depending on how many were assigned.
Q. And was one of the detectives you worked with Detective Jesse Perkins?
A. Yes.
Q. And was one of the detectives that you worked with Detective Robert Lashinsky?
A. Yes.
Q. And how many years did you or have you worked with Detective Perkins?
A. It was probably a little less than two years.
Q. And how long did you work with Detective Lashinsky?
A. Probably about a year.
Q. Now, in October 11th of 2018, were you the ranking detective at the Seventh?
A. Yes.
Q. And physically, where were you stationed?
A. In the Seventh Squad. Second floor of the Seventh Precinct building.
Q. Okay. About how big is the second floor of the Seventh Precinct building?
A. It's not very big.
Q. Would 800 square feet or so be a good estimate?

A. Of the whole second floor?
Q. Yeah.
A. No.
Q. Bigger or smaller?
A. Probably bigger.
Q. Okay. About how much bigger do you think?
A. Are you asking me the size of the detective squad or the whole floor? Because there are other offices up there besides --
Q. Just the detective squad area.
A. Maybe 1,000 square feet, if that.
Q. Okay. Now, I'd like to talk about the layout of the detective squad. When you get upstairs and you go through the door, what's the first thing that you would sort of see in front of you?
A. The two desks that belong to the secretaries.
Q. And beyond that, were there any desks that belong to the detectives?
A. Yes.
Q. There's a holding cell area for interrogations; is that right?
A. Yes.
Q. And where is that physically, with respect to the door and those desks that you described?
A. Once you come through the door and past the secretary's

desk, the holding cell would be a room to the left.
Q. Okay. And can you describe the door to the holding cell?
A. It's a pretty solid -- solid door.
Q. Solid wood door?
A. I -- my recollection is it probably has like a metal sheeting.
Q. And is there a hole in it, a cutout of some kind?
A. There's a window.
Q. Okay. And what shape is the window?
A. Rectangular.
Q. Okay. And where is your desk with respect to the holding cell?
A. That would be the room next to the holding cell. If you went further into the squad room, it would be the next room, the second room on the left.
Q. So if you're going down, you come through the door, you take a left, your first room on the left would be the holding cell, the next room on the left would be yours?
A. I'd -- picture the squad room as a square, and then on the -- on the left, there are two rooms side by side. It's not down a hallway. There's the holding cell, next to that the supervisor's office.
Q. If I'm understanding this correctly, then they both would open into the sort of more communal area with the

detectives' desk and the secretary?
A. That would be correct.
Q. Okay. And did you share that office with anyone?
A. I did.
Q. Who?
A. The three sergeants who were assigned to the squad.
Q. Okay. Would they, all four of you, share the room at once or was there some sort of shift to break out?
A. There were shifts. I worked weekdays, and then the sergeants worked a rotating shift.
Q. So would it be correct to say the typical, you'd have one other sergeant with you when you were at work?
A. Typically, yes.
Q. Okay. Was there a window where you could see into the holding cell from your office?
A. No.
Q. Okay. Could you hear what was going on in the holding cell?
A. I couldn't hear conversation from the holding cell. I could hear loud noises.
Q. Okay. So just to be correct, you couldn't hear, you know, a conversation, but you could hear, like, a bump or a knock or something like that?
A. At times. Yes.
Q. If people got loud, you could hear the voices

distinctly, or is it more just kind of a muffled "I can hear people saying something"?
A. I could just hear that there was a loud conversation. I could never make out.
Q. Now, with respect to the squad room, I think that's what it's called, the common area. Is that called the squad room?
A. It is.
Q. Okay. I'm getting it. Could you hear sometimes what was going on in the squad room?
A. Yes.
Q. Okay. And would you actually be able to hear conversations that were had in there?
A. If they were loud and I wanted to, yes.
Q. Now, October 11th of 2018, did you see Roger Basile actually come into the squad room in the detective area?
A. I don't think I did. No.
Q. So I just want to be clear. Did you see him at all when he first came in?
A. I don't recall if I did.
Q. I put a binder in front of you. Can you go to the first tab and turn to page 9? And just take a look at lines 13 through 18?
A. Sure. Okay.
Q. Does that refresh your recollection that maybe you saw him right when he came in?

A. It does.
Q. Do you remember if you saw him in any way injured?
A. I do not believe he was injured. No.
Q. Okay. Now, would it be correct to say that on October 11th in 2018, about this time, that there were four detectives working that day?
A. I believe there were four detectives. Yes.
Q. And just to be clear, that would be Detectives Capozi (ph.), Lashinsky, Scott, and Perkins?
A. Yes.
Q. Okay. And there was also a detective sergeant, right?
A. Yes.
Q. And his name is Shnayderman, I believe?
A. Yes.
Q. Could you spell that for the record?
A. I can't spell that at all. I -- I can't spell it.
Q. Fair enough. And was Detective Shnayderman also present when Mr. Basile came up?
A. I don't recall.
Q. Okay. Now, with respect to Mr. Basile, he was placed into that holding cell we discussed, right?
A. Yes.
Q. Now, would it be correct to say that while he was in the holding cell you couldn't hear the conversation that he was having with whoever was in there?

A. That's correct.
Q. Okay. Did something happen that alerted you to the holding cell, to things going on in the holding cell?
A. Yes.
Q. And what was that?
A. I started hearing loud thumping.
Q. Okay. Could you describe that thump?
A. Started hearing, you know, loud coming from the -- the cell area. It's not something that -- that I would normally hear in the squad, so it did attract my attention.
Q. Okay. And what did you do?
A. I believe I sent Detective Sergeant Shnayderman to take a look and find out what was going on.
Q. Okay. And did the noise stop?
A. It did.
Q. You know what, that wasn't a very good question. Let me try do a little bit. At some point, did you decide that you wanted to go into the cell?
A. Yes.
Q. Okay. And about how many minutes was that after you sent in Detective Shnayderman?
A. I don't recall exactly. Pretty quickly.
Q. Okay. And that loud noise was the first thing that brought your attention to Mr. Basile when he was in the holding cell?

A. I believe so. Yes.

Q. Okay. Now, when you went into the holding cell, did you see Detective Shnayderman in the cell?

A. Detective Sergeant, I believe, was outside the cell.

Q. Okay. And when you got to the cell, was Detective Lashinsky in the cell coming out?

A. I don't recall.

Q. And when Detective Lashinsky came out of the cell did he announce, "I didn't hit him" in quotes?

A. Yes.

Q. Okay. And to be clear -- you know, actually, I'd like you to turn to page 48 of that same binder. And please look at 15 through 19.

A. Okay.

Q. And does that refresh your recollection that Detective Lashinsky made this statement right as he was coming out of the cell?

A. Yes.

Q. Now, at that point after Detective Lashinsky comes out of the cell, is Mr. Basile alone in the cell?

A. I believe so.

Q. And how was he positioned?

A. I believe he was on the floor.

Q. And was he conscious?

A. I don't recall.

Q. Well, was he yelling at you?
A. I don't recall.
Q. I'd like to direct you, actually, to page 15 of your prior testimony. And look at lines 21 through 24.
A. Okay.
Q. Does that refresh your recollection that you remembered him being conscious because he was yelling?
A. Yes.
THE COURT: Can I just jump in on the question of refresh your recollection? When that question is asked, does this refresh your recollection of X, that doesn't mean do you see in a prior transcript that you said X. That means does that really refresh your recollection, such that having seen whatever you've just looked at, now you're thinking to yourself, "Okay. Yes. I remember X." Recollection either has been refreshed or it has not. I just want to make sure that you understand the question that's being asked.
THE WITNESS: Yeah. I do, Your Honor.
THE COURT: Please continue.
BY MR. RICKNER:
Q. Now, was one of the things that Mr. Basile yelling that Detective Lashinsky had hit him, headbutted him, slapped him?
A. Yes.
Q. Now, did you see any blood at that time?
A. I think there was a little blood on Mr. Basile.

Q. Now, did you ever see Detective Shnayderman go into that cell?
A. I don't believe so. I guess on that side of the cell.
Q. Okay. And did Roger Basile stay into the cell until EMS came?
A. Yes.
Q. About how long did it take for the emergency medical professionals to show up?
A. I don't recall.
Q. More than half an hour?
A. I don't think so.
Q. At that point, by the time you first observed Mr. Basile in the cell, how long had he been in there since he first entered when you noticed him?
A. I don't recall.
Q. And could you tell me just how long in total he spent in the cell?
A. I don't recall.
Q. Do you think it was more or less than 15 minutes?
A. I think it was more than 15 minutes.
Q. Think it was more than half an hour?
A. That I don't recall.
Q. Now, after you saw Roger Basile in the cell, did you see Detective Shnayderman interact with him at all?
A. I believe he spoke to him.

Q. Okay. Was that inside the cell or outside the cell?
A. I don't recall the detective sergeant's position.
Q. You recall the conversation?
A. I do not.
Q. Now, at some point, do you remember investigating this incident?
A. Yes.
Q. Okay. Now, right after, let's say on October 11th of 2018, did you take photographs of Detective Lashinsky?
A. Yes.
Q. Did you take any photographs of Detective Perkins?
A. I did not.
Q. Did you take any photographs of his hands, for example?
A. I didn't take any photos of Detective Perkins.
Q. Okay. And beyond this investigation, taking photos of Detective Lashinsky, did you do anything else maybe sometime down the line?
A. I did. Yes.
Q. And would it be correct to say that Mr. Basile made a complaint about what had happened to him the cell; is that right?
A. Yes.
Q. What did you do with respect to that complaint?
A. My investigation at the scene was to take pictures of Detective Lashinsky to come to the conclusion that he did not

assault Mr. Basile. I took photos, again, of his hands and his head, and I forwarded that information with the prisoner to -- as he went through the process.
Q. I meant later on. Let's say some weeks later, did you do an additional investigation?
A. I did. Yes.
Q. And was that additional investigation because Mr. Basile had complained to the chief of police in the district attorney's office?
A. The investigation came to me through internal affairs.
Q. Okay. And at some point, you spoke with Mr. Basile; is that correct?
A. That is correct.
Q. And he expressed reluctance to cooperate with you because you were an eyewitness in the Seventh, right?
A. That is correct.
Q. And another internal affairs officer was assigned?
A. I believe that's correct. Yes.
Q. Now, are there cameras in, let's say, the front desk area downstairs of the Seventh Precinct?
A. There are cameras downstairs. Yes.
Q. Okay. And that's the primary entrance and exit?
A. Yes.
Q. And so if you had checked those cameras, you could've seen who came in and out of the precinct in, let's say, the

prior hour or two; is that correct?
A. I believe so.
Q. Did you do that?
A. I did not.
Q. Now, you said you only worked with Detective Lashinsky for a year; is that right?
A. Roughly, yes.
Q. Was he transferred over from another precinct?
A. He was.

Q. Why?

MR. REISSMAN: Objection, Your Honor.

THE COURT: Let's take this up at the sidebar.

(Sidebar begins)

THE COURT: So we had a conversation about this exact subject when we were talking about motions in limine. And it emerged to me that you were not going to go into the officer's disciplinary histories unless there was some, you know, massive door opening by the plaintiff.

MR. RICKNER: That's exactly what I did. He denied that it was a physical altercation and I believe that he's going to now testify that it was a physical altercation, which becomes credibility.

THE COURT: He denied that in response to your question.

MR. RICKNER: What?

MS. PANOUSIERIS: Yesterday, Your Honor, the detective himself denied it on the stand.

THE COURT: After you asked him about it, after you said you wouldn't.

MR. RICKNER: So he says it is a physical altercation. That's --

THE COURT: When I said I didn't get motions in limine in this case from anybody, even though your joint pre-trial order had contemplated motion practice on this subject, you said, "We are not going to go through the disciplinary history." You can't open the door to go into it yourself. Only the other side can open the door. This is

something you said was off-limits and now you're going into it.

MR. RICKNER: I'll do two things. One, I'll stop the questioning. And two, I'm going to just respectfully disagree. I think it is okay, but I'm not going to go any further. I'll just stop right now.

THE COURT: It might've been okay in theory, but not when you expressly carved this out and said, "We don't have a live dispute about this" from a motion in limine perspective. How could it possibly be okay to go into something you committed not to go into?

MR. RICKNER: Because it's now a credibility issue. Because I believe --

THE COURT: That was imminently foreseeable to you from the get-go. And if that was the basis on which you were going to try to include this information, we should've talked about it and had some trial.

MR. RICKNER: I thought I did. But as I said, I'm not going to go any further, so --

THE COURT: The objection is sustained.

MR. RICKNER: Understood, Your Honor. And no further questions. Thank you.

THE WITNESS: Thank you.

(Sidebar ends)

CROSS-EXAMINATION

BY MR. REISSMAN:

Q. Deputy Inspector, you stated earlier that you believe that Detective Perkins was working that day?

A. Yes.

Q. Did you see him in the Seventh Precinct that day?

A. I did.

Q. Okay. What time of the day?

A. Earlier in the morning.

Q. Did you see Detective Perkins? Let me strike that.

After Mr. Basile was brought into the cell, did you see Detective Perkins anywhere near the cell?

A. I did not.

Q. Now, you said you took pictures of Detective Lashinsky, correct?

A. Correct.

Q. Why did you not take pictures of Detective Perkins?

A. Because he wasn't there.

Q. And what did you see from the pictures you too of Detective Lashinsky?

A. Nothing. He had no unbroken skin, no swelling, nothing on his hands.

Q. Thank you, Deputy Inspector.

MR. RICKNER: I have just one follow-up question.

REDIRECT EXAMINATION

BY MR. RICKNER:

Q. I believe you testified before regarding the statement that my client made about Detective Lashinsky. When he made that statement, did he use Detective Lashinsky's name, or did he say that guy, or this person, or something else?

A. I do not believe he used Detective Lashinsky's name.

MR. RICKNER: No further questions.

MR. REISSMAN: Nothing, Your Honor.

THE COURT: Thank you. You may step down.

MS. PANOUSIERIS: Plaintiff calls Thomas Garibotto.

THE COURT: Please.

MR. RICKNER: I'll go get him.

MS. PANOUSIERIS: Your Honor, may I approach and switch out that binder?

THE COURT: Yes. I'll give you this back.

THE CLERK: Would you raise your right hand?

THOMAS GARIBOTTO, WITNESS, sworn

THE CLERK: You may be seated. Please state and spell your name for the record, please.

THE WITNESS: It's Thomas Garibotto. First name is T-H-O-M-A-S. Last name, G-A-R-I-B, as in boy, O-T-T-O.

DIRECT EXAMINATION

BY MS. PANOUSIERIS:

Q. Good morning, Officer.

A. Good morning.

Q. Is your current rank police officer?
A. Yes.
Q. Okay. So it will be appropriate if I refer to you as such throughout this questioning?
A. That's fine.
Q. Okay. Are you currently employed?
A. Yes.
Q. Where do you work?
A. Nassau County Police Department.
Q. When did you start working with the Nassau County PD?
A. I was hired November 1st, 2005.
Q. On October 11th of 2018, did you have any particular squad or assignment?
A. Yes.
Q. And what was that?
A. I was assigned to post 709 in the Seventh Precinct.
Q. Were you a patrol officer or something else?
A. Patrol officer, correct.
Q. On October 11th of 2018, did there come a time when you were assigned to respond to a call with Officer Minervini?
A. Yes.
Q. Around what time did you get that call?
A. To the best of my recollection, about 11 a.m.
Q. And did you in fact respond to that call?
A. Yes.

Q. Did Officer Minervini also respond to the call?
A. Yes.
Q. What location did you respond to first?
A. It was a -- it was a residence in South Bellmore. I don't know the address.
Q. And what was the purpose of going to the residence?
A. That was the location we were given via radio to respond to.
Q. And did you and Officer Minervini speak with someone at that location?
A. Yes.
Q. Was that Mrs. Basile, Mr. Basile's wife?
A. Yes.
Q. You left Mrs. Basile's home before Officer Minervini, correct?
A. Correct.
Q. And what was the purpose of leaving before Officer Minervini? What was your goal?
A. Officer Minervini was conducting his investigation, and at that time, I decided to leave to see if I could locate the vehicle that the wife had mentioned Mr. Basile had taken.
Q. And did you in fact --
A. Excuse me.
Q. -- locate that vehicle?
A. I did.

Q. How long after you left the Basile home did you locate the vehicle?
A. I would say approximately 15 minutes or so.
Q. Was it very far from the home?
A. I don't believe so. It was right off of Merrick Road.
Q. What did you do next when you saw the vehicle that you were looking for?
A. I initiated a VTL stop. I turned on the lights and pulled the car off.
Q. And just for the jury, can you explain what a VTL stop is?
A. Sure. It's -- it's a vehicle traffic law stop. There were no traffic violations committed, but I had notice that the vehicle fit the description of what we were looking for and had a older male occupant, a younger male occupant, which also was consistent with what we were looking for, Mr. Basile and his son.
So I ran the plate, verified that was the vehicle we were looking for and pulled the car over.
Q. And who was driving the vehicle when you pulled it over?
A. The son. Mr. Basile's son. I don't know his first name.
Q. And Mr. Basile, the father who is here with us today, the plaintiff, was he in the front passenger seat?
A. Yes.

Q. And there came a team that you and Officer Minervini placed Mr. Basile under arrest, correct?
A. Yes.
Q. What was his demeanor like when he was placed under arrest?
A. Well, calm. Almost joking in a way.
Q. And did you personally accompany Mr. Basile back to the Seventh Precinct?
A. Yes.
Q. Were any other officers with you in the car during that transport?
A. I believe Officer Monet was with me on the transport.
Q. What was Mr. Basile's demeanor like inside the car on the transport on the way back?
A. Calm.
Q. He wasn't yelling?
A. No.
Q. Screaming?
A. No.
Q. What was the first thing you did with respect to Mr. Basile when you returned to the precinct?
A. The first thing would be most likely to lodge him in the cell downstairs while we remove our -- our belts and our duty weapons. That's standard practice.
Q. And that is in fact what you recall doing? Putting Mr.

Basile in the cell downstairs?
A. Yes. To the best of my recollection, yes.
Q. How long do you think Mr. Basile was in the cell downstairs?
A. I don't think it was for very long. We knew that the case was going to be going up to the detective division, so we would just generally lodge our weapons, and then he would be brought upstairs.
Q. Did you accompany Mr. Basile upstairs to the detective's division?
A. Yes.
Q. What was his demeanor like while walking up the stairs? Any different?
A. Calm, cooperative.
Q. What about walking through the detective squad room? Anything else?
A. Nope. Same. Calm, cooperative.
Q. So as you're walking through, there wasn't any reason for attention to be drawn to you taking him into the cell?
A. No.
Q. Did you personally help with placing Mr. Basile into the cell?
A. I don't remember that specifically. I -- I was one of the officers that brought him up, so most likely, yes.
Q. Okay. And you mentioned the other officer's name. Who

was that?
A. I believe it was Officer Monet.
Q. Inside the second floor holding cell, is there a certain way that a person who is detained is cuffed or restrained?
A. Yes. Could be one of two ways, generally speaking. Their hands are cuffed behind their backs. We have another handcuff that we chain to a bench, and either that handcuff could be put around the chain of the cuffs that are already on the person, or we could remove those cuffs and just put the one handcuff on the person as they're seated on the bench.
Q. What goes into the decision to place someone's hands behind their back or to cuff them with two hands rather than one?
A. Generally, the -- the nature of whether or not they're cooperative.
Q. And Mr. Basile was placed in one or two handcuffs?
A. I believe he was placed in one.
Q. And that was because he was being cooperative?
A. Yes.
Q. What did you do after Mr. Basile was cuffed with one hand in the second floor cell?
A. I believe I just went out to the common area and sat down. At that point, it was going to be a detective division investigation.

Q. About how far away were you positioned from the cell when you sat down in the detective's division?

A. Ten to fifteen feet, maybe.

Q. Could you hear what was going on from inside the cell from where you were?

A. I couldn't hear specific words or anything that was -- that were being spoken, but you could hear that people were talking, yeah.

Q. Officer Minervini was your partner during the arrest, correct?

A. Yes. He was the arresting officer.

Q. Where was he when you sat back down in the detective squad room?

A. I don't recall if he was back at the station house yet or not.

MS. PANOUSIERIS: I apologize to the Court and everyone. I just need one second. My screen went down.

THE COURT: Yeah. Take your time.

MS. PANOUSIERIS: Thank you.

BY MS. PANOUSIERIS:

Q. Okay, Officer. There's a binder right there in front of you, and the first tab contains your deposition testimony that you gave in this case. I'd like you to turn to page 13.

You'll see at the bottom that there's a page number, and then there's a parenthetical with page numbers as well. Do

you see that?
A. I do.
Q. Okay. So I'm looking for page 13, and then there's four small pages on that page. Do you see that?
A. Yes.
MR. REISSMAN: Oh. I see it.
BY MS. PANOUSIERIS:
Q. I'd like you to take a look and just read to yourself, not out loud, starting on -- the small box is page 48, line 8. And just read down to line 13.
A. Okay.
Q. Does reading that testimony that you previously gave refresh your recollection as to whether Officer Minervini was present?
A. He was present. I just wasn't sure if he was present at that time when I first left the cell.
Q. I see. Thank you for the clarification.
A. You're welcome.
Q. Did you observe Officer Minervini speaking to any of the detectives?
A. Yes.
Q. Which detectives?
A. I don't recall which ones.
Q. Was it more than one?
A. There may have been two, if I remember correctly.

Q. So I'm going to stay on page 13. If you could just go to the bottom right hand box, which is page 49 of the deposition?
A. Okay.
Q. And line, let's start with -- start with line 20 and then continue onto the following page all the way until you get to line 18. Just to yourself.
A. Okay.
Q. Does that refresh your recollection as to which detectives that Officer Minervini was speaking to?
A. Yes.
Q. And who was that?
A. I believe he was speaking to Detective Lashinsky.
Q. Was there anyone else present?
A. I don't remember if -- well, there was -- I believe there was one other detective present, but I -- I couldn't tell you exactly which one.
Q. Okay. Did you hear Detective Lashinsky say anything to Officer Minervini? Did you overhear any part of that conversation?
A. No. I wasn't really paying attention to them.
Q. What was the next thing that you observed Detective Lashinsky do, if anything?
A. At some point, he went into the arrest room to talk to Mr. Basile.

Q. Do you know why he went into the room?
A. I believe it's standard practice in the detective division to talk to the person when you're the investigating detective. Yeah.
Q. Was it your understanding that Detective Lashinsky was the investigating detective?
A. That was my understanding at the time, yes.
Q. And that would be why he went into the cell?
A. Yes.
Q. Did Detective Lashinsky go into the cell alone?
A. Yes.
Q. To your knowledge, who else was in the cell when Detective Lashinsky entered?
A. To my knowledge, only Mr. Basile.
Q. How long was Detective Lashinsky in the cell alone with Mr. Basile?
A. About a minute or so.
Q. And did you hear anything during that time?
A. There was, like, a commotion. It sounded like some -- just loud voices and -- and some banging noises.
Q. Could you describe the banging and -- wood on wood, metal on metal, something else?
A. Just sort of like -- like a thudding sound. Yeah. Not -- not really like a metal to metal, but just like a thud.

Q. Did you also observe Detective Lashinsky exit the cell?
A. Yes.
Q. And I think you said it was about a minute later?
A. About.
Q. Did he say anything when he exited?
A. Yes. He gestured like this with his hands and said something along the lines of, "I don't know what just happened in there."
Q. Did he say anything else?
A. No. Not that I remember.
Q. What did you do next after you heard this commotion and Detective Lashinsky exits? Anything?
A. Yes. I approached the cell to see what was happening in there.
Q. And were you concerned because of the noises that you heard?
A. Yeah. We were just wondering what it was, what had -- what had happened.
Q. You say we. Were there other officers or detectives who joined you?
A. Yes. Yeah.
Q. Who, to your recollection, joined you to go look in the cell?
A. Specifically, I don't -- I don't remember. It might have been Officer Monet. I believe he was still up there

with me, but I couldn't tell you for sure.
Q. Did any detectives come into the cell after the commotion?
A. I don't remember. I'm sure they did, but I don't remember who or when.
Q. What did you observe when you went into the cell?
A. I saw Mr. Basile laying on the floor.
Q. Was he still cuffed?
A. Yes.
Q. Can you describe the position that he was in?
A. He was laying, I believe, on his right side with his head away from the door, feet kind of towards the door. And I think his left hand was still cuffed, so the left hand was kind of up on the bench.
Q. So he was hanging a bit because the --
A. It was either the left --
Q. -- arm was up. Is that fair to say?
A. Yes.
Q. Was he moving at all?
A. No.
Q. Did he say anything --
A. No.
Q. -- at first? Did you see any blood on Mr. Basile at this point?
A. I remember seeing a -- a little bit of blood on the

inside of the bottom lip.
Q. At some point while you were still inside of the cell, did Mr. Basile wake up and become responsive to you?
A. Yes.
Q. And what was his demeanor when he came to?
A. Still calm and, you know, not at all aggressive or -- or violent or anything.
Q. Did he say anything at first when he first became responsive?
A. I don't know what he said initially, what the first thing he said was, but at some point he stated that he was struck by the detective.
Q. And did he give a name, or did he just say the detective?
A. He just said -- I believe he said, "He hit me." Or, "He headbutt me and he punched me," or something along those lines.
Q. What did you do next after Mr. Basile -- after Mr. Basile was responsive, did you assist him up?
A. Yes. We helped him up off the floor and back onto the bench.
Q. And again we. You believe it's another police officer?
A. Yes. It could have been a detective. I'm not sure who it was that was actually with me at the time.
Q. At this point while Mr. Basile is responsive and you've

put him up onto the bench, other than you and the police officer assisting, were there other officers or detectives inside the cell at this point?
A. I don't remember.
Q. Your focus was on Mr. Basile?
A. Yes.
Q. Because you were concerned that he was injured?
A. Well, didn't know what had occurred yet, but yes.
Q. At some point, EMS arrived after Mr. Basile had already become responsive, correct?
A. Yes.
Q. So EMS didn't have to wake him in any way?
A. I'm not sure if he -- no. I -- no. I believe they came later on. I don't think they were there at the time that he woke up -- or yeah. Excuse me.
Q. Did you travel to the hospital where Mr. Basile was taken?
A. Yes.
Q. Were you in the ambulance?
A. Yes.
Q. During that time, did Mr. Basile make any other statements while in the ambulance --
A. Not that I remember.
Q. -- related to what happened?
A. No. Sorry that I interrupted.

Q. And what was his demeanor inside the ambulance? Was it the same?
A. Yes.
Q. At any point during your interactions with Mr. Basile on October 11th of 2018, would you describe his demeanor as irate?
A. No.
Q. At the arrest location at any point, would you describe him as combative or angry?
A. No.
Q. What about inside the first floor of the precinct? At any point, was he a problem for you?
A. No.
Q. When you took him upstairs and walked through the detective squad, any problems?
A. Not that I recall, no.
Q. You lodged him in the cell. You cuffed him up. Any problems from him?
A. No.
Q. When you returned to render him aide when he was on the floor, it sounds like he was still calm; is that right?
A. Yes.
Q. I don't have any further questions right now. Thank you, Officer.
A. You're welcome.

CROSS-EXAMINATION

BY MR. REISSMAN:

Q. Officer, you testified that you were -- I'm sorry. You were in -- that's a leading question. I can't do that.

Officer, did there come a time you apprehended Mr. Basile driving a car in Nassau County?

A. Yes.

Q. And where was that location?

A. On Merrick Road, in Merrick, I believe.

Q. And did there come a time Mr. Basile got out of the car?

A. Yes.

Q. And did there come a time -- excuse me. Okay.

I'd like you to -- let me strike that.

Did there come a time you transported Mr. Basile to the Seventh Precinct?

A. Yes.

Q. I'd like you to look at the book in front of you and on the bottom right, it says 11, parentheses pages 38 to 41.

MS. PANOUSIERIS: Objection, Your Honor. It's improper. He hasn't asked a question, but he's having him look at his prior testimony.

THE COURT: The transcript is not in evidence.

MR. REISSMAN: No. I'm asking him to refresh his recollection.

MS. PANOUSIERIS: He didn't say --

THE COURT: You have to first establish a failure of recollection before you can go about refreshing.

MR. REISSMAN: Sure. Okay.

THE COURT: So do you remember whether --

MR. REISSMAN: Yes.

BY MR. REISSMAN:

Q. Do you remember whether Mr. Basile said anything to you in the transport over to the precinct?

A. In the transport over to the precinct? No.

Q. Did you tell Mr. Basile why he was pulled over?

A. Yes.

Q. And what did you tell him?

A. That we were conducting an investigation for a domestic incident that occurred earlier in the morning, and we were attempting his wife's vehicle and belongings.

Q. And did there come a time you located her belongings?

A. Yes.

Q. And what was that?

A. What were the belongings?

Q. Yes.

A. A pocketbook and personal affects -- credit cards, wallet, cell phone.

Q. And what did you tell him about the pocketbook?

A. Well, when he -- when he initially stopped, and he asked why he was being pulled over, I said we were conducting an investigation and that we were looking for a pocketbook with her belongings. He said he didn't know anything about it and wasn't going to answer any questions without an attorney present.

THE COURT: Can we come to the sidebar for a

second?

MR. REISSMAN: Yes, Your Honor.

(Sidebar begins)

THE COURT: So this was also a subject of the phantom motions in limine that never materialized. You said we might have a few sentences on background while he was -- I think we were --

MR. REISSMAN: Yeah.

THE COURT: -- past the point now where --

MR. REISSMAN: I'm getting to the arrest, and I'm trying to get him to testify what he recalls Mr. Basile saying after he was arrested. So I was just putting him in the geographical location and asking him what Mr. Basile said.

THE COURT: Said about what?

MR. REISSMAN: Said about being arrested.

MR. RICKNER: He was arrested --

MR. REISSMAN: I want to know -- I'd like to know --

THE COURT: What does the transcript say that you're trying to --

MR. REISSMAN: I'll tell you what it says. The transcript says when the officer told Mr. Basile that he was being arrested for the pocketbook, Mr. Basile -- and this is in the transcript.

Mr. Basile said to him, "This is all good for the lawsuit."

THE COURT: Okay.

MR. REISSMAN: I can't ask him that direct question. I can't ask him, did Mr. Basile say this is all good for the lawsuit? I can't. That's a leading question, right?

MS. PANOUSIERIS: It's cross-examination.

MR. REISSMAN: That's true.

THE COURT: It's cross-exam. Ask him whether he said anything about a lawsuit. See if he remembers yes or no. Refresh recollection properly if nothing.

MR. REISSMAN: Yes, Your Honor.

THE COURT: That means don't read from the -- just put the document in front of him, give him the chance to read it, ask him if that actually refreshes his recollection, and we'll go from there.

MR. REISSMAN: Thank you, Judge.

(Sidebar ends)

BY MR. REISSMAN:
Q. Officer, after you told Mr. Basile that he was being arrested for the pocketbook, did he say anything about a lawsuit?
A. Yes.
Q. And what did he say?
A. When I had told him -- he jokingly said, "I can't believe I'm getting arrested," and I told him that that didn't have to be the case. If he had just given us the pocketbook back, we would have been on our way. And he said, "Oh, it's okay. It's all good for the lawsuit."
Q. And what did you understand him to mean by that?
A. I took it to mean he planned on suing for some reason.
Q. Excuse me a second. Did there come a time you were in the hospital room with Mr. Basile?
A. Yes.
Q. And where was he located in the room?
A. He was in one of the beds.
Q. And where were you located in the room?
A. Either right inside the room or just outside it.
Q. And did you have any conversation with him?
A. Yes.
Q. And what did you say to him, and what did he say to you?
A. At some point, I said to him, "This is nice. It's better than the precinct. You're not sitting on a hard,

wooden bench. You got a nice bed to lay in and a TV to watch."

And -- and he said, "If I knew I'd gotten this, I would have thrown myself on the floor when you pulled me over."

Q. Now, did there come a time that you saw Mr. Basile going back to the precinct -- now, did there come a time you saw Mr. Basile lying on the floor in the interrogation room?

A. Yes.

Q. And what position was he in?

A. Laying on his right side.

Q. And was he moving?

A. No.

Q. Was he talking?

A. No.

Q. Did you believe him to be unconscious?

A. No.

Q. And why not?

A. I had seen people unconscious many times over the course of my career, and this appeared more to me to be somebody who was pretending to be unconscious.

Q. And why did you come to that conclusion?

A. It appeared as if he were trying to keep his eyes closed, rather than the eyes just being closed.

THE COURT: What did you observe that led you to that conclusion?

THE WITNESS: If I can demonstrate for you? When -- when -- normally, when people are unconscious, everything is very relaxed. In this case, it appeared his eyes were kind of like that, as if he were trying to keep them closed rather than them just being in a normal, relaxed position.

THE COURT: For the sake of the record, when you say his eyes were like that, tell us in words as best you can what that means.

THE WITNESS: Lightly kind of squeeze closed.

BY MR. REISSMAN:

Q. Officer, on October 11th, 2018 -- well, let me strike that.

Do you know a Detective Jesse Perkins at the time of the Seventh Squad?

A. I do know him. Yes.

Q. And on October 11th, 2018, after you brought Mr. Basile into the precinct, at any time did you see Detective Perkins in the precinct?

A. Not that I can remember, no.

Q. Did you ever see Detective Perkins go into the holding cell on October 11th, 2018?

A. Not that I remember, no.

Q. Okay. Thank you.

A. You're welcome.

REDIRECT EXAMINATION

BY MS. PANOUSIERIS:

Q. Officer, you mentioned a second ago when we were speaking, and I think to the county attorney, that Mr. Basile had been joking with you at the arrest location; is that right?

A. Yes.

Q. He thought it was kind of ridiculous that he was being arrested?

A. I would assume that was his intent, yeah.

Q. So when he mentioned the lawsuit, did you take that -- you said you took that to mean that he wanted to bring a lawsuit at some point?

A. Yes.

Q. Related to the arrest that he thought was silly?

A. I suppose, yes.

Q. So it sounds like also when you were at the hospital, you and Mr. Basile had kind of a good rapport and you were speaking to one another back and forth. Is that fair to say?

A. Yes. It was in no way adversarial.

Q. So when you told him, "It's much nicer than being in the precinct. You've got a nice bed here," and he responded, "If I had known, I would have thrown myself at the arrest site," did you take that to be sarcastic?

A. No.

Q. Why is that? What about the statement made you think that it was an honest statement?
A. I -- I found it strange that he would specifically say throw himself on the floor. To me, that seemed an admission that he had thrown himself on the floor at the station house.
Q. Did you ever see Mr. Basile engage in any self-destructive behavior during your time with him on October 11th of 2018?
A. No.
Q. At any point did you see him act in a manner that would indicate to you he wanted to harm himself?
A. No.
Q. I know you just explained your personal reasons for believing that Mr. Basile was not actually unconscious, right?
A. Yes.
Q. Do you specifically have any expertise or medical training in concussions?
A. In concussions? No.
Q. No further questions. Thank you, Officer.
A. You're welcome.

MR. REISSMAN: Nothing further, Your Honor.

THE COURT: All right. You may step down.

THE WITNESS: Thank you, Your Honor.

MR. REISSMAN: Minervini.

THE COURT: How many more witnesses do we have today?

MR. RICKNER: I was going to say, can we sidebar briefly, Your Honor?

THE COURT: Yeah. Please.

(Sidebar begins)

MR. RICKNER: This is probably a first, but I think we're going to run out of witnesses.

THE COURT: Okay.

MR. RICKNER: Minervini is going to take another hour.

MS. PANOUSIERIS: And then we'll be done.

THE COURT: Let's break for lunch. Let's take a long lunch break, unless anybody objects, and that'll give us more time to think about jury instructions, which to me is the main event here today.

I'm going to tell the jury that we're going to ask them to come back at 2. And Minervini is the last witness today?

MR. REISSMAN: For the Plaintiff's case unless he rests. I mean, will he rest?

THE COURT: No. He subpoenaed Scott to be here.

MR. REISSMAN: Oh. That's tomorrow.

MS. PANOUSIERIS: Yeah.

MR. REISSMAN: And then after Scott?

THE COURT: So why don't we take a shorter lunch break?

MS. PANOUSIERIS: And be done early?

THE COURT: And be done for the day.

MR. RICKNER: Take a break because I'd like to --

THE COURT: Okay. All right. So if let's say that we're going to resume with the jury at 1:15.

MR. RICKNER: And we'll be back at 1?

THE COURT: Yeah.

MR. RICKNER: Because there is an issue regarding a tie and some new things that we haven't talked about.

THE COURT: The necktie?

MR. RICKNER: The necktie. Guess what color it is.

(Sidebar ends)

THE COURT: All right, ladies and gentlemen. The good news -- I think this is good news from your perspective and certainly from the perspective of judicial efficiency, generally.

This case is going very efficiently, and we are getting relatively nearer to the end of the Plaintiff's case in chief. We've got one more witness today and then one witness for the Plaintiff's tomorrow. That's where we currently see this going.

We're going to break for lunch and ask to resume at 1:15. So a little over an hour from now. We're going to hear from, I think, one witness today and then most likely break relatively early. That will give the lawyers and me time to work through some legal issues that we need to work through, and it will give you all some time for your lives outside this court case this afternoon.

But in the meantime, have a good lunch. Don't discuss the case, and we will see you at 1:15.

THE COURTROOM DEPUTY: All rise.

(Jury exits)

THE COURT: All right. At some point this afternoon, the parties should confer with my law clerk to make sure that we are all in agreement as to what exhibits have been admitted and which have not.

I haven't looked through the Defense exhibits.

MR. RICKNER: My understanding is that there aren't any.

MR. REISSMAN: No.

MR. RICKNER: That was the prior representation.

THE COURT: No exhibits?

MR. REISSMAN: No. All Defense were withdrawn. We did not introduce any exhibits.

THE COURT: Okay. So these pictures of Detective Lashinsky's hands that we've heard so much about, nobody is putting that in?

MR. REISSMAN: I have a black and white. I have black and white photo of his head and his hands today in my binder.

THE COURT: A photo, or a photocopy of a photo?

MR. REISSMAN: It's a photocopy of a photo. It's black and white. I believe the color is back in my office, but the visual of the black and white is sufficient to see Detective Lashinsky's head and hands.

I can put them in evidence if Your Honor permits.

THE COURT: Well --

(Recess)

THE COURT: Please be seated.

MR. RICKNER: I can go out and grab my colleagues or opposing counsel.

THE COURT: I like that you say your colleagues, but -- even if it confuses me, I appreciate the sentiment.

MR. RICKNER: I try to be like that.

THE COURT: I have said this, too. I said this in a speech I gave recently that I had a big sprawling -- it was my one organized crime case as a prosecutor. I did almost exclusively corporate and mostly securities related to crime, but I had one big, organized crime white collar case in which literally a who's who of New York trial lawyers was on the other side.

Like, Ben Brafman, Jerry Shargel, Ron Fischetti, on and on and on.

And Shargel came into the case late, and he called me. His client was like defendant number 9 or something to be arrested in the superseding indictment. He called me just to chat about, like, where do you see my client and standard first conversation, tell me about the case. And after five minutes of chitchat, he said, "Well, I look forward to working with you on this. I'll see you soon."

And my prosecutor brain could not process the

information that he was looking forward to working with me. It was like, do you mean your client wants to cooperate immediately? I don't understand what's -- but I like it.

So I have a law clerk and an intern toiling away on jury instruction issues as you might imagine. The preliminary conclusion on the question I posed this morning is that the jury does not need to be unanimous on the question of who committed the assault, but they need to be unanimous that an officer, an employee of Nassau County did so, but they do not need to be unanimous on the identity of that officer.

We're still researching. That may change, but if the county has a different view, you're going to need to surface direct authority to the contrary sooner rather than later. I don't know if you have an update in terms of what's going on in the home front on your side.

MS. LAGRECA: We --

MR. REISSMAN: Go ahead.

MS. LAGRECA: We did get an update, Your Honor. We had a colleague look into it, and basically it was consistent with what you just said, that the county could still be held liable even if they didn't determine which officer it was, but just that an officer committed an assault.

THE COURT: Okay. All right. So that may make this all fairly easy. I think this is a question that the

jury is going to have whether we explain this point or not, and the jury instructions should be clear on this question because it is kind of complicated.

The other thing that caught my eye in the proposed jury instructions is that there's a lot of stuff about punitive damages and how you go about fixing them if you find them, but no statement and it surprised me that the county did not having anything to this effect, included no statement regarding the fact that it is a matter of law. The county is not subject to a punitive damage award.

And if everybody agrees that that's the law, I would have thought, again, it's borderline misleading to tell the jury to go figure out what punitive damages are without telling them that that's the case.

MR. REISSMAN: That was an oversight, Your Honor. I was working late last night and trying to cobble together some instructions and I did not address -- I put in a small charge about damages but not compensatory punitive.

I think we can all agree that under Supreme Court case of Fact Concerts, that the municipality cannot be held for punitive damages, and if Your Honor could insert that instruction, I would appreciate it.

THE COURT: It's even more than that possibly because what I've seen in punitive damages instructions typically include some guidance to the jury on how to think

about punitive damages in light of their purposes. And some of those thoughts involve the particular profile of the defendant you're talking about. Like, what is their net worth?

And obviously the net worth of Nassau County is a lot different than the net worth of a recently retired detective. I don't know whose net worth is higher, but they're probably very different.

MR. RICKNER: I think there's a few things, Your Honor. One is, I think looking at the Triolo case, which to be clear was more about qualified immunity, but it isn't a very long stretch to look at that case and say, if you don't tag the officer, you only tag the municipality, you don't get punitive damages.

I don't think that is a huge, logical leap from the finding at the very end of that case. So I guess what I'm saying is, I think I'm agreeing with you.

With respect to -- because of indemnification, I think like the income of the various parties hasn't been brought up. I generally -- well, my position would have been if they had started pleading poverty on the stand, I would have started waving around the indemnification agreement that I brought that said, "Well, guess what? They're not going to have to pay, so you shouldn't be thinking about that."

In general, this is addressed in cases I've dealt

with. I call it the truce, you know? You don't talk about their finances. I don't talk about the fact they aren't actually going to have to pay for it.

And so we both just leave that fact out, and I think then to leave it out of the jury instruction would also be important because they don't have anything to consider there.

THE COURT: Well, the jury instruction would say that punitive damages are unavailable as against the county.

MR. RICKNER: Sure.

THE COURT: And so you are imposing a -- if you are imposing punitive damages, you can do that as to two defendants but not --

MR. RICKNER: Yeah.

THE COURT: -- the third. I agree we don't need to say anything about considering net worth when there's been no testimony about that one way or the other. I think that resolves the question.

So the County cannot be directly liable for punitive damages, but it agrees to indemnity punitive -- even punitive damages awards, and we talked about this a little bit in the conflicts --

MR. RICKNER: What happens outside of our view with respect to conflicts at hypothetical points in this trial kind of isn't about the jury instructions.

THE COURT: Right. Okay.

MR. RICKNER: Just to be clear, are we going to do a charge conference tomorrow morning? Are we doing it this afternoon? Something else?

THE COURT: We can't do a charge conference without a charge.

MR. RICKNER: Fair.

THE COURT: Here's my proposal. I would like to put my crack at the jury instructions -- well, I don't know if we put it on the docket. I think we just send it to the parties by email.

MR. RICKNER: I've seen both.

THE COURT: Well, if you've seen both, maybe we should just put it on the docket in the interest of transparency? Well, whatever it is, I'll get the jury instructions to the parties, ideally by or before 8:00, and you will digest them overnight.

MR. RICKNER: I was going to say which 8:00? Today?

THE COURT: 8 p.m. tonight.

MR. RICKNER: Thank you.

THE COURT: Yes. You'll digest them overnight. I can't really be in tomorrow until kind of 10:30-ish, so we're getting a late start regardless. Maybe I'll just tell the jury that they have the -- well, we have one more witness

tomorrow. Maybe we start at 11:00 tomorrow. We put your witness on, and then we --

MR. REISSMAN: Defense has two witnesses.

THE COURT: Then the defense has two witnesses. We get through those. We may be letting the jury go for the day after those three witnesses. We work through the charge, and then we bring the jury back on Thursday morning for instructions and closing arguments.

MR. RICKNER: I mean, I'd certainly be delighted, because I would like the evening to prepare for them, so --

THE COURT: Yeah. Yeah. This has all gone very quickly. All right. So that's the plan. Should we --

MR. REISSMAN: Ms. LaGreca would like to address the color photo issue.

THE COURT: Please.

MS. LAGRECA: So yes, Your Honor. Over the lunch break we did obtain copies of the color photographs. Obviously I'm a little big newer to the case. I don't know if the color photographs have been turned over to Plaintiff's Counsel. It is his representation that they have not. However, we would like to put them in evidence either with Detective Lashinsky's testimony or Shnayderman's testimony, considering he took the photographs.

We don't see any prejudice to the Plaintiff by entering the color photographs into evidence. We do think it

would be highly prejudicial to our clients after hearing testimony from several witnesses about the photographs about what the photographs depict and about the taking of the photographs. We do think it would be prejudicial to our clients if they were not entered into evidence.

Obviously, if Plaintiff's Counsel has not seen them, I have them in my work email right now to show him, and I can also show Your Honor.

THE COURT: You can forward the photos.

MR. RICKNER: Yeah. I --

MS. LAGRECA: Sure. I could also do that as well, of course.

MR. RICKNER: I'd just like to see them before we talk about this.

THE COURT: Okay. When is Shnayderman on the stand?

MR. RICKNER: Tomorrow.

MR. REISSMAN: I would call Detective Lashinsky first. Not too many questions, and then Lieutenant Shnayderman last.

THE COURT: Okay.

MS. LAGRECA: Sorry. I'm just trying to send them.

MR. REISSMAN: Oh. Maybe you need Rob's email.

MS. LAGRECA: Yeah. Rob, do you mind just putting your email in?

MR. RICKNER: Yeah. Absolutely.

MS. LAGRECA: I don't know if I got it right.

MR. RICKNER: It is right. I believe that's right. And is this all of the color photos from the IB?

MS. LAGRECA: Yes. Correct.

MR. RICKNER: Okay. Just doesn't look like a very big file. That's why I was curious.

THE COURT: All right. Why don't we bring in the jury since I told them we'd be on at 1:15? And we can argue about these photographs, if we are arguing about them, after the jury is dismissed for the day.

MR. RICKNER: It's not red.

MS. LAGRECA: It's not. It's blue and green.

MR. RICKNER: Oh. You told me about a red tie.

MS. LAGRECA: I know. We were mistaken about that.

MR. RICKNER: Oh, okay. Well, it's not neon blue either, so I'm good with it. But we'll talk later about admissibility.

THE COURT: I have no idea what you all are talking about.

MS. PANOUSIERIS: Colors of ties.

MR. RICKNER: Sorry about that. Just a little blindsided.

MS. LAGRECA: Dan, the jury is going to come through there. Maybe just move up a little bit. Perfect.

THE COURT: You can have a seat on the stand.

THE WITNESS: Thank you, Your Honor.

THE COURT: We're all going to stand when the jury comes in, so you may as well.

I don't think the Defendants' proposed verdict form even has a question about the County's liability.

MR. REISSMAN: I can advise it tonight if you want, unless you want me to revise the form? I can do that.

THE COURTROOM DEPUTY: All rise.

(Jury enters)

THE COURTROOM DEPUTY: You may be seated.

MS. PANOUSIERIS: Your Honor, may I approach with the binder?

THE COURT: Yes, please.

MR. REISSMAN: Thank you.

THE COURT: I'm going to give this back.

THE CLERK: Please stand and raise your right hand.

DANIEL MINERVINI, WITNESS, sworn

THE CLERK: Please state and spell your name for the record.

THE WITNESS: My first name is Daniel, D-A -- I'm sorry. My first name is Daniel, D-A-N-I-E-L. Last name Minervini, M-I-N-E-R-V-I-N-I.

THE COURT: You can put the microphone about 6 to 12 inches from you, I would guess.

DIRECT EXAMINATION

BY MS. PANOUSIERIS:

Q. Good afternoon, Officer. How are you today?

A. I'm doing well. How are you?

Q. Good. Is your current rank police officer?

A. Yes. It is.

Q. And I believe you said your name is Minervini. I want to say it correctly.

A. Yes. That's correct.

Q. Okay. Great. Are you currently employed?
A. Yes.
Q. Where do you work?
A. The Nassau County Police Department.
Q. When did you first start working with Nassau County PD?
A. June 2nd, 2016.
Q. In October of 2018, did you have any particular command that you worked out of?
A. The Seventh Precinct.
Q. On October 11th of 2018, what tour were you working?
A. 7 a.m. to 7 p.m.
Q. And did you have a partner that day?
A. I had someone working with me but not in the same car.
Q. And who was that?
A. That was Officer Thomas Garibotto.
Q. You were both working patrol that day; is that right?
A. That's correct.
Q. Did there come a time on October 11th of 2018 when you arrested Mr. Roger Basile, who is sitting here today?
A. Yes.
Q. Approximately what time did you effectuate that arrest?
A. I'm not certain of the exact time, but it was, I believe, around 11:00 in the morning.
Q. What location did you first encounter Mr. Basile?
A. It was the Gap located at the corner of Lindenmere Drive

and Merrick Road in Merrick.

Q. And why were you and Mr. Basile in this particular location? How did you end up there?

A. I had been at Mr. Basile's residence prior to going there for a domestic incident. While I was interviewing Mr. Basile's wife about the particulars of that incident, Officer Garibotto, who had previously left the house to look for Mr. Basile, had communicated that he had stopped Mr. Basile at that location.

Q. So it's essentially a traffic stop at that point?

A. Yes.

Q. So you responded to the scene where that traffic stop had occurred?

A. Yes.

Q. Was Mr. Basile in the driver's side or the passenger side of the vehicle when you arrived?

A. The passenger side.

Q. What other officers were present at that time when you arrived?

A. I'm not certain of all of them, but I know that Officer Garibotto and Officer Monet were there as well.

Q. At some point did you or the other officers ask Mr. Basile to step out of the car?

A. Yes. We did.

Q. And he complied with that request?

A. Yes.
Q. And then Mr. Basile was placed in handcuffs, correct?
A. Yes.
Q. And he was transported back to the Seventh Precinct?
A. Yes.
Q. Do you know who took him back to the Seventh Precinct?
A. I'm not certain.
Q. After the car stopped, you returned to speak to Mrs. Basile for about a half hour; is that right?
A. Approximately a half hour, yes.
Q. And then you also returned to the Seventh Precinct?
A. Yes.
Q. Where was Mr. Basile located when you arrived back at the Seventh when you first saw him?
A. Initially, he was on the first floor of the precinct in the arrest room.
Q. Was he cuffed?
A. Yes.
Q. What was his demeanor like at that point?
A. He was clam and quiet.
Q. Did you speak to Officer Garibotto?
MS. PANOUSIERIS: I apologize to the officer if that's incorrect.
BY MS. PANOUSIERIS:
Q. About how the transport went on the way back to the

Seventh?
A. I don't remember if I specifically asked him about the transport.
Q. Okay. There's a binder right there in front of you.
A. Yes.
Q. And it contains the transcript of your deposition on tab 1, if you could go to tab 1, and turn to page 17. You'll see at the bottom, there's a page number, and then there's a parenthesis with more page numbers because there are four pages to one page here. Does that make sense?
A. Yes.
Q. Okay. So on page 17, I'd like you to go to the internal page 62, and just to yourself, not out loud, take a look at lines -- on page 62, line 19 to 24 or 23, rather.
A. Okay.
Q. Does that refresh your recollection about whether or not you spoke to the other officer about the transport?
A. Yes.
Q. And did you in fact speak to him about it?
A. Yes.
Q. And what did you learn, if anything, about Mr. Basile's demeanor during transport?
A. He was calm and cooperative.
Q. Did there come a time that you or with the other officers took Mr. Basile upstairs to the detective squad?

A. Yes.
Q. And he was placed into a second holding cell, right?
A. Yes.
Q. And was he also cuffed inside the second holding cell?
A. Yes. He was.
Q. Was that in a different manner or the same manner as he was cuffed downstairs?
A. He was cuffed with one hand to a single handcuff to a chain that extended to a bracket that was mounted to the bench.
Q. And you're referring to when he was upstairs?
A. Yes.
Q. Okay. Did you personally escort Mr. Basile into the cell upstairs?
A. I don't remember.
Q. Once you were upstairs, did you speak with any of the detectives about Mr. Basile or his arrest?
A. Yes.
Q. Who did you speak with?
A. There were several detectives standing outside that -- the room where the cell is contained. I know Detective Perkins and Detective Lashinsky were among that group. I don't remember who else was in that group.
Q. But you recall speaking directly to both Detective Perkins and Detective Lashinsky?

A. Yes. They were both there.
Q. Did either Detective Lashinsky or Perkins say anything to you about the case or Mr. Basile in response to what you were reporting?
A. Detective Lashinsky indicated that he wanted to talk to Mr. Basile, and he had a Miranda card.
Q. Can you just explain to the jury what a Miranda card is?
A. So a Miranda card is a card that contains a defendant's Miranda rights. Normally, that card is read to the defendant. They acknowledge that they've received those Miranda rights, and then they sign acknowledging that they've received those rights before engaging in a custodial interrogation.
Q. So Detective Lashinsky was holding this Miranda card, so you presumed that he wanted to interrogate Mr. Basile?
A. Yes.
Q. Because Detective Lashinsky actually stated he wanted to talk to him, right?
A. I don't remember exactly what he said, but it -- he indicated that he wanted to talk to him.
Q. Did there come a time that Detective Lashinsky did in fact enter the cell?
A. Yes.
Q. I'm going to back up for a second. At the time that you're speaking with Detectives Lashinsky and Perkins and

maybe others in the squad room, was Detective Perkins present when Detective Lashinsky was standing there with the Miranda card?

A. I'm not sure if he was present at that exact moment, but I know during the conversation he had been present.

Q. Did you follow Detective Lashinsky into the cell?

A. Yes.

Q. Was anyone else present when you followed him into the cell?

A. There was another officer there.

Q. Do you recall who that was?

A. I'm not certain as to who it was. I believe it may have been Officer Kahl, K-A-H-L.

Q. And he would be a uniformed officer?

A. Yes.

Q. Do you recall seeing any other detectives inside the cell?

A. Not that I recall, no.

Q. Prior to entering -- I apologize.

After Detective Lashinsky entered, did he begin speaking to Mr. Basile or something else?

A. He began speaking to him, yes.

Q. And shortly after he asked you to leave, right?

A. Yes.

Q. What did you understand? What was the purpose of you

leaving? What did you understand that to be?
A. I understood it to be that he wanted to speak to him alone.
Q. And both you and the other officer who was present left the room?
A. Yes.
Q. And you closed the door behind you?
A. I don't remember who shut the door, but the door was shut behind us.
Q. So now, Mr. Basile and Detective Lashinsky are in the cell alone with the door closed?
A. Yes.
Q. Where did you go when you were asked to step out?
A. I went to the area -- so just to clarify, the cell is within a room that has a corridor leading to the cell. At the end of that corridor is the door that was shut, and then I was outside that door in the main detective area where they have filing cabinets, computers, and just their general desks.
Q. So if I understand correctly, you were outside both the cell door and the second door that leads into the squad room?
A. So the -- the second door that leads into the area where the cell is. I was outside that outermost door.
Q. Okay. So generally speaking, there were two doors between you and Mr. Basile at this point?

A. Yes.
Q. Could you hear what was going on inside the cell?
A. Yes.
Q. What did you hear?
A. So at first I heard loud talking, and then after a few seconds of talking, I started to hear yelling and banging noises coming from the cell.
Q. Can you describe what you mean by banging noises? Did it sound like metal or wood or something else?
A. I don't have a very clear recollection of the exact noises, but I remember it was a yelling and then repeated banging noises coming from the room.
Q. Prior to Detective Lashinsky entering the cell, Mr. Basile had been completely calm, correct?
A. Yes.
Q. What happened just after you heard that yelling and banging?
A. So a few seconds after that -- after those noises began, Detective Lashinsky came out of the cell with his hands up in front of him like this, shaking his head.
Q. Did he say anything?
A. I don't remember exactly what he said, but I took his reaction to mean that he didn't know what was going on really.
Q. So I'll just ask you again --

A. Yes.

Q. -- in your binder, the same tab, to turn to page 23.

THE COURT: Okay. Please proceed.

BY MS. PANOUSIERIS:

Q. And within page 23, I'd like you to go to page 87. And begin just reading to yourself again, line 19, and continue to page 88, line 6.

A. Yes.

Q. Does that refresh your recollection as to if Detective Lashinsky said anything when he walked out of the cell?

A. Yes. I -- I may have been mistaken in my recollection there. I -- I'm not certain if I inferred it from his body language or if he actually said something.

THE COURT: The question is, does that refresh your actual recollection about what happened? And if the thing you just looked at may have refreshed your recollection of what happened, not of any depositions, but in the events in question, or it may not have refreshed that recollection.

Do you now have a refreshed recollection about the actual events of October 11th?

MS. PANOUSIERIS: 11th.

THE WITNESS: My recollection is not any clearer after having read that.

THE COURT: Okay.

BY MS. PANOUSIERIS:

Q. Did anyone ask the detective if he had hit my client?
A. Yes.
Q. And what was his response?
A. He said that he hadn't.
Q. So you gave this sworn deposition testimony in November of 2020; is that right?
A. yes.
Q. And you were under oath when you gave it, correct?
A. Yes.
Q. You understood that that meant you had to tell the whole truth?
A. Yes.
Q. And you did tell the truth, didn't you?
A. Yes.
Q. As you are today?
A. Yes.
Q. So during that deposition, you were asked, "When Detective Lashinsky came out of the room, did he have his hands up?"
"A. Yes. He came out of the door with his hands up in front of him shaking his head.
"Q. And --
"A. And something to this --
THE COURT: I'm sorry. Is this in evidence that we're reading from?

MS. PANOUSIERIS: No, Your Honor. I'm impeaching his testimony.

THE COURT: Don't you need to -- well, come to the side for a moment.

MS. PANOUSIERIS: Okay.

(Sidebar begins)

MS. PANOUSIERIS: So, Your Honor, I just asked this question, if anybody asked or accused of touching him, and he said yes. And the answer is no. I started here for context.

THE COURT: Right.

MS. PANOUSIERIS: If Your Honor -- I can start it back here for context. If you would like me to read fewer lines, I can do so. But he gave the opposite answer to this question just now.

THE COURT: Right.

MS. LAGRECA: No. He didn't. He said he didn't remember, and his memory wasn't refreshed.

MS. PANOUSIERIS: No. He said he didn't remember this, and I asked did anybody ask him or accuse him of touching him. He said yes.

If I misspoke, I'm happy to reask the question.

MS. LAGRECA: He said he didn't -- that's exactly what he's just said. What he said was consistent with that, that the detective said that he didn't touch him.

MS. PANOUSIERIS: No. The second question is what I'm referring to, which is I asked him, had anybody ever asked him or accused him.

MS. LAGRECA: Accused him?

MS. PANOUSIERIS: The detective. I'll rephrase. I can do it again.

MS. LAGRECA: Wait.

MS. PANOUSIERIS: Sure. No problem.

MS. LAGRECA: Thank you.

MS. PANOUSIERIS: I do realize the discrepancy, Your Honor, and I'm happy to reask the question before I read further.

THE COURT: Hold on one second.

MS. PANOUSIERIS: Okay.

THE COURT: Okay. So you're not moving to admit --

MS. PANOUSIERIS: No. I'm not.

THE COURT: So you just want to ask him about --

MS. PANOUSIERIS: I realize the discrepancy, so I'm happy to back up and reask the question. I meant to ask him, had anybody accused Detective Lashinsky of hitting him, and I said asked. So I can back up, stop reading, and see if I get this answer first.

THE COURT: Okay --

MS. PANOUSIERIS: All right.

MR. RICKNER: To be clear, if you impeach somebody with their own statement successfully, that statement becomes part of the record and the jury can consider it.

THE COURT: But you just have to move to admit it, right?

MR. RICKNER: Generally speaking, I don't know if you can go through the formality of --

THE COURT: Part of the record, just to be in transcript, you mean or --

MR. RICKNER: Yeah.

MS. PANOUSIERIS: Yes.

MR. RICKNER: Because that's when impeachment becomes part of the -- successful impeachment becomes part of the record that the jury can consider --

THE COURT: What does successful impeachment mean, though?

MR. RICKNER: Meaning --

THE COURT: That the witness agrees that, yes, I said that thing?

MR. RICKNER: No. That you contradict them directly with a statement that they had previously acknowledged from a sworn transcript.

THE COURT: Yeah. But the transcript, when it's read, is read in the context of the question.

MR. RICKNER: Right.

THE COURT: And you said ask, and I'm going to be instructing the jury at the end of the day, and I already have, that questions from the lawyers are not evidence.

MR. RICKNER: That's true.

THE COURT: So the question still is begged, what is the evidence from which the jury can conclude that there was a prior --

MR. RICKNER: The impeachment itself, the impeached statement, i.e. the prior statement that they gave goes into evidence as part of filing the impeachment.

THE COURT: What does that mean? Goes into evidence?

MR. RICKNER: It's evidence that the jury can consider. I think it's actually in the Sands instruction on evidence that actually says --

THE COURT: It doesn't matter now.

MR. RICKNER: Yeah. But I think it could be relevant --

THE COURT: I think you're right if the witness says, "Yes. I agree. I made that prior inconsistent statement," because then you have the witness's answer, and that's of course evidence, but if the witness continues to deny that, then that just begs the question of how is it in evidence if it's only in the transcript of the question from the lawyer? The hypothetical --

MR. RICKNER: The witness just fully denies the prior sworn testimony --

THE COURT: Okay.

(Sidebar ends)

BY MS. PANOUSIERIS:

Q. Sorry about that, Officer. You don't have to look at the book right now. I'm going to back up for a second, so we can be on the same page, okay?

A. Okay.

Q. So do you recall specifically seeing Detective Lashinsky exit the cell?

A. The room that led to the cell, yes.

Q. Yes. And you mentioned that he threw his hands up when he did so?

A. Yes.

Q. Okay. And he also said, "I didn't touch him." Didn't he?

A. Again, I'm not certain if he said it, or if he -- if I inferred that from his body language at that time.

Q. When you gave your deposition in this case, you -- I'm actually going to back up again. I apologize.

You were asked during your deposition what Detective Lashinsky said when he exited the room, weren't you?

A. Yes.

Q. Okay. And you responded that he --

"Q. When Detective Lashinsky came out of the room, did he have his hands up?

"A. Yes. He came out of the door with his hands up in front of him and shaking his head.

"Q. And?

Q. It's cut off.

"A. And something to the effect of, "I didn't touch him."

Q. Do you remember being asked that question and give that answer?

A. Yes. I do.

Q. Had anyone accused Detective Lashinsky of hitting my client at that point?

A. Not that I can recall, no.

Q. What did you do next after Detective Lashinsky came out of the cell?

A. I went into the cell area that he had come out of.

Q. And did you go inside with anyone else?

A. There were other officers and detectives who came in with me. I'm not certain exactly who else came in, but there were a few of us who went in.

Q. What did you see when you walked in?

A. Mr. Basile was laying on the floor in front of the bench making jerking motions on the floor, not responding.

Q. What do you mean by jerking motions? Can you tell me a little more about that?

A. So almost as though seizure-like movements. He was on the floor shaking his body, laying on the floor.

Q. How long was Mr. Basile unresponsive in this state making these seizure-like movements?

A. I'm not certain exactly how long.
Q. Did there come a time when Mr. Basile became responsive while you were still in the cell?
A. He became a little more responsive. Yes.
Q. How would you describe his general demeanor as he became a little more responsive?
A. He was fairly quiet, still a little lethargic. Not entirely responsive.
Q. Did he ever ask specifically for an ambulance?
A. I don't remember if he specifically asked or not.
Q. But someone called one, right?
A. Yes.
Q. Did you remain with Mr. Basile until EMS or the EMTs arrived?
A. I don't remember.
Q. At any point in any of your interactions with Mr. Basile on October 11th, 2018, did you ever witness him engage in any self-destructive behavior?
A. No.
Q. Did you ever see him try to hit his head against the cell wall either downstairs or upstairs?
A. No.
Q. Did you ever see him flail into a wall or intentionally fall to the ground?
A. No.

Q. Thank you, Officer.
A. Thank you.

CROSS-EXAMINATION

BY MR. REISSMAN:
Q. Officer, you testified that you arrived at the location of Mr. Basile's car; is that correct?
A. Yes.
Q. Okay. As part of the pursuit; is that correct?
A. I'm sorry. I didn't hear the last word.
Q. I'm sorry. When you arrived at that car in which Mr. Basile was riding in the passenger seat, did you ask him to step out of the car?
A. Yes.
Q. And did you place him in handcuffs?
A. Yes.
Q. And did he say anything at that time?
A. As I was putting handcuffs on him, he said something to the effect of, "This is all good for the lawsuit."
Q. Now, did there come a time that you prepared your arrest report?
A. Yes.
Q. And how do you prepare an arrest report?
A. I type it up on the computer.
Q. And while you were in the process of typing up that report, did you receive any call from any other officer?

A. Yes.
Q. And which officer was that?
A. Officer Garibotto.

Q. And what did he tell you?

A. He told me that while he was at the hospital with Mr. Basile, Mr. Basile had something to the effect of, "If I'd known I'd get treated like this, I would have thrown myself on" --

MS. PANOUSIERIS: Objection. It's hearsay.

THE COURT: I'm sorry. Can you repeat the question, please?

MR. REISSMAN: Yes.

BY MR. REISSMAN:

Q. The question was, did another officer call you while you were preparing the arrest report?

THE COURT: Sustained.

MR. REISSMAN: Okay. Okay. So I'm not going to pursue that question, correct, Your Honor?

THE COURT: I sustained the objection.

MR. REISSMAN: Yes. Okay.

BY MR. REISSMAN:

Q. Now, Officer, you said that when you came up to the squad room, you saw Detective Perkins and Detective Lashinsky; is that correct?

A. Yes.

Q. And you saw Detective Lashinsky into the interrogation room?

A. I'm sorry. Can you repeat the question?

Q. Did you see Detective Lashinsky go into the cell?

A. Yes.

Q. And was Mr. Basile in the cell?

A. Yes.

Q. And how did Mr. Basile react when Detective Lashinsky went into the cell?

A. He was calm at first.

Q. And did his behavior change?

A. Yes.

Q. And how did it change?

A. When Detective Lashinsky began talking to him, he became irate and he started yelling.

Q. Did you hear what he said?

A. No. I don't remember what he said.

Q. On that date, on the second floor, did you ever see Detective Perkins go into the cell?

A. Not that I can remember.

Q. Thank you.

REDIRECT EXAMINATION

BY MS. PANOUSIERIS:

Q. Officer, you just mentioned that Mr. Basile's demeanor changed when Detective Lashinsky entered the cell; is that right?

A. Shortly after he entered the cell.

Q. And you mentioned that he became angry, and he yelled?

A. Yes.

Q. Was Detective Lashinsky also yelling? Was it an argument back and forth?

A. Mr. Basile had started yelling and then Detective Lashinsky had attempted to talk over him a few times, and yes, it was loud.

Q. So both parties were loud and speaking over one another?

A. Yes.

MS. PANOUSIERIS: No further questions.

MR. REISSMAN: Nothing further, Your Honor.

THE COURT: Thank you. You may step down.

THE WITNESS: Thank you, Your Honor. I'm sorry. Should I leave this here?

THE COURT: You can. Thank you. Okay.

That concludes today's witness testimony.

Ladies and gentlemen, thank you again for your close attention over two trials days now, including your

close attention after lunch, which is the hardest part of the day, obviously, to maintain focus during, at least for me.

We're going to break for the day now. There are certain witnesses whose testimony remains. I think approximately three witnesses. Their testimony will be relatively short, and I have every expectation that it will conclude tomorrow, and that will mark the end not only of the Plaintiff's case, if I'm correct, but also the Defense case.

I think we are going -- we are going to both start on the later side tomorrow and probably break on the earlier side tomorrow, so a relatively short trial day.

I will ask you all to be in at 11 -- well, 10:45 a.m. so that we can start in court at 11:00 sharp. And if I'm right in my predictions, we'll be dismissing you well before 4 or 5:00 or 5:30.

And the case should conclude on Thursday.

So again, thank you all for your service here. Please do not do any outside research or discuss the case with anyone. Have a good evening, and we will see you tomorrow.

THE COURTROOM DEPUTY: All rise.

(Jury exits)

THE COURT: Okay. What else before we --

MR. RICKNER: Just for clarity --

THE COURT: -- let you all guy?

MR. RICKNER: -- what are our assignments for tonight?

THE COURT: Everything that I've asked you to do over the course of --

MR. RICKNER: Which is?

THE COURT: -- the last 24 hours, which is your role in the first instance to remember, not mine. I'll try to help you.

We're drilling down. I have a preliminary review, as I've said, on the question of whether jury unanimity is required on the identity of the officer who committed any assault. That's question 1. I think we are getting close to an answer, but I want to hear the parties' considered answers.

Question 2 is, are we going to have an instruction concerning damages for a future harm? Right? Harm that --

MR. RICKNER: Yeah. And if so --

THE COURT: -- has not materialized, like the possibility of dementia and how should the jury think about that. Question number 3 is on punitive damages, what should the instruction say?

I think I know the answer to this question, but this is a question on my plate. What should the instructions say about the unavailability of punitive damages against the County?

Question 4 is do we need to have separate instructions and/or separate questions on a jury form for the federal civil rights violation versus the assault or not. The state assault and battery claim.

MR. RICKNER: To be clear, do you mean separate instructions, or do you mean separate just questions on the verdict sheet?

THE COURT: I was asking about both.

MR. RICKNER: Oh.

THE COURT: And/or.

MR. RICKNER: I think I tried to answer the first one, I'm pretty sure. But the second one, I do think the answer is it's got to be separated out. It's different; it's just the same rule.

THE COURT: So one set of instructions, two questions on a jury verdict form.

MR. RICKNER: Right.

THE COURT: Okay.

MR. RICKNER: And --

THE COURT: Okay.

MR. RICKNER: -- maybe a line that says, "The

elements of common law battery are in this case effectively the same as the excessive force instruction I gave you," and that's the way I -- for what it's worth, I've had Judge Pollak, Judge Kovner, and somebody I'm forgetting issue exactly those -- the order --

THE COURT: What was the Kovner case? I think I might have those --

MR. RICKNER: That would have been --

THE COURT: -- instructions somewhere.

MR. RICKNER: I can get them for you. I don't remember offhand because my client used so many fake names, I can't remember what's on the docket.

THE COURT: Yeah.

MR. RICKNER: It's either Burnett or Freestat (ph.).

THE COURT: Yes. I think we have those. So no need.

MR. RICKNER: It didn't go well. I mean, I lost.

THE COURT: Okay. So you're telling me you want to modify your proposed verdict form, right? Because I think your verdict form does not include separate questions for the federal claim and the state claim.

MR. RICKNER: Oh. I see. I misunderstood what you were getting at. I do think that for the individual officers, and this actually oddly I think maybe supported

what the Defendant was trying to get with the double damages.

If you put down two questions on exactly the same thing -- you assume the common law battery in 1983 are the same thing with the same ruled decision. You've got two potential risks. One is they check one without the other, and now we have an inconsistent verdict to deal with without a different rule or decision to allow us to parse the difference, and the second is, they might award damages for each one, which is double counting, and I acknowledge the County is right; you can't do that, which is why I broke it out the way I did.

THE COURT: So hold on one second. Let me just look at the complaint for a moment here. Okay.

So yeah. II is your assault and battery question on the verdict form. Did Roger Basile prove a preponderance of the evidence that any Nassau County officer or detective subjected him to assault and battery.

MR. RICKNER: That --

THE COURT: But he's sued --

MR. RICKNER: That's correct.

THE COURT: -- both officers individually for assault and battery, right?

MR. RICKNER: That's correct, and I can't remember if I put in a footnote or if it's in an email or if it's in my -- what I was trying to do was to explain that with

respect to the constitutional violation and excessive force, I mean, either we combine them into one because it's one rule of decision for each officer, or we just call it one thing like section 1983.

With respect to the County, there's no Monell claim here. If I don't --

THE COURT: No. I understand that. You have an allegation of liability. You have a claim against the County for assault and battery --

MR. RICKNER: And against the --

THE COURT: -- under the doctrine of respondeat superior, right?

MR. RICKNER: And against the individual officers, and the way I was trying to do the verdict sheet -- and again, if this is confusing them, it's not the right way to do it -- is to essentially collapse that inquiry for the County because if they find that either of the officers have done it, it effectively forecloses the decision with the County.

So if any officer, and that includes both of the Defendants, are found responsible for excessive force/battery, then the County is as well.

But again, if this is confusing to you, then it's going to be confusing to the jury, and we should do it a different way.

THE COURT: It's surely confusing me.

MR. RICKNER: That's not a good -- so, not a good sign for the jury.

THE COURT: Yeah. I think there should be a place for the jury to check a box for each count for each defendant, even if that creates some risk that they will come up with answers that we think are logically or legally inconsistent, just because you've sued multiple defendants for multiple things, and we need to know what the verdict is on those things.

MR. RICKNER: Okay.

THE COURT: So worth with the -- work with the Defendants on that, and work with the Defendants on the punitive damage question to make it clear. If there's award of punitive damages in this case, it will have to be as against one of the --

MR. RICKNER: Right.

THE COURT: -- defendants you've sued, right? You can't get punitive damages against the County, I don't think.

MR. RICKNER: Not on these facts. I'll give you that.

THE COURT: Yeah. An employee who's not here.

MR. RICKNER: Yeah.

THE COURT: Especially on these facts. So I think we need a stronger tie in the verdict form between the

punitive damages question and the individual counts against the individual defendants on the state common law claim.

And you're on the question about nominal damages, even though I've seen that in some of the other verdict forms I'm looking at. You don't want the $1 that --

MR. RICKNER: I'm not looking for it.

THE COURT: Yeah.

MR. RICKNER: If he wants to close on it, have at it.

THE COURT: Okay. Did one of you give me this set of instructions from Judge Hurley or did my law clerk surface this? I was just looking at --

MR. RICKNER: Is that the Greenwood, Greenway, something case?

THE COURT: I'll tell you in a second.

(Court and clerk confer.)

THE COURT: Oh. This definitely came to me from my law clerk then because I'm being told that --

MR. RICKNER: Is this the Greenaway case?

THE COURT: Yeah. Would you mind printing another copy, please?

THE CLERK: Okay.

THE COURT: Thank you. We're going to print three copies now. Thank you. Thank you.

THE CLERK: You're welcome.

(Counsel confer)

THE COURT: Griffin against the County of Suffolk. This seems more like what I would have intuited. Obviously we don't have failure to intervene claims, but it separates out the federal claims and the state claims.

MR. RICKNER: Oh. There's two plaintiffs as well.

THE COURT: And separates out the compensatory damages according to which defendant they are awarded against, has questions about nominal damages which I could take or leave according to whatever the parties want, separates punitive damages out by reference to the particular individual against whom they are being awarded, and this is how I'm leaning, just because this -- if you'd asked me before I started researching any of this what I would have expected the jury form to look like, this is what I would have said, but I welcome of course feedback.

MR. RICKNER: No. I think this is right, except I think we'd need a separate line for the County given the particular quirk here.

THE COURT: Yes. Indeed. Yeah. I don't know why this doesn't have that. That's a good question.

MR. RICKNER: Well, if there's no -- a lot of time -- the way I've done it previously, if there's no question with respect to -- there's none of this alternate officer or anything or question that you won't be able to

tell. It's just one or the other, logically just collapsed it in and the County pays without -- the respondeat happens automatically as a matter of law once the state claims are against one of the individual officers.

THE COURT: Okay. Yeah. It is. It's odd to me again to have a cause of action against the county and not have the jury come back with the verdict on that cause of action, and so I agree with you. It just makes more aesthetic sense to include the question, but --

MR. RICKNER: Okay.

THE COURT: -- I see the legal issue. What else are we taking away? Do we have a live dispute on the photographic evidence or not?

MR. RICKNER: Can I sleep on it?

THE COURT: Yes. Remind me what the -- your photographic exhibits also were not also on the JPTO, right? And so there may be a symmetry here, or there may not. Sleep on it. I think there's probably a good argument that this is rebuttal evidence, even if it wasn't properly flagged as evidence in their case in chief, and there may be an argument to be made that since you put in your photographs without them being on your part of the JPTO that it would only be sporting for them to be able to do the same.

There may be asymmetries that I'm not thinking of either, and so I'm happy to hear argument both ways tomorrow,

but maybe you all come to agreement, and that makes my life easier.

MS. PANOUSIERIS: Okay.

MR. REISSMAN: Thank you, Your Honor.

MR. RICKNER: Thank you.

THE COURT: What else?

MR. RICKNER: When do you want us here?

THE COURT: I would like you here at 10:30 a.m. I may be 10 minutes behind you, but you can all hang out with each other for 10 minutes.

Any other instructions about which we're going to fight tomorrow that you can think of?

MR. RICKNER: I would like to see the specific text. There was one comment in one of the Sands standard instructions that used a question about beating your wife as one of -- it was in his, and it was actually --

THE COURT: In Sands?

MR. RICKNER: I'm not saying that he did anything wrong. It was to make a rather innocuous point, but if there's something like that in the most current version of the Sands instructions, which I only was able to skim, obviously I would want to tweak that because I don't think that's appropriate --

THE COURT: Yeah.

MR. RICKNER: -- in any jury instruction, but --

THE COURT: Yes. That makes sense to me.

MR. RICKNER: I guess what I'm saying is I reserve my rights to sort of -- if there are tweaks that are necessary, I'd like to --

THE COURT: Yeah. I start with Sand because I presume that the Second Circuit has gotten to the pattern of instructions in the Sand volumes more than anything else that we might see, but that doesn't mean that I'm wetted verbatim to every sentence for sure.

All right. Anything else you think we should take up before we adjourn today?

MR. RICKNER: No, Your Honor. Thank you.

THE COURT: Anything else from the County side?

MR. REISSMAN: Real quick. Do you want the parties to rework the verdict sheet or will the Court do that?

THE COURT: I want the parties to rework the verdict sheet --

MR. REISSMAN: Okay.

THE COURT: -- in accordance with our conversation here today as best you can.

MR. REISSMAN: Yes.

THE COURT: I may do the same, but in a perfect world, we all come back with exactly the same verdict form tomorrow, and it turns out that great minds are thinking alike all around.

Anything else on the Defense side?

MR. REISSMAN: No, Your Honor.

THE COURT: All right. We got our work cut out for us. Thank you all.

MR. REISSMAN: Thank you, Judge.

MS. PANOUSIERIS: Thank you.

MR. RICKNER: Thank you.

(Proceedings adjourned at 2:07 p.m.)

TRANSCRIBER'S CERTIFICATE

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

*Tracey Hamilton* October 31, 2023
______________________________ ____________________
Tracey Hamilton DATE
Legal Transcriber

*Laura Hunt* October 31, 2023
______________________________ ____________________
Laura Hunt DATE
Legal Transcriber

*Faith Vance* October 31, 2023
______________________________ ____________________
Faith Vance DATE
Legal Transcriber

# Keyword Index


## $

**$1** [1] **387**:5
**$750** [1] **291**:1

## 0

**0** [1] **272**:15

## 1

**1** [8] **254**:16,20,21 **282**:25 **343**:3 **360**:7,7 **381**:16
**1,000** [1] **299**:11
**1:15** [4] **343**:2 **344**:11,18 **354**:9
**10** [8] **261**:9 **286**:5,21,23 **287**:11 **290**:19 **390**:9,10
**10:30** [1] **390**:8
**10:30-ish** [1] **351**:23
**10:45** [1] **380**:7
**10-minute** [1] **291**:12
**11** [5] **291**:14,19 **316**:23 **331**:18 **380**:7
**11:00** [3] **352**:1 **357**:23 **380**:8
**11th** [16] **298**:16 **302**:14 **303**:5 **308**:8 **316**:12,19 **330**:5 **338**:12,17,22 **340**:8 **357**:10,18 **366**:20,21 **375**:17
**12** [3] **290**:19 **298**:3 **356**:16
**13** [5] **302**:21 **322**:23 **323**:3,10 **324**:1
**14** [1] **249**:17
**15** [11] **265**:25 **286**:5,21,23 **287**:11 **298**:3 **305**:13 **306**:3 **307**:19,20 **318**:3
**17** [3] **297**:19 **360**:7,12
**175** [1] **293**:16
**17th** [1] **297**:3
**18** [2] **302**:22 **324**:7
**19** [3] **305**:13 **360**:14 **366**:6
**1983** [8] **245**:18 **281**:18 **282**:4,7,11 **283**:6 **384**:3 **385**:4
**1996** [1] **260**:20
**1997** [8] **258**:19 **260**:20 **261**:1,3,8 **262**:19 **297**:3,4
**1999** [1] **261**:11
**1st** [1] **316**:11

## 2

**2** [6] **254**:16,20,21 **278**:5 **342**:13 **381**:19
**2:07** [1] **392**:8
**20** [2] **274**:6 **324**:5
**2005** [2] **297**:11 **316**:11
**2009** [2] **261**:11,13
**2015** [1] **297**:12
**2016** [3] **297**:13,19 **357**:6
**2018** [21] **272**:5 **274**:18 **287**:17 **288**:15,25 **289**:3 **298**:16 **302**:14 **303**:5 **308**:9 **316**:12,19 **330**:5 **338**:12,17,22 **340**:8 **357**:7,10,18 **375**:17
**2019** [3] **274**:16,18 **297**:13
**2020** [2] **275**:9 **367**:6
**2021** [2] **275**:16,17
**21** [1] **306**:4
**23** [5] **272**:15 **275**:19 **360**:14 **366**:2,5
**24** [3] **306**:4 **360**:14 **381**:10
**254** [3] **243**:1,2,3
**26** [3] **272**:16,16 **275**:19
**2nd** [1] **357**:6

## 3

**3** [5] **254**:16,20,21 **278**:5 **381**:24
**30** [2] **265**:4 **272**:15
**300,000** [4] **277**:20 **285**:4,5,16
**30s** [1] **286**:15
**38** [1] **331**:18

## 4

**4** [2] **380**:10 **382**:5
**40** [1] **287**:5
**41** [1] **331**:18
**42** [1] **245**:19
**43** [1] **245**:18
**45** [1] **265**:25
**48** [2] **305**:12 **323**:9
**49** [1] **324**:2

## 5

**5:00** [1] **380**:10
**5:30** [1] **380**:10
**50** [1] **287**:5
**59** [1] **248**:10

## 6

**6** [2] **356**:15 **366**:7
**6:30** [1] **247**:18
**60** [1] **286**:15
**611(c** [1] **294**:18
**62** [2] **360**:13,14

## 7

**7** [2] **357**:11,11
**70** [1] **286**:15
**702** [1] **262**:23
**709** [1] **316**:16

## 8

**8** [2] **323**:10 **351**:20
**8:00** [2] **351**:16,18
**80** [2] **274**:6 **286**:16
**800** [1] **298**:25
**81** [1] **282**:13
**87** [1] **366**:5
**88** [2] **282**:13 **366**:7

## 9

**9** [3] **247**:12 **302**:21 **346**:19
**9:30** [1] **252**:5
**90** [2] **261**:18 **286**:16

## A

**a.m** [6] **247**:12 **291**:14 **316**:23 **357**:11 **380**:8 **390**:8
**able** [7] **263**:20 **273**:8 **276**:10 **302**:11 **388**:25 **389**:23 **390**:21
**abnormal** [2] **272**:17 **275**:19
**above** [1] **272**:16
**above-entitled** [1] **393**:4
**absence** [2] **249**:22 **268**:3
**absolutely** [3] **266**:17 **279**:9 **354**:1
**accompany** [2] **319**:7 **320**:9
**accordance** [1] **391**:19
**according** [2] **388**:8,10
**accuse** [1] **369**:14
**accused** [5] **369**:3,22,23 **370**:14 **374**:7
**acknowledge** [2] **362**:10 **384**:9
**acknowledged** [1] **371**:15
**acknowledging** [1] **362**:11
**act** [2] **245**:5 **340**:10
**action** [4] **281**:23 **283**:7 **389**:6,8
**active** [1] **263**:23
**actual** [2] **366**:15,20
**actually** [27] **245**:8 **248**:3 **254**:9 **255**:8 **264**:12 **269**:17 **279**:6 **280**:16 **283**:6 **286**:19 **291**:11 **293**:8 **302**:11,15 **305**:11 **306**:3 **328**:24 **335**:14 **340**:14 **350**:3 **362**:17 **366**:13 **372**:7,8 **373**:17 **383**:25 **390**:16
**adams** [1] **250**:17
**add** [1] **266**:6
**additional** [7] **249**:17 **258**:14 **260**:11,25 **291**:19 **309**:5,7
**address** [4] **249**:16 **317**:5 **348**:17 **352**:13
**addressed** [2] **294**:13 **349**:25
**adjourn** [1] **391**:11
**adjourned** [1] **392**:8
**admissibility** [1] **354**:18
**admission** [1] **340**:4
**admit** [2] **370**:9,22

# Keyword Index


**admitted** [2] **254:**16 **345:** 5
**adopting** [1] **282:**16
**advanced** [1] **297:**10
**adversarial** [1] **339:**20
**advise** [1] **355:**7
**aesthetic** [1] **389:**9
**affairs** [2] **309:**10,17
**affects** [1] **332:**21
**affiliated** [1] **294:**16
**afghanistan** [1] **277:**21
**afternoon** [4] **344:**16 **345:**3 **351:**4 **356:**19
**age** [7] **285:**23 **286:**19,24 **287:**2,3,3,6
**agency** [1] **252:**22
**aggressive** [1] **328:**6
**ago** [3] **277:**19 **287:**5 **339:**3
**agree** [7] **244:**23 **249:**11 **250:**4 **348:**19 **350:**15 **372:**13 **389:**8
**agreeing** [1] **349:**17
**agreement** [4] **245:**4 **345:**4 **349:**22 **390:**1
**agrees** [4] **249:**9 **348:**11 **350:**20 **371:**11
**ahead** [2] **275:**8 **347:**18
**aide** [1] **330:**20
**alerted** [1] **304:**2
**aligned** [1] **273:**15
**alike** [1] **391:**25
**allegation** [1] **385:**8
**allow** [1] **384:**7
**allowed** [3] **281:**8 **292:**14, 14
**almost** [6] **272:**23 **275:**13 **282:**11 **319:**6 **346:**11 **374:**22
**alone** [5] **305:**20 **325:**10,15 **364:**3,11
**already** [3] **321:**8 **329:**9 **371:**20
**altercation** [3] **312:**8,9, 19
**alternate** [1] **388:**24
**alzheimer** [1] **286:**13
**ambulance** [4] **329:**19, 22 **330:**1 **375:**9
**american** [1] **277:**18
**among** [3] **277:**3 **285:**19 **361:**22
**amongst** [1] **291:**17
**amount** [1] **291:**1
**analog** [2] **246:**7,8
**analysis** [3] **279:**17 **282:** 25 **283:**13
**and/or** [2] **382:**6,14
**angry** [2] **330:**9 **379:**3
**announce** [1] **305:**9
**annoying** [1] **282:**16
**another** [11] **275:**9 **309:** 17 **310:**8 **321:**6 **328:**22 **339:** 19 **342:**5 **363:**10 **377:**14 **379:** 10 **387:**20
**answer** [20] **244:**4 **247:**8 **248:**24 **282:**2 **283:**3,15 **288:** 23 **289:**22 **292:**17,20 **333:**3 **369:**4,8 **370:**16 **372:**14 **374:** 5 **381:**17 **382:**1,15,17
**answers** [3] **244:**14 **381:** 18 **386:**7
**antianxiety** [1] **290:**2
**antidepressive** [1] **290:** 2
**anxiety** [5] **274:**11,24 **276:** 2 **288:**16,21
**anybody** [6] **312:**21 **342:** 9 **369:**3,14,21 **370:**14
**anyway** [1] **292:**21
**apologize** [4] **322:**16 **359:**22 **363:**19 **373:**17
**apparently** [1] **277:**5
**appeal** [2] **248:**11 **251:**10
**appeals** [1] **251:**8
**appearance** [2] **268:**2 **271:**4
**appeared** [4] **276:**6 **337:** 19,22 **338:**3
**apples** [1] **280:**11
**application** [2] **259:**24 **261:**24
**appreciate** [4] **246:**4 **255:**7 **346:**7 **348:**22
**apprehended** [1] **331:**5
**approach** [4] **254:**22 **296:** 13 **315:**13 **356:**3
**approached** [1] **326:**13
**appropriate** [2] **316:**3 **390:**23
**approximate** [1] **281:**19
**approximately** [5] **275:** 9 **318:**3 **357:**21 **359:**10 **379:** 25
**area** [20] **265:**10,10,12,25 **270:**16,18,22 **271:**9 **299:**10, 20 **300:**25 **302:**6,15 **304:**9 **309:**20 **321:**23 **364:**14,17,22 **374:**12
**areas** [2] **260:**22 **265:**24
**arena** [1] **246:**14
**aren't** [2] **345:**7 **350:**2
**arentfox** [1] **293:**9
**argue** [1] **354:**9
**arguing** [1] **354:**10
**argument** [7] **244:**14 **249:** 6 **281:**10 **379:**6 **389:**18,20,25
**arguments** [1] **352:**8
**arise** [1] **293:**23
**arm** [1] **327:**17
**arms** [1] **258:**25
**arnold** [2] **296:**11,18
**a-r-n-o-l-d** [1] **296:**18
**around** [5] **316:**22 **321:**8 **349:**22 **357:**23 **391:**25
**arrest** [15] **319:**2,5 **322:**9 **324:**24 **330:**8 **334:**8 **339:**5, 15,23 **357:**21 **359:**16 **361:**17 **376:**19,22 **377:**15
**arrested** [9] **334:**10,14,15, 22 **336:**3,8 **339:**9 **346:**20 **357:**19
**arresting** [1] **322:**11
**arrived** [7] **329:**9 **358:**16, 19 **359:**13 **375:**14 **376:**5,10
**asbestos** [4] **292:**2,4,17 **293:**11
**aside** [1] **289:**16
**aspect** [2] **262:**12 **266:**10
**assault** [12] **244:**24 **249:** 19 **309:**1 **347:**8,23 **381:**16 **382:**7,8 **384:**14,17,22 **385:**9
**assaulted** [1] **272:**8
**assertions** [1] **246:**4
**assessment** [2] **272:**13 **275:**23
**assigned** [7] **252:**15 **297:** 15 **298:**4 **301:**6 **309:**17 **316:** 16,20
**assignment** [2] **297:**18 **316:**13
**assignments** [1] **381:**5
**assist** [1] **328:**19
**assisting** [1] **329:**2
**associated** [1] **292:**7
**association** [1] **277:**19
**assume** [2] **339:**10 **384:**3
**asymmetries** [1] **389:**24
**attempted** [1] **379:**8
**attempting** [1] **332:**15
**attention** [8] **272:**12 **274:** 13 **304:**10,24 **320:**19 **324:**21 **379:**20,21
**attorney** [11] **250:**10,11, 13,14,17,18 **252:**14,25 **288:** 11 **333:**3 **339:**4
**attorney's** [7] **250:**8,20 **251:**8,14 **252:**20,21 **309:**9
**attract** [1] **304:**10
**authority** [6] **245:**1 **246:** 23 **247:**12 **248:**3,7 **347:**14
**automatically** [1] **389:**3
**average** [1] **287:**1
**award** [4] **292:**15 **348:**10 **384:**8 **386:**14
**awarded** [2] **388:**8,12
**awards** [1] **350:**21
**away** [5] **295:**6 **322:**1 **327:**

# Keyword Index


12 **347**:4 **389**:12
**ayres** [1] **292**:3
**a-y-r-e-s** [1] **292**:3

## B

**back** [43] **244**:10 **247**:1 **249**:25 **252**:5 **262**:13 **264**:14, 14,25 **265**:2 **268**:12 **285**:2 **287**:16 **291**:13,14,18 **315**:15 **319**:7,14 **321**:13 **322**:12,14 **328**:20 **336**:10 **337**:6 **339**:19 **342**:13 **343**:3 **345**:22 **352**:7 **356**:7 **359**:4,6,13,25 **362**:24 **369**:7 **370**:13,15 **373**:3,17 **379**:6 **389**:7 **391**:23
**background** [2] **255**:16 **334**:4
**backs** [1] **321**:6
**balance** [8] **272**:24,25 **273**:4,7,9 **274**:11 **275**:23 **276**:3
**banging** [6] **325**:20,21 **365**:6,8,12,17
**bankrupt** [1] **293**:10
**bankruptcy** [2] **261**:12 **293**:20
**based** [6] **249**:2 **263**:18 **267**:21,23 **281**:14 **287**:8
**baseline** [6] **279**:15 **283**: 20 **285**:12,15 **286**:4,22
**basic** [1] **249**:16
**basically** [3] **268**:1 **283**: 21 **347**:20
**basile's** [10] **276**:18 **317**: 12,14 **318**:21 **319**:13 **358**:4,6 **360**:21 **376**:6 **378**:24
**basis** [3] **246**:16 **261**:17 **313**:15
**battery** [8] **249**:19 **382**:8 **383**:1 **384**:3,14,17,22 **385**:9
**beat** [2] **272**:23 **273**:23
**beating** [3] **273**:20,24 **390**: 15
**became** [9] **260**:23 **297**:8, 20 **328**:8 **375**:2,4,5 **378**:14 **379**:3
**become** [3] **260**:21 **328**:3 **329**:10
**becomes** [5] **271**:5 **312**: 10 **370**:20 **371**:6,6
**bed** [2] **337**:1 **339**:22
**bedrock** [1] **244**:25
**beds** [1] **336**:18
**began** [3] **363**:22 **365**:18 **378**:14
**begged** [1] **371**:23
**begin** [4] **261**:1 **283**:22 **363**:20 **366**:6
**begins** [5] **279**:1 **312**:1 **334**:1 **342**:1 **369**:1
**begs** [1] **372**:16
**behalf** [2] **290**:15,20
**behavior** [3] **340**:7 **375**: 18 **378**:11
**behind** [6] **250**:9 **321**:6,13 **364**:7,9 **390**:9
**believe** [53] **244**:15,18 **254**:16 **259**:14 **262**:22 **272**: 15 **274**:15 **275**:15 **276**:16 **277**:1 **287**:11,18 **288**:23 **289**: 10,23 **303**:3,7,13 **304**:12 **305**: 1,4,21,23 **307**:3,25 **309**:18 **310**:2 **312**:8 **313**:13 **314**:3 **315**:2,6 **318**:5 **319**:12 **321**:2, 18,23 **324**:13,15 **325**:2 **326**: 25 **327**:11 **328**:15,22 **329**:13 **331**:9 **336**:8 **337**:15 **345**:22 **354**:3 **356**:23 **357**:23 **363**:12
**believing** [1] **340**:14
**bellmore** [1] **317**:4
**belong** [2] **299**:16,17
**belongings** [4] **332**:15, 16,19 **333**:2
**below** [1] **272**:17
**belts** [1] **319**:23
**ben** [1] **346**:16
**bench** [8] **321**:7,11 **327**:14 **328**:21 **329**:1 **337**:1 **361**:10 **374**:18
**beneath** [2] **270**:25 **288**:4
**besides** [1] **299**:9
**best** [8] **277**:17 **286**:25 **287**: 10 **292**:22 **316**:23 **320**:2 **338**: 8 **391**:20
**better** [2] **248**:7 **336**:25
**between** [4] **265**:10 **266**: 24 **364**:25 **386**:25
**beyond** [4] **271**:17 **286**:15 **299**:17 **308**:15
**big** [7] **293**:10 **298**:22,24 **346**:10,13 **352**:18 **354**:7
**bigger** [3] **299**:4,5,6
**binder** [9] **270**:2 **302**:20 **305**:12 **315**:14 **322**:21 **345**: 19 **356**:4 **360**:4 **366**:2
**binders** [1] **296**:13
**bit** [11] **248**:1 **255**:15 **259**: 19 **261**:6 **263**:3 **292**:3 **304**: 17 **327**:15,25 **350**:22 **354**:25
**black** [4] **345**:17,18,22,23
**bleed** [1] **271**:3
**bleeding** [1] **266**:23
**blind** [1] **280**:18
**blindsided** [1] **354**:23
**blood** [6] **271**:1,4 **306**:24, 25 **327**:23,25
**blow** [11] **262**:8 **263**:21 **265**:7,9,17 **266**:4 **268**:23 **269**:5,7 **276**:23 **290**:7
**blue** [2] **354**:13,16
**blunt** [1] **279**:20
**blurry** [1] **274**:10
**board** [2] **260**:22,23
**body** [6] **264**:8 **271**:8 **282**: 12 **366**:12 **373**:15 **374**:23
**bone** [1] **262**:12
**book** [2] **331**:17 **373**:3
**border** [2] **275**:20,23
**borderline** [1] **348**:12
**both** [28] **247**:2 **265**:18 **266**:13 **267**:18 **270**:10 **273**: 15,18 **277**:4,5 **290**:21,22 **293**: 15 **294**:16 **300**:24 **350**:4 **351**: 12,13 **357**:16 **361**:24 **362**:1 **364**:4,20 **379**:10 **380**:4 **382**: 12 **384**:21 **385**:20 **389**:25
**bottom** [6] **269**:24 **322**:24 **324**:2 **328**:1 **331**:18 **360**:8
**box** [3] **323**:9 **324**:2 **386**:5
**boy** [1] **315**:21
**bracket** [1] **361**:9
**brafman** [1] **346**:16
**brain** [52] **258**:15,21,24 **259**:7,15,17,18,20,25 **260**:12, 24 **261**:19,20,23,24 **262**:12 **263**:6,8,10,25 **264**:3,10 **265**: 5,16,21 **266**:12,15,17,24 **267**: 19 **268**:3,23 **270**:24 **271**:9,14, 14 **273**:13,14 **277**:15 **279**:24, 25 **280**:4,5,9 **285**:8 **287**:18, 24 **288**:1,3 **290**:6,9 **346**:25
**break** [15] **251**:19 **271**:2 **291**:11,12 **293**:25 **301**:8 **342**: 8,9,22,25 **344**:10,13 **352**:17 **379**:23 **380**:5
**breaks** [1] **271**:4
**briefed** [1] **247**:12
**briefly** [1] **341**:4
**bring** [8] **246**:20 **252**:7 **282**:4 **293**:22,24 **339**:13 **352**: 7 **354**:8
**bringing** [1] **296**:8
**brings** [1] **266**:19
**broadly** [1] **289**:13
**broke** [1] **384**:10
**broken** [1] **271**:2
**brooklyn** [1] **261**:10
**brought** [7] **304**:24 **314**: 11 **320**:8,24 **338**:17 **349**:20, 23
**bruise** [2] **266**:8 **271**:1
**bruising** [1] **270**:18
**building** [2] **298**:21,23
**bump** [1] **301**:22
**burden** [2] **245**:22 **249**:5
**burnett** [1] **383**:14

# Keyword Index


## C

**cabinets** [1] **364:**18
**call** [25] **244:**16,19 **251:**1, 17,20,21 **252:**1,3,5 **254:**7 **261:**25 **262:**15 **264:**8 **276:**20 **288:**13 **291:**8 **316:**20,22,24 **317:**1 **350:**1 **353:**18 **376:**25 **377:**14 **385:**3
**called** [15] **256:**5,6 **264:**9 **268:**16,22,24,25 **272:**13 **273:** 12 **285:**9 **302:**6,6 **346:**18,20 **375:**11
**calling** [1] **263:**9
**calls** [2] **296:**3 **315:**10
**calm** [9] **319:**6,15 **320:**14, 17 **328:**6 **330:**21 **360:**23 **365:** 14 **378:**10
**came** [26] **244:**3 **248:**1 **250:**22 **272:**4 **274:**17 **302:**18, 25 **303:**18 **305:**8 **307:**5 **309:** 10,25 **319:**1 **328:**5 **329:**13 **346:**18 **365:**19 **367:**18,20 **373:**22,24 **374:**10,14,15 **377:** 22 **387:**17
**cameras** [3] **309:**19,21,24
**cancer** [1] **292:**5
**cannot** [5] **249:**22 **288:**6,6 **348:**20 **350:**19
**capozi** [1] **303:**8
**captain** [1] **297:**13
**car** [12] **318:**9,19 **319:**10,13 **331:**6,10 **357:**13 **358:**23 **359:** 8 **376:**6,10,12
**card** [7] **362:**6,7,8,8,9,14 **363:**3
**cards** [1] **332:**21
**career** [1] **337:**19
**carved** [1] **313:**8
**case** [50] **246:**5 **248:**12,21 **249:**3,21 **250:**22 **254:**6,22 **267:**19 **276:**17 **279:**20 **288:** 12 **291:**17 **292:**3 **294:**19,19, 20 **296:**5 **312:**21 **320:**6 **322:** 23 **336:**9 **338:**3 **342:**15 **344:** 5,6,16,18 **346:**11,13,18,22 **348:**14,20 **349:**10,12,16 **352:** 18 **362:**3 **373:**16 **380:**3,3,11, 13 **383:**1,6 **386:**15 **387:**14,19 **389:**20
**cases** [15] **250:**14,14 **264:** 6 **266:**18 **267:**17,17,18 **271:** 12 **279:**18 **282:**14 **286:**12,14 **290:**16 **293:**14 **349:**25
**cat** [5] **266:**22 **287:**22,23 **288:**2,5
**category** [1] **294:**18
**catholic** [1] **261:**10
**caught** [1] **348:**4
**causation** [1] **281:**19
**cause** [7] **265:**20 **281:**19 **282:**9,10 **283:**6 **389:**6,7
**caused** [9] **262:**16 **264:**2, 9 **276:**22 **277:**2 **282:**23 **290:** 6,10,12
**causes** [4] **263:**25 **265:**13 **266:**6 **281:**23
**causing** [1] **268:**23
**cell** [91] **299:**20 **300:**1,3,13, 14,19,22 **301:**15,18,19 **303:** 21,24 **304:**3,3,9,18,25 **305:**2, 3,4,5,6,8,17,20,20 **307:**2,3,4, 13,17,23 **308:**1,1,20 **314:**11, 12 **319:**23 **320:**1,3,19,22 **321:** 3,22 **322:**1,4 **323:**16 **325:**8, 10,12,15 **326:**1,13,23 **327:**2,6 **328:**2 **329:**3 **330:**17 **332:**22 **338:**22 **361:**2,4,14,21 **362:**22 **363:**6,9,17 **364:**11,14,15,21, 23 **365:**2,7,13,19 **366:**10 **373:** 7,8 **374:**11,12 **375:**3,21 **378:** 4,6,9,19,25 **379:**2
**center** [3] **262:**7 **263:**18 **266:**11
**centers** [1] **261:**10
**certain** [13] **285:**21 **286:** 24 **287:**13 **321:**3 **357:**22 **358:** 20 **359:**7 **363:**12 **366:**12 **373:** 14 **374:**15 **375:**1 **379:**24
**certainly** [2] **344:**3 **352:**9
**certainty** [1] **277:**1
**certificate** [1] **393:**1
**certified** [2] **260:**22,23
**certify** [1] **393:**2
**chain** [3] **321:**7,8 **361:**9
**challenged** [1] **276:**12
**challenging** [2] **273:**4 **276:**7
**chance** [7] **277:**23 **279:**10 **280:**22 **281:**5 **285:**23 **286:**16 **335:**13
**chances** [1] **277:**12
**change** [8] **264:**4,21 **275:** 6 **276:**13 **279:**15 **347:**12 **378:** 11,13
**changed** [3] **274:**21 **275:** 14 **378:**25
**changes** [4] **271:**4,5 **274:** 22 **275:**1
**charge** [8] **247:**8 **248:**9,11 **348:**18 **351:**3,5,6 **352:**6
**charter** [2] **252:**22,23
**chat** [1] **346:**21
**check** [2] **384:**5 **386:**5
**checked** [2] **272:**19 **309:** 24
**chest** [3] **271:**11,11,13
**chicago** [1] **294:**19
**chief** [5] **254:**6 **261:**9 **309:** 8 **344:**7 **389:**20
**child** [5] **266:**19,19,20,22, 23
**chitchat** [1] **346:**23
**chronic** [3] **276:**20 **277:** 23 **292:**5
**circuit** [3] **249:**21 **294:**20 **391:**6
**circulate** [1] **270:**11
**cited** [4] **248:**3 **249:**17 **294:** 18,21
**civil** [4] **246:**17,18 **250:**14 **382:**7
**claim** [9] **244:**17 **245:**18 **249:**19 **382:**8 **383:**22,22 **385:** 5,8 **387:**2
**claims** [5] **245:**15 **388:**4,5, 5 **389:**3
**clam** [1] **359:**20
**clarification** [1] **323:**17
**clarify** [1] **364:**14
**clarity** [2] **262:**18 **381:**3
**classify** [1] **263:**9
**clean** [1] **281:**9
**clear** [17] **248:**25 **264:**22 **270:**1 **276:**3 **278:**3 **280:**7 **281:**18 **302:**17 **303:**8 **305:**11 **348:**2 **349:**11 **351:**2 **365:**10 **370:**19 **382:**9 **386:**14
**clearer** [1] **366:**22
**clearly** [1] **271:**15
**clerk** [24] **254:**25 **255:**2,5,7, 12 **269:**20 **270:**4 **294:**3,10 **296:**10,12,16,20 **315:**16,18 **345:**3 **347:**4 **356:**8,10 **387:** 11,16,18,22,25
**client** [8] **279:**3 **315:**3 **346:** 19,21 **347:**2 **367:**1 **374:**8 **383:**11
**clients** [2] **353:**1,5
**close** [9] **245:**10 **248:**5 **276:**9 **279:**19,19 **379:**20,21 **381:**16 **387:**8
**closed** [7] **273:**2 **337:**23, 23 **338:**5,10 **364:**7,11
**closer** [1] **248:**1
**closing** [2] **281:**10 **352:**8
**cobble** [1] **348:**16
**coefficient** [1] **268:**5
**cognitive** [6] **272:**7,13 **274:**12 **275:**18,22 **277:**23
**coherent** [1] **264:**16
**cohort** [2] **285:**3,7
**collapse** [2] **264:**11 **385:** 16
**collapsed** [2] **271:**13 **389:**1

# Keyword Index


**collar** [1] **346:**13
**colleague** [1] **347:**20
**colleagues** [2] **346:**4,6
**collect** [1] **292:**6
**collection** [3] **261:**21 **262:**1 **269:**25
**college** [3] **255:**17,18 **258:**10
**collision** [1] **266:**5
**colloquial** [1] **248:**15
**color** [8] **271:**5 **343:**8 **345:**22 **352:**14,17,19,25 **354:**4
**colors** [2] **270:**2 **354:**21
**combative** [1] **330:**9
**combine** [1] **385:**2
**combined** [2] **255:**20 **287:**1
**come** [38] **245:**13 **248:**24 **249:**15 **264:**14,14,25 **276:**17 **291:**14 **292:**21 **299:**25 **300:**17 **302:**15 **308:**25 **316:**19 **327:**2 **331:**5,10,12,14 **332:**16 **333:**5 **336:**14 **337:**5,6,21 **342:**13 **354:**24 **357:**18 **360:**24 **362:**21 **368:**3 **374:**12 **375:**2 **376:**19 **386:**6 **389:**7 **390:**1 **391:**23
**comes** [3] **282:**3 **305:**19 **355:**4
**coming** [6] **265:**2 **304:**8 **305:**6,16 **365:**7,12
**command** [1] **357:**7
**commanding** [1] **297:**24
**comment** [1] **390:**14
**committed** [10] **244:**24 **245:**4,25 **246:**15 **249:**19 **313:**11 **318:**13 **347:**8,23 **381:**15
**common** [11] **244:**17 **273:**9,19 **274:**10 **281:**23 **286:**13 **302:**6 **321:**23 **383:**1 **384:**3 **387:**2
**commotion** [3] **325:**19 **326:**11 **327:**3
**communal** [1] **300:**25
**communicated** [1] **358:**8
**companies** [2] **293:**10,12
**compared** [4] **247:**24 **285:**16,20,25
**compensatory** [2] **348:**18 **388:**7
**complained** [2] **272:**6 **309:**8
**complaining** [1] **276:**1
**complaint** [3] **308:**20,23 **384:**13
**complaints** [1] **275:**25
**complete** [1] **283:**6
**completed** [6] **255:**20 **258:**4,7,14 **259:**17 **260:**11
**completely** [1] **365:**14
**complicated** [1] **348:**3
**complications** [1] **262:**1
**complied** [1] **358:**25
**component** [1] **266:**9
**components** [1] **288:**4
**computer** [1] **376:**23
**computers** [1] **364:**18
**concept** [1] **286:**18
**concern** [1] **249:**16
**concerned** [2] **326:**15 **329:**7
**concerning** [1] **381:**20
**concerts** [1] **348:**20
**conclude** [3] **371:**24 **380:**2,11
**concluded** [1] **244:**15
**concludes** [1] **379:**18
**conclusion** [6] **268:**3 **276:**19 **308:**25 **337:**21,25 **347:**6
**conclusions** [2] **273:**8 **276:**18
**concrete** [3] **279:**3 **282:**22 **283:**15
**concretized** [2] **282:**1 **283:**2
**concussion** [26] **262:**15 **263:**4,8,10,17 **265:**6 **266:**9,11 **268:**13 **273:**10,20 **274:**4 **275:**21 **276:**20,21 **277:**15,21,25 **278:**1 **280:**14 **285:**9,17,19,21 **286:**1,3
**concussions** [2] **340:**18,19
**condition** [5] **263:**25 **268:**16,25 **276:**18 **288:**19
**conditions** [1] **289:**16
**conduct** [3] **244:**21 **246:**12 **249:**23
**conducting** [3] **317:**19 **332:**13,25
**confer** [3] **345:**3 **387:**16 **388:**1
**conference** [2] **351:**3,5
**confident** [2] **280:**20,23
**conflicts** [2] **350:**22,24
**confused** [2] **264:**15 **266:**20
**confuses** [1] **346:**7
**confusing** [4] **385:**15,23,24 **386:**1
**confusion** [2] **264:**5,23
**connect** [1] **280:**4
**connoisseurship-level** [1] **251:**12
**conscious** [2] **305:**24 **306:**7
**consciousness** [8] **264:**6,7,24 **265:**4 **269:**8,9,12 **278:**2
**consent** [1] **254:**17
**consequences** [4] **260:**1 **261:**25,25 **281:**15
**consider** [10] **265:**9,23 **279:**12,21 **281:**8 **283:**23 **350:**6 **370:**21 **371:**7 **372:**7
**considered** [3] **272:**16,18 **381:**17
**considering** [2] **350:**16 **352:**23
**consistent** [3] **318:**16 **347:**20 **369:**18
**consists** [1] **262:**8
**constantly** [1] **273:**15
**constituted** [1] **259:**20
**constitution** [1] **283:**14
**constitutional** [2] **281:**24 **385:**1
**constraints** [1] **250:**7
**contact** [1] **263:**23
**contained** [1] **361:**21
**contains** [4] **271:**14 **322:**22 **360:**6 **362:**8
**contemplated** [1] **312:**22
**context** [4] **292:**2 **369:**4,7 **371:**17
**continuation** [1] **254:**6
**continue** [6] **261:**14 **274:**7 **275:**15 **306:**19 **324:**6 **366:**6
**continued** [1] **261:**3
**continues** [2] **274:**5 **372:**15
**contracted** [1] **252:**25
**contradict** [1] **371:**13
**contrary** [1] **347:**14
**control** [3] **262:**8 **263:**18 **266:**11
**conversation** [11] **301:**19,22 **302:**3 **303:**24 **308:**3 **312:**2 **324:**20 **336:**21 **346:**22 **363:**5 **391:**19
**conversations** [1] **302:**12
**convulsion** [3] **264:**8 **269:**8,12
**cooperate** [2] **309:**14 **347:**2
**cooperative** [5] **320:**14,17 **321:**16,19 **360:**23
**coordination** [1] **273:**13

# Keyword Index


**copies** [2] **352**:17 **387**:24
**copy** [1] **387**:21
**cord** [1] **258**:25
**corner** [1] **357**:25
**corporate** [2] **246**:16 **346**:12
**corporation** [1] **246**:14
**corporations** [1] **246**:10
**correct** [45] **248**:20 **260**:5 **262**:5,20 **271**:24 **274**:17 **275**:16 **283**:11 **290**:7,8,11 **301**:2,11,21 **303**:4,23 **304**:1 **308**:19 **309**:12,13,16,18 **310**:1 **314**:15,16 **316**:18 **317**:15,16 **319**:2 **322**:10 **329**:10 **354**:5 **356**:25 **357**:17 **359**:2 **365**:14 **367**:8 **376**:6,8 **377**:18,24 **380**:3 **384**:20,23 **393**:2
**correctly** [4] **300**:24 **323**:25 **356**:24 **364**:20
**correlated** [1] **267**:12
**correlation** [8] **266**:24 **267**:3,4,14,14,16,25 **268**:5
**corridor** [2] **364**:15,16
**couldn't** [6] **301**:19,21 **303**:24 **322**:6 **324**:16 **327**:1
**could've** [1] **309**:24
**counsel** [4] **346**:5 **352**:20 **353**:6 **388**:1
**count** [2] **249**:10 **386**:5
**counter** [1] **289**:24
**counting** [1] **384**:9
**counts** [1] **387**:1
**county** [52] **244**:21 **245**:2 **248**:2 **250**:8,10,11,14,14,16,20 **251**:8,14,25 **252**:11,14,17,19,20,21,22,25 **294**:17 **297**:2,16 **316**:9,10 **331**:6 **339**:4 **347**:9,13,21 **348**:7,9 **349**:5 **350**:9,19 **357**:4,5 **382**:4 **384**:10,16 **385**:5,8,17,19,22 **386**:19 **388**:2,18 **389**:2,6 **391**:13
**county's** [1] **355**:6
**course** [7] **254**:13 **270**:7 **337**:18 **353**:12 **372**:15 **381**:8 **388**:16
**courtroom** [9] **252**:8 **253**:2 **254**:2 **295**:7 **296**:2 **344**:19 **355**:9 **356**:2 **380**:16
**court's** [1] **270**:7
**covered** [2] **247**:20 **259**:14
**covers** [1] **258**:21
**crack** [1] **351**:9
**crafting** [1] **292**:15
**created** [1] **252**:22
**creates** [1] **386**:6
**credibility** [2] **312**:10 **313**:12
**credible** [2] **263**:21 **264**:1
**credit** [1] **332**:21
**crime** [4] **246**:16 **346**:11,12,13
**criminal** [3] **246**:10,17 **250**:13
**criminally** [1] **246**:11
**criteria** [6] **263**:16,19 **264**:18,20 **265**:1 **269**:6
**cross** [1] **280**:1
**cross-exam** [1] **335**:8
**cross-examination** [7] **283**:22 **288**:9,14 **314**:1 **331**:1 **335**:6 **376**:3
**cross-examiner** [1] **294**:23
**cuff** [1] **321**:13
**cuffed** [10] **321**:4,6,21 **327**:8,13 **330**:17 **359**:17 **361**:4,7,8
**cuffs** [2] **321**:8,9
**curative** [1] **283**:25
**curious** [2] **279**:6 **354**:7
**current** [3] **316**:1 **356**:21 **390**:20
**currently** [3] **316**:6 **344**:9 **357**:1
**custodial** [1] **362**:12
**cut** [2] **374**:2 **392**:3
**cutout** [1] **300**:8


## D


**d-a** [1] **356**:12
**damage** [4] **266**:8 **279**:12 **348**:10 **386**:14
**damages** [31] **279**:6 **281**:14,19 **282**:11,12 **292**:1,7,15 **348**:6,13,18,21,24 **349**:1,14 **350**:9,12,20,21 **381**:20,24 **382**:3 **384**:1,8 **386**:15,19 **387**:1,3 **388**:8,9,11
**dan** [1] **354**:24
**daniel** [3] **356**:9,12,13
**d-a-n-i-e-l** [1] **356**:13
**dark** [2] **272**:20,24
**darker** [1] **271**:5
**darkness** [1] **272**:21
**date** [6] **275**:24 **288**:16 **378**:18 **393**:7,10,13
**day** [19] **247**:5 **251**:13 **274**:2 **275**:6 **277**:3 **284**:1 **303**:6 **314**:4,6,8 **342**:24 **352**:5 **354**:11 **357**:12,16 **371**:20 **379**:22,23 **380**:6
**days** [2] **270**:21 **379**:20
**day-to-day** [2] **261**:17 **276**:11
**dazed** [1] **264**:23
**dead** [1] **245**:21
**deadly** [1] **266**:17
**deal** [1] **384**:6
**dealing** [2] **281**:22 **287**:24
**dealt** [1] **349**:25
**december** [4] **272**:4 **274**:18 **275**:9 **288**:15
**decide** [2] **283**:24 **304**:17
**decided** [1] **317**:20
**decision** [7] **282**:24 **293**:19 **321**:12 **384**:4,7 **385**:3,18
**declared** [1] **261**:11
**dedicated** [1] **261**:18
**deep** [1] **247**:13
**deeper** [2] **271**:7 **292**:12
**defendant** [7] **282**:24 **346**:19 **349**:3 **362**:10 **384**:1 **386**:6 **388**:8
**defendants** [10] **288**:12 **290**:21 **294**:17 **350**:13 **385**:21 **386**:8,13,13,18 **387**:2
**defendants'** [1] **355**:5
**defendant's** [1] **362**:8
**defenders** [1] **282**:20
**defense** [8] **293**:4,6 **345**:6,12 **352**:3,4 **380**:3 **392**:1
**defined** [1] **262**:7
**definitely** [1] **387**:17
**definitive** [1] **247**:8
**degrade** [1] **281**:6
**degree** [8] **255**:24,25,25 **259**:24 **266**:7,12,22 **276**:25
**degrees** [1] **265**:22
**deliberate** [1] **244**:10
**deliberately** [1] **283**:4
**deliberations** [1] **244**:16
**delighted** [1] **352**:9
**demeanor** [10] **319**:4,13 **320**:12 **328**:5 **330**:1,5 **359**:19 **360**:22 **375**:5 **378**:24
**dementia** [19] **277**:16,24 **278**:2 **279**:7,15 **280**:4,13 **283**:20 **285**:10,18,22,24 **286**:4,9,13,18,22 **287**:4 **381**:23
**demonstrate** [1] **338**:1
**denied** [3] **312**:7,11,15
**denies** [1] **372**:19
**deny** [1] **372**:16
**department** [3] **297**:2 **316**:9 **357**:4
**depending** [1] **298**:3
**depends** [1] **291**:1
**depict** [1] **353**:3
**deposition** [7] **322**:22 **324**:3 **360**:6 **367**:5,17 **373**:16,18
**depositions** [1] **366**:17
**depressing** [1] **293**:1

# Keyword Index

**depression** [5] **274:**11, 25 **276:**2 **289:**1,4
**deputy** [17] **252:**8,14 **253:** 2 **254:**2 **295:**7 **296:**2,4,5,25 **297:**1,14 **314:**3,23 **344:**19 **355:**9 **356:**2 **380:**16
**describe** [9] **274:**8 **300:**2 **304:**7 **325:**21 **327:**10 **330:**5, 8 **365:**8 **375:**5
**described** [2] **266:**10 **299:**24
**describes** [1] **274:**4
**description** [1] **318:**14
**designed** [1] **247:**22
**desk** [4] **300:**1,12 **301:**1 **309:**19
**desks** [4] **299:**16,17,24 **364:**19
**detail** [2] **259:**19 **263:**3
**detained** [1] **321:**4
**detectives** [18] **298:**1,5,8 **299:**18 **303:**6,7,8 **323:**20,22 **324:**10 **326:**19 **327:**2 **329:**2 **361:**17,20 **362:**25 **363:**16 **374:**14
**detectives'** [1] **301:**1
**detective's** [2] **320:**9 **322:**2
**determinable** [1] **279:** 10
**determine** [3] **272:**3 **276:** 22 **347:**22
**developed** [1] **292:**5
**developing** [3] **277:**16, 23 **278:**2
**diagnose** [1] **279:**24
**diagnosed** [1] **277:**10
**diagnoses** [1] **292:**4
**diagnostic** [2] **258:**23 **274:**3
**diagnostics** [1] **259:**23
**diagonally** [1] **270:**17
**died** [1] **264:**12
**difference** [3] **250:**12 **270:**13 **384:**8
**different** [27] **246:**18 **250:** 15,16 **261:**21 **263:**8,10 **265:** 21,24 **267:**1,11 **268:**25 **269:** 10 **270:**9 **271:**23 **280:**2 **282:** 15,19 **285:**5 **289:**15 **320:**13 **347:**13 **349:**6,8 **361:**6 **382:** 17 **384:**7 **385:**25
**difficult** [1] **273:**15
**difficulties** [1] **273:**1
**difficulty** [2] **272:**25 **273:** 3
**digest** [2] **351:**17,22
**direct** [15] **251:**16 **255:**13 **262:**8,16 **265:**14,19 **270:**16 **290:**5,7 **296:**22 **306:**3 **315:** 22 **335:**2 **347:**14 **356:**17
**direction** [1] **266:**2
**directly** [3] **350:**19 **361:**24 **371:**14
**disagree** [3] **246:**22 **283:** 12 **313:**5
**disappears** [1] **271:**6
**disciplinary** [2] **312:**5,24
**discrepancy** [2] **370:**4, 12
**discuss** [4] **259:**6 **291:**17 **344:**18 **380:**13
**discussed** [2] **278:**4 **303:** 21
**disease** [3] **262:**8 **263:**18 **266:**11
**diseases** [1] **258:**24
**dismissed** [1] **354:**11
**dismissing** [1] **380:**9
**disorder** [1] **288:**21
**display** [1] **269:**15
**displayed** [2] **269:**20,22
**dispute** [2] **313:**9 **389:**12
**disputing** [1] **245:**17
**distant** [1] **246:**8
**distinctly** [1] **302:**1
**district** [4] **250:**8,13,17 **309:**8
**division** [5] **320:**6,10 **321:** 24 **322:**2 **325:**3
**dizziness** [2] **274:**10 **276:** 1
**dizzy** [1] **272:**7
**docket** [4] **247:**15 **351:**10, 14 **383:**12
**doctor** [12] **255:**15 **260:**2 **270:**1 **279:**23 **280:**5 **285:**2 **288:**7,11 **290:**5,15 **291:**3,6
**doctorate** [1] **255:**25
**doctors** [1] **266:**21
**doctrine** [3] **245:**2 **246:**11 **385:**11
**document** [1] **335:**13
**documents** [3] **243:**1,2,3
**doing** [4] **259:**16 **319:**25 **351:**3 **356:**20
**domestic** [2] **332:**13 **358:** 5
**done** [7] **283:**22,25 **342:**7, 23,24 **385:**18 **388:**23
**door** [24] **299:**14,23,25 **300:**2,4,5,17 **312:**6,24,25 **327:**12,12 **364:**7,8,8,11,16,17, 21,21,22,23 **367:**20 **373:**24
**doors** [1] **364:**24
**double** [6] **285:**11,13,18, 20 **384:**1,9
**doubled** [1] **285:**25
**double-vision** [1] **273:** 16
**doubt** [1] **283:**17
**down** [17] **247:**6 **271:**4,20 **291:**6 **300:**17,22 **308:**17 **315:** 9 **321:**24 **322:**2,12,17 **323:**10 **340:**23 **379:**14 **381:**13 **384:**2
**downstairs** [7] **309:**20, 21 **319:**23 **320:**1,4 **361:**7 **375:**21
**dramatic** [1] **264:**17
**drastic** [1] **270:**13
**draw** [1] **273:**8
**drawn** [1] **320:**19
**drill** [1] **247:**5
**drilling** [1] **381:**13
**drive** [1] **357:**25
**driven** [1] **283:**13
**driver's** [1] **358:**15
**driving** [2] **318:**20 **331:**6
**during** [12] **251:**23 **319:**10 **322:**9 **325:**18 **329:**21 **330:**4 **340:**7 **360:**22 **363:**5 **367:**17 **373:**18 **379:**22
**duty** [1] **319:**23
**dying** [1] **293:**5

## E

**each** [6] **273:**17 **384:**9 **385:** 3 **386:**5,5 **390:**10
**ear** [5] **265:**11 **271:**9 **273:** 22,22,25
**earlier** [7] **271:**10,15 **285:** 25 **314:**3,9 **332:**14 **380:**5
**early** [6] **277:**16,23 **286:**14 **297:**19 **342:**23 **344:**13
**ears** [1] **270:**24
**easier** [1] **390:**2
**easy** [1] **347:**25
**education** [2] **255:**17 **259:**7
**effect** [4] **348:**8 **374:**3 **376:** 18 **377:**6
**effectively** [2] **383:**1 **385:** 18
**effectuate** [1] **357:**21
**efficiency** [1] **344:**3
**efficiently** [1] **344:**5
**eight** [3] **256:**2,3 **285:**13
**eighty** [1] **273:**14
**either** [25] **244:**25 **248:**3, 10 **249:**3,5 **262:**8,16 **263:**21 **264:**4 **265:**6,14 **279:**4 **294:** 13 **306:**15 **321:**7 **327:**16 **336:** 20 **352:**21 **354:**17 **362:**2 **375:** 21 **383:**14 **385:**2,17 **389:**25
**electronic** [1] **393:**3
**elements** [2] **282:**20 **383:**

# Keyword Index


1
**elevated** [2] **279**:7 **280**:12
**elevation** [1] **280**:13
**elmo** [1] **269**:14
**email** [5] **351**:11 **353**:7,23, 25 **384**:24
**embarrass** [1] **269**:18
**emerged** [1] **312**:4
**emergency** [2] **266**:19 **307**:7
**employed** [2] **316**:6 **357**: 1
**employee** [7] **244**:21 **245**:23 **246**:15 **252**:12,16 **347**:9 **386**:22
**employees** [1] **246**:13
**employer** [2] **249**:21 **252**: 18
**employment** [1] **245**:24
**ems** [4] **307**:4 **329**:9,12 **375**:13
**emts** [1] **375**:13
**encounter** [1] **357**:24
**end** [8] **244**:15 **264**:19 **344**: 6 **349**:16 **358**:3 **364**:16 **371**: 20 **380**:2
**ended** [1] **261**:11
**ends** [5] **284**:7 **313**:24 **335**: 17 **343**:9 **372**:22
**enforcement** [1] **246**:9
**engage** [2] **340**:6 **375**:17
**engaged** [1] **244**:21
**engaging** [1] **362**:12
**enough** [7] **250**:21 **276**: 13 **283**:5 **286**:10,11,23 **303**: 17
**enter** [1] **362**:22
**entered** [6] **307**:14 **325**: 13 **353**:5 **363**:20 **378**:25 **379**: 2
**entering** [3] **352**:25 **363**: 19 **365**:13
**enters** [3] **254**:1 **296**:1 **356**:1
**entire** [3] **260**:14,15,18
**entirely** [1] **375**:8
**entrance** [1] **309**:22
**epilepsy** [3] **268**:16,18 **269**:1
**episodes** [2] **268**:19 **269**: 1
**equilibrium** [1] **274**:11
**equivalent** [2] **257**:3 **293**: 13
**escort** [1] **361**:13
**especially** [1] **386**:24
**essentially** [3] **282**:7 **358**:10 **385**:16
**establish** [1] **332**:1
**estimate** [1] **298**:25
**evaluate** [2] **271**:22 **274**: 15
**evaluation** [3] **258**:24 **259**:22,23
**evaluations** [1] **272**:1
**even** [21] **244**:22,23 **245**:3, 21 **266**:10 **278**:1 **281**:22 **282**: 1 **286**:13,14,19 **293**:21 **312**: 21 **346**:7 **347**:22 **348**:23 **350**: 20 **355**:6 **386**:6 **387**:4 **389**: 19
**evening** [2] **352**:10 **380**: 14
**event** [2] **264**:1 **342**:11
**events** [2] **366**:17,20
**eventually** [1] **248**:10
**everybody** [2] **244**:2 **348**: 11
**everyone** [3] **249**:8 **286**: 24 **322**:17
**everything** [2] **338**:3 **381**:7
**evidence** [27] **244**:12,13 **254**:16,20,21 **269**:23 **270**:8 **271**:16 **294**:16 **331**:22 **345**: 25 **352**:21,25 **353**:5 **367**:24 **371**:21,24 **372**:3,5,6,8,15,17 **384**:16 **389**:13,19,20
**exact** [4] **312**:3 **357**:22 **363**:4 **365**:10
**exactly** [15] **282**:23 **284**:4 **285**:18 **290**:19 **304**:22 **312**:7 **324**:17 **362**:19 **365**:22 **369**: 17 **374**:15 **375**:1 **383**:5 **384**: 2 **391**:23
**exam** [1] **287**:17
**examination** [10] **255**: 13 **272**:11 **276**:5 **290**:5 **296**: 22 **314**:25 **315**:22 **339**:1 **356**: 17 **378**:22
**examinations** [1] **275**: 18
**examine** [1] **275**:10
**examined** [2] **272**:10 **288**:14
**example** [4] **250**:5 **265**: 10 **281**:3 **308**:13
**exceeds** [1] **265**:4
**excellent** [2] **245**:12 **281**: 5
**except** [1] **388**:17
**exception** [1] **294**:18
**excessive** [3] **383**:2 **385**: 1,21
**exclusively** [2] **285**:8 **346**:12
**excuse** [4] **317**:23 **329**:15 **331**:12 **336**:14
**exhibit** [1] **270**:11
**exhibits** [8] **254**:16,20,21 **345**:4,6,11,13 **389**:16
**existence** [1] **289**:9
**exit** [3] **309**:22 **326**:1 **373**:7
**exited** [2] **326**:5 **373**:19
**exits** [4] **291**:22 **326**:12 **345**:1 **381**:1
**expectancy** [5] **286**:20 **287**:2,3,6,9
**expectation** [1] **380**:1
**expected** [2] **287**:8 **388**: 15
**experience** [2] **255**:16 **267**:22
**experiences** [1] **269**:1
**expertise** [1] **340**:17
**explain** [9] **258**:20 **259**:15 **262**:6 **268**:14 **287**:19 **318**:10 **348**:1 **362**:7 **384**:25
**explained** [1] **340**:13
**explanations** [1] **266**:11
**expressed** [2] **285**:10 **309**:14
**expresses** [1] **268**:5
**expressly** [1] **313**:8
**extended** [1] **361**:9
**extension** [5] **262**:11,17 **263**:22,24 **265**:14
**extent** [2] **267**:12 **277**:12
**external** [7] **266**:12,21 **267**:6,7,13,19 **268**:2
**externally** [1] **266**:25
**extremely** [2] **273**:9 **288**: 4
**eye** [8] **265**:10 **270**:17 **272**: 19 **273**:7,13,17,20 **348**:4
**eyes** [14] **272**:20,22,22 **273**: 2,11,15,18,22,24 **276**:9 **337**: 22,23 **338**:4,8
**eyewitness** [1] **309**:15

## F

**face** [1] **266**:14
**fact** [12] **273**:23 **277**:2 **280**: 18 **316**:24 **317**:22 **319**:25 **348**:9,20 **350**:2,4 **360**:19 **362**:22
**facts** [2] **386**:20,24
**fai** [1] **393**:12
**failure** [2] **332**:1 **388**:4
**fair** [6] **271**:23 **281**:2 **303**: 17 **327**:17 **339**:19 **351**:7
**fairly** [2] **347**:25 **375**:7
**faith** [1] **393**:13
**fake** [1] **383**:11
**fall** [1] **375**:24
**falling** [1] **276**:13

# Keyword Index


**falls** [2] **287:**25 **294:**17
**familiar** [1] **257:**2
**far** [7] **245:**17 **246:**24 **279:**5, 7 **296:**6 **318:**4 **322:**1
**fast** [2] **276:**13 **284:**3
**father** [1] **318:**23
**favor** [1] **251:**21
**favorable** [2] **249:**2 **282:**24
**fear** [1] **292:**7
**federal** [13] **262:**23 **279:**2 **280:**21 **281:**21,24 **282:**1,5,25 **283:**4,9 **382:**7 **383:**22 **388:**5
**feedback** [1] **388:**16
**feels** [1] **279:**4
**feet** [4] **298:**25 **299:**11 **322:**3 **327:**12
**felt** [1] **272:**6
**few** [9] **264:**13 **277:**19 **289:**23 **334:**4 **349:**9 **365:**5,18 **374:**16 **379:**8
**fewer** [1] **369:**7
**fibers** [2] **265:**16,21
**field** [3] **258:**20,23 **259:**9
**fifteen** [2] **286:**8 **322:**3
**fight** [1] **390:**12
**figure** [1] **348:**13
**file** [1] **354:**7
**filing** [2] **364:**18 **372:**3
**filling** [2] **282:**8 **283:**9
**finances** [1] **350:**2
**find** [8] **246:**21 **254:**13 **277:**11 **281:**17,20 **304:**13 **348:**6 **385:**17
**finding** [1] **349:**16
**fine** [4] **247:**6 **248:**17 **270:**12 **316:**5
**finish** [2] **258:**18 **283:**19
**finished** [1] **260:**25
**firm** [2] **252:**10 **293:**6
**first** [53] **248:**13 **255:**11 **258:**4,9 **259:**23 **263:**11 **264:**20 **266:**3 **272:**1,4 **274:**17 **278:**4 **280:**10,14 **286:**7,21 **287:**17 **288:**14 **297:**18 **299:**14 **300:**18 **302:**18,20 **304:**23 **307:**12,13 **315:**20 **317:**3 **318:**21 **319:**20,22 **322:**22 **323:**16 **327:**23 **328:**8,8,10 **330:**11 **332:**1 **342:**2 **346:**22 **353:**19 **356:**12,13 **357:**5,24 **359:**14, 15 **365:**5 **370:**16 **378:**10 **381:**11 **382:**15
**first-degree** [1] **263:**9
**fischetti** [1] **346:**16
**fit** [1] **318:**14
**five** [5] **251:**4,19,24 **291:**18 **346:**22
**fixing** [1] **348:**6
**flagged** [1] **389:**19
**flail** [1] **375:**23
**flexion** [5] **262:**10,17 **263:**22,24 **265:**14
**floor** [21] **298:**20,22 **299:**1, 8 **305:**23 **321:**3,22 **327:**7 **328:**20 **330:**11,21 **337:**4,7 **340:**4,5 **359:**15 **374:**18,19,23, 23 **378:**18
**focus** [3] **249:**23 **329:**5 **379:**22
**focused** [3] **258:**14 **260:**12 **282:**25
**focuses** [1] **259:**18
**focusing** [1] **280:**17
**follow** [1] **363:**6
**followed** [2] **277:**22 **363:**8
**following** [4] **244:**9 **260:**21 **261:**13 **324:**6
**follow-up** [2] **288:**13 **314:**24
**foot** [2] **273:**2 **276:**8
**footing** [1] **279:**21
**footnote** [1] **384:**24
**force** [4] **259:**25 **261:**24 **383:**2 **385:**1
**force/battery** [1] **385:**22
**forecloses** [1] **385:**18
**foregoing** [1] **393:**2
**foreign** [1] **257:**2
**foreseeable** [1] **313:**14
**forget** [1] **297:**19
**forgetting** [1] **383:**4
**form** [12] **285:**8,8 **355:**5,8 **382:**6,20 **383:**20,21 **384:**15 **386:**25 **388:**15 **391:**23
**formality** [1] **370:**25
**formally** [1] **254:**15
**former** [1] **292:**16
**forms** [3] **287:**22 **291:**20 **387:**4
**forth** [2] **339:**19 **379:**6
**forward** [4] **262:**12 **346:**23 **347:**1 **353:**9
**forwarded** [1] **309:**2
**found** [3] **249:**16 **340:**3 **385:**21
**four** [7] **247:**12 **285:**13 **301:**7 **303:**5,7 **323:**3 **360:**9
**fourth** [2] **269:**23 **270:**3
**france** [1] **255:**21
**fraud** [1] **246:**17
**fraudulent** [1] **246:**12
**freestat** [1] **383:**14
**frequency** [1] **285:**25
**friend** [2] **251:**22 **252:**1
**front** [16] **247:**2 **273:**2 **276:**9 **299:**15 **302:**20 **309:**19 **318:**24 **322:**21 **331:**17 **335:**13 **347:**16 **360:**4 **365:**20 **367:**20 **373:**24 **374:**18
**full** [1] **246:**18
**fully** [2] **274:**6 **372:**19
**function** [2] **272:**7 **280:**13
**fundamental** [1] **269:**6
**further** [16] **264:**5 **281:**6 **288:**7 **289:**22 **291:**3 **300:**15 **313:**6,19,22 **315:**7 **330:**23 **340:**20,22 **370:**6 **379:**12,13
**future** [12] **277:**8,12 **279:**8, 10,12 **280:**4 **281:**7,8 **292:**1,7, 14 **381:**20
**fuzzy** [1] **273:**16


## G


**game** [1] **252:**2
**gap** [3] **282:**8 **283:**9 **357:**25
**g-a-r-i-b** [1] **315:**21
**garibotto** [8] **315:**10,17, 20 **357:**15 **358:**7,21 **359:**21 **377:**3
**gave** [9] **322:**23 **323:**12 **346:**10 **367:**5,8 **369:**8 **372:**2 **373:**16 **383:**2
**general** [7] **249:**9 **288:**21 **289:**9,12 **349:**25 **364:**18 **375:**5
**generally** [7] **320:**7 **321:**5, 15 **344:**4 **349:**20 **364:**24 **370:**24
**gentlemen** [4] **254:**4 **291:**16 **344:**1 **379:**19
**geographical** [1] **334:**11
**gestured** [1] **326:**6
**get-go** [1] **313:**15
**gets** [2] **249:**3 **281:**3
**getting** [9] **247:**7 **279:**5 **302:**8 **334:**8 **336:**8 **344:**6 **351:**24 **381:**16 **383:**24
**give** [13] **268:**8 **283:**25 **289:**23 **315:**15 **328:**13 **335:**13 **342:**9 **344:**13,15 **356:**7 **374:**4 **386:**20 **387:**10
**given** [5] **249:**10 **287:**2 **317:**7 **336:**9 **388:**18
**gives** [1] **282:**4
**goal** [1] **317:**18
**golzad** [2] **255:**1,4
**g-o-l-z-a-d** [2] **255:**6,10
**got** [14] **244:**3 **248:**5 **284:**2 **292:**22 **301:**25 **305:**5 **331:**10 **337:**1 **339:**22 **344:**7 **354:**2 **382:**17 **384:**4 **392:**3
**gotten** [2] **337:**3 **391:**6
**governed** [1] **281:**24

# Keyword Index


**government** [2] **252:**12, 16
**grab** [2] **254:**10 **346:**4
**grade** [1] **263:**14
**grades** [1] **263:**6
**graduate** [1] **258:**5
**graduated** [1] **258:**2
**granted** [1] **262:**25
**great** [3] **295:**3 **357:**1 **391:**24
**green** [1] **354:**13
**greenaway** [1] **387:**19
**greenway** [1] **387:**13
**greenwood** [1] **387:**13
**grew** [1] **246:**9
**griffin** [1] **388:**2
**ground** [1] **375:**24
**group** [3] **292:**3 **361:**23,23
**grows** [1] **287:**4
**guess** [9] **261:**13 **281:**9 **286:**2 **307:**3 **343:**8 **349:**16, 23 **356:**16 **391:**2
**guidance** [1] **348:**25
**guy** [2] **315:**5 **381:**4

## H

**hairline** [1] **270:**18
**half** [9] **244:**15,18 **277:**20 **285:**16,17 **307:**10,21 **359:**9, 10
**hallway** [1] **300:**22
**hamilton** [1] **393:**7
**hand** [10] **248:**6 **254:**25 **296:**10 **315:**16 **321:**22 **324:**2 **327:**13,13 **356:**8 **361:**8
**handcuff** [4] **321:**7,7,10 **361:**8
**handcuffs** [4] **321:**17 **359:**2 **376:**14,17
**hands** [16] **308:**13 **309:**1 **314:**22 **321:**6,12,13 **326:**6 **345:**15,18,24 **365:**19 **367:**19, 20 **373:**9,23,24
**hang** [1] **390:**9
**hanging** [1] **327:**15
**happen** [8] **248:**20 **265:**23 **268:**19,22 **273:**10 **277:**11 **279:**10 **304:**2
**happened** [8] **276:**14 **308:**20 **326:**8,18 **329:**24 **365:**16 **366:**15,17
**happening** [2] **266:**25 **326:**13
**happens** [7] **262:**2 **263:**23 **266:**18 **270:**23 **273:**21 **350:**23 **389:**2
**happy** [8] **279:**16,16,21 **280:**10 **369:**16 **370:**5,13 **389:**25
**hard** [1] **336:**25
**hardest** [1] **379:**21
**hardin** [1] **293:**8
**hardly** [1] **274:**22
**harm** [5] **292:**7,15 **340:**11 **381:**20,20
**harms** [1] **292:**1
**hated** [1] **292:**24
**head** [29] **262:**9,9,9,11 **263:**21 **264:**2 **265:**13,14,18 **266:**2, 3 **268:**23 **269:**6,7 **271:**10,13, 14,16 **276:**23 **277:**3 **290:**10 **309:**2 **327:**12 **345:**18,24 **365:**20 **367:**21 **373:**25 **375:**20
**headaches** [4] **272:**6 **274:**10,24 **276:**1
**headbutt** [1] **328:**16
**headbutted** [1] **306:**22
**head-on** [1] **266:**5
**healthy** [1] **268:**21
**hear** [27] **259:**3 **294:**7 **301:**17,19,20,21,22,25 **302:**1,3,8, 11 **303:**24 **304:**10 **322:**4,6,7 **324:**18 **325:**18 **344:**12 **365:**2, 4,6 **376:**9 **378:**16 **381:**17 **389:**25
**heard** [5] **326:**11,16 **345:**15 **365:**5,16
**hearing** [3] **304:**6,8 **353:**1
**hearsay** [1] **377:**9
**held** [2] **347:**21 **348:**20
**helmet** [1] **263:**24
**help** [5] **250:**23,24 **260:**2 **320:**21 **381:**12
**helped** [1] **328:**20
**helping** [1] **275:**3
**high** [1] **249:**9
**higher** [7] **276:**13 **277:**16 **278:**2 **285:**22 **286:**16,16 **349:**7
**highly** [1] **353:**1
**himself** [4] **312:**15 **340:**4, 5,11
**hired** [1] **316:**11
**histories** [1] **312:**5
**history** [3] **263:**21 **264:**1 **312:**24
**hit** [6] **244:**25 **305:**9 **306:**22 **328:**15 **367:**1 **375:**20
**hits** [4] **262:**12,13 **266:**3 **277:**5
**hitting** [5] **262:**9,9 **290:**10 **370:**14 **374:**7
**hold** [7] **245:**1 **246:**14 **278:**6 **291:**10 **294:**3 **370:**7 **384:**12
**holding** [22] **273:**3 **299:**20 **300:**1,2,13,14,18,22 **301:**15,17,19 **303:**21,24 **304:**3,3, 25 **305:**2 **321:**3 **338:**21 **361:**2,4 **362:**14
**hole** [1] **300:**8
**home** [5] **247:**1 **317:**14 **318:**1,4 **347:**16
**honest** [1] **340:**2
**honestly** [1] **292:**10
**honor** [42] **245:**6 **247:**10 **249:**14 **262:**21,24 **263:**1 **283:**24 **289:**8 **295:**1 **296:**3,14 **306:**18 **311:**2 **312:**14 **313:**21 **315:**8,13 **331:**19 **333:**7 **335:**11 **340:**22,24 **341:**4 **345:**25 **347:**19 **348:**15,21 **349:**10 **352:**16 **353:**8 **355:**2 **356:**3 **368:**1 **369:**2,6 **370:**5 **377:**18 **379:**13,15 **390:**4 **391:**12 **392:**2
**hope** [1] **254:**4
**hospital** [6] **258:**5,11 **329:**16 **336:**15 **339:**17 **377:**5
**hospitals** [2] **261:**11 **277:**17
**hour** [9] **264:**16 **291:**1 **307:**10,21 **310:**1 **342:**6 **344:**11 **359:**9,10
**hours** [1] **381:**10
**house** [3] **322:**14 **340:**5 **358:**7
**housekeeping** [1] **254:**14
**however** [3] **245:**21 **248:**11 **352:**21
**huge** [1] **349:**15
**humans** [1] **286:**9
**hung** [1] **245:**14
**hunt** [1] **393:**10
**hurley** [1] **387:**11
**hyper** [1] **247:**23
**hypo** [1] **244:**23
**hypothetical** [4] **245:**14 **265:**9 **350:**24 **372:**18
**hypothetically** [1] **244:**11

## I

**i.e** [1] **372:**2
**ib** [1] **354:**4
**ice** [1] **276:**12
**idea** [3] **248:**8 **283:**14 **354:**19
**ideally** [1] **351:**16
**identical** [2] **262:**2 **275:**13
**identification** [1] **294:**18
**identify** [2] **245:**21 **249:**5
**identity** [2] **347:**10 **381:**15

# Keyword Index


**ii** [1] **384:**14
**imagine** [3] **271:**11 **292:**25 **347:**5
**imaging** [2] **287:**22 **288:**1
**immediately** [1] **347:**3
**imminent** [4] **279:**4 **282:**1 **283:**2,15
**imminently** [2] **282:**22 **313:**14
**immunity** [1] **349:**11
**impact** [9] **262:**16 **264:**9 **265:**13,19 **268:**12,15,22,24 **269:**4
**impaired** [1] **274:**13
**impeach** [1] **370:**19
**impeached** [1] **372:**1
**impeaching** [1] **368:**1
**impeachment** [5] **371:**5,6,8 **372:**1,3
**important** [3] **255:**8 **269:**6 **350:**6
**imposing** [2] **350:**11,12
**impression** [3] **274:**3 **275:**6 **277:**4
**impressions** [1] **274:**1
**impressive** [2] **264:**10,13
**improper** [1] **331:**20
**improvement** [1] **275:**21
**inches** [1] **356:**16
**incident** [5] **270:**21 **308:**6 **332:**14 **358:**5,6
**include** [6] **269:**9 **278:**5 **313:**16 **348:**25 **383:**21 **389:**9
**included** [2] **285:**7 **348:**8
**includes** [1] **385:**20
**including** [2] **289:**18 **379:**20
**income** [1] **349:**19
**inconsistent** [3] **372:**13 **384:**6 **386:**8
**incorporate** [1] **283:**9
**incorporated** [1] **283:**4
**incorrect** [1] **359:**23
**indeed** [1] **388:**20
**indemnification** [2] **349:**18,22
**indemnity** [1] **350:**20
**indicate** [1] **340:**11
**indicated** [3] **273:**24 **362:**5,20
**indicates** [1] **271:**1
**indication** [1] **271:**10
**indictment** [1] **346:**20
**indirect** [1] **262:**16
**individual** [9] **245:**4 **260:**1,3 **383:**24 **385:**13 **387:**1,2 **388:**12 **389:**4
**individually** [1] **384:**21
**individuals** [1] **268:**21
**induce** [1] **265:**18
**infant** [1] **266:**18
**inferred** [2] **366:**12 **373:**15
**information** [6] **255:**16 **286:**3 **289:**2 **309:**2 **313:**16 **347:**1
**infrared** [1] **272:**21
**initial** [2] **259:**22 **272:**15
**initially** [3] **328:**10 **332:**24 **359:**15
**initiated** [1] **318:**8
**injured** [3] **303:**2,3 **329:**7
**injuries** [18] **259:**5,7 **261:**16,21 **262:**19 **265:**15,17,22 **266:**14,17 **267:**19 **273:**22 **279:**3 **280:**21 **281:**25 **282:**6 **283:**1 **290:**12
**injury** [70] **258:**15,21 **259:**15,17,18,20,24 **260:**13,24 **261:**19,21,23 **263:**6,8,10,19,20,25 **264:**2,4,21,21 **265:**5,8,18 **266:**7,12,12,13,14,17,21 **267:**6,6,7,8,13,13,20 **268:**3,24 **271:**11,11,12,13,14,15,16 **272:**5 **273:**10,22,25 **276:**23 **277:**15 **279:**24,25 **280:**4,6,9 **281:**3 **282:**21 **283:**14 **285:**9 **287:**18,25 **288:**1 **289:**9,11 **290:**6,9
**inner** [2] **262:**12 **273:**21
**innocuous** [1] **390:**19
**inquire** [1] **289:**17
**inquiries** [2] **272:**2 **274:**20
**inquiry** [1] **385:**16
**insert** [1] **348:**21
**inside** [15] **266:**23 **308:**1 **319:**13 **321:**3 **322:**4 **328:**1,2 **329:**3 **330:**1,11 **336:**20 **361:**4 **363:**16 **365:**2 **374:**13
**inspector** [8] **296:**4,5,24,25 **297:**1,14 **314:**3,23
**instance** [1] **381:**11
**institute** [2] **258:**17 **260:**12
**instruct** [1] **283:**24
**instructed** [2] **244:**6 **246:**13
**instructing** [1] **371:**20
**instruction** [12] **244:**3 **248:**16 **283:**25 **347:**5 **348:**22 **350:**5,8 **372:**7 **381:**19,25 **383:**2 **390:**25
**instructions** [24] **244:**6 **249:**2 **281:**10 **284:**2 **291:**20 **342:**10 **348:**2,5,17,24 **350:**25 **351:**9,16 **352:**8 **382:**2,6,10,19 **383:**9 **387:**11 **390:**11,15,21 **391:**7
**instrument** [1] **272:**13
**insurance** [2] **293:**6,11
**intent** [1] **339:**10
**intentionally** [1] **375:**23
**interact** [1] **307:**24
**interactions** [2] **330:**4 **375:**16
**interactive** [1] **264:**16
**interest** [1] **351:**14
**interested** [1] **293:**18
**intern** [1] **347:**4
**internal** [8] **258:**6 **266:**13 **267:**6,8,13 **309:**10,17 **360:**12
**internally** [1] **266:**25
**interrogate** [1] **362:**15
**interrogation** [3] **337:**7 **362:**13 **378:**1
**interrogations** [1] **299:**20
**interrupted** [1] **329:**25
**intervene** [1] **388:**4
**interviewing** [1] **358:**5
**introduce** [1] **345:**13
**intuited** [1] **388:**3
**investigating** [3] **308:**5 **325:**3,6
**investigation** [9] **308:**15,24 **309:**5,7,10 **317:**19 **321:**25 **332:**13 **333:**1
**involve** [2] **258:**24 **349:**2
**involved** [3] **273:**13,14 **293:**14
**iraq** [1] **277:**21
**irate** [2] **330:**6 **378:**15
**irreducible** [1] **282:**20
**isn't** [3] **294:**20 **349:**11 **350:**25
**issue** [15] **244:**22 **247:**6,23 **251:**2 **268:**6 **283:**7 **293:**23 **294:**2,12,21 **313:**12 **343:**5 **352:**14 **383:**4 **389:**11
**issues** [5] **274:**11 **275:**24 **276:**1 **344:**14 **347:**5
**itself** [2] **270:**11 **372:**1


## J


**jerking** [2] **374:**19,20
**jerry** [1] **346:**16
**jersey** [2] **258:**17 **260:**11
**jesse** [2] **298:**6 **338:**14
**job** [2] **292:**24 **293:**3
**joined** [2] **326:**20,22
**joint** [1] **312:**21
**jokes** [1] **293:**21
**joking** [2] **319:**6 **339:**5

# Keyword Index


**jokingly** [1] **336:**7
**journal** [2] **277:**18,18
**jpto** [2] **389:**16,22
**judge** [9] **250:**17 **291:**15, 21 **293:**22 **335:**16 **383:**3,4 **387:**11 **392:**5
**judicial** [1] **344:**3
**july** [2] **260:**20,20
**jump** [1] **306:**9
**june** [1] **357:**6
**juries** [2] **246:**13 **281:**7
**jurors** [3] **244:**10,15,18
**jury** [68] **244:**3,6,8,22 **245:**1, 14 **246:**21 **247:**8 **248:**9,16 **249:**2,10 **250:**6 **252:**7 **254:**1 **270:**7,10 **279:**12 **281:**10 **283:** 23 **284:**2 **291:**20,22 **292:**13 **293:**24 **296:**1 **318:**10 **342:**10, 12 **343:**2 **345:**1 **347:**5,7 **348:** 1,2,5,13,25 **350:**5,8,25 **351:**9, 15,25 **352:**5,7 **354:**9,11,24 **355:**3 **356:**1 **362:**7 **370:**21 **371:**7,20,24 **372:**6 **381:**1,14, 23 **382:**6,20 **385:**24 **386:**3,5 **388:**15 **389:**7 **390:**25

## K

**kahl** [1] **363:**13
**k-a-h-l** [1] **363:**13
**keep** [3] **249:**25 **337:**22 **338:**4
**kept** [2] **275:**5 **276:**1
**kind** [16] **247:**1 **266:**8 **274:** 19 **294:**2,23 **300:**8 **302:**1 **327:**12,14 **338:**4,10 **339:**8,18 **348:**3 **350:**25 **351:**23
**knee** [3] **281:**3,4,6
**knock** [1] **301:**23
**knowledge** [3] **276:**14 **325:**12,14
**known** [3] **286:**19 **339:**23 **377:**7
**kovner** [2] **383:**4,6

## L

**ladies** [4] **254:**3 **291:**16 **344:**1 **379:**19
**lagreca** [19] **250:**22 **252:** 17 **347:**17,19 **352:**13,16 **353:** 11,22,24 **354:**2,5,13,15,24 **369:**11,17,23 **370:**1,3
**language** [3] **282:**23 **366:** 13 **373:**15
**large** [2] **273:**12 **293:**10
**lashinsky** [56] **244:**19 **298:**9,14 **303:**9 **305:**6,8,16, 19 **306:**22 **308:**9,16,25 **310:**5 **314:**14,20 **315:**3 **324:**13,18, 23 **325:**5,10,13,15 **326:**1,12 **353:**18 **361:**22,25 **362:**2,5,14, 17,21,25 **363:**2,6,20 **364:**10 **365:**13,19 **366:**10 **367:**18 **370:**14 **373:**6,19,22 **374:**7,10 **377:**24 **378:**1,4,8,14,25 **379:** 5,8
**lashinsky's** [5] **315:**4,6 **345:**15,24 **352:**22
**last** [15] **247:**18,21,22,22 **249:**15 **255:**10 **260:**1 **296:**18 **315:**21 **342:**13 **348:**16 **353:** 20 **356:**13 **376:**9 **381:**10
**late** [3] **346:**18 **348:**16 **351:** 24
**later** [7] **309:**4,4 **326:**3 **329:** 14 **347:**15 **354:**17 **380:**5
**laura** [2] **393:**9,10
**law** [27] **244:**17 **249:**17,18 **252:**10 **279:**8 **281:**21,23,24 **282:**1,8,17 **283:**9,9,16 **294:** 19,20 **318:**12 **345:**3 **347:**4 **348:**9,11 **383:**1 **384:**3 **387:**2, 11,18 **389:**3
**lawsuit** [8] **334:**25 **335:**4,9 **336:**4,11 **339:**11,13 **376:**18
**lawyer** [3] **247:**4 **292:**17 **372:**18
**lawyers** [4] **291:**18 **344:** 13 **346:**14 **371:**21
**lay** [1] **337:**1
**laying** [5] **327:**7,11 **337:**10 **374:**18,23
**layman** [2] **262:**14 **264:**4
**layout** [1] **299:**12
**layperson** [1] **269:**4
**lead** [1] **295:**6
**leading** [5] **294:**14,24 **331:** 4 **335:**4 **364:**15
**leads** [2] **364:**21,22
**leaning** [1] **388:**13
**leap** [1] **349:**15
**learn** [1] **360:**21
**least** [4] **244:**5 **265:**9 **294:** 14 **379:**22
**leave** [6] **317:**20 **350:**4,5 **363:**23 **379:**16 **388:**10
**leaving** [2] **317:**17 **364:**1
**led** [2] **337:**24 **373:**8
**left** [17] **266:**3 **272:**23 **273:** 24 **300:**1,16,18,18,19,21 **317:** 14 **318:**1 **323:**16 **327:**13,13, 16 **358:**7 **364:**4
**legal** [6] **245:**1 **246:**23 **248:** 24 **251:**12 **344:**14 **389:**11
**legally** [1] **386:**7
**legs** [1] **258:**25
**lesions** [1] **288:**5
**less** [4] **272:**16 **280:**22 **298:** 13 **307:**19
**lethargic** [2] **266:**20 **375:** 7
**letter** [3] **247:**11 **248:**3 **294:** 13
**letting** [1] **352:**5
**level** [7] **249:**9 **257:**1 **263:** 11 **278:**4 **280:**14,14 **292:**12
**levels** [3] **263:**10,13 **280:** 10
**lexis** [1] **249:**15
**liability** [6] **246:**16 **249:**10, 23 **293:**11 **355:**6 **385:**8
**liable** [10] **244:**17,19 **245:**2 **246:**11,14,22 **249:**18,22 **347:** 22 **350:**19
**lieutenant** [4] **297:**13,13, 20 **353:**19
**life** [5] **276:**11 **277:**16 **286:**9 **287:**9 **390:**1
**light** [2] **272:**21 **349:**1
**lightly** [2] **294:**14 **338:**10
**lights** [1] **318:**8
**likely** [6] **277:**11 **279:**11 **282:**22 **319:**22 **320:**24 **344:** 12
**limine** [4] **312:**3,21 **313:**9 **334:**3
**limitations** [2] **282:**15,17
**lindenmere** [1] **357:**25
**line** [11] **308:**17 **323:**9,10 **324:**5,5,7 **360:**14 **366:**6,7 **382:**25 **388:**18
**lines** [6] **302:**21 **306:**4 **326:** 7 **328:**17 **360:**14 **369:**8
**lingering** [1] **265:**3
**lip** [1] **328:**1
**list** [1] **264:**19
**literally** [2] **282:**10 **346:**14
**literature** [5] **267:**23,24 **268:**1 **277:**9,11
**little** [20] **255:**15 **259:**19 **261:**6 **263:**3 **265:**11 **271:**7 **292:**3 **298:**13 **304:**17 **306:**25 **327:**25 **344:**11 **350:**21 **352:** 18 **354:**22,25 **374:**21 **375:**4,6, 7
**live** [6] **285:**22 **286:**10,23,24 **313:**9 **389:**12
**lives** [1] **344:**15
**locate** [3] **317:**20,24 **318:**1
**located** [5] **332:**16 **336:**17, 19 **357:**25 **359:**13
**location** [11] **317:**3,7,10 **330:**8 **331:**8 **334:**11 **339:**5 **357:**24 **358:**3,9 **376:**5
**lodge** [2] **319:**22 **320:**7
**lodged** [1] **330:**17

# Keyword Index


**logical** [2] **248:**9 **349:**15
**logically** [3] **248:**23 **386:**7 **389:**1
**long** [16] **286:**10,11,11,23 **298:**14 **307:**7,13,16 **318:**1 **320:**3,5 **325:**15 **342:**9 **349:**12 **374:**24 **375:**1
**look** [29] **249:**24 **266:**20 **270:**1,2 **279:**18 **281:**3 **282:**9,9,11,14 **283:**5 **285:**14 **302:**21 **304:**13 **305:**12 **306:**4 **323:**8 **326:**22 **331:**17,21 **346:**23 **347:**20 **349:**12 **354:**6 **358:**7 **360:**13 **373:**2 **384:**13 **388:**15
**looked** [5] **272:**20 **277:**20 **306:**14 **345:**6 **366:**16
**looking** [17] **249:**25 **255:**7 **270:**22 **282:**1 **283:**16 **292:**2 **318:**7,14,16,19 **323:**3 **333:**1 **347:**1 **349:**10 **387:**5,6,12
**looks** [2] **266:**19 **270:**9
**lose** [5] **248:**10,11,17 **249:**7 **264:**5
**loses** [1] **272:**24
**loss** [7] **264:**7,24 **265:**4 **269:**7,9,11 **278:**1
**lost** [2] **248:**17 **383:**18
**lot** [8] **249:**14 **280:**24,25,25 **284:**2 **348:**5 **349:**6 **388:**22
**loud** [13] **301:**20,25 **302:**3,13 **304:**6,8,23 **323:**9 **325:**20 **360:**13 **365:**5 **379:**9,10
**love** [1] **248:**8
**low** [1] **267:**14
**lower** [2] **286:**20 **287:**6
**lujan** [1] **282:**19
**lunch** [8] **293:**25 **342:**8,9,21 **344:**10,17 **352:**16 **379:**21
**lung** [4] **271:**12,13 **292:**5,5
**lying** [1] **337:**7

## M

**made** [9] **274:**20 **287:**17 **305:**16 **308:**19 **315:**3,3 **340:**1 **372:**13 **389:**21
**main** [2] **342:**11 **364:**17
**mainly** [1] **274:**12
**maintain** [1] **379:**22
**majored** [1] **255:**18
**majority** [5] **244:**22,23 **245:**4 **286:**15 **292:**6
**male** [2] **318:**15,15
**manner** [3] **340:**10 **361:**6,6
**many** [12] **247:**3 **250:**19 **256:**1 **290:**18 **298:**1,3,11 **304:**20 **337:**18 **341:**1 **353:**19 **383:**11
**mark** [1] **380:**2
**massive** [1] **312:**6
**materialize** [1] **282:**22
**materialized** [5] **280:**21 **281:**15 **292:**2 **334:**3 **381:**22
**materials** [1] **248:**6
**matter** [7] **254:**14 **283:**5,8 **348:**9 **372:**9 **389:**3 **393:**4
**md** [1] **255:**25
**mean** [26] **246:**1 **249:**17 **250:**3,6 **262:**6 **263:**4 **281:**9 **283:**11 **306:**11 **336:**12,13 **339:**12 **342:**16 **347:**2 **352:**9 **365:**8,23 **371:**2,8 **372:**4 **374:**20 **382:**9,10 **383:**18 **385:**2 **391:**8
**meaning** [3] **274:**12 **288:**2 **371:**10
**means** [13] **250:**5 **263:**8 **264:**9,22 **266:**13 **268:**19,21 **276:**11,12 **287:**4 **306:**12 **335:**12 **338:**9
**meant** [5] **287:**19,21 **309:**4 **367:**10 **370:**13
**meantime** [1] **344:**17
**mechanism** [5] **262:**2,3,10 **263:**19 **264:**20
**mechanisms** [2] **262:**16 **265:**18
**medical** [14] **255:**20,25,25 **258:**9 **259:**22 **261:**10 **276:**25 **277:**18 **288:**19,23 **289:**12,16 **307:**7 **340:**17
**medication** [4] **275:**3,3 **288:**16 **289:**4
**medications** [5] **274:**24 **289:**7,19,23 **290:**2
**medicine** [5] **258:**6 **259:**18 **260:**24 **261:**1,3
**meet** [3] **278:**6 **291:**18 **297:**1
**mehrdad** [2] **255:**1,4
**m-e-h-r-d-a-d** [1] **255:**11
**member** [1] **252:**15
**memory** [5] **272:**7,12 **274:**12 **276:**2 **369:**12
**mental** [3] **264:**4,22 **272:**11
**mention** [3] **271:**15 **285:**15 **290:**1
**mentioned** [10] **269:**11 **271:**10 **290:**5 **317:**21 **320:**25 **339:**3,11 **373:**9 **378:**24 **379:**3
**merrick** [5] **318:**5 **331:**9,9 **358:**1,1
**met** [1] **272:**1
**metal** [6] **300:**6 **325:**22,22,24,24 **365:**9
**microphone** [4] **245:**10 **255:**8 **296:**6 **356:**15
**might** [9] **244:**8 **248:**8 **252:**4 **326:**24 **334:**4 **347:**5 **383:**7 **384:**8 **391:**8
**might've** [1] **313:**7
**mild** [7] **263:**7,7 **265:**5 **277:**15,25 **285:**8,8
**million** [1] **293:**16
**mind** [5] **244:**5 **245:**9 **247:**11 **353:**24 **387:**20
**minds** [1] **391:**24
**mine** [1] **381:**11
**minervini** [18] **316:**20 **317:**1,9,14,18,19 **319:**1 **322:**9 **323:**13,19 **324:**10,19 **340:**25 **342:**5,13 **356:**9,14,23
**m-i-n-e-r-v-i-n-i** [1] **356:**14
**minute** [3] **251:**19 **325:**17 **326:**3
**minutes** [13] **251:**4,24 **264:**13,15 **265:**5 **291:**19 **304:**20 **307:**19,20 **318:**3 **346:**23 **390:**9,10
**miranda** [7] **362:**6,7,8,9,11,14 **363:**2
**misleading** [1] **348:**12
**missed** [2] **249:**5 **259:**2
**misspoke** [1] **369:**16
**mistaken** [2] **354:**15 **366:**11
**mister** [1] **279:**25
**misunderstood** [1] **383:**23
**moderate** [5] **263:**7,14 **265:**6 **287:**21,25
**modify** [1] **383:**20
**moment** [5] **278:**7 **289:**17 **363:**4 **368:**4 **384:**13
**monell** [1] **385:**5
**monet** [4] **319:**12 **321:**2 **326:**25 **358:**21
**monsanto** [1] **293:**14
**months** [2] **272:**5,9
**montreal** [2] **272:**13 **275:**22
**morning** [13] **244:**2 **247:**12 **254:**3,5 **255:**15 **314:**9 **315:**24,25 **332:**14 **347:**6 **351:**3 **352:**7 **357:**23
**most** [9] **246:**1 **251:**11 **274:**10 **286:**12,13 **319:**22 **320:**24 **344:**12 **390:**20
**mostly** [3] **246:**8,10 **346:**12
**motion** [3] **248:**11 **312:**22 **313:**9

# Keyword Index


**motions** [5] **312:**3,20 **334:**3 **374:**19,20
**mount** [2] **258:**10,12
**mounted** [1] **361:**9
**move** [4] **254:**15 **275:**8 **354:**25 **370:**22
**moved** [1] **258:**4
**movement** [3] **262:**11 **265:**13,19
**movements** [7] **265:**15 **272:**19 **273:**7,11,13 **374:**22,25
**moves** [2] **262:**12 **266:**4
**moving** [4] **284:**2 **327:**19 **337:**11 **370:**9
**mri** [4] **287:**22,23 **288:**2,5
**ms** [63] **250:**22 **252:**17 **254:**12 **312:**14 **315:**10,13,23 **322:**16,19,20 **323:**7 **331:**19,25 **335:**6 **339:**2 **342:**7,19,23 **347:**17,19 **352:**13,16 **353:**11,22,24 **354:**2,5,13,15,21,24 **356:**3,18 **359:**22,24 **366:**4,21,25 **368:**1,5 **369:**2,6,11,13,17,20,23,24 **370:**1,2,3,4,8,10,12,18 **371:**4 **373:**1 **377:**9 **378:**23 **379:**12 **390:**3 **392:**6
**much** [9] **248:**2 **277:**24 **288:**7 **290:**25 **292:**8,10 **299:**6 **339:**21 **345:**15
**muffled** [1] **302:**1
**multiple** [3] **261:**25 **386:**8,9
**municipal** [1] **249:**21
**municipality** [3] **249:**18 **348:**20 **349:**13
**muscles** [1] **259:**1
**must** [2] **269:**5,7
**myself** [5] **269:**19 **279:**21 **337:**4 **339:**23 **377:**7

## N

**name** [23] **255:**3,5,10,11 **288:**11 **289:**14,23 **296:**16,19 **303:**13 **315:**4,6,19,20,21 **318:**22 **320:**25 **328:**13 **356:**10,12,13,13,23
**names** [1] **383:**11
**nassau** [15] **245:**2 **250:**8 **252:**16,19,22 **297:**2,16 **316:**9,10 **331:**6 **347:**9 **349:**5 **357:**4,5 **384:**16
**nature** [1] **321:**15
**near** [1] **314:**12
**nearer** [1] **344:**6
**necessarily** [2] **271:**12 **277:**8
**necessary** [2] **266:**9 **391:**4
**neck** [2] **265:**20 **273:**10
**necktie** [2] **343:**7,8
**need** [24] **246:**5,15 **247:**7 **263:**19,20 **264:**1 **279:**14 **281:**4,7 **292:**12 **322:**17 **344:**14 **347:**7,8,10,13 **350:**15 **353:**23 **368:**3 **382:**5 **383:**17 **386:**9,25 **388:**18
**needed** [1] **244:**7
**needs** [1] **246:**21
**negative** [2] **288:**2,24
**neither** [1] **244:**22
**neon** [1] **354:**16
**nerve** [2] **265:**16,21
**nerves** [1] **258:**25
**net** [5] **349:**3,5,6,7 **350:**16
**neurological** [2] **259:**4 **272:**10
**neurology** [9] **258:**7,21,23 **259:**14 **260:**8,9,10,24 **261:**9
**neuroscience** [2] **258:**17 **260:**12
**never** [2] **302:**4 **334:**3
**new** [5] **258:**9,17 **260:**11 **343:**6 **346:**14
**newer** [1] **352:**18
**news** [2] **344:**2,2
**next** [17] **254:**7 **258:**3,13 **274:**14 **284:**1 **291:**8 **294:**8 **296:**3 **300:**14,15,19,22 **318:**6 **324:**22 **326:**11 **328:**18 **374:**10
**nice** [4] **297:**1 **336:**24 **337:**1 **339:**22
**nicer** [1] **339:**21
**night** [3] **247:**19 **249:**15 **348:**16
**nobody** [2] **250:**23 **345:**15
**noise** [2] **304:**14,23
**noises** [8] **301:**20 **325:**20 **326:**15 **365:**7,8,11,12,18
**nominal** [2] **387:**3 **388:**9
**none** [2] **266:**17 **388:**24
**non-party** [1] **294:**15
**nope** [1] **320:**17
**nor** [1] **244:**23
**normal** [9] **272:**16,18,19 **275:**20,23 **276:**6,10 **277:**24 **338:**5
**normally** [3] **304:**9 **338:**2 **362:**9
**notations** [1] **287:**16
**notes** [1] **254:**13
**nothing** [9] **273:**17 **282:**10,12 **314:**21,21 **315:**8 **335:**10 **340:**22 **379:**13
**notice** [1] **318:**13
**noticed** [1] **307:**14
**noting** [1] **270:**13
**november** [2] **316:**11 **367:**5
**number** [11] **263:**25 **285:**17,18,21,25 **287:**2,5 **322:**24 **346:**19 **360:**8 **381:**24
**numbers** [5] **268:**7,8 **285:**14 **322:**25 **360:**9
**nystagmus** [1] **273:**12
**n-y-s-t-a-g-m-u-s** [1] **273:**12

## O

**oath** [1] **367:**8
**object** [3] **262:**9,10 **290:**10
**objection** [8] **254:**19 **262:**24 **294:**25 **311:**2 **313:**20 **331:**19 **377:**9,19
**objects** [2] **266:**6 **342:**9
**observation** [1] **276:**6
**observe** [4] **323:**19 **326:**1 **327:**6 **337:**24
**observed** [3] **288:**6 **307:**12 **324:**22
**observing** [1] **276:**4
**obtain** [1] **352:**17
**obviously** [8] **271:**3 **285:**21 **349:**5 **352:**18 **353:**6 **379:**22 **388:**3 **390:**22
**occasions** [1] **271:**23
**occupant** [2] **318:**15,15
**occur** [2] **265:**12 **269:**5
**occurred** [3] **329:**8 **332:**14 **358:**13
**occurrence** [2] **264:**7 **285:**18
**occurs** [1] **285:**24
**october** [21] **272:**9 **274:**16,18 **288:**25 **297:**3 **298:**16 **302:**14 **303:**4 **308:**8 **316:**12,19 **330:**5 **338:**12,17,22 **340:**8 **357:**7,10,18 **366:**20 **375:**17
**odd** [1] **389:**5
**oddly** [1] **383:**25
**offhand** [1] **383:**11
**office** [15] **249:**25 **250:**8,20,23 **251:**8,14 **252:**20,21,22 **291:**13 **300:**23 **301:**3,15 **309:**9 **345:**22
**officer** [70] **245:**22 **249:**5,6,20 **297:**11,24 **309:**17 **315:**24 **316:**1,17,18,20 **317:**1,9,14,17,19 **319:**1,12 **321:**2 **322:**9,11,21 **323:**13,19 **324:**10,19 **326:**25 **328:**22 **329:**2 **330:**24 **331:**3,5 **334:**21 **336:**2 **338:**12 **339:**3 **340:**20 **347:**9,11,22,23 **349:**13 **356:**19,21 **357:**15

358:6,20,21 359:21,22 360:17 363:10,13,14 364:4 373:2 376:1,5,25 377:2,3,14,22 378:24 381:15 384:16 385:3,20 388:25
**officers** [15] 245:13 298:1 319:10 320:24 326:19 329:2 358:18,22 360:25 374:14 383:25 384:21 385:13,17 389:4
**officer's** [2] 312:5 320:25
**offices** [1] 299:8
**off-limits** [1] 313:1
**older** [2] 285:22 318:15
**once** [5] 263:18 299:25 301:8 361:16 389:3
**one** [84] 244:7 245:14 246:23 247:11,17 248:7 252:3 258:14 261:21 263:25 264:21 265:19,19 266:2 267:2,2 268:22 270:2,21 273:2,21,22 275:17 276:8 279:23 280:22 281:7,7 285:6 286:7 287:16 289:13,13 292:12,13 298:5,8 301:12 306:21 313:3 314:24 320:23 321:5,10,14,17,18,21 322:17 323:24 324:16,17 336:18 339:19 344:7,7,12 346:11,13 349:10 350:17 351:25 360:10 361:8 370:7 375:11 379:10 382:16,16,19 384:5,5,9,12 385:2,2,3 386:16 387:10 389:1,4 390:14,14,16
**ones** [1] 323:23
**one-third** [1] 267:18
**only** [14] 244:20 270:5 277:6 286:24 290:20,21 310:5 312:25 325:14 349:13 372:17 380:2 389:22 390:21
**open** [3] 300:25 312:24,25
**opening** [1] 312:6
**opinions** [1] 262:22
**opportunity** [4] 271:19,22 274:15 275:10
**opposed** [2] 268:16 273:21
**opposing** [1] 346:5
**opposite** [4] 248:18 262:14 273:23 369:8
**oranges** [1] 280:12
**order** [4] 247:15 251:16 312:22 383:5
**ordinate** [1] 252:15
**organized** [3] 263:12 346:11,13
**original** [1] 262:1
**other** [42] 244:18 246:23 262:14 263:13 265:19 267:3,3 270:24 271:9 273:3,21 276:9 277:3 283:2 285:17 292:5 299:8 301:12 312:25 319:10 320:25 324:16 326:19 329:1,2,21 346:15 348:4 350:17 358:18,22 360:17,24 363:16 364:4 374:14 376:25 384:5 387:4 389:1 390:10,11
**others** [1] 363:1
**otherwise** [3] 249:12 273:16 291:13
**o-t-t-o** [1] 315:21
**out** [49] 245:15 247:5 248:21 264:24 265:2 279:25 280:5,8 287:18 297:6 301:8 302:4 304:13 305:6,8,16,19 309:25 313:8 315:14 321:23 323:9 331:10 342:3 346:4 348:13 350:4,5 357:8 358:23 360:13 364:13 365:19 366:10 367:18,20 373:22,24 374:10,12 376:12 382:17 384:11 388:5,7,11 390:9 391:24 392:3
**outermost** [1] 364:23
**outside** [12] 254:9 283:1 305:4 308:1 336:20 344:16 350:23 361:20 364:17,20,23 380:13
**outward** [1] 269:3
**over** [23] 261:7 271:5 277:22 284:1 289:24 293:12 296:6 310:8 318:19,20 332:8,9,10,25 337:4,18 344:11 352:16,19 379:8,10,20 381:8
**overall** [2] 274:25 275:14
**overhear** [1] 324:19
**overnight** [3] 244:4 351:17,22
**oversight** [1] 348:15
**over-the-counter** [2] 274:23 275:3
**own** [1] 370:20

## P

**p.m** [4] 247:18 351:20 357:11 392:8
**page** [27] 249:17 269:24 270:3 302:21 305:12 306:3 322:23,24,25 323:3,4,9 324:1,2,6 360:7,8,9,10,12,13,14 366:2,5,5,7 373:4
**pages** [3] 323:4 331:18 360:10
**paid** [3] 252:16 290:23,25
**pain** [3] 279:12 281:8 289:23
**panousieris** [44] 254:12 312:14 315:10,13,23 322:16,19,20 323:7 331:19,25 335:6 339:2 342:7,19,23 354:21 356:3,18 359:22,24 366:4,21,25 368:1,5 369:2,6,13,20,24 370:2,4,8,10,12,18 371:4 373:1 377:9 378:23 379:12 390:3 392:6
**paper** [1] 270:9
**parent** [1] 266:18
**parentheses** [1] 331:18
**parenthesis** [1] 360:9
**parenthetical** [1] 322:25
**paris** [3] 255:21,22,23
**parse** [1] 384:7
**part** [14] 259:22,23 260:1,4 273:12 324:19 370:21 371:1,6,6 372:3 376:8 379:21 389:22
**particular** [11] 244:5 255:22 260:7 266:10 297:22 316:12 349:2 357:7 358:2 388:11,19
**particulars** [1] 358:6
**parties** [8] 345:3 349:19 351:11,16 379:10 388:10 391:14,16
**parties'** [1] 381:17
**partner** [2] 322:9 357:12
**parts** [2] 278:5 284:2
**party** [1] 244:25
**pass** [1] 264:24
**passenger** [4] 318:24 358:15,17 376:11
**past** [3] 286:24 299:25 334:7
**patients** [1] 289:17
**patrol** [3] 316:17,18 357:16
**patrolman** [1] 297:6
**pattern** [1] 391:6
**pause** [1] 248:6
**pay** [2] 349:24 350:3
**paying** [1] 324:21
**pays** [1] 389:2
**pd** [2] 316:10 357:5
**pennsylvania** [1] 258:6
**people** [24] 247:19 250:15,20 257:1 274:6 275:20 277:14 278:1,3 285:4,5,19,20,21 286:1,2,24 293:5,14 301:25 302:2 322:7 337:18 338:2
**per** [2] 285:23 291:1
**percent** [11] 261:18 273:14 274:6,6 280:22 286:5,8,21,23 287:8,11

# Keyword Index


**perfect** [2] **354:**25 **391:**22
**performed** [1] **277:**17
**period** [4] **261:**13 **264:**25 **265:**2,25
**perkins** [21] **244:**17 **294:**3 **298:**6,12 **303:**9 **308:**11,14 **314:**4,10,12,17 **338:**14,18,21 **361:**22,25 **362:**2,25 **363:**1 **377:**23 **378:**19
**permission** [2] **270:**7 **294:**24
**permits** [1] **345:**25
**person** [11] **264:**5,11,12 **269:**1 **276:**10 **285:**23 **315:**5 **321:**4,9,10 **325:**3
**personal** [3] **267:**21 **332:**21 **340:**13
**personally** [4] **276:**4 **319:**7 **320:**21 **361:**13
**perspective** [3] **313:**10 **344:**2,3
**ph** [2] **303:**9 **383:**15
**phantom** [1] **334:**3
**phone** [3] **251:**20 **252:**3 **332:**22
**photo** [5] **345:**18,20,20,21 **352:**14
**photocopy** [2] **345:**20,21
**photograph** [3] **269:**15,24 **270:**21
**photographic** [2] **389:**13,16
**photographs** [12] **308:**9,11,13 **352:**17,19,23,25 **353:**2,3,4 **354:**10 **389:**21
**photos** [6] **269:**25 **308:**14,15 **309:**1 **353:**9 **354:**4
**phrase** [2] **268:**12,14
**physical** [10] **259:**25 **261:**24 **262:**4,7 **264:**3,21 **266:**7 **312:**8,9,18
**physically** [2] **298:**19 **299:**23
**physiologically** [1] **270:**23
**physiology** [1] **265:**11
**picking** [1] **249:**5
**picture** [5] **264:**11,17 **275:**13,14 **300:**20
**pictures** [5] **308:**24 **314:**14,17,19 **345:**14
**place** [5] **273:**2 **276:**8 **321:**12 **376:**14 **386:**4
**placed** [9] **251:**11 **272:**20 **303:**20 **319:**2,4 **321:**17,18 **359:**2 **361:**2
**placing** [1] **320:**21
**plaintiff** [12] **250:**7 **279:**2 **280:**20 **282:**21 **290:**16 **291:**8 **293:**2 **296:**3 **312:**6 **315:**10 **318:**24 **352:**24
**plaintiffs** [3] **290:**20 **292:**4 **388:**6
**plaintiff's** [9] **254:**6,20,21 **342:**15 **344:**6,8 **352:**19 **353:**6 **380:**3
**plan** [2] **294:**14 **352:**12
**plane** [1] **265:**20
**planned** [1] **336:**13
**plate** [2] **318:**18 **382:**2
**plausible** [1] **263:**19
**pleading** [1] **349:**21
**please** [25] **244:**2 **252:**7 **254:**24,25 **255:**3 **258:**20 **291:**24 **294:**4 **296:**15 **297:**10 **305:**12 **306:**19 **315:**11,18,19 **341:**5 **346:**3 **352:**15 **356:**5,8,10 **366:**3 **377:**11 **380:**13 **387:**21
**plumb** [1] **283:**24
**plus** [1] **269:**12
**pocketbook** [6] **332:**21,23 **333:**1 **334:**22 **336:**3,10
**point** [37] **271:**18 **272:**6 **273:**6 **281:**2 **286:**9 **289:**24 **297:**8,15 **304:**17 **305:**19 **307:**12 **308:**5 **309:**11 **321:**24 **324:**24 **327:**24 **328:**2,11,25 **329:**3,9 **330:**4,8,12 **334:**7 **336:**24 **339:**13 **340:**10 **345:**2 **348:**1 **358:**10,22 **359:**19 **364:**25 **374:**8 **375:**16 **390:**19
**points** [2] **247:**11 **350:**24
**police** [10] **249:**19 **297:**2,11 **309:**8 **316:**1,9 **328:**22 **329:**1 **356:**21 **357:**4
**pollak** [1] **383:**4
**population** [3] **277:**24 **287:**3,8
**portion** [1] **259:**25
**posed** [2] **291:**25 **347:**6
**position** [7] **273:**4 **276:**7 **308:**2 **327:**10 **337:**9 **338:**6 **349:**20
**positioned** [2] **305:**22 **322:**1
**positive** [2] **287:**23,23
**possibilities** [3] **267:**9,10 **279:**5
**possibility** [2] **279:**7 **381:**23
**possible** [5] **266:**15,16 **267:**2 **290:**12,14
**possibly** [2] **313:**10 **348:**23
**post** [4] **260:**5 **276:**19,20 **316:**16
**post-concussion** [6] **274:**4,9 **277:**1,10 **279:**24 **287:**20
**postgraduate** [1] **258:**5
**potential** [2] **281:**15 **384:**5
**poverty** [1] **349:**21
**practice** [11] **261:**1,3,7,8,14,17,18 **263:**5 **312:**22 **319:**24 **325:**2
**precinct** [25] **297:**16,23 **298:**21,23 **309:**20,25 **310:**8 **314:**6 **316:**16 **319:**8,21 **330:**11 **331:**15 **332:**8,9 **336:**25 **337:**6 **338:**18,19 **339:**22 **357:**9 **359:**4,6,11,15
**predict** [2] **277:**8 **281:**7
**predictions** [1] **380:**9
**predictive** [1] **266:**13
**predominance** [1] **273:**20
**prejudice** [1] **352:**24
**prejudicial** [2] **353:**1,4
**preliminary** [3] **244:**6 **347:**6 **381:**13
**premedical** [1] **255:**20
**prepare** [2] **352:**10 **376:**22
**prepared** [1] **376:**19
**preparing** [1] **377:**15
**preponderance** [1] **384:**15
**presence** [1] **268:**3
**present** [17] **261:**4 **275:**24 **279:**4 **281:**20 **303:**17 **323:**14,15,15 **324:**14,16 **333:**4 **358:**18 **363:**1,4,5,8 **364:**4
**presents** [1] **277:**9
**prestige** [1] **257:**1
**presume** [1] **391:**6
**presumed** [1] **362:**15
**pretending** [1] **337:**20
**pre-trial** [1] **312:**22
**pretty** [6] **246:**8 **279:**20 **294:**19 **300:**4 **304:**22 **382:**16
**previous** [2] **288:**22 **289:**9
**previously** [4] **323:**12 **358:**7 **371:**14 **388:**23
**primary** [1] **309:**22
**print** [1] **387:**23
**printing** [1] **387:**20
**prior** [17] **272:**9 **288:**15,19,25 **289:**3 **306:**4,12 **310:**1 **331:**21 **345:**10 **358:**4 **363:**19 **365:**13 **371:**25 **372:**2,13,20
**prisoner** [1] **309:**2
**private** [5] **252:**10 **261:**6,8,14,17
**probably** [14] **264:**15

# Keyword Index


267:16 277:5 286:5 287:5 290:19 298:13,15 299:5 300:6 342:2 349:8 380:5 389:18
**problem** [7] 273:19 279:23 283:19 288:23 295:5 330:12 370:2
**problems** [10] 273:1,5,9 274:12,12 277:23 289:12 292:5 330:15,18
**proceed** [1] 366:3
**proceedings** [2] 392:8 393:4
**process** [3] 309:3 346:25 376:24
**professionals** [1] 307:8
**profile** [1] 349:2
**program** [1] 255:20
**promoted** [2] 297:12,12
**proof** [1] 245:22
**properly** [2] 335:10 389:19
**proposal** [2] 283:19 351:8
**proposed** [3] 348:4 355:5 383:20
**proposition** [1] 249:9
**prosecutor** [2] 346:11,25
**protected** [1] 263:24
**prove** [1] 384:15
**provide** [1] 260:2
**provided** [1] 276:17
**provision** [2] 282:8 283:10
**provoke** [1] 268:20
**provoked** [1] 268:15
**proximate** [2] 282:9,10
**psychiatric** [1] 289:13
**psychological** [1] 289:12
**ptsd** [1] 274:12
**publish** [2] 270:6,10
**published** [2] 267:23 277:18
**pull** [2] 279:18 281:20
**pulled** [6] 318:9,19,20 332:10,25 337:4
**punched** [1] 328:16
**punitive** [20] 348:6,10,13,18,21,24 349:1,14 350:9,12,20,20,21 381:24 382:3 386:14,15,19 387:1 388:11
**purely** [1] 282:4
**purpose** [4] 272:14 317:6,17 363:25
**purposes** [4] 250:22 260:19 285:12 349:1
**pursue** [1] 377:18
**pursuit** [1] 376:8
**put** [20] 247:16,18 289:16,25 302:20 321:8,9 329:1 335:13 345:25 348:17 351:9,10,14 352:1,21 356:15 384:2,24 389:21
**putting** [5] 319:25 334:10 345:16 353:24 376:17

## Q

**qualifications** [2] 259:4 263:16
**qualified** [3] 262:22 286:22 349:11
**qualify** [1] 263:7
**quantified** [1] 277:13
**quantitative** [2] 279:17 285:11
**queens** [1] 261:10
**question** [80] 244:5,8,20 245:1 247:8 248:2,4 249:11,24 250:5 251:13 259:8 267:11 277:14 279:8 280:8,17,19 281:13,21,25 282:2,3,25 283:15 285:2 287:7 289:16 291:25 292:11,12 304:16 306:9,10,17 312:12 314:24 331:4,20 335:3,4 347:6,8,25 348:2 350:18 355:6 366:14,18 369:3,9,16,20 370:5,13 371:17,23 372:16,17 374:4 377:11,14,18 378:3 381:14,16,19,24 382:1,2,5 384:14 386:14 387:1,3 388:21,24,25 389:9 390:15
**questioning** [3] 293:5 313:4 316:4
**questions** [24] 244:14 281:11,19 282:19 288:8,13 291:3,20 294:14,24 313:22 315:7 330:23 333:3 340:20 353:19 371:21 379:12 382:6,10,20 383:21 384:2 388:9
**quick** [2] 262:11 391:14
**quickly** [3] 259:3 304:22 352:12
**quiet** [2] 359:20 375:7
**quirk** [1] 388:19
**quite** [1] 247:13
**quotes** [1] 305:9

## R

**radio** [1] 317:7
**raise** [4] 254:25 296:10 315:16 356:8
**ralph** [1] 288:11
**ran** [1] 318:18
**range** [3] 272:14 275:19,23
**rank** [2] 316:1 356:21
**ranking** [1] 298:16
**ranks** [1] 297:10
**rapport** [1] 339:18
**rate** [1] 287:4
**rather** [7] 265:2 321:13 337:23 338:5 347:14 360:14 390:19
**ratio** [1] 285:20
**reached** [1] 275:23
**react** [1] 378:8
**reaction** [1] 365:23
**read** [11] 283:7 323:8,10 335:12,13 362:9 366:23 369:7 370:5 371:17,17
**re-addressable** [1] 282:24
**reading** [5] 293:18 323:12 366:6 367:25 370:15
**ready** [2] 291:9 292:20
**real** [1] 391:14
**realize** [3] 246:8 370:4,12
**realized** [2] 272:22 277:22
**really** [14] 246:2 249:16,23,24,25 250:2,25 292:12,24 306:13 324:21 325:24 351:23 365:24
**realm** [2] 279:5 283:1
**reask** [3] 369:16 370:5,13
**reason** [5] 252:24 282:15 288:3 320:18 336:13
**reasonable** [1] 276:25
**reasons** [2] 246:19 340:13
**rebounds** [1] 262:13
**rebuttal** [1] 389:19
**recall** [22] 302:19 303:19 304:22 305:7,25 306:2 307:9,15,18,22 308:2,3 319:25 322:14 323:23 330:16 361:24 363:11,16,18 373:6 374:9
**recalls** [1] 334:9
**receive** [3] 255:24 297:18 376:25
**received** [4] 254:20,21 362:10,12
**recently** [2] 346:10 349:6
**recess** [3] 252:6 291:23 346:2
**recollection** [28] 287:1,10 300:6 302:24 305:15 306:6,10,11,13,15 316:23 320:2 323:13 324:9 326:22 331:24 332:2 335:10,14 360:16 365:10 366:9,11,15,16,18,19,22
**reconvene** [1] 291:14
**record** [9] 255:3 296:17 303:15 315:19 338:7 356:11

# Keyword Index

370:21 371:1,7
**recording** [1] 393:3
**recover** [2] 260:3 274:6
**rectangular** [1] 300:11
**recurrent** [2] 268:18 269:1
**red** [2] 354:12,14
**redirect** [4] 291:4 314:25 339:1 378:22
**refer** [1] 316:3
**reference** [2] 254:23 388:11
**referred** [1] 287:21
**referring** [2] 361:11 369:21
**reflex** [1] 266:4
**reflexes** [1] 276:12
**refresh** [13] 302:24 305:15 306:6,10,11,13 323:13 324:9 331:23 335:10 360:16 366:9,14
**refreshed** [5] 306:16 366:16,18,19 369:12
**refreshes** [1] 335:14
**refreshing** [1] 332:2
**regard** [1] 286:4
**regarding** [3] 315:2 343:5 348:9
**regardless** [1] 351:24
**regroup** [1] 251:24
**reissman** [84] 249:14 250:3,10,13,16,21 251:1,4,6,10,15,17,19 252:10,12,14,19,21 253:1 254:18 262:24 279:23 280:3 288:10,11 290:4 291:15,21 293:22 294:1,25 295:6 296:9 311:2 314:2 315:8 323:6 331:2,23 332:3,5,6 333:7 334:6,8,14,16,20 335:2,7,11,16 336:1 338:11 340:22,25 342:15,18,20 345:9,12,17,21 347:18 348:15 352:3,13 353:18,23 355:7 356:6 376:4 377:12,13,17,20,21 379:13 390:4 391:14,18,21 392:2,5
**related** [3] 329:24 339:15 346:12
**relatively** [6] 262:2 265:24 344:6,13 380:1,6
**relaxed** [2] 338:3,5
**relevant** [1] 372:11
**reluctance** [1] 309:14
**rely** [1] 268:2
**remain** [3] 245:8 264:15 375:13
**remained** [1] 272:21
**remains** [1] 379:24
**remarkable** [1] 277:25
**remedial** [1] 280:19
**remember** [37] 290:19 292:17 303:2 306:15 308:5 320:23 323:25 324:15 326:10,24 327:4,5,25 329:4,23 332:4,7 338:20,23 360:2 361:15,23 362:19 364:8 365:11,22 369:12,13 374:4 375:10,15 378:17,20 381:11 383:11,12 384:23
**remembered** [1] 306:6
**remembers** [1] 335:9
**remind** [1] 389:15
**remittitur** [1] 293:19
**remove** [2] 319:23 321:9
**render** [1] 330:20
**repeat** [2] 377:10 378:3
**repeated** [1] 365:11
**rephrase** [1] 369:24
**replacement** [1] 281:5
**report** [8] 276:17 285:11 286:6 289:25 376:20,22,25 377:15
**reporting** [1] 362:4
**represent** [1] 270:20
**representation** [2] 345:10 352:20
**representing** [1] 288:12
**represents** [1] 250:14
**request** [2] 262:25 358:25
**require** [1] 250:6
**required** [2] 289:11 381:15
**research** [3] 251:13 283:18 380:13
**researching** [2] 347:12 388:14
**reserve** [1] 391:2
**residence** [3] 317:4,6 358:4
**residency** [8] 258:5,7,8,9 260:4,5,5,25
**resident** [3] 260:6,9,10
**residual** [3] 276:1,15,19
**resolution** [1] 288:5
**resolves** [1] 350:18
**resources** [1] 247:1
**respect** [23] 246:1 257:1 258:21 259:4 268:13 270:23 274:1 277:9 283:23 285:10 287:19 294:15 299:23 300:12 302:5 303:20 308:23 319:20 349:18 350:24 385:1,5 388:24
**respectfully** [1] 313:4
**respond** [5] 316:20,24 317:1,3,7
**respondeat** [6] 245:2,23 246:12 249:6 385:11 389:2
**responded** [3] 339:22 358:12 373:21
**responding** [1] 374:19
**response** [3] 312:11 362:3 367:3
**responsible** [1] 385:21
**responsive** [10] 248:4 328:3,9,19,25 329:10 375:2,4,6,8
**rest** [3] 247:5 282:12 342:16
**rested** [1] 254:5
**restrained** [1] 321:4
**rests** [1] 342:16
**result** [7] 259:24 261:23 264:10 265:15,21 266:6 268:24
**results** [2] 262:11 268:17
**resume** [3] 254:5 343:2 344:10
**retired** [2] 250:17 349:6
**retrial** [2] 248:18 249:1
**returned** [4] 319:21 330:20 359:8,11
**reversed** [1] 249:3
**review** [1] 381:13
**revise** [1] 355:8
**rework** [2] 391:15,16
**ridiculous** [1] 339:8
**riding** [1] 376:11
**right-hand** [1] 269:24
**rights** [6] 246:17 362:9,11,12 382:7 391:3
**rise** [5] 253:2 295:7 344:19 355:9 380:16
**risk** [8] 277:16 278:2 279:15 280:12 292:1,7,14 386:6
**risks** [1] 384:5
**road** [3] 318:5 331:9 358:1
**rob** [1] 353:24
**robert** [1] 298:9
**rob's** [1] 353:23
**roger** [6] 270:21 302:14 307:4,23 357:19 384:15
**role** [2] 297:22 381:11
**ron** [1] 346:16
**room** [37] 266:19 272:20 300:1,14,15,15,16,18,19,20 301:7 302:5,6,9,15 320:15 322:13 324:24 325:1 336:15,17,19,20 337:7 359:16 361:21 363:1 364:5,15,21 365:12 367:18 373:8,19,22 377:23 378:2
**rooms** [1] 300:21
**rotating** [1] 301:10
**rotational** [3] 265:14,15,

# Keyword Index

20
**rothenberg** [8] **294:**6,8 **296:**4,5,11,18,19,24
**r-o-t-h-e-n-b-e-r-g** [1] **296:**19
**roughly** [2] **258:**20 **310:**7
**roundup** [1] **293:**14
**rule** [9] **248:**10 **262:**23 **279:**25 **280:**5,8 **287:**18 **382:**18 **384:**7 **385:**2
**ruled** [1] **384:**4
**rules** [1] **281:**23
**run** [1] **342:**3

## S

**saga** [1] **293:**17
**saint** [1] **261:**9
**sake** [2] **244:**14 **338:**7
**same** [22] **272:**9 **274:**22,25 **275:**25 **282:**15 **287:**3,5 **305:**12 **320:**17 **330:**2 **357:**13 **361:**6 **366:**2 **373:**4 **382:**18 **383:**2 **384:**2,4,4 **389:**23 **391:**22,23
**sand** [2] **391:**5,7
**sands** [4] **372:**7 **390:**14,17,21
**sarcastic** [1] **339:**24
**sat** [3] **321:**23 **322:**2,12
**satisfied** [1] **248:**23
**saw** [12] **274:**20 **275:**15 **302:**24 **303:**2 **307:**23 **318:**6 **327:**7 **337:**5,6 **359:**14 **377:**23 **378:**1
**saying** [13] **244:**11 **267:**13,14 **280:**2,3 **283:**12 **285:**12 **286:**23 **302:**2 **334:**10 **349:**17 **390:**18 **391:**2
**says** [12] **280:**8,12 **283:**8,20 **292:**6 **312:**18 **331:**18 **334:**20,21 **372:**8,13 **382:**25
**scan** [5] **266:**23 **287:**22,23 **288:**2,5
**scary** [1] **264:**11
**scene** [2] **308:**24 **358:**12
**schiff** [2] **293:**8,9
**scope** [1] **245:**24
**score** [3] **272:**15,17 **275:**18
**scores** [2] **272:**14 **275:**22
**scott** [3] **303:**9 **342:**17,20
**screaming** [1] **319:**18
**screen** [3] **270:**10,10 **322:**17
**search** [1] **244:**25
**seat** [3] **318:**24 **355:**1 **376:**11
**seated** [11] **244:**3 **245:**8 **254:**2 **255:**2 **291:**24 **296:**2,12 **315:**18 **321:**10 **346:**3 **356:**2
**second** [38] **247:**22 **248:**12,21 **249:**3,20,21 **258:**10 **262:**10 **263:**14 **264:**21 **266:**4 **278:**6 **280:**9,14 **298:**20,22 **299:**1 **300:**16 **321:**3,22 **322:**17 **333:**6 **336:**14 **339:**3 **361:**2,4 **362:**24 **364:**21,22 **369:**20 **370:**7 **373:**3 **378:**18 **382:**16 **384:**8,12 **387:**15 **391:**6
**seconds** [3] **266:**1 **365:**6,18
**secretaries** [1] **299:**16
**secretary** [1] **301:**1
**secretary's** [1] **299:**25
**section** [6] **251:**8,10 **282:**4,11 **283:**6 **385:**4
**securities** [4] **246:**9,12,17 **346:**12
**see** [65] **245:**22 **246:**5 **247:**15 **264:**21 **266:**23 **267:**18 **269:**17 **270:**16,17 **271:**16 **272:**4,21 **273:**16,19 **274:**17 **275:**17,20 **281:**13 **282:**14 **291:**18 **299:**14 **301:**14 **302:**14,17 **305:**3 **306:**12,24 **307:**1,23 **314:**6,10,11,19 **317:**20 **322:**24 **323:**1,4,6,17 **326:**13 **327:**23 **335:**9 **338:**18,21 **340:**6,10 **344:**9,18 **345:**23 **346:**21,24 **352:**24 **353:**13 **360:**7 **370:**15 **374:**17 **375:**20,23 **378:**4,18 **380:**14 **383:**23 **389:**11 **390:**13 **391:**8
**seeing** [3] **327:**25 **363:**16 **373:**6
**seeking** [1] **279:**6
**seemed** [1] **340:**4
**seems** [1] **388:**3
**seen** [11] **246:**24 **267:**18 **294:**22 **306:**13 **309:**25 **337:**18 **348:**24 **351:**12,13 **353:**6 **387:**4
**seizure** [10] **264:**8 **268:**13,15,15,21,23,25 **269:**2,4,5
**seizure-like** [2] **374:**22,25
**seizures** [4] **264:**9 **268:**17,19,24
**self-destructive** [2] **340:**7 **375:**18
**self-infliction** [1] **290:**13
**send** [3] **266:**22 **351:**10 **353:**22
**sense** [5] **248:**9 **283:**13 **360:**10 **389:**9 **391:**1
**sent** [2] **304:**12,21
**sentence** [6] **247:**21,22,22 **249:**20 **292:**13 **391:**9
**sentences** [1] **334:**4
**sentiment** [1] **346:**7
**separate** [7] **283:**13 **382:**5,6,9,10 **383:**21 **388:**18
**separated** [1] **382:**17
**separates** [3] **388:**4,7,11
**sergeant** [5] **297:**12 **301:**12 **303:**11 **304:**12 **305:**4
**sergeants** [2] **301:**6,10
**sergeant's** [1] **308:**2
**serious** [3] **265:**15,17 **266:**6
**service** [1] **380:**12
**set** [2] **382:**19 **387:**10
**seventh** [20] **294:**20 **297:**16,22 **298:**17,20,20,22 **309:**15,20 **314:**6 **316:**16 **319:**8 **331:**15 **338:**15 **357:**9 **359:**4,6,11,14 **360:**1
**seventy** [1] **273:**13
**several** [9] **264:**15 **267:**19 **270:**21 **271:**5,22 **277:**22 **292:**18 **353:**2 **361:**20
**severe** [9] **263:**7,15 **265:**6 **266:**14 **267:**7 **277:**6 **287:**21,24,25
**severities** [1] **265:**22
**shaken** [1] **266:**18
**shaking** [4] **365:**20 **367:**21 **373:**25 **374:**23
**shape** [1] **300:**10
**share** [3] **249:**13 **301:**3,7
**shargel** [2] **346:**16,18
**sharp** [2] **252:**5 **380:**8
**sheet** [4] **382:**11 **385:**14 **391:**15,17
**sheeting** [1] **300:**7
**shift** [2] **301:**8,10
**shifting** [1] **280:**11
**shifts** [1] **301:**9
**shnayderman** [9] **303:**13,17 **304:**12,21 **305:**3 **307:**1,24 **353:**15,20
**shnayderman's** [1] **352:**22
**short** [5] **264:**25 **265:**2,24 **380:**1,6
**shorter** [1] **342:**21
**shortly** [2] **363:**23 **379:**2
**shouldn't** [2] **293:**21 **349:**24
**should've** [1] **313:**16
**show** [6] **252:**2 **279:**21 **288:**3 **307:**8 **353:**7,8
**showed** [1] **285:**24
**shows** [2] **286:**6 **294:**16
**shut** [3] **364:**8,9,16

# Keyword Index


**sic** [1] **275**:4
**side** [30] **246**:10 **262**:14,14 **265**:17 **266**:3,5 **272**:23 **273**: 21,23 **277**:2,6,6 **293**:2,4 **300**: 21,21 **307**:3 **312**:25 **327**:11 **337**:10 **346**:15 **347**:16 **358**: 15,16,17 **368**:4 **380**:5,6 **391**: 13 **392**:1
**sidebar** [16] **278**:7 **279**:1 **284**:7 **291**:25 **294**:13 **311**:3 **312**:1 **313**:24 **333**:5 **334**:1 **335**:17 **341**:3 **342**:1 **343**:9 **369**:1 **372**:22
**sides** [3] **277**:4,5 **293**:15
**sign** [5] **266**:21 **267**:6,7 **362**:11 **386**:3
**significant** [5] **263**:22 **265**:17 **267**:19 **268**:23 **274**: 25
**significantly** [2] **286**:20 **287**:6
**signs** [1] **269**:3
**silly** [1] **339**:15
**similar** [2] **265**:3 **275**:13
**sinai** [2] **258**:10,12
**since** [6] **261**:8 **262**:19 **292**:21 **307**:13 **354**:9 **389**:21
**single** [1] **361**:8
**sir** [2] **252**:8 **297**:5
**site** [1] **339**:23
**sitting** [2] **336**:25 **357**:19
**situation** [2] **245**:3 **274**:5
**situations** [2] **263**:23 **268**:20
**size** [1] **299**:7
**skim** [1] **390**:21
**skin** [4] **266**:8 **270**:25 **271**: 3 **314**:21
**skull** [2] **262**:13 **270**:24
**sky** [1] **246**:21
**slapped** [1] **306**:22
**sleep** [2] **389**:14,17
**slightly** [2] **270**:1 **272**:17
**slips** [1] **276**:12
**small** [6] **271**:1,2 **288**:4 **323**:4,9 **348**:17
**smaller** [1] **299**:4
**solid** [3] **300**:4,4,5
**somebody** [15] **244**:24, 24 **251**:2,7,9 **265**:24 **266**:3 **268**:17 **272**:24 **274**:5 **277**:9 **281**:3 **337**:19 **370**:19 **383**:4
**somebody's** [2] **247**:4 **265**:12
**somehow** [1] **283**:16
**someone** [4] **246**:21 **317**: 9 **357**:13 **375**:11
**someone's** [1] **321**:12
**sometime** [1] **308**:16
**sometimes** [4] **253**:1 **256**:5 **286**:14 **302**:8
**somewhere** [1] **383**:9
**son** [3] **318**:17,21,21
**soon** [2] **291**:18 **346**:24
**sooner** [1] **347**:14
**sophisticated** [1] **251**: 12
**sorbonne** [2] **256**:5 **258**: 2
**sorry** [20] **248**:15 **255**:9 **259**:2 **260**:6 **270**:4 **285**:2 **286**:8 **296**:7 **329**:25 **331**:3 **353**:22 **354**:22 **356**:13 **367**: 24 **373**:2 **376**:9,10 **377**:10 **378**:3 **379**:15
**sort** [13] **248**:5 **257**:3 **262**: 4 **265**:3,7 **270**:13,16 **284**:1 **299**:14 **300**:25 **301**:8 **325**:23 **391**:3
**sound** [3] **325**:23 **365**:9 **393**:3
**sounded** [1] **325**:19
**sounds** [2] **330**:21 **339**:17
**south** [1] **317**:4
**span** [2] **272**:12 **274**:13
**speaking** [14] **244**:11 **321**:5 **323**:19 **324**:10,13 **339**: 4,19 **361**:24 **362**:25 **363**:20, 22 **364**:24 **370**:24 **379**:10
**specializes** [1] **258**:23
**specialty** [2] **258**:7 **260**: 23
**specific** [8] **245**:22 **247**: 23 **267**:25 **268**:8 **270**:22 **285**: 4 **322**:6 **390**:13
**specifically** [13] **259**:4, 11 **262**:3 **288**:20 **289**:6 **320**: 23 **326**:24 **340**:3,17 **360**:2 **373**:6 **375**:9,10
**speech** [1] **346**:10
**speed** [1] **266**:5
**spell** [7] **255**:5 **296**:16 **303**: 15,16,16 **315**:19 **356**:10
**spent** [3] **249**:14 **291**:2 **307**:16
**spinal** [1] **258**:24
**split** [1] **249**:23
**spoke** [3] **307**:25 **309**:11 **360**:17
**spoken** [3] **290**:20 **291**:25 **322**:7
**spontaneously** [1] **268**: 20
**sporting** [1] **389**:23
**sports** [1] **263**:23
**sprawling** [1] **346**:10
**squad** [22] **297**:25 **298**:20 **299**:7,10,13 **300**:15,20 **301**:6 **302**:5,6,9,15 **304**:10 **316**:13 **320**:15 **322**:13 **330**:15 **338**: 15 **360**:25 **363**:1 **364**:21 **377**: 23
**square** [3] **298**:25 **299**:11 **300**:20
**squeeze** [1] **338**:10
**stable** [1] **272**:22
**stages** [4] **285**:5,6,6,6
**stairs** [1] **320**:12
**stand** [9] **273**:1 **276**:8 **283**: 21 **312**:15 **349**:21 **353**:16 **355**:1,3 **356**:8
**standard** [5] **272**:14 **319**: 24 **325**:2 **346**:21 **390**:14
**standing** [8] **279**:3 **281**: 23 **282**:3,4,21 **283**:13 **361**:20 **363**:2
**start** [16] **250**:1 **264**:14,23 **286**:14,15 **297**:1 **316**:10 **324**: 5,5 **351**:24 **352**:1 **357**:5 **369**: 6 **380**:4,8 **391**:5
**started** [13] **261**:10 **272**: 10 **273**:3 **297**:6 **304**:6,8 **349**: 21,22 **365**:6 **369**:4 **378**:15 **379**:7 **388**:14
**starting** [2] **255**:17 **323**:9
**state** [20] **244**:17 **249**:18 **255**:2 **281**:17,18,22 **282**:8,16, 17 **283**:9,16 **296**:16 **315**:18 **356**:10 **374**:24 **382**:8 **383**:22 **387**:2 **388**:5 **389**:3
**stated** [3] **314**:3 **328**:11 **362**:17
**statement** [16] **294**:22, 23,23 **305**:16 **315**:2,4 **340**:1, 2 **348**:7,8 **370**:20,20 **371**:14 **372**:2,2,14
**statements** [1] **329**:22
**states** [1] **258**:4
**station** [2] **322**:14 **340**:5
**stationed** [1] **298**:19
**status** [3] **264**:4,22 **272**:11
**statute** [4] **282**:10,15,17 **283**:7
**stay** [2] **307**:4 **324**:1
**step** [8] **247**:5 **291**:6 **315**:9 **340**:23 **358**:23 **364**:13 **376**: 12 **379**:14
**still** [16] **274**:22,25 **275**:13, 24 **281**:23 **326**:25 **327**:8,13 **328**:2,6 **330**:21 **347**:12,21 **371**:23 **375**:3,7
**stock** [1] **279**:20
**stop** [9] **304**:14 **313**:3,6 **318**:8,10,12 **358**:10,12 **370**: 15
**stopped** [4] **280**:17 **332**:

# Keyword Index


24 **358:**8 **359:**8
**strange** [1] **340:**3
**street** [1] **242:**14
**stretch** [1] **349:**12
**strike** [3] **314:**10 **331:**13 **338:**12
**strikes** [1] **277:**3
**stronger** [1] **386:**25
**struck** [4] **265:**12,24 **277:**2 **328:**12
**studied** [1] **255:**19
**studies** [4] **258:**22 **259:**15 **287:**22 **288:**2
**study** [9] **256:**3 **259:**21 **268:**5 **277:**17 **278:**3 **280:**18 **283:**20 **285:**3,24
**studying** [1] **259:**10
**stuff** [4] **279:**20 **283:**2 **294:**21 **348:**5
**subject** [8] **246:**23 **260:**7 **265:**16 **292:**13 **312:**3,23 **334:**2 **348:**10
**subjected** [1] **384:**17
**submission** [1] **248:**1
**submissions** [1] **244:**3
**subpoenaed** [1] **342:**17
**subsequent** [5] **259:**25 **264:**3 **269:**7 **271:**3 **275:**18
**subspecialty** [2] **259:**17 **260:**24
**successful** [2] **371:**6,8
**successfully** [1] **370:**20
**sudden** [1] **262:**10
**sue** [4] **279:**3,9 **280:**20 **281:**25
**sued** [3] **384:**19 **386:**8,18
**suffer** [2] **277:**15 **285:**22
**suffered** [12] **259:**24 **273:**25 **274:**3 **277:**21,25 **278:**1 **285:**19,20 **286:**1,3 **289:**1,10
**suffering** [4] **279:**13 **281:**8 **288:**21,22
**suffers** [3] **264:**3 **268:**18,18
**sufficient** [1] **345:**23
**sufficiently** [2] **283:**15 **294:**16
**suffolk** [1] **388:**2
**suggestions** [1] **250:**7
**suing** [1] **336:**13
**sum** [1] **292:**8
**superior** [3] **245:**3 **246:**12 **385:**12
**superseding** [1] **346:**20
**supervise** [1] **298:**1
**supervisor** [1] **251:**1
**supervisor's** [1] **300:**23
**supported** [1] **383:**25
**suppose** [1] **339:**16
**supreme** [7] **282:**14 **283:**4,5,8 **291:**24 **292:**6 **348:**19
**surely** [1] **386:**1
**surface** [2] **347:**14 **387:**11
**surgery** [1] **289:**11
**surprised** [1] **348:**7
**suspect** [1] **249:**12
**suspicion** [2] **249:**13 **266:**22
**sustained** [4] **257:**4 **313:**20 **377:**16,19
**sway** [1] **273:**3
**swelling** [1] **314:**21
**switch** [1] **315:**14
**sworn** [7] **255:**1 **296:**11 **315:**17 **356:**9 **367:**5 **371:**15 **372:**20
**symmetry** [1] **389:**17
**sympathetic** [1] **250:**6
**symptom** [1] **265:**3
**symptoms** [8] **274:**5,7,8,9,23 **275:**14,25,25
**syndrome** [8] **266:**18 **274:**4,9 **276:**20,21 **277:**1,10 **287:**20

## T

**tab** [5] **302:**21 **322:**22 **360:**6,7 **366:**2
**tag** [2] **349:**13,13
**talked** [4] **265:**8 **313:**16 **343:**6 **350:**21
**taxpayers** [1] **252:**16
**tbi** [5] **263:**10 **265:**6 **278:**4 **279:**20 **280:**15
**team** [1] **319:**1
**teaming** [1] **273:**18
**technical** [1] **273:**11
**temple** [1] **265:**10
**ten** [2] **286:**8 **322:**3
**tendency** [2] **272:**23 **273:**23
**term** [6] **262:**14 **263:**4,17 **264:**5 **268:**7 **273:**11
**terminology** [1] **280:**8
**terms** [3] **288:**22 **289:**9 **347:**15
**terrible** [1] **293:**5
**test** [3] **272:**11,12,14
**testified** [5] **290:**9,16 **315:**2 **331:**3 **376:**5
**testify** [3] **262:**22 **312:**9 **334:**9
**testifying** [1] **290:**15
**testimony** [14] **306:**4 **322:**22 **323:**12 **331:**21 **350:**17 **352:**22,22 **353:**2 **367:**5 **368:**2 **372:**20 **379:**18,24,25
**text** [1] **390:**14
**that'll** [2] **280:**1 **342:**9
**theory** [1] **313:**7
**there's** [41] **244:**22 **248:**17 **249:**1 **250:**23 **264:**4,6 **266:**21,24 **267:**3 **269:**7 **273:**11,20,22 **275:**21 **279:**23 **280:**3,12 **281:**17 **282:**10 **294:**19 **299:**20 **300:**9,22 **322:**21,24,25 **323:**3 **348:**5 **349:**9 **350:**16 **360:**4,8,8 **385:**5 **386:**14 **388:**6,22,23,24 **389:**18 **390:**20
**they've** [2] **362:**10,11
**thinking** [4] **306:**14 **349:**24 **389:**24 **391:**24
**third** [8] **258:**10 **263:**14 **265:**1 **267:**17,17 **280:**10,14 **350:**15
**thomas** [5] **250:**17 **315:**10,17,20 **357:**15
**t-h-o-m-a-s** [1] **315:**21
**though** [5] **286:**13 **312:**21 **371:**9 **374:**22 **387:**4
**thoughts** [1] **349:**2
**three** [14] **245:**15 **252:**4 **254:**17 **263:**6,10 **264:**18 **267:**10 **282:**20 **285:**5,6 **301:**6 **352:**6 **379:**25 **387:**23
**three-minute** [1] **291:**11
**threw** [1] **373:**9
**throughout** [1] **316:**4
**throw** [1] **340:**4
**throwing** [1] **248:**21
**thrown** [4] **337:**4 **339:**23 **340:**5 **377:**7
**thud** [1] **325:**25
**thudding** [1] **325:**23
**thump** [1] **304:**7
**thumping** [1] **304:**6
**thursday** [2] **352:**7 **380:**11
**tie** [3] **343:**6 **354:**14 **386:**25
**ties** [1] **354:**21
**tight** [1] **246:**24
**timetable** [1] **246:**25
**timing** [1] **260:**18
**today** [17] **251:**7,13 **290:**15,23 **318:**23 **341:**2 **342:**11,14 **344:**7,12 **345:**18 **351:**19 **356:**19 **357:**19 **367:**15 **391:**11,20
**today's** [3] **287:**9 **293:**13 **379:**18
**together** [1] **348:**16
**toiling** [1] **347:**4
**tomorrow** [17] **247:**12 **293:**23 **294:**2 **342:**18 **344:**8 **351:**3,23 **352:**1,1 **353:**17

# Keyword Index


380:2,5,6,15 389:25 390:12 391:24
ton [1] 294:20
tonight [4] 279:18 351:20 355:7 381:6
took [9] 309:1 314:14 330:14 336:13 339:12 352:23 359:6 360:25 365:22
tort [1] 245:25
tortious [2] 244:21 245:5
torts [1] 249:19
total [3] 272:21 291:1 307:16
totally [3] 264:16,22 281:1
touch [3] 369:19 373:12 374:3
touching [2] 369:3,15
tour [1] 357:10
towards [1] 327:12
tracey [2] 393:6,7
traffic [4] 318:12,13 358:10,12
trained [1] 266:21
training [6] 258:14 259:17 260:5,11,21 340:18
transcriber's [1] 393:1
transcript [11] 306:12 331:22 334:18,21,23 360:6 371:2,15,16 372:17 393:3
transferred [1] 310:8
transparency [1] 351:15
transport [9] 319:11,12,14 332:8,9 359:25 360:3,17,22
transported [2] 331:14 359:4
trauma [3] 262:4,7 264:10
traumatic [31] 258:15,21 259:7,15,18,20 260:12 261:19,20,23 263:6,7,9,20 264:1 265:5,8 276:23 277:15 279:24,25 280:3,5,9 287:18,24 288:1 289:9,11 290:6,9
travel [1] 329:16
treat [1] 261:16
treated [1] 377:7
treating [1] 262:19
treatment [1] 260:2
trial [6] 249:3 250:23 313:17 346:14 350:24 380:6
trials [2] 284:3 379:20
tried [2] 271:15 382:15
tries [1] 250:13
triolo [2] 249:21 349:10
triple [1] 280:18
truce [1] 350:1
true [2] 335:7 371:22
truth [2] 367:11,13
try [9] 248:7,12,20 291:18 304:17 313:16 346:8 375:20 381:11
trying [11] 249:15 267:5 334:9,19 337:22 338:4 348:16 353:22 384:1,25 385:14
turn [6] 269:14 302:21 305:12 322:23 360:7 366:2
turned [2] 318:8 352:19
turns [1] 391:24
tv [1] 337:1
tweak [1] 390:22
tweaks [1] 391:3
twice [2] 277:24 279:11
twist [1] 265:16
twisting [1] 265:20
two [40] 245:15 247:11 248:6,8 250:15,16 262:15 263:13 264:18 266:6 267:1,12 272:5,9 275:9 281:11 282:18 285:6,24 291:11 292:13 298:13 299:16 300:21 310:1 313:3,4 321:5,13,17 323:25 350:12 352:3,4 364:24 379:20 382:19 384:2,4 388:6
type [5] 287:24 288:1,20 289:10 376:23
types [3] 259:20 261:16 262:18
typical [2] 274:9 301:11
typically [2] 301:13 348:25
typing [1] 376:24


## U


ultimate [2] 276:17,19
ultimately [2] 248:24 276:16
unanimity [6] 244:8,20,23 245:3 250:6 381:14
unanimous [6] 244:7 246:15 249:10 347:7,9,10
unavailability [1] 382:3
unavailable [1] 350:9
unbroken [1] 314:21
unconscious [5] 337:15,18,20 338:2 340:14
undeniable [1] 271:16
under [9] 245:2 246:11 262:22 271:3 319:2,4 348:19 367:8 385:11
understand [13] 267:9 277:7 279:15 283:12,18,22 306:17 336:12 347:3 363:25 364:1,20 385:7
understanding [5] 265:1 300:24 325:5,7 345:7
understood [11] 247:10,25 248:5 258:12 265:7 269:13 277:7 297:15 313:21 364:2 367:10
unfortunately [2] 292:18,19
unidentified [1] 245:13
uniformed [1] 363:14
union [1] 252:15
united [1] 258:4
universe [1] 246:18
universities [1] 257:2
university [6] 255:21,22,23 256:5 257:3 258:6
unlawful [1] 249:22
unless [5] 249:11 312:5 342:9,15 355:8
unprovoked [3] 268:17,19 269:2
unresponsive [1] 374:24
until [5] 275:24 307:4 324:6 351:23 375:13
up [53] 246:9,20 247:16,18 248:24 249:15 266:6 272:1 275:18,24 276:8 280:8 281:9 283:19 286:7 292:8,21 293:23 299:8 303:18 307:8 311:3 320:6,12,24 326:25 327:14,17 328:3,19,20 329:1,15 330:17 349:20 354:25 358:3 362:24 365:19 367:19,20 370:13,15 373:3,9,17,23,24 376:23,24 377:22 386:7 391:11
update [2] 347:15,19
upstairs [9] 299:13 320:8,9 330:14 360:25 361:11,14,16 375:21
upwards [1] 270:17
usc [1] 245:18
uses [1] 282:8
using [2] 263:17 294:14


## V


va [1] 277:17
valid [1] 267:17
vance [1] 393:13
various [2] 262:1 349:19
vehicle [10] 317:21,24 318:2,6,12,14,18,20 332:15 358:16
vein [2] 244:8,13
verbatim [1] 391:8
verdict [17] 244:7 291:20 355:5 382:11,20 383:20,21 384:6,15 385:14 386:9,25 387:4 389:7 391:15,17,23
verified [1] 318:18

# Keyword Index


**version** [1] **390:**20
**versus** [3] **280:**12 **282:**19 **382:**7
**vessels** [2] **271:**2,2
**veterans** [1] **277:**20
**via** [1] **317:**7
**vicariously** [2] **249:**18, 22
**view** [3] **244:**13 **347:**13 **350:**23
**views** [1] **244:**12
**vincent** [1] **261:**9
**violation** [2] **382:**7 **385:**1
**violations** [1] **318:**13
**violent** [1] **328:**7
**visible** [2] **266:**16,25
**vision** [3] **273:**17,18 **274:**10
**visit** [1] **274:**20
**visual** [1] **345:**23
**visualized** [1] **288:**6
**voices** [2] **301:**25 **325:**20
**volumes** [1] **391:**7
**vtl** [2] **318:**8,10

## W

**wait** [1] **370:**1
**wake** [2] **328:**3 **329:**12
**walk** [3] **271:**25 **272:**25 **276:**7
**walked** [3] **330:**14 **366:**10 **374:**17
**walking** [3] **320:**12,15,18
**wall** [3] **242:**14 **375:**21,23
**wallet** [1] **332:**22
**wanted** [9] **302:**13 **304:**18 **339:**12 **340:**11 **362:**5,15,17, 20 **364:**2
**wants** [3] **254:**23 **347:**2 **387:**8
**watch** [1] **337:**2
**watched** [1] **276:**7
**waving** [1] **349:**22
**way** [28] **246:**23 **247:**7 **248:**9,12,13,14,18 **249:**3 **250:**4 **263:**9,17 **264:**24 **303:**2 **319:**6,14 **321:**4 **324:**6 **329:**12 **336:**10 **339:**20 **350:**17 **359:**25 **383:**3 **384:**11 **385:**14,15, 25 **388:**23
**ways** [3] **266:**13 **321:**5 **389:**25
**weak** [1] **279:**21
**weakness** [1] **276:**15
**weapons** [2] **319:**24 **320:**7
**weekdays** [1] **301:**9
**weeks** [2] **271:**5 **309:**4
**welcome** [7] **294:**10 **323:**18 **330:**25 **338:**25 **340:**21 **387:**25 **388:**16
**wetted** [1] **391:**8
**whatever** [7] **251:**23 **259:**5 **282:**13,23 **306:**14 **351:**15 **388:**10
**whether** [16] **245:**1 **275:**2 **277:**14 **279:**6 **283:**14 **288:**20 **289:**17,18 **321:**15 **323:**13 **332:**4,7 **335:**8 **348:**1 **360:**16 **381:**14
**whiplash** [1] **263:**22
**whiplash-induced** [1] **262:**15
**white** [5] **345:**17,18,22,23 **346:**13
**whoever** [1] **303:**25
**whole** [6] **246:**18 **282:**12 **287:**8 **299:**1,8 **367:**10
**whom** [2] **277:**20 **388:**12
**who's** [2] **346:**14 **386:**22
**wife** [4] **317:**12,21 **358:**6 **390:**15
**wife's** [1] **332:**15
**wildlife** [1] **282:**20
**will** [23] **249:**12 **250:**21 **251:**17,24 **252:**15 **283:**22 **286:**9 **291:**14 **293:**23 **316:**3 **342:**16 **344:**13,15,18 **351:**17 **379:**25 **380:**1,2,7,14 **386:**6,15 **391:**15
**win** [2] **249:**2,6
**window** [3] **300:**9,10 **301:**14
**withdrawn** [1] **345:**12
**within** [7] **245:**24 **264:**13, 15,25 **276:**25 **364:**15 **366:**5
**without** [12] **254:**19 **267:**2 **271:**14 **272:**25 **278:**1 **333:**3 **348:**13 **351:**5 **384:**5,6 **389:**2,21
**witness** [64] **254:**8,23 **255:**1,4,6,10 **260:**8,10,15 **262:**22 **267:**5,10,16,23 **268:**1, 7 **269:**4,21,23 **270:**4,14 **286:**10,12,18,25 **287:**10,13 **289:**8, 20,22 **290:**3 **291:**7,9 **294:**8, 11,15 **296:**4,8,11,18 **306:**18 **313:**23 **315:**17,20 **338:**1,10 **340:**24 **342:**13 **344:**7,8,12 **351:**25 **352:**2 **355:**2 **356:**9, 12 **366:**22 **371:**11 **372:**12,15, 19 **375:**17 **379:**15,18
**witnesses** [8] **341:**1 **342:**3 **352:**3,4,6 **353:**2 **379:**24,25
**witness's** [1] **372:**14
**woke** [1] **329:**15
**wondering** [2] **286:**2 **326:**17
**wood** [4] **300:**5 **325:**21,21 **365:**9
**wooden** [1] **337:**1
**word** [1] **376:**9
**words** [2] **322:**6 **338:**8
**work** [15] **250:**20 **252:**11, 11 **292:**18 **298:**14 **301:**12 **316:**8 **344:**14,14 **352:**6 **353:**7 **357:**3 **386:**12,13 **392:**3
**worked** [7] **298:**5,8,11 **301:**9,10 **310:**5 **357:**8
**working** [13] **251:**7,13 **297:**2 **303:**6 **314:**4 **316:**10 **346:**24 **347:**1 **348:**16 **357:**5, 10,13,16
**world** [3] **246:**8,9 **391:**23
**worth** [7] **349:**4,5,6,7 **350:**16 **383:**3 **386:**12
**would've** [2] **274:**15 **282:**2
**writing** [1] **292:**21
**written** [1] **246:**21
**wrote** [2] **249:**20 **287:**18

## Y

**year** [14] **258:**5,9,10,14,18 **260:**11,14,15,18,19 **272:**9 **275:**9 **298:**15 **310:**6
**years** [11] **256:**1,2,3 **261:**7, 9 **277:**19,22 **287:**5 **292:**18 **298:**11,13
**yelled** [1] **379:**3
**yelling** [10] **306:**1,7,21 **319:**16 **365:**6,11,16 **378:**15 **379:**5,7
**yesterday** [4] **244:**6 **247:**13 **293:**16 **312:**14
**york** [2] **258:**9 **346:**14
**younger** [1] **318:**15
**yourself** [6] **306:**15 **312:**25 **323:**8 **324:**7 **360:**13 **366:**6
**yourselves** [1] **291:**17

## Z

**zero** [3] **266:**14 **267:**14,19
**zoom** [1] **269:**18